ACCEPTED
03-15-00100-CV
6678421
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/27/2015 11:28:32 AM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00100-CV

# IN THE COURT OF APPEALS
# FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
# AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/27/2015 11:28:32 AM
JEFFREY D. KYLE
Clerk

## IN RE THE ESTATE OF EDELL WADE, DECEASED.

## JAMES E. WADE,
*Appellant*,
v.
## JOHNNY WADE AND AMANDA WADE, INDIVIDUALLY AND AMANDA WADE AS THE INDEPENDENT EXECUTOR OF THE ESTATE OF EDELL WADE,
*Appellees.*

**Appealed from the County Court at Law of Burnet County, Texas**

## APPELLANT'S BRIEF IN REPLY
## TO APPELLEES' BRIEF

**RICHIE & GUERINGER, P.C.**
**SHELDON E. RICHIE**
**State Bar No. 16877000**
**EMILY J. SEIKEL**
**State Bar No. 24072331**
**100 Congress Avenue, Suite 1750**
**Austin, Texas 78701**
**512-236-9220 telephone**
**512-236-9230 facsimile**
**srichie@rg-austin.com Email**
**eseikel@rg-austin.com Email**
**ATTORNEYS FOR JAMES E. WADE**

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**INDEX OF AUTHORITIES**................................................................3

**REPLY TO APPELLEES' PRELIMINARY STATEMENT** ...........................4

**REPLY TO APPELLEES' ARGUMENTS ON ISSUE ONE** ..........................10

    A.      Appellees' Response Ignored That Bud Had No Legal Duty or Standing Until 2010 .................................................................................... 11

    B.      The Discovery Rule Does Apply to Bud's Claims ................................... 12

    C.      Bud Did Not Have Notice of His Claims.............................................. 14

    D.      The Trial Court's Summary Judgment was Based on Limitations, and Limitations Alone ................................................................................ 16

**REPLY TO APPELLEES' ARGUMENTS ON ISSUE TWO** ..........................17

    A.      Amanda Wade Testified that She Did Not Think About Fairness or Benefit to Edell ................................................................................... 18

    B.      The Evidence does Not Support that Edell was Represented by Counsel in Both Transactions ................................................................................ 19

    C.      The Evidence does Not Support that Edell Voluntarily, and with Full Disclosure, Chose to Sell the Ranch and Chose to Reduce the Principal in Connection with the Modification ................................................ 21

**PRAYER** ...................................................................................25

**CERTIFICATE OF COMPLIANCE** ...................................................26

**CERTIFICATE OF SERVICE** .........................................................27

**APPENDIX** ................................................................................28

**VERIFICATION**...........................................................................31

# INDEX OF AUTHORITIES

**Cases**

*Boucher v. Willis*, 236 S.W.2d 519 ..................................................................11

*Chapal v. Vela*, 461 S.W.2d 466 .......................................................................11

*Cobb v. TDCJ*, 965 S.W.2d 59 ..........................................................................10

*In re Estate of Herring*, 970 S.W.2d 583 .........................................................10

*Jordan v. Lyles,* 455 S.W.3d 785 ......................................................................24

*Kansa Reinsurance Co. V. Congressional Mortgage Corp.,* 20 F3d 1362 ...........11

*Matter of Estate of Matejek*, 928 S.W.2d 742 ..................................................10

*Moczygemba v. Moczygemba*, -- S.W.3d --, No. 04-14-00110, 2015 WL 704405 .12

*Mooney v. Harlin*, 622 S.W.2d 83 .....................................................................11

*Stephen County Museum, Inc. v. Swenson*, 571 S.W.2d 257 .................................18

*Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 ........................................18

*Vogt v. Warnock*, 107 S.W.3d 778 ............................................................. 18, 23

## REPLY TO APPELLEES' PRELIMINARY STATEMENT

1.      Appellees' list of "Bud's representations vs. the evidence" in their Preliminary Statement contains inaccuracies.  In reply Appellant would show the following.

2.      ***Alleged misrepresentation #1***:   Appellees' evidence does <u>not</u> controvert Bud's representations that "**Johnny and Amanda Wade were the clients of Michael Martin**," and that "**there is no evidence that [Mrs. Wade] had the benefit of independent advice**."   First, it is an undeniable fact that Mr. Martin clearly and repeatedly identified Johnny and Amanda as the 'client' in the physical file he created at the time in 2009 and that he was paid for his work on the Modification by Amanda Wade, not Edell Wade.[1]   While Michael Martin did testify at the trial in 2014 that he believed that Edell Wade had been his client, he also testified that he had considered the Modification a "joint project."[2]   Mr. Martin further confirmed that he could have used the unique file number that he used for previous work he had done directly for Edell, yet he chose to list Johnny and Amanda as clients with a separate file number for his work on the

---

[1]      RR:          Vol. 3 of 4 at 14, 15, 19, 21 [Tab J, Martin & Millican File]; and
        SUPP. RR:   Vol. 2 of 6 at 116:17 – 118:1 [Tab K, Martin Trial Testimony].
[2]      SUPP RR:    Vol. 2 of 6 at 87:21-24 [Tab K, Martin Trial Testimony].

Modification.[3]  He acknowledged that communications on the Modification were sent directly to Amanda and that Amanda paid for the work.[4]

3.     Mr. Martin's testimony that he believed he had an obligation to serve Edell's interests does not, however, demonstrate that she had "**the benefit of independent advice**."  There is absolutely no evidence that Edell Wade was aware at all of the principal reduction of around $40,000.00, and the Modification document stated on its face in bold letters that its "**SOLE PURPOSE**" was elimination of interest.[5]  Mr. Martin's file entry on the matter stated that the note was to be modified for *either* an elimination of interest *or* reduction of the principal.[6]  Mr. Martin could hardly have given independent advice on something he knew nothing about, and he testified ignorance on the principal reduction.  Mr. Martin testified "I may not have remembered at that time that they even talked about reducing the balance.  And **to this day I don't know if or how much they reduced it**" and that he thought he was reducing the interest to zero.[7]  He testified that he did not scrutinize the numbers as "I really didn't know what was going on. It changed two or three times.  I really didn't know and hoped that with the accountant they would work it out to where everybody was happy," and "I didn't

---

3      SUPP RR:     Vol. 2 of 6 at 116:2-19 [Tab K, Martin Trial Testimony].
4      SUPP RR:     Vol. 2 of 6 at 116:20 – 118:1 [Tab K, Martin Trial Testimony].
5      RR:          Vol. 3 of 4 at 39-46 [Tab L, Modification Agreement].
6      RR:          Vol. 3 of 4 at 15 [Tab J, Martin & Millican File].
7      SUPP RR:     Vol. 2 of 6 at 121:13 – 122:8 [Tab K, Martin Trial Testimony].

imagine they wanted my input."[8]  Mr. Martin could not have provided any meaningful independent counsel because he was not cognizant of the fact that a principal reduction was even occurring as part of the Modification, much less in what amount.

4.      Nor did Edell receive independent counsel from her accountant Lori Graham.  In her testimony Ms. Graham confirmed that the post-it note that advised her of the elimination of interest had been delivered to her by Amanda Wade with other documents for her work in 2010 on Edell's 2009 taxes.[9]  The post-it note was written by Amanda Wade several months *after* the Modification and states that payments with interest were made only through May, and that Edell "then relieved us of our interest and changed our note to principal only."[10]  It contains no mention of a gift or a principal reduction.[11]  Ms. Graham confirmed that Amanda was her point of contact and she testified that Edell didn't actually come in to get her return, and that she hadn't spoken with Edell in several years.[12]  Ms. Graham testified that she went off of the information provided to her to prepare Edell's tax returns and that she would have needed to know about a forgiveness of debt or gift

---

[8]      SUPP RR:     Vol. 2 of 6 at 88:12-25 [Tab K, Martin Trial Testimony].
[9]      SUPP RR:     Vol. 3 of 6 at 8:6 – 9:20 [Tab M, Lori Graham Trial Testimony].
[10]     RR:              Vol. 3 of 4 at 3 [Tab N, Amanda Wade Note to Lori Graham]; and
          SUPP RR:     Vol. 3 of 6 at 132 [Tab O, Amanda Wade Trial Testimony].
[11]     RR:              Vol. 3 of 4 at 3 [Tab N, Amanda Wade Note to Lori Graham]; and
          SUPP RR:     Vol. 3 of 6 at 132 [Tab O, Amanda Wade Trial Testimony].
[12]     SUPP RR:     Vol. 3 of 6 at 9:12 – 20; 12:15 – 16; 12:2-3 [Tab M, Lori Graham Trial Testimony].

or other details of a loan restructure but that she did not interview Edell Wade to get the details.[13] Ms. Graham testified that she "probably" spoke with Mr. Martin but she did not recall the specifics. She stated "I do know that the modification was not my recommendation."[14]

5. ***Alleged misrepresentation #2***: Appellees have not controverted Bud's representation that the only hard evidence of communication between Mr. Martin and Edell is dated *after* the execution of the Modification.[15] Johnny's self-serving testimony that he took his mother to Mr. Martin's office and left the room while they discussed it is (a) not confirmed by Mr. Martin and (b) was never mentioned by Johnny Wade or anyone else in prior deposition testimony or other discovery conducted during more than three years leading up to trial. And, as already discussed, the terms "Mrs. Wade" and "client" are frequently used in Mr. Martin's file to reference Amanda Wade. Mr. Martin did not testify that he spoke with Edell Wade.

6. ***Alleged misrepresentation #3***: Appellees have not produced any evidence that Edell wanted the Modification, in particular the $40,000.00 reduction in principal, other than self-serving testimony from Johnny and Amanda. The reliable evidence supports the other view: the Modification that Edell signed

---

[13] SUPP RR: Vol. 3 of 6 at 16:21 – 19:5 [Tab M, Lori Graham Trial Testimony].
[14] SUPP RR: Vol. 3 of 6 at 21:11 – 24 [Tab M, Lori Graham Trial Testimony].
[15] RR: Vol. 3 of 4 at 20 [Tab J, Martin & Millican File].

7

stated on its face in bold lettering that its "**SOLE PURPOSE**" was only for the elimination of interest.[16] The testimony of Mr. Martin and Ms. Graham – the individuals who were not a party to the transaction and who were in a position to ostensibly implement Edell's wishes – confirmed that they were not aware of a principal reduction and did not speak with Edell about a principal reduction.

7. *Alleged misrepresentation #4***:** Appellants claim that Cavness never rejected the material terms about which Bud complains, but this too is not supported by the evidence. Amanda herself testified that Mr. Cavness had questioned the price and also recommended a "regular interest rate."[17] The documents show that Amanda reduced the default interest rate from 18% to 12%.[18]

8. *Alleged misrepresentation #5***:** The jury was permitted to hear only a limited testimony on the 2004 sale of the ranch to Johnny and Amanda, and specifics about the sale were not discussed. Appellant was not able to, for example, call an expert to appraise the fair market value of the ranch. At trial, in response to an objection to testimony about the sale, Judge Savage directed counsel during trial: "So we can't go into the specific facts of the sale other than to allow plaintiff to show part of a plan or scheme to defraud her from the beginning."[19]

---

[16]  RR:  Vol. 3 of 4 at 39-46 [Tab L, Modification Agreement].
[17]  SUPP RR:  Vol. 3 of 6 at 57:4-7 [Tab O, Amanda Wade Trial Testimony]; and
        CR:  407 [Tab P, Amanda Wade Deposition].
[18]  CR:  364 – 380 [Tab Q, Pat Cavness File].
[19]  SUPP RR:  Vol. 3 of 6 at 46 [Tab R, Judge Savage Statement During Trial].

9. ***Alleged misrepresentation #6***: Bud's testimony at trial is irrelevant to the legal question that was improperly decided at summary judgment regarding whether or not he had a duty of reasonable diligence to investigate the terms of the 2004 sale of the ranch (as discussed more fully herein) and whether improper fact-findings were made at summary judgment prior to trial.

10. Moreover, Bud's professed vague suspicion did not serve as notice to toll the limitations period. He attempted to obtain details on the sale of the ranch from Nancy and was unsuccessful. Nancy Burns testified that Johnny purposefully decided to conceal the sale from the other siblings before it happened. She recalled suggesting to him that he notify the other siblings of the sale by letter, but that "Johnny said no, that the place would not ever sell if they ever found out."[20] Nancy testified that Johnny said he would not send a letter "because he was afraid that somebody would object and that the place would not sell."[21] Johnny also testified that he did not notify other people about the sale or its terms.[22] Amanda also testified that information on the sale was deliberately not sent to the other siblings.[23] Bud, a third party who had no duty in terms of diligence, was decidedly not on notice of its terms and did not find out the terms until the passing of his mother when, in connection with the administration of her Estate, he had access to

---

[20]  SUPP RR:  Vol. 2 of 6 at 39:6 – 24 [Tab S, Nancy Burns Trial Testimony].
[21]  SUPP RR:  Vol. 2 of 6 at 41:7 – 12 [Tab S, Nancy Burns Trial Testimony].
[22]  SUPP RR:  Vol. 5 of 6 at 9:23 – 10:5 [Tab T, Johnny Wade Trial Testimony].
[23]  SUPP RR:  Vol. 3 of 6 at 141 – 142 [Tab O, Amanda Wade Trial Testimony].

information previously undisclosed.  As he testified, the sale "was all done in secret."[24]  The very existence of conflicting testimony on what Bud could have known or what he should have done to find out proves the Appellant's point as to Issue One – summary judgment was improper because there were disputed issues of material fact that were for a jury, not a judge, to assess.

## REPLY TO APPELLEES' ARGUMENTS ON ISSUE ONE

11.    In their summary judgment arguments to the Trial Court, Appellees did not meet their "particularly heavy burden" to establish their affirmative defense of limitations and to either (*i*) conclusively negate the applicability of the discovery rule or, if the discovery rule does apply, (*ii*) conclusively establish that the limitations was not tolled by showing that there is no genuine issue of material fact about when Bud discovered or should have discovered through reasonable diligence, the nature of the injury.  *Cobb v. TDCJ*, 965 S.W.2d 59, 61 (Tex.App.—Houston 1st Dist.] 1998, no writ); *Matter of Estate of Matejek*, 928 S.W.2d 742 (Tex.App.—Corpus Christi, 1996) *writ denied per curiam; In re Estate of Herring*, 970 S.W.2d 583, at 586 (Tex.App.—Corpus Christi 1998, no pet.) ("Specifically, a defendant seeking summary judgment on the basis of limitations must prove when the cause of action accrued and, when applicable, must negate the discovery rule by proving as a matter of law that there no genuine

---

[24]    SUPP RR:    Vol. 4 of 6 at 43:23 [Tab U, Bud Wade Trial Testimony].

issue of fact about when the plaintiff discovered or should have discovered the nature of the injury."). Appellees have failed to meet their burden as to both.

## A. Appellees' Response Ignored That Bud Had No Legal Duty or Standing Until 2010

12. Bud had no duty of reasonable diligence to discover the terms of the 2004 sale of the ranch, nor did he have standing to challenge it, until after the death of his mother, Edell Wade, in 2010 when he became a beneficiary of her Estate. Bud was neither a party to the 2004 sale nor a third-party beneficiary. For purposes of limitations, a person may not be charged with constructive notice of the actual knowledge discernible from examination of public records unless that person was "under an obligation to search the records." *Kansa Reinsurance Co. v. Congressional Mortgage Corp.*, 20 F.3d 1362, 1370 (5th Cir. 1994); *Boucher v. Willis*, 236 S.W.2d 519 (Tex.Civ.App.—Eastland 1951) (the absence of a legal duty to examine deed records bars constructive notice). It was not until Bud became a beneficiary of the Estate after his mother's passing that he was charged with a duty to investigate the contents of the probate records, and he fulfilled that duty. *Mooney v. Harlin*, 622 S.W.2d 83, 84 (Tex. 1981); see also *Chapal v. Vela*, 461 S.W.2d 466, 470 (Tex.Civ.App.—Corpus Christi 1970) (charging devisees under a will with constructive notice of all of the ownership of land by the father's estate).

**B.     The Discovery Rule <u>Does</u> Apply to Bud's Claims**

13.     The evidence of Bud's injury is "objectively verifiable" and the nature of his injury is "inherently undiscoverable."   Appellees' summary judgment arguments to the Trial Court were insufficient to show otherwise and their current arguments also fail.

14.     The recent case relied upon by Appellees is distinguishable from the instant case; moreover, it was a fact-specific holding and does <u>not</u> stand for the general proposition Appellees urge, that "there is no 'objectively verifiable' evidence of wrongdoing when a mother sells her ranch to her son and his wife" and the discovery rule is therefore inapplicable.   *See* page 32 of Appellees' Brief; *Moczygemba v. Moczygemba*, --- S.W.3d ---, No. 04-14-00110, 2015 WL 704405 (Tex.App.—San Antonio, Feb 18, 2015, n.p.h.).

15.     *Moczygemba* addressed a dispute between a living mother (who was the plaintiff), and her sons, to whom she had transferred real property for below market value years prior.  2015 WL 704405.  She claimed she did not realize that she had conveyed mineral rights along with the land, despite the fact that the inclusion of mineral rights was readily apparent on the deeds.   After reciting testimony from the mother about her intentions and the sons' intentions, the court found no objectively verifiable evidence of an injury based on the deeds.  *Id.* at *6.

16.	In the instant case, there is no available testimony from Edell regarding her intentions as to the sale of the ranch in 2004. Even if she had a reason to sell the Ranch at below-market value, there remains objectively verifiable evidence of injury to her and to Bud individually. The *terms of this seller-financed sale,* in addition to the purchase price itself, caused injury to Edell and to Bud as a beneficiary of her Estate and the Note itself (which was not recorded) provides objectively verifiable evidence of that. The Note required Johnny and Amanda to pay Edell – who was 89 years old at the time – $500,000 over a period of 32 years, and at an annual interest rate of two percent (2%).[25] This meant that Edell would have to live to be 121 years old in order to be fully paid on the Note.[26] Thus, in lieu of the Ranch – by far the most significant asset in Edell's possession – and in lieu of payment for that asset (even a below-market value lump sum), Edell and her Estate received comparatively insignificant monthly payments of $1,848 and later just $1,200 (after the Modification in 2009).

17.	The injury is also "inherently undiscoverable." First, Bud had no duty of reasonable diligence until his mother passed in 2010. Moreover, he nonetheless did exercise reasonable diligence and could not discover the terms of the Note. First, the publicly recorded documents did not reveal the purchase price nor the

---

[25]	RR:	Vol. 3 of 4 at 58-66 [Tab V, Promissory Note].
[26]	RR:	Vol. 3 of 4 at 58-66 [Tab V, Promissory Note].

13

terms of the Note.[27]  Second, Johnny purposefully decided to conceal the sale from the other siblings before it happened.  Nancy Burns testified that she suggested that the other children be notified of the sale by letter, but that "Johnny said no, that the place would not ever sell if they ever found out."[28]  Nancy testified that Johnny said he would not send a letter "because he was afraid that somebody would object and that the place would not sell."[29]  Johnny also testified that he did not notify other people about the sale or its terms.[30]  Amanda also testified that information on the sale was deliberately not sent to the other siblings.[31]

18.    The discovery rule is applicable.

## C.    Bud Did <u>Not</u> Have Notice of His Claims

19.    The Appellees did not carry their high burden at summary judgment to conclusively demonstrate that Bud had notice of his claims, and the absence of any disputed issues of material fact on the issue of notice.  Bud's attempt to obtain details from Nancy and inability to do so, coupled with Johnny's intentional decision not to disclose the terms of the sale, evidences his lack of notice.  He could not have gleaned the details of the Note from the public records because they were not there.

---

[27]    Appellees incorrectly state that the purchase price of $500,000 was of public record as of March 2004.  The Deed of Trust does not state "purchase price," rather identifies the amount of principal that was financed.  <u>Tab W</u>, CR 86.
[28]    SUPP RR:    Vol. 2 of 6 at 39:6 – 24 [<u>Tab S</u>, Nancy Burns Trial Testimony].
[29]    SUPP RR:    Vol. 2 of 6 at 41:7 – 12 [<u>Tab S</u>, Nancy Burns Trial Testimony].
[30]    SUPP RR:    Vol. 5 of 6 at 9:23 – 10:5 [<u>Tab T</u>, Johnny Wade Trial Testimony].
[31]    SUPP RR:    Vol. 3 of 6 at 141 – 142 [<u>Tab O</u>, Amanda Wade Trial Testimony].

14

20.     In their current brief, Appellees refer to an interrogatory response where Bud stated his belief that Johnny and Amanda pressured Edell into selling the ranch and that they took advantage of her. *See* page 35 of Appellees' Brief. His response does not say he thought that "at the time" of the sale, and is not evidence of notice.

21.     Bud's testimony at trial is, needless to say, not informative to whether the Appellees carried their burden as movant in a summary judgment proceeding conducted prior to trial. Nonetheless, the testimony cited to by Appellees also does not serve to conclusively establish that he had notice and that the limitations period cannot be tolled. The recorded documents did not reveal critical information on the terms of the deal. Johnny and Amanda explicitly testified that they deliberately did not reveal information to their siblings.[32] Bud testified it was all done in secret.[33] There is no denying that there were material issues of disputed fact on the issue of notice and reasonable diligence, and disposition by summary judgment was premature and improper. The Trial Court, as explained in Appellants' Brief, made improper findings of fact.[34]

---

[32]     SUPP RR:     Vol. 5 of 6 at 9:23 – 10:5 [Tab T, Johnny Wade Trial Testimony]; and
         SUPP RR:     Vol. 3 of 6 at 141 – 142 [Tab O, Amanda Wade Trial Testimony].
[33]     SUPP RR:     Vol. 4 of 6 at 43:23 [Tab U, Bud Wade Trial Testimony].
[34]     RR:     Vol. 2 of 4 at 66, 75 [Tab X, Summary Judgment Hearing Transcript].

**D.**     **The Trial Court's Summary Judgment was Based on Limitations, and Limitations Alone**

22.     Appellees' attempt to argue that the Trial Court granted summary judgment on grounds in addition to limitations is wrong at best, and disingenuous at worst. The transcript of the summary judgment hearing and Court's ruling is in the appellate record. It is more than clear that the Court's basis for the ruling was limitations. At the hearing, Judge Savage asked, noting the period during which Edell Wade was living after the 2004 sale:

> "Why didn't the son call mom and say, Mom what's going on? . . . he was aware of the fact that there was a sale but didn't inquire of his mother or anyone else what the terms of the sale were. If he was so concerned about all of this, why didn't he inquire using the - - I'm not talking about going down and digging through public records. I'm talking about picking up the phone or dropping by and saying, what's going on?"[35]

> "All right. After hearing the evidence -- and let me just say this. I know that families, kids and families, may take advantage of a parent to the detriment of the other kids. I also know that sons don't want to rock the boat if mama is happy and bring her into the picture of a possible conflict between the kids. They want their mom to have a happy home, happy life. And I don't think that possibly mom got the best deal, but at the same time mom got other benefits as a result of this deal. And that is to have someone at the ranch caring for her. **I can understand why** he insisted upon buying the ranch if he was going to live there and take care of mom. **Then that would be in**

---

[35]     RR:     Vol. 2 of 4 at 66 [Tab X, Summary Judgment Hearing Transcript].

16

**effect, in my mind**, a part of the consideration of the sale of the ranch, was that promise from her son."[36]

23. As pointed out in Appellants' Brief, this statement is replete with language that implicates impression, inference, and fact-finding that properly should be the provenance of the jury. This statement also unequivocally demonstrates that the basis for the ruling was limitations.

## REPLY TO APPELLEES' ARGUMENTS ON ISSUE TWO

24. The Court instructed the jury that Johnny and Amanda <u>were</u> fiduciaries to Edell and, as such, they bore the burden to prove that they complied with their fiduciary duty in connection with the Modification. The instruction to the jury was that Johnny and Amanda had to prove *each and every* item of a list of required conduct. The only way to show compliance with their fiduciary obligations was to prove by a preponderance of the evidence **each** of the following:

(a) The transaction in question was fair and equitable to Edell Wade; **and**

(b) [Johnny and Amanda] made reasonable use of the confidence that Edell Wade placed in [them]; **and**

(c) [Johnny and Amanda] acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; **and**

(d) [Johnny and Amanda] placed the interests of Edell Wade before [their] own, did not use the advantage of [their] position to gain any benefit for [themselves] at the expense of Edell Wade, and did not place [themselves] in any position where [their] self-interest might conflict with [their] obligations as a fiduciary. [37]

---

[36]  RR:    Vol. 2 of 4 at 75 [Tab X, Summary Judgment Hearing Transcript].
[37]  CR:    1541, 1543 [Tab Y, Charge to the Court].

[emphasis added.]

25. Texas law applies a <u>presumption of unfairness</u> to transactions between a fiduciary and a party to whom the fiduciary owes her duties. *Texas Bank and Trust Co. v. Moore*, 595 S.W.2d 502 (Tex. 1980). "Critical" to determining whether there was a breach of fiduciary duty is the 'determination of whether there was under the circumstances a good faith effort on the party of [the party claiming validity] to <u>fully inform</u> [Edell] of the nature and effect of the transactions." *Vogt v. Warnock*, 107 S.W.3d at 778. Both Johnny and Amanda had a duty to ensure that Edell's decisions in connection with the Modification were the result of "voluntary and intelligent consideration." *Stephen County Museum, Inc. v. Swenson*, 571 S.W.2d 257, at 261 (Tex. 1974).

## A. Amanda Wade Testified that She Did Not Think About Fairness or Benefit to Edell

26. Amanda Wade testified that she did not think about the Modification in terms of fairness.[38] She did so despite her awareness that she held a power of attorney and that she and Edell had a relationship of trust and confidence.[39] She testified that the Modification "obviously benefited me."[40] She testified that she

---

[38]  SUPP RR:   Vol. 3 of 6 at 130:8-9, 139 [Tab O, Amanda Wade Trial Testimony].

[39]  SUPP RR:   Vol. 3 of 6 at 59, 129 – 130, 124 - 125 [Tab O, Amanda Wade Trial Testimony].

[40]  SUPP RR:   Vol. 3 of 6 at 130:15 [Tab O, Amanda Wade Trial Testimony].

didn't consider whether the Modification would be financially beneficial to Edell.[41]

She acknowledged that Edell received less money as a result of the Modification and that it benefited herself and Johnny.[42]  The payments dropped from $1,848 to $1,200.[43]

## B. The Evidence does Not Support that Edell was Represented by Counsel in Both Transactions

27.    It is undisputed that Amanda fired Edell's long-time attorney Pat Cavness – an attorney whom Edell was paying[44] – in the middle of negotiations over the sale of the ranch in 2004.  Amanda testified that "I did decide not to use Pat anymore."[45]  She testified she recalled "he questioned the price."[46]  She testified "I contacted Armbrust & Brown."[47]  Amanda testified further that she never took Edell to the Armbrust & Brown offices in Austin and that no lawyer from the firm came out to meet with Edell either.[48]  She testified that she paid the legal fees for the Armbrust & Brown deal, and the communications from the firm were directed to her, not to Edell.[49]

---

[41]     SUPP RR:      Vol. 3 of 6 at 135[Tab O, Amanda Wade Trial Testimony].
[42]     SUPP RR:      Vol. 3 of 6 at 131, 138 - 139[Tab O, Amanda Wade Trial Testimony].
[43]     SUPP RR:      Vol. 3 of 6 at 127, 138 – 139 [Tab O, Amanda Wade Trial Testimony].
[44]     CR:           383 [Tab Q, Pat Cavness File].
[45]     SUPP RR:      Vol. 3 of 6 at 55:24 [Tab O, Amanda Wade Trial Testimony].
[46]     SUPP RR:      Vol. 3 of 6 at 57:6-7 [Tab O, Amanda Wade Trial Testimony].
[47]     SUPP RR:      Vol. 3 of 6 at 58:8 [Tab O, Amanda Wade Trial Testimony].
[48]     SUPP RR:      Vol. 3 of 6 at 58:9-23 [Tab O, Amanda Wade Trial Testimony].
[49]     SUPP RR:      Vol. 3 of 6 at 59 [Tab O, Amanda Wade Trial Testimony].

28. It is telling that Amanda fired Mr. Cavness, who had questions and suggestions of his own in furtherance of Edell's interests regarding the sale of the ranch, and who also wrote a non-representation letter to advise Johnny and Amanda that he represented Edell's interests, not theirs.[50] It is also telling that, in the next transaction spearheaded by Johnny and Amanda – the Modification – they used an attorney who was happy to plug in the information that they fed him, and who, despite having a unique file number for Edell he had used in previous legal work for her, instead used a file number associated with Johnny and Amanda and named them as the client.[51] Mr. Martin wrote to Johnny and Amanda that "we have inserted the balance of $227,528.00, reduced the interest rate to zero, and made the monthly payment $1,200 **per Amanda's phone call of the 28th**."[52]

29. Mr. Martin clearly and repeatedly identified Johnny and Amanda as the 'client' in the physical file he created at the time in 2009 and that he was paid for his work on the Modification by Amanda Wade, not Edell Wade.[53] Michael Martin testified he had considered the Modification a "joint project."[54] He acknowledged that communications on the Modification were sent directly to

---

[50] CR: 363 [Tab Q, Pat Cavness File].
[51] SUPP RR: Vol. 2 of 6 at 116:2-19 [Tab K, Martin Trial Testimony].
[52] RR: Vol. 3 of 4 at 24 [Tab J, Martin & Millican File].
[53] RR: Vol. 3 of 4 at 14, 15, 19, 21 [Tab J, Martin & Millican File]; and
SUPP. RR: Vol. 2 of 6 at 116:17 – 118:1 [Tab K, Martin Trial Testimony].
[54] SUPP RR: Vol. 2 of 6 at 87:21-24 [Tab K, Martin Trial Testimony].

Amanda and that Amanda paid for the work.[55]  Mr. Martin could not have

provided Edell with independent counsel because he knew nothing about the

principal reduction: "I may not have remembered at that time that they even talked

about reducing the balance.  And to this day I don't know if or how much they

reduced it" and that he thought he was reducing the interest to zero.[56]  "I really

didn't know what was going on.  It changed two or three times.  I really didn't

know and hoped that with the accountant they would work it out to where

everybody was happy," and "I didn't imagine they wanted my input."[57]  Mr.

Martin could not have provided any meaningful independent counsel because he

was not cognizant of the fact that a principal reduction was even occurring as part

of the Modification, much less in what amount.

C.    **The Evidence does <u>Not</u> Support that Edell Voluntarily, and with Full Disclosure, Chose to Sell the Ranch and Chose to Reduce the Principal in Connection with the Modification**

30.    Appellees have not produced any evidence that Edell wanted the

Modification, in particular the reduction in principal, other than self-serving

testimony from Johnny and Amanda.  There is absolutely no evidence that Edell

Wade was aware at all of the principal reduction of around $40,000.  The reliable

evidence supports the other view:  the Modification that Edell signed stated on its

---

[55]    SUPP RR:    Vol. 2 of 6 at 116:20 – 118:1 [<u>Tab K</u>, Martin Trial Testimony].
[56]    SUPP RR:    Vol. 2 of 6 at 121:13 – 122:8 [<u>Tab K</u>, Martin Trial Testimony].
[57]    SUPP RR:    Vol. 2 of 6 at 88:12-25 [<u>Tab K</u>, Martin Trial Testimony].

face in bold lettering that its "**SOLE PURPOSE**" was elimination of interest.[58] Mr. Martin's file entry on the matter stated that the note was to be modified for *either* an elimination of interest *or* reduction of the principal.[59]

31. Johnny's self-serving testimony that he took his mother to Mr. Martin's office and left the room while they discussed it is (a) not confirmed by Mr. Martin and (b) was never mentioned by Johnny or anyone else in prior deposition testimony or other discovery conducted during the more than three years leading up to trial.

32. Everyone involved in the Modification around the time it was executed has testified ignorance as to the principal balance at the time. Johnny did not know what the unpaid balance was at the time.[60] Amanda Wade testified that she did not know where the modified principal amount came from or how it was arrived at.[61] The testimony of Mr. Martin and Ms. Graham (Edell's longtime accountant) – the individuals who were in a position to ostensibly implement Edell's wishes – confirmed that neither of them were aware of a principal reduction and they did not speak with Edell about a principal reduction.[62] There is

---

[58] RR: Vol. 3 of 4 at 39-46 [Tab L, Modification Agreement].
[59] RR: Vol. 3 of 4 at 15 [Tab J, Martin & Millican File].
[60] SUPP RR: Vol. 5 of 6 at 16:14 – 16 [Tab T, Johnny Wade Trial Testimony].
[61] SUPP RR: Vol. 3 of 6 at 130:3-4, 134 – 135 [Tab O, Amanda Wade Trial Testimony].
[62] SUPP RR: Vol. 2 of 6 at 88:12-25, 121:13 – 122:8 [Tab K, Martin Trial Testimony];
SUPP RR: Vol. 3 of 6 at 8:6 – 9:20, 12:15 – 16, 12:2-3, 16:21 – 19:5 [Tab M, Lori Graham Trial Testimony]; and

no viable way to look at the evidence and find that Edell Wade was provided with full disclosure on the terms of the Modification when the principal reduction is not stated on the document and the people involved did not even know what the actual balance on the Note was, much less how much was reduced.

33.     The Appellees assert that Edell was just like the decedent in *Vogt v. Warnock*, who "had made the gifts (i) voluntarily, (ii) while competent and (iii) after talking to an attorney." *See* page 44 of Appellees' Brief.  In the instant case there exists substantiated evidence only for competency, but as previously outlined, not for the premise that the transactions were made by Edell voluntarily and after talking to an attorney.  While no one has disputed that Edell was of sound mind, that does not mean she was not unduly influenced to enter into the Modification, nor does it mean that Johnny and Amanda fulfilled their fiduciary obligations of ensuring fairness and full disclosure in connection thereto.

34.     Edell was increasingly isolated from the world after Johnny and Amanda moved onto the ranch.  Amanda testified that the gate to the ranch was locked after 2005 and that no key was given to Bud or to his wife Gwen.[63]  She also testified that she had told the family that Edell could no longer host her birthday parties at the ranch, despite the fact that family gatherings had traditionally taken place at the ranch and despite the life estate they had ostensibly

---

[63] RR:         Vol. 3 of 4 at 3 [Tab N, Amanda Wade Note to Lori Graham].
SUPP. RR:    Vol. 3 of 6 at 116 - 121 [Tab O, Amanda Wade Trial Testimony].

granted to Edell.[64]  There was no evidence that Edell consulted with Lori Graham, Michael Martin, or anyone else regarding the details of the Modification.  As in *Jordan v. Lyles*, "**the record contains no evidence that [] anyone [] specifically discussed**" the transaction "**and informed [her] of all material facts relating thereto**.  455 S.W.3d 785, 795 (Tex.App.—Tyler 2015 n.p.h.).

35.     Amanda herself testified that the Modification did not benefit Edell financially, that it benefited herself and Johnny, and that she never thought about its fairness.[65]  Such testimony confirms that she did <u>not</u> fulfill her obligation to ensure that the Modification was "fair and equitable" to Edell.

36.     The evidence simply does not establish that Johnny and Amanda complied with their obligations to (a) ensure the Modification was fair and equitable to Edell, (b) make reasonable use of the confidence Edell placed in them, (c) act in utmost good faith and exercise the most scrupulous honesty towards Edell, **and** (d) place Edell's interests above their own, not use their position to their advantage or to gain any benefit at Edell's expense, and not place themselves in a position where their self-interest might conflict with their obligations as

---

[64]     SUPP. RR:     Vol. 3 of 6 at 121 – 123 [<u>Tab O</u>, Amanda Wade Trial Testimony].
[65]     SUPP RR:     Vol. 3 of 6 at 129 – 131, 135, 138 - 139 [<u>Tab O</u>, Amanda Wade Trial Testimony].

fiduciaries.[66] They failed to produce evidence showing they fulfilled their duties; and in fact the record establishes that they did not.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, James E. Wade prays that this Court overturn the Summary Judgment Order and the Final Judgment in this case and remand the case for a new trial. Appellant further prays for such other relief, whether at law or in equity to which this Court deems he is justly entitled.

Respectfully submitted,

RICHIE & GUERINGER, P.C.


BY:    /s/ *Sheldon E. Richie*
      SHELDON E. RICHIE
      State Bar of Texas No. 16877000
      Email: srichie@rg-austin.com
      EMILY J. SEIKEL
      State Bar of Texas No. 24072331
      Email: eseikel@rg-austin.com
      100 Congress Avenue, Suite 1750
      Austin, Texas 78701
      512-236-9220 telephone
      512-236-9230 facsimile

      ATTORNEYS FOR APPELLANT
      JAMES E. WADE

---

[66]    CR:    1539-1558 [Tab Y, Charge of the Court and Verdict].

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rules of Appellate Procedure 9.4, the undersigned certifies Appellant's Reply Brief complies with 9.4.

1.   Exclusive of the exempted portions in Texas Rules of Appellate Procedure 9.4(i)(1), Appellant's Reply Brief contains 5,795 words.

2.   Appellant's Reply Brief has been prepared in proportionally spaced typeface using Microsoft Word Version 2007 in Times New Roman 14 point.

3.   The undersigned has provided an electronic version of Appellant's Reply Brief.

4.   The undersigned understands a material misrepresentation in completing this certificate, or circumvention of Texas Rules of Appellate Procedure 9.4, may result in the Court's striking Appellant's Reply Brief.

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of August, 2015, a true and correct copy of the foregoing was served as follows:

*Counsel for Appellees*

*For Johnny Wade and Amanda Wade Individually*
Kathryn E. Allen
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2200
Austin, Texas 78701
512-480-5651 Telephone
512-480-5851 Facsimile
kallen@gdhm.com Email

*For Amanda Wade as Independent Executor*
Claude E. Ducloux
Hill, Ducloux, Carnes & De La Garza
400 West 15th Street, Suite 808
Austin, Texas 78701
512-474-7054 Telephone
512-474-5605 Facsimile
cducloux@hdcdlaw.com Email

*/s/ Emily J. Seikel*
Sheldon E. Richie/Emily J. Seikel

**NO. 03-15-00100-CV**

**IN THE COURT OF APPEALS**

**FOR THE THIRD JUDICIAL DISTRICT OF TEXAS**

**AT AUSTIN**

---

**IN RE THE ESTATE OF EDELL WADE, DECEASED.**

**JAMES E. WADE,**
*Appellant.*

---

**APPENDIX**

---

28

# TABLE OF CONTENTS[67]
## OF RECORD EXHIBITS ACCOMPANYING
## APPELLANT'S BRIEF IN REPLY TO APPELLEES' BRIEF

| NO. | TITLE OF DOCUMENT |
|---|---|
| Tab J. | Martin & Millican File[68] |
| Tab K. | Michael Martin Trial Testimony[69] |
| Tab L. | Modification Agreement[70] |
| Tab M. | Lori Graham Trial Testimony[71] |
| Tab N. | Amanda Wade Note to Lori Graham[72] |
| Tab O. | Amanda Wade Trial Testimony[73] |
| Tab P. | Amanda Wade Deposition Testimony (Excerpts)[74] |
| Tab Q. | Pat Cavness File[75] |
| Tab R. | Statement by Judge Savage During Trial[76] |
| Tab S. | Nancy Burns Trial Testimony[77] |
| Tab T. | Johnny Wade Trial Testimony[78] |
| Tab U. | Bud Wade Trial Testimony[79] |
| Tab V. | Promissory Note[80] |
| Tab W. | Deed of Trust[81] |

---

[67] The Appendix to Appellant's Brief is hereby incorporated herein by reference and, for ease of reading, the instant Appendix begins with the next available Tab designation.

[68] RR:  Vol. 3 of 4 at 14-86

[69] SUPP. RR:  Vol. 2 of 6 at 78-131

[70] RR:  Vol. 3 of 4 at 39-46

[71] SUPP. RR:  Vol. 3 of 6 at 7-21

[72] RR:  Vol. 3 of 4 at 3

[73] SUPP. RR:  Vol. 3 of 6 at 22-230

[74] CR:  407

[75] CR:  347-387

[76] SUPP. RR:  Vol. 3 of 6 at 45

[77] SUPP. RR:  Vol. 2 of 6 at 7-77

[78] SUPP. RR:  Vol. 5 of 6 at 7-74.

[79] SUPP. RR:  Vol. 4 of 6 at 30-65.

[80] RR:  Vol. 3 of 4 at 58-66

[81] CR:  86-100

| NO. | TITLE OF DOCUMENT |
|---|---|
| Tab X. | Statements by Judge Savage During Summary Judgment Hearing[82] |
| Tab Y. | Charge of the Court and Verdict[83] |

---

[82] RR: Vol. 2 of 4
[83] CR: 1539-1558

NO. 03-15-00100-CV

IN THE COURT OF APPEALS

FOR THE THIRD JUDICIAL DISTRICT OF TEXAS

AT AUSTIN

---

IN RE THE ESTATE OF EDELL WADE, DECEASED.

JAMES E. WADE,
*Appellant.*

---

## VERIFICATION

---

Before me, the undersigned notary, on this day personally appeared Emily J. Seikel, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

1.    "My name is Emily J. Seikel. I am over 18 years of age, of sound mind, and capable of making this affidavit. I am an attorney for Appellant James E. Wade. The facts in this affidavit are within my personal knowledge and are true and correct.

2.    "I certify and verify that I have reviewed the Appellant's Reply Brief and concluded that every factual statement in the Reply Brief is supported by competent evidence included in the appendix or record, and that the items contained in the Appendix are accurate copies of documents from the Clerk and Reporter's Records that are material to the Appellant's Brief.

_____
Emily J. Seikel

31

STATE OF TEXAS       §
                              §

TRAVIS COUNTY       §

        SUBSCRIBED AND SWORN TO before me on this the 26th day of August 2015, to certify which witness my hand and seal of office.

M L STEVENSON
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-20-2016

_____
Notary Public In and For State of Texas

32

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 10:35:27 AM
JEFFREY D. KYLE
Clerk

REPORTER'S RECORD

VOLUME 3 OF 4 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

| IN THE MATTER OF | ) | IN THE COUNTY COURT |
| THE ESTATE OF | ) | AT LAW |
| EDELL WADE | ) | BURNET COUNTY, TEXAS |

EXHIBITS

On the 11th day of April, 2014, the foregoing proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding at Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

TAB J
RR VOL 3 OF 4 AT 14-86
Page 1 of 86

                          EXHIBIT INDEX

**Plaintiff's Trial Exhibits:**

NUMBER    DESCRIPTION              OFFERED  RECEIVED   VOL

7         Payments made           (trial not transcribed)

9         Power of Attorney       (trial not transcribed)

11        Modification Agreement (trial not transcribed)

38        File from Michael Martin(trial not transcribed)

TAB J
RR VOL 3 OF 4 AT 14-86
Page 2 of 86



PLAINTIFF'S
EXHIBIT
38

09-16,163
WADE, JOHNNY ET UX
(Modification of Note)

**WORK ORDER**

ATTORNEY: MM/PM                        DATE: 4-16-09

Client: Johnny Wade etux

Address: _____

_____

Phone Numbers: Home _____ Business: _____ Other: _____

File Name: _____

Fee Arrangement: _____

| Date: | Work Done: |
|-------|-----------|
| 4-16-09 | Office conf. w/ client .40 - wants to cooperate to 0% o/ take 1/2 off principal bal. |
| 4-30-09 | Call to Lori Graham .03/ Rec'd call client .06 / |
| 5-6-09 | Call to Lori Graham .03 - left work |
| 5-13-09 | Call to Lori Graham .06 - no installment sale even - not send Johnny 1059 - likely no prob.-- / Request redivision |
| 5-14-09 | Rec'd call Amanda Wade .03/ ~~Request redivision~~ |
| 5-20-09 | Rec'd call Amanda .06/ Request redivision w/ Lori 6/4/11 |
| 6-15-11 | get copy for file Wade 77 ... w/ delinquent yard ... ... ... for ... ... ... ... ... file him |
| 3-14-11 | All contents of this file given to Evan Stubbs |
| 7-5/12 | Fax to Evan Stubbs |
| 1/31/12 | Original Deed of ... to Stubbs 1/4 dif - Prepared + submitted to Stubbs .35 |

MARTIN, MILLICAN, HENDERSON & SHRUM
ATTORNEYS AT LAW
512 EAST FOURTH STREET
LAMPASAS, TEXAS 76550
512/556-6228

Re: 16,163/MMM/Wade

Date:    January 31, 2012

Enclosed is original Record of Examination on Written Questions on the Wade matter.


MR EVAN STUBBS
ATTORNEY AT LAW
202 NORTH PORTER
LAMPASAS TX 765650

**FAX**

TO: MR. EVAN STUBBS
ATTORNEY AT LAW

AT FAX: 556-8975

FROM: MICHAEL M. MARTIN
MARTIN, MILLICAN, HENDERSON & SHRUM
ATTORNEYS AT LAW
512 EAST FOURTH ST.
LAMPASAS, TX 76550

PHONE: 512/556-6226

OUR FAX: 512/556-6621

e-mail: martinmillican@sbcglobal.net

DATE: January 25, 2012

Pages including
this cover sheet-4

Re: Cause No. P9127; *In the Estate of Edsil Wade, Deceased*

Faxed herewith is proposed Record of Examination on Written Questions. Please look this over and contact me. Thank you.

The documents accompanying this facsimile transmission contain confidential information which is legally privileged. The information is intended solely for the use of the recipient named above. If you have received this facsimile in error, please immediately notify us by telephone to arrange for the return of the original documents. If you are the intended recipient, any disclosure, copying, distribution or the taking of any action in reliance on the contents of this fax information is strictly prohibited. If this document you are receiving is illegible or incomplete, please call 512/556-6226.

```
                                    * * *  Communication Result Report ( Jan. 25. 2012  1:59PM )  * * *
                                                                                                    1) Martin & Millican

Date/Time: Jan. 25. 2012  1:59PM

File                                                                                          Page
No.   Mode          Destination                            Pg(s)    Result:                   Not Sent
-----------------------------------------------------------------------------------------------------
9615  Memory TX      5568975                               P. 4      OK


Reason for error
1) Hang up or line fail                              E. 2) Busy
3) No answer                                         E. 4) No facsimile connection
5) Exceeded max. E-mail size
```



202 N. PORTER ST. • LAMPASAS, TEXAS 76550
PHONE: (512) 556-8970 • FAX: (512) 556-8975

www.stubbslawoffice.com

January 17, 2012

Mike Martin
Attorney at Law
512 E. Fourth Street
Lampasas, Texas 76550

VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED
70101870000175742990

Re: Estate of Edell Wade, Deceased; Cause No. P9127, in the County Court at Law of Burnet County, Texas

Dear Mike:

Enclosed you a Notice of Intention to Take Written Deposition directed to you. Please forward the answers back to my office after answering before a Notary Public.

If you have any questions, please let me know.

Sincerely,

Evan Stubbs by: JB
Evan Stubbs

ES/jjb

Encl: 1.     Notice of Intention to Take Written Deposition of Michael Martin

Cc:     Amanda Wade

**MARTIN & MILLICAN**

ATTORNEYS AT LAW

*512 E FOURTH STREET*
*LAMPASAS, TEXAS 76550*
(512) 556-6228
(512) 556-8621

PAGE NO 1
June 15, 2009
Account No. 16163-00

MR. & MS. JOHNNY WADE
REDACTED
REDACTED      REDACTED
              REDACTED

RE: MODIFICATION OF NOTE

| Date | Description | HOURS | |
|---|---|---|---|
| 04/16/2009 | OFFICE CONFERENCE WITH CLIENT | 0.40 | 68.00 |
| 04/30/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.03 | 5.10 |
| | TELEPHONE CALL FROM CLIENT | 0.06 | 10.20 |
| 05/06/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.03 | 5.10 |
| 05/13/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.06 | 10.20 |
| 05/14/2009 | TELEPHONE CALL FROM AMANDA WADE | 0.03 | 5.10 |
| 05/26/2009 | TELEPHONE CALL FROM AMANDA WADE | 0.06 | 10.20 |
| | PREPARED MODIFICATION AGREEMENT | | 125.00 |
| 06/15/2009 | PREPARED LETTER TO CLIENT; COPY TO HOLDER | 0.12 | 20.40 |
| | FOR CURRENT SERVICES RENDERED | 0.79 | 259.30 |
| 06/02/2009 | PAID TO BURNET CO. CLERK CK #18984 | | 40.00 |
| | TOTAL EXPENSES | | 40.00 |
| | TOTAL CURRENT WORK | | 299.30 |
| | BALANCE DUE | | $299.30 |
| | Please Remit | | $299.30 |

THANK YOU

REDACTED

MARTIN & MILLICAN
ATTORNEYS AT LAW
512 EAST FOURTH STREET
LAMPASAS, TEXAS 76550
512/556-6228

Re: 16,163/MMM/Wade                                    Date:   June 15, 2009

Enclosed is original recorded Modification Agreement for your files.  A copy has been sent to Johnny and Amanda Wade.

MS EDELL WADE
REDACTED
  REDACTED

REDACTED

**MARTIN & MILLICAN**
ATTORNEYS AT LAW
512 EAST FOURTH STREET
LAMPASAS, TEXAS 76550
512/556-6228

Re: 16,163/MMM/Wade                                            Date:    June 15, 2009

Enclosed are copy of recorded Modification Agreement the original of which has been sent to Edell Wade
and your file regarding this matter which you left with us.  Also enclosed is a bill for services.  Thank you.

MR AND MRS JOHNNY WADE
REDACTED
REDACTED REDACTED
REDACTED
REDACTED

REDACTED

**BURNET COUNTY CLERK'S OFFICE**
**220 SOUTH PIERCE STREET**
**BURNET, TX 78611**
**512-756-5406**

ISSUED TO: MARTIN & MILLICAN

RECEIPT #: 109611                          DATE: 06/09/2009  10:01:48 AM
DEPARTMENT: OPR                          WORK STATION: KGRIMES

| DOCUMENT # | PGS | FEE |
|---|---|---|
| 200905193 | 7 | |
| MOD | | 40.00 |
| Total Amount Due | | 40.00 |
| CHECK 18984 | | 40.00 |
| Total Amount Paid | | 40.00 |

**THANK YOU**
**JANET PARKER**
**COUNTY CLERK**
**Deputy: KGRIMES**

**MARTIN & MILLICAN**
ATTORNEYS AT LAW
512 E. FOURTH ST.
LAMPASAS, TEXAS 76550

512/556-6228

Re: FN: 16,163 - MODIFICATION AGREEMENT/EDELL WADE/JOHNNY & AMANDA WADE          June 2, 2009

Please record the above document and return to this office. We are enclosing our check #18984 in the amount of $40.00.

Ms. Janet F. Parker
Burnet Co. Clerk
220 S. Pierce St.
Burnet, Tx 78611

TAB J
RR VOL 3 OF 4 AT 14-86
Page 23 of 86

MICHAEL M. MARTIN
PAT MILLICAN

TEL. 512-556-6228
FAX 512-556-8621
martinmillican@sbcglobal.net

May 26, 2009

Mr. Johnny Wade
REDACTED
REDACTED

Re:    Modification Agreement
       File No. 16,163

Dear Johnny:

Enclosed you will find the Modification Agreement on the note to your mother in which we have inserted the balance of $227,528.00, reduced the interest rate to zero, and made the monthly payment $1,200 per Amanda's phone call of the 26th. If this is satisfactory, each of you should sign as your names are typed, have notarized, and return for recording with the Burnet County Clerk. If you would like us to notarize, each/all of you can come by with the Modification and sign here. Also enclosed is an amortization schedule on the modified note. If you have any additional changes, please let me know. Thank you.

Sincerely yours,


Michael M. Martin

MMM:bp

Enclosures

REDACTED

NOTE FROM
JOHNNY WADE AND AMANDA WADE
TO EDELL WADE

PREPARED BY:
MARTIN & MILLICAN
ATTORNEYS AT LAW
512 EAST FOURTH ST.
LAMPASAS, TX 76550

| Amount Borrowed | Loan Date | Loan Rate% | First Pmt Date | #of Pds | Last Pmt Date | Pmts /Year | Payment | Points | APR % |
|---|---|---|---|---|---|---|---|---|---|
| 227,528.00 | 5/13/2009 | 0.0000 | 6/1/2009 | 180 | 3/1/2025 | 12 | 1,200.00 | | |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 1 | 6/ 1/09 | 0.00 | 1,200.00 | 226,328.00 | 0.00 |
| 2 | 7/ 1/09 | 0.00 | 1,200.00 | 225,128.00 | 0.00 |
| 3 | 8/ 1/09 | 0.00 | 1,200.00 | 223,928.00 | 0.00 |
| 4 | 9/ 1/09 | 0.00 | 1,200.00 | 222,728.00 | 0.00 |
| 5 | 10/ 1/09 | 0.00 | 1,200.00 | 221,528.00 | 0.00 |
| 6 | 11/ 1/09 | 0.00 | 1,200.00 | 220,328.00 | 0.00 |
| 7 | 12/ 1/09 | 0.00 | 1,200.00 | 219,128.00 | 0.00 |
| Subtotal: | | 0.00 | 8,400.00 | 219,128.00 | 0.00 |
| 8 | 1/ 1/10 | 0.00 | 1,200.00 | 217,928.00 | 0.00 |
| 9 | 2/ 1/10 | 0.00 | 1,200.00 | 216,728.00 | 0.00 |
| 10 | 3/ 1/10 | 0.00 | 1,200.00 | 215,528.00 | 0.00 |
| 11 | 4/ 1/10 | 0.00 | 1,200.00 | 214,328.00 | 0.00 |
| 12 | 5/ 1/10 | 0.00 | 1,200.00 | 213,128.00 | 0.00 |
| 13 | 6/ 1/10 | 0.00 | 1,200.00 | 211,928.00 | 0.00 |
| 14 | 7/ 1/10 | 0.00 | 1,200.00 | 210,728.00 | 0.00 |
| 15 | 8/ 1/10 | 0.00 | 1,200.00 | 209,528.00 | 0.00 |
| 16 | 9/ 1/10 | 0.00 | 1,200.00 | 208,328.00 | 0.00 |
| 17 | 10/ 1/10 | 0.00 | 1,200.00 | 207,128.00 | 0.00 |
| 18 | 11/ 1/10 | 0.00 | 1,200.00 | 205,928.00 | 0.00 |
| 19 | 12/ 1/10 | 0.00 | 1,200.00 | 204,728.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 204,728.00 | 0.00 |
| 20 | 1/ 1/11 | 0.00 | 1,200.00 | 203,528.00 | 0.00 |
| 21 | 2/ 1/11 | 0.00 | 1,200.00 | 202,328.00 | 0.00 |
| 22 | 3/ 1/11 | 0.00 | 1,200.00 | 201,128.00 | 0.00 |
| 23 | 4/ 1/11 | 0.00 | 1,200.00 | 199,928.00 | 0.00 |
| 24 | 5/ 1/11 | 0.00 | 1,200.00 | 198,728.00 | 0.00 |
| 25 | 6/ 1/11 | 0.00 | 1,200.00 | 197,528.00 | 0.00 |
| 26 | 7/ 1/11 | 0.00 | 1,200.00 | 196,328.00 | 0.00 |
| 27 | 8/ 1/11 | 0.00 | 1,200.00 | 195,128.00 | 0.00 |
| 28 | 9/ 1/11 | 0.00 | 1,200.00 | 193,928.00 | 0.00 |
| 29 | 10/ 1/11 | 0.00 | 1,200.00 | 192,728.00 | 0.00 |
| 30 | 11/ 1/11 | 0.00 | 1,200.00 | 191,528.00 | 0.00 |
| 31 | 12/ 1/11 | 0.00 | 1,200.00 | 190,328.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 190,328.00 | 0.00 |
| 32 | 1/ 1/12 | 0.00 | 1,200.00 | 189,128.00 | 0.00 |
| 33 | 2/ 1/12 | 0.00 | 1,200.00 | 187,928.00 | 0.00 |
| 34 | 3/ 1/12 | 0.00 | 1,200.00 | 186,728.00 | 0.00 |
| 35 | 4/ 1/12 | 0.00 | 1,200.00 | 185,528.00 | 0.00 |
| 36 | 5/ 1/12 | 0.00 | 1,200.00 | 184,328.00 | 0.00 |
| 37 | 6/ 1/12 | 0.00 | 1,200.00 | 183,128.00 | 0.00 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 38 | 7/ 1/12 | 0.00 | 1,200.00 | 181,928.00 | 0.00 |
| 39 | 8/ 1/12 | 0.00 | 1,200.00 | 180,728.00 | 0.00 |
| 40 | 9/ 1/12 | 0.00 | 1,200.00 | 179,528.00 | 0.00 |
| 41 | 10/ 1/12 | 0.00 | 1,200.00 | 178,328.00 | 0.00 |
| 42 | 11/ 1/12 | 0.00 | 1,200.00 | 177,128.00 | 0.00 |
| 43 | 12/ 1/12 | 0.00 | 1,200.00 | 175,928.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 175,928.00 | 0.00 |
| 44 | 1/ 1/13 | 0.00 | 1,200.00 | 174,728.00 | 0.00 |
| 45 | 2/ 1/13 | 0.00 | 1,200.00 | 173,528.00 | 0.00 |
| 46 | 3/ 1/13 | 0.00 | 1,200.00 | 172,328.00 | 0.00 |
| 47 | 4/ 1/13 | 0.00 | 1,200.00 | 171,128.00 | 0.00 |
| 48 | 5/ 1/13 | 0.00 | 1,200.00 | 169,928.00 | 0.00 |
| 49 | 6/ 1/13 | 0.00 | 1,200.00 | 168,728.00 | 0.00 |
| 50 | 7/ 1/13 | 0.00 | 1,200.00 | 167,528.00 | 0.00 |
| 51 | 8/ 1/13 | 0.00 | 1,200.00 | 166,328.00 | 0.00 |
| 52 | 9/ 1/13 | 0.00 | 1,200.00 | 165,128.00 | 0.00 |
| 53 | 10/ 1/13 | 0.00 | 1,200.00 | 163,928.00 | 0.00 |
| 54 | 11/ 1/13 | 0.00 | 1,200.00 | 162,728.00 | 0.00 |
| 55 | 12/ 1/13 | 0.00 | 1,200.00 | 161,528.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 161,528.00 | 0.00 |
| 56 | 1/ 1/14 | 0.00 | 1,200.00 | 160,328.00 | 0.00 |
| 57 | 2/ 1/14 | 0.00 | 1,200.00 | 159,128.00 | 0.00 |
| 58 | 3/ 1/14 | 0.00 | 1,200.00 | 157,928.00 | 0.00 |
| 59 | 4/ 1/14 | 0.00 | 1,200.00 | 156,728.00 | 0.00 |
| 60 | 5/ 1/14 | 0.00 | 1,200.00 | 155,528.00 | 0.00 |
| 61 | 6/ 1/14 | 0.00 | 1,200.00 | 154,328.00 | 0.00 |
| 62 | 7/ 1/14 | 0.00 | 1,200.00 | 153,128.00 | 0.00 |
| 63 | 8/ 1/14 | 0.00 | 1,200.00 | 151,928.00 | 0.00 |
| 64 | 9/ 1/14 | 0.00 | 1,200.00 | 150,728.00 | 0.00 |
| 65 | 10/ 1/14 | 0.00 | 1,200.00 | 149,528.00 | 0.00 |
| 66 | 11/ 1/14 | 0.00 | 1,200.00 | 148,328.00 | 0.00 |
| 67 | 12/ 1/14 | 0.00 | 1,200.00 | 147,128.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 147,128.00 | 0.00 |
| 68 | 1/ 1/15 | 0.00 | 1,200.00 | 145,928.00 | 0.00 |
| 69 | 2/ 1/15 | 0.00 | 1,200.00 | 144,728.00 | 0.00 |
| 70 | 3/ 1/15 | 0.00 | 1,200.00 | 143,528.00 | 0.00 |
| 71 | 4/ 1/15 | 0.00 | 1,200.00 | 142,328.00 | 0.00 |
| 72 | 5/ 1/15 | 0.00 | 1,200.00 | 141,128.00 | 0.00 |
| 73 | 6/ 1/15 | 0.00 | 1,200.00 | 139,928.00 | 0.00 |
| 74 | 7/ 1/15 | 0.00 | 1,200.00 | 138,728.00 | 0.00 |
| 75 | 8/ 1/15 | 0.00 | 1,200.00 | 137,528.00 | 0.00 |
| 76 | 9/ 1/15 | 0.00 | 1,200.00 | 136,328.00 | 0.00 |
| 77 | 10/ 1/15 | 0.00 | 1,200.00 | 135,128.00 | 0.00 |
| 78 | 11/ 1/15 | 0.00 | 1,200.00 | 133,928.00 | 0.00 |
| 79 | 12/ 1/15 | 0.00 | 1,200.00 | 132,728.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 132,728.00 | 0.00 |
| 80 | 1/ 1/16 | 0.00 | 1,200.00 | 131,528.00 | 0.00 |
| 81 | 2/ 1/16 | 0.00 | 1,200.00 | 130,328.00 | 0.00 |
| 82 | 3/ 1/16 | 0.00 | 1,200.00 | 129,128.00 | 0.00 |
| 83 | 4/ 1/16 | 0.00 | 1,200.00 | 127,928.00 | 0.00 |
| 84 | 5/ 1/16 | 0.00 | 1,200.00 | 126,728.00 | 0.00 |
| 85 | 6/ 1/16 | 0.00 | 1,200.00 | 125,528.00 | 0.00 |
| 86 | 7/ 1/16 | 0.00 | 1,200.00 | 124,328.00 | 0.00 |
| 87 | 8/ 1/16 | 0.00 | 1,200.00 | 123,128.00 | 0.00 |
| 88 | 9/ 1/16 | 0.00 | 1,200.00 | 121,928.00 | 0.00 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 89 | 10/ 1/16 | 0.00 | 1,200.00 | 120,728.00 | 0.00 |
| 90 | 11/ 1/16 | 0.00 | 1,200.00 | 119,528.00 | 0.00 |
| 91 | 12/ 1/16 | 0.00 | 1,200.00 | 118,328.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 118,328.00 | 0.00 |
| 92 | 1/ 1/17 | 0.00 | 1,200.00 | 117,128.00 | 0.00 |
| 93 | 2/ 1/17 | 0.00 | 1,200.00 | 115,928.00 | 0.00 |
| 94 | 3/ 1/17 | 0.00 | 1,200.00 | 114,728.00 | 0.00 |
| 95 | 4/ 1/17 | 0.00 | 1,200.00 | 113,528.00 | 0.00 |
| 96 | 5/ 1/17 | 0.00 | 1,200.00 | 112,328.00 | 0.00 |
| 97 | 6/ 1/17 | 0.00 | 1,200.00 | 111,128.00 | 0.00 |
| 98 | 7/ 1/17 | 0.00 | 1,200.00 | 109,928.00 | 0.00 |
| 99 | 8/ 1/17 | 0.00 | 1,200.00 | 108,728.00 | 0.00 |
| 100 | 9/ 1/17 | 0.00 | 1,200.00 | 107,528.00 | 0.00 |
| 101 | 10/ 1/17 | 0.00 | 1,200.00 | 106,328.00 | 0.00 |
| 102 | 11/ 1/17 | 0.00 | 1,200.00 | 105,128.00 | 0.00 |
| 103 | 12/ 1/17 | 0.00 | 1,200.00 | 103,928.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 103,928.00 | 0.00 |
| 104 | 1/ 1/18 | 0.00 | 1,200.00 | 102,728.00 | 0.00 |
| 105 | 2/ 1/18 | 0.00 | 1,200.00 | 101,528.00 | 0.00 |
| 106 | 3/ 1/18 | 0.00 | 1,200.00 | 100,328.00 | 0.00 |
| 107 | 4/ 1/18 | 0.00 | 1,200.00 | 99,128.00 | 0.00 |
| 108 | 5/ 1/18 | 0.00 | 1,200.00 | 97,928.00 | 0.00 |
| 109 | 6/ 1/18 | 0.00 | 1,200.00 | 96,728.00 | 0.00 |
| 110 | 7/ 1/18 | 0.00 | 1,200.00 | 95,528.00 | 0.00 |
| 111 | 8/ 1/18 | 0.00 | 1,200.00 | 94,328.00 | 0.00 |
| 112 | 9/ 1/18 | 0.00 | 1,200.00 | 93,128.00 | 0.00 |
| 113 | 10/ 1/18 | 0.00 | 1,200.00 | 91,928.00 | 0.00 |
| 114 | 11/ 1/18 | 0.00 | 1,200.00 | 90,728.00 | 0.00 |
| 115 | 12/ 1/18 | 0.00 | 1,200.00 | 89,528.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 89,528.00 | 0.00 |
| 116 | 1/ 1/19 | 0.00 | 1,200.00 | 88,328.00 | 0.00 |
| 117 | 2/ 1/19 | 0.00 | 1,200.00 | 87,128.00 | 0.00 |
| 118 | 3/ 1/19 | 0.00 | 1,200.00 | 85,928.00 | 0.00 |
| 119 | 4/ 1/19 | 0.00 | 1,200.00 | 84,728.00 | 0.00 |
| 120 | 5/ 1/19 | 0.00 | 1,200.00 | 83,528.00 | 0.00 |
| 121 | 6/ 1/19 | 0.00 | 1,200.00 | 82,328.00 | 0.00 |
| 122 | 7/ 1/19 | 0.00 | 1,200.00 | 81,128.00 | 0.00 |
| 123 | 8/ 1/19 | 0.00 | 1,200.00 | 79,928.00 | 0.00 |
| 124 | 9/ 1/19 | 0.00 | 1,200.00 | 78,728.00 | 0.00 |
| 125 | 10/ 1/19 | 0.00 | 1,200.00 | 77,528.00 | 0.00 |
| 126 | 11/ 1/19 | 0.00 | 1,200.00 | 76,328.00 | 0.00 |
| 127 | 12/ 1/19 | 0.00 | 1,200.00 | 75,128.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 75,128.00 | 0.00 |
| 128 | 1/ 1/20 | 0.00 | 1,200.00 | 73,928.00 | 0.00 |
| 129 | 2/ 1/20 | 0.00 | 1,200.00 | 72,728.00 | 0.00 |
| 130 | 3/ 1/20 | 0.00 | 1,200.00 | 71,528.00 | 0.00 |
| 131 | 4/ 1/20 | 0.00 | 1,200.00 | 70,328.00 | 0.00 |
| 132 | 5/ 1/20 | 0.00 | 1,200.00 | 69,128.00 | 0.00 |
| 133 | 6/ 1/20 | 0.00 | 1,200.00 | 67,928.00 | 0.00 |
| 134 | 7/ 1/20 | 0.00 | 1,200.00 | 66,728.00 | 0.00 |
| 135 | 8/ 1/20 | 0.00 | 1,200.00 | 65,528.00 | 0.00 |
| 136 | 9/ 1/20 | 0.00 | 1,200.00 | 64,328.00 | 0.00 |
| 137 | 10/ 1/20 | 0.00 | 1,200.00 | 63,128.00 | 0.00 |
| 138 | 11/ 1/20 | 0.00 | 1,200.00 | 61,928.00 | 0.00 |
| 139 | 12/ 1/20 | 0.00 | 1,200.00 | 60,728.00 | 0.00 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| Subtotal: | | 0.00 | 14,400.00 | 60,728.00 | 0.00 |
| 140 | 1/ 1/21 | 0.00 | 1,200.00 | 59,528.00 | 0.00 |
| 141 | 2/ 1/21 | 0.00 | 1,200.00 | 58,328.00 | 0.00 |
| 142 | 3/ 1/21 | 0.00 | 1,200.00 | 57,128.00 | 0.00 |
| 143 | 4/ 1/21 | 0.00 | 1,200.00 | 55,928.00 | 0.00 |
| 144 | 5/ 1/21 | 0.00 | 1,200.00 | 54,728.00 | 0.00 |
| 145 | 6/ 1/21 | 0.00 | 1,200.00 | 53,528.00 | 0.00 |
| 146 | 7/ 1/21 | 0.00 | 1,200.00 | 52,328.00 | 0.00 |
| 147 | 8/ 1/21 | 0.00 | 1,200.00 | 51,128.00 | 0.00 |
| 148 | 9/ 1/21 | 0.00 | 1,200.00 | 49,928.00 | 0.00 |
| 149 | 10/ 1/21 | 0.00 | 1,200.00 | 48,728.00 | 0.00 |
| 150 | 11/ 1/21 | 0.00 | 1,200.00 | 47,528.00 | 0.00 |
| 151 | 12/ 1/21 | 0.00 | 1,200.00 | 46,328.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 46,328.00 | 0.00 |
| 152 | 1/ 1/22 | 0.00 | 1,200.00 | 45,128.00 | 0.00 |
| 153 | 2/ 1/22 | 0.00 | 1,200.00 | 43,928.00 | 0.00 |
| 154 | 3/ 1/22 | 0.00 | 1,200.00 | 42,728.00 | 0.00 |
| 155 | 4/ 1/22 | 0.00 | 1,200.00 | 41,528.00 | 0.00 |
| 156 | 5/ 1/22 | 0.00 | 1,200.00 | 40,328.00 | 0.00 |
| 157 | 6/ 1/22 | 0.00 | 1,200.00 | 39,128.00 | 0.00 |
| 158 | 7/ 1/22 | 0.00 | 1,200.00 | 37,928.00 | 0.00 |
| 159 | 8/ 1/22 | 0.00 | 1,200.00 | 36,728.00 | 0.00 |
| 160 | 9/ 1/22 | 0.00 | 1,200.00 | 35,528.00 | 0.00 |
| 161 | 10/ 1/22 | 0.00 | 1,200.00 | 34,328.00 | 0.00 |
| 162 | 11/ 1/22 | 0.00 | 1,200.00 | 33,128.00 | 0.00 |
| 163 | 12/ 1/22 | 0.00 | 1,200.00 | 31,928.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 31,928.00 | 0.00 |
| 164 | 1/ 1/23 | 0.00 | 1,200.00 | 30,728.00 | 0.00 |
| 165 | 2/ 1/23 | 0.00 | 1,200.00 | 29,528.00 | 0.00 |
| 166 | 3/ 1/23 | 0.00 | 1,200.00 | 28,328.00 | 0.00 |
| 167 | 4/ 1/23 | 0.00 | 1,200.00 | 27,128.00 | 0.00 |
| 168 | 5/ 1/23 | 0.00 | 1,200.00 | 25,928.00 | 0.00 |
| 169 | 6/ 1/23 | 0.00 | 1,200.00 | 24,728.00 | 0.00 |
| 170 | 7/ 1/23 | 0.00 | 1,200.00 | 23,528.00 | 0.00 |
| 171 | 8/ 1/23 | 0.00 | 1,200.00 | 22,328.00 | 0.00 |
| 172 | 9/ 1/23 | 0.00 | 1,200.00 | 21,128.00 | 0.00 |
| 173 | 10/ 1/23 | 0.00 | 1,200.00 | 19,928.00 | 0.00 |
| 174 | 11/ 1/23 | 0.00 | 1,200.00 | 18,728.00 | 0.00 |
| 175 | 12/ 1/23 | 0.00 | 1,200.00 | 17,528.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 17,528.00 | 0.00 |
| 176 | 1/ 1/24 | 0.00 | 1,200.00 | 16,328.00 | 0.00 |
| 177 | 2/ 1/24 | 0.00 | 1,200.00 | 15,128.00 | 0.00 |
| 178 | 3/ 1/24 | 0.00 | 1,200.00 | 13,928.00 | 0.00 |
| 179 | 4/ 1/24 | 0.00 | 1,200.00 | 12,728.00 | 0.00 |
| 180 | 5/ 1/24 | 0.00 | 1,200.00 | 11,528.00 | 0.00 |
| 181 | 6/ 1/24 | 0.00 | 1,200.00 | 10,328.00 | 0.00 |
| 182 | 7/ 1/24 | 0.00 | 1,200.00 | 9,128.00 | 0.00 |
| 183 | 8/ 1/24 | 0.00 | 1,200.00 | 7,928.00 | 0.00 |
| 184 | 9/ 1/24 | 0.00 | 1,200.00 | 6,728.00 | 0.00 |
| 185 | 10/ 1/24 | 0.00 | 1,200.00 | 5,528.00 | 0.00 |
| 186 | 11/ 1/24 | 0.00 | 1,200.00 | 4,328.00 | 0.00 |
| 187 | 12/ 1/24 | 0.00 | 1,200.00 | 3,128.00 | 0.00 |
| Subtotal: | | 0.00 | 14,400.00 | 3,128.00 | 0.00 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 188 | 1/ 1/25 | 0.00 | 1,200.00 | 1,928.00 | 0.00 |
| 189 | 2/ 1/25 | 0.00 | 1,200.00 | 728.00 | 0.00 |
| 190 | 3/ 1/25 | 0.00 | 728.00 | 0.00 | 0.00 |

----------------------------------------------------------------

Subtotal:               0.00           3,128.00              0.00              0.00

Final payment amount:        728.00

----------------------------------------------------------------

Total payments:    227,528.00    Principal:    227,528.00    Interest:         0.00

Settings:   360 Arr PrePd 1950 12 perYr

**MARTIN & MILLICAN**
**ATTORNEYS AT LAW**
**512 EAST FOURTH STREET**
**LAMPASAS, TEXAS 76550**
**512/556-6228**

Re: 16,163/MMM/Wade                                                    Date:   May 13, 2009

Enclosed is draft of proposed Modification Agreement.  Please look this over carefully and let me know if changes are needed.  If it is correct as it stands you may bring it by the office to sign and have notarized.

MR AND MRS JOHNNY WADE
REDACTED
REDACTED

REDACTED

NOTE FROM
JOHNNY WADE AND AMANDA WADE
TO EDELL WADE

PREPARED BY:
MARTIN & MILLICAN
ATTORNEYS AT LAW
512 EAST FOURTH ST.
LAMPASAS, TX 76550

| Amount Borrowed | Loan Date | Loan Rate% | First Pmt Date | #of Pds | Last Pmt Date | Pmts /Year | Payment | Points | APR % |
|---|---|---|---|---|---|---|---|---|---|
| 500,000.00 | 2/1/2006 | 0.0200 | 3/1/2006 | 272 | 10/1/2028 | 12 | 1,848.10 | | |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 1 | 3/ 1/06 | 8.33 | 1,839.77 | 498,160.23 | 8.33 |
| 2 | 4/ 1/06 | 8.30 | 1,839.80 | 496,320.43 | 16.63 |
| 3 | 5/ 1/06 | 8.27 | 1,839.83 | 494,480.60 | 24.90 |
| 4 | 6/ 1/06 | 8.24 | 1,839.86 | 492,640.74 | 33.14 |
| 5 | 7/ 1/06 | 8.21 | 1,839.89 | 490,800.85 | 41.35 |
| 6 | 8/ 1/06 | 8.18 | 1,839.92 | 488,960.93 | 49.53 |
| 7 | 9/ 1/06 | 8.15 | 1,839.95 | 487,120.98 | 57.68 |
| 8 | 10/ 1/06 | 8.12 | 1,839.98 | 485,281.00 | 65.80 |
| 9 | 11/ 1/06 | 8.09 | 1,840.01 | 483,440.99 | 73.89 |
| 10 | 12/ 1/06 | 8.06 | 1,840.04 | 481,600.95 | 81.95 |
| Subtotal: | | 81.95 | 18,399.05 | 481,600.95 | 81.95 |
| 11 | 1/ 1/07 | 8.03 | 1,840.07 | 479,760.88 | 89.98 |
| 12 | 2/ 1/07 | 8.00 | 1,840.10 | 477,920.78 | 97.98 |
| 13 | 3/ 1/07 | 7.97 | 1,840.13 | 476,080.65 | 105.95 |
| 14 | 4/ 1/07 | 7.93 | 1,840.17 | 474,240.48 | 113.88 |
| 15 | 5/ 1/07 | 7.90 | 1,840.20 | 472,400.28 | 121.78 |
| 16 | 6/ 1/07 | 7.87 | 1,840.23 | 470,560.05 | 129.65 |
| 17 | 7/ 1/07 | 7.84 | 1,840.26 | 468,719.79 | 137.49 |
| 18 | 8/ 1/07 | 7.81 | 1,840.29 | 466,879.50 | 145.30 |
| 19 | 9/ 1/07 | 7.78 | 1,840.32 | 465,039.18 | 153.08 |
| 20 | 10/ 1/07 | 7.75 | 1,840.35 | 463,198.83 | 160.83 |
| 21 | 11/ 1/07 | 7.72 | 1,840.38 | 461,358.45 | 168.55 |
| 22 | 12/ 1/07 | 7.69 | 1,840.41 | 459,518.04 | 176.24 |
| Subtotal: | | 94.29 | 22,082.91 | 459,518.04 | 176.24 |
| 23 | 1/ 1/08 | 7.66 | 1,840.44 | 457,677.60 | 183.90 |
| 24 | 2/ 1/08 | 7.63 | 1,840.47 | 455,837.13 | 191.53 |
| 25 | 3/ 1/08 | 7.60 | 1,840.50 | 453,996.63 | 199.13 |
| 26 | 4/ 1/08 | 7.57 | 1,840.53 | 452,156.10 | 206.70 |
| 27 | 5/ 1/08 | 7.54 | 1,840.56 | 450,315.54 | 214.24 |
| 28 | 6/ 1/08 | 7.51 | 1,840.59 | 448,474.95 | 221.75 |
| 29 | 7/ 1/08 | 7.47 | 1,840.63 | 446,634.32 | 229.22 |
| 30 | 8/ 1/08 | 7.44 | 1,840.66 | 444,793.66 | 236.66 |
| 31 | 9/ 1/08 | 7.41 | 1,840.69 | 442,952.97 | 244.07 |
| 32 | 10/ 1/08 | 7.38 | 1,840.72 | 441,112.25 | 251.45 |
| 33 | 11/ 1/08 | 7.35 | 1,840.75 | 439,271.50 | 258.80 |
| 34 | 12/ 1/08 | 7.32 | 1,840.78 | 437,430.72 | 266.12 |
| Subtotal: | | 89.88 | 22,087.32 | 437,430.72 | 266.12 |
| 35 | 1/ 1/09 | 7.29 | 1,840.81 | 435,589.91 | 273.41 |
| 36 | 2/ 1/09 | 7.26 | 1,840.84 | 433,749.07 | 280.67 |
| 37 | 3/ 1/09 | 7.23 | 1,840.87 | 431,908.20 | 287.90 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 38 | 4/ 1/09 | 7.20 | 1,840.90 | 430,067.30 | 295.10 |
| 39 | 5/ 1/09 | 7.17 | 1,840.93 | 428,226.37 | 302.27 |
| 40 | 6/ 1/09 | 7.14 | 1,840.96 | 426,385.41 | 309.41 |
| 41 | 7/ 1/09 | 7.11 | 1,840.99 | 424,544.42 | 316.52 |
| 42 | 8/ 1/09 | 7.08 | 1,841.02 | 422,703.40 | 323.60 |
| 43 | 9/ 1/09 | 7.05 | 1,841.05 | 420,862.35 | 330.65 |
| 44 | 10/ 1/09 | 7.01 | 1,841.09 | 419,021.26 | 337.66 |
| 45 | 11/ 1/09 | 6.98 | 1,841.12 | 417,180.14 | 344.64 |
| 46 | 12/ 1/09 | 6.95 | 1,841.15 | 415,338.99 | 351.59 |
| Subtotal: | | 85.47 | 22,091.73 | 415,338.99 | 351.59 |
| 47 | 1/ 1/10 | 6.92 | 1,841.18 | 413,497.81 | 358.51 |
| 48 | 2/ 1/10 | 6.89 | 1,841.21 | 411,656.60 | 365.40 |
| 49 | 3/ 1/10 | 6.86 | 1,841.24 | 409,815.36 | 372.26 |
| 50 | 4/ 1/10 | 6.83 | 1,841.27 | 407,974.09 | 379.09 |
| 51 | 5/ 1/10 | 6.80 | 1,841.30 | 406,132.79 | 385.89 |
| 52 | 6/ 1/10 | 6.77 | 1,841.33 | 404,291.46 | 392.66 |
| 53 | 7/ 1/10 | 6.74 | 1,841.36 | 402,450.10 | 399.40 |
| 54 | 8/ 1/10 | 6.71 | 1,841.39 | 400,608.71 | 406.11 |
| 55 | 9/ 1/10 | 6.68 | 1,841.42 | 398,767.29 | 412.79 |
| 56 | 10/ 1/10 | 6.65 | 1,841.45 | 396,925.84 | 419.44 |
| 57 | 11/ 1/10 | 6.62 | 1,841.48 | 395,084.36 | 426.06 |
| 58 | 12/ 1/10 | 6.58 | 1,841.52 | 393,242.84 | 432.64 |
| Subtotal: | | 81.05 | 22,096.15 | 393,242.84 | 432.64 |
| 59 | 1/ 1/11 | 6.55 | 1,841.55 | 391,401.29 | 439.19 |
| 60 | 2/ 1/11 | 6.52 | 1,841.58 | 389,559.71 | 445.71 |
| 61 | 3/ 1/11 | 6.49 | 1,841.61 | 387,718.10 | 452.20 |
| 62 | 4/ 1/11 | 6.46 | 1,841.64 | 385,876.46 | 458.66 |
| 63 | 5/ 1/11 | 6.43 | 1,841.67 | 384,034.79 | 465.09 |
| 64 | 6/ 1/11 | 6.40 | 1,841.70 | 382,193.09 | 471.49 |
| 65 | 7/ 1/11 | 6.37 | 1,841.73 | 380,351.36 | 477.86 |
| 66 | 8/ 1/11 | 6.34 | 1,841.76 | 378,509.60 | 484.20 |
| 67 | 9/ 1/11 | 6.31 | 1,841.79 | 376,667.81 | 490.51 |
| 68 | 10/ 1/11 | 6.28 | 1,841.82 | 374,825.99 | 496.79 |
| 69 | 11/ 1/11 | 6.25 | 1,841.85 | 372,984.14 | 503.04 |
| 70 | 12/ 1/11 | 6.22 | 1,841.88 | 371,142.26 | 509.26 |
| Subtotal: | | 76.62 | 22,100.58 | 371,142.26 | 509.26 |
| 71 | 1/ 1/12 | 6.19 | 1,841.91 | 369,300.35 | 515.45 |
| 72 | 2/ 1/12 | 6.16 | 1,841.94 | 367,458.41 | 521.61 |
| 73 | 3/ 1/12 | 6.12 | 1,841.98 | 365,616.43 | 527.73 |
| 74 | 4/ 1/12 | 6.09 | 1,842.01 | 363,774.42 | 533.82 |
| 75 | 5/ 1/12 | 6.06 | 1,842.04 | 361,932.38 | 539.88 |
| 76 | 6/ 1/12 | 6.03 | 1,842.07 | 360,090.31 | 545.91 |
| 77 | 7/ 1/12 | 6.00 | 1,842.10 | 358,248.21 | 551.91 |
| 78 | 8/ 1/12 | 5.97 | 1,842.13 | 356,406.08 | 557.88 |
| 79 | 9/ 1/12 | 5.94 | 1,842.16 | 354,563.92 | 563.82 |
| 80 | 10/ 1/12 | 5.91 | 1,842.19 | 352,721.73 | 569.73 |
| 81 | 11/ 1/12 | 5.88 | 1,842.22 | 350,879.51 | 575.61 |
| 82 | 12/ 1/12 | 5.85 | 1,842.25 | 349,037.26 | 581.46 |
| Subtotal: | | 72.20 | 22,105.00 | 349,037.26 | 581.46 |
| 83 | 1/ 1/13 | 5.82 | 1,842.28 | 347,194.98 | 587.28 |
| 84 | 2/ 1/13 | 5.79 | 1,842.31 | 345,352.67 | 593.07 |
| 85 | 3/ 1/13 | 5.76 | 1,842.34 | 343,510.33 | 598.83 |
| 86 | 4/ 1/13 | 5.73 | 1,842.37 | 341,667.96 | 604.56 |
| 87 | 5/ 1/13 | 5.69 | 1,842.41 | 339,825.55 | 610.25 |
| 88 | 6/ 1/13 | 5.66 | 1,842.44 | 337,983.11 | 615.91 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 89 | 7/ 1/13 | 5.63 | 1,842.47 | 336,140.64 | 621.54 |
| 90 | 8/ 1/13 | 5.60 | 1,842.50 | 334,298.14 | 627.14 |
| 91 | 9/ 1/13 | 5.57 | 1,842.53 | 332,455.61 | 632.71 |
| 92 | 10/ 1/13 | 5.54 | 1,842.56 | 330,613.05 | 638.25 |
| 93 | 11/ 1/13 | 5.51 | 1,842.59 | 328,770.46 | 643.76 |
| 94 | 12/ 1/13 | 5.48 | 1,842.62 | 326,927.84 | 649.24 |
| Subtotal: | | 67.78 | 22,109.42 | 326,927.84 | 649.24 |
| 95 | 1/ 1/14 | 5.45 | 1,842.65 | 325,085.19 | 654.69 |
| 96 | 2/ 1/14 | 5.42 | 1,842.69 | 323,242.51 | 660.11 |
| 97 | 3/ 1/14 | 5.39 | 1,842.71 | 321,399.80 | 665.50 |
| 98 | 4/ 1/14 | 5.36 | 1,842.74 | 319,557.06 | 670.86 |
| 99 | 5/ 1/14 | 5.33 | 1,842.77 | 317,714.29 | 676.19 |
| 100 | 6/ 1/14 | 5.30 | 1,842.80 | 315,871.49 | 681.49 |
| 101 | 7/ 1/14 | 5.26 | 1,842.84 | 314,028.65 | 686.75 |
| 102 | 8/ 1/14 | 5.23 | 1,842.87 | 312,185.78 | 691.98 |
| 103 | 9/ 1/14 | 5.20 | 1,842.90 | 310,342.88 | 697.18 |
| 104 | 10/ 1/14 | 5.17 | 1,842.93 | 308,499.95 | 702.35 |
| 105 | 11/ 1/14 | 5.14 | 1,842.96 | 306,656.99 | 707.49 |
| 106 | 12/ 1/14 | 5.11 | 1,842.99 | 304,814.00 | 712.60 |
| Subtotal: | | 63.36 | 22,113.84 | 304,814.00 | 712.60 |
| 107 | 1/ 1/15 | 5.08 | 1,843.02 | 302,970.98 | 717.68 |
| 108 | 2/ 1/15 | 5.05 | 1,843.05 | 301,127.93 | 722.73 |
| 109 | 3/ 1/15 | 5.02 | 1,843.08 | 299,284.85 | 727.75 |
| 110 | 4/ 1/15 | 4.99 | 1,843.11 | 297,441.74 | 732.74 |
| 111 | 5/ 1/15 | 4.96 | 1,843.14 | 295,598.60 | 737.70 |
| 112 | 6/ 1/15 | 4.93 | 1,843.17 | 293,755.43 | 742.63 |
| 113 | 7/ 1/15 | 4.90 | 1,843.20 | 291,912.23 | 747.53 |
| 114 | 8/ 1/15 | 4.87 | 1,843.23 | 290,069.00 | 752.40 |
| 115 | 9/ 1/15 | 4.83 | 1,843.27 | 288,225.73 | 757.23 |
| 116 | 10/ 1/15 | 4.80 | 1,843.30 | 286,382.43 | 762.03 |
| 117 | 11/ 1/15 | 4.77 | 1,843.33 | 284,539.10 | 766.80 |
| 118 | 12/ 1/15 | 4.74 | 1,843.36 | 282,695.74 | 771.54 |
| Subtotal: | | 58.94 | 22,118.26 | 282,695.74 | 771.54 |
| 119 | 1/ 1/16 | 4.71 | 1,843.39 | 280,852.35 | 776.25 |
| 120 | 2/ 1/16 | 4.68 | 1,843.42 | 279,008.93 | 780.93 |
| 121 | 3/ 1/16 | 4.65 | 1,843.45 | 277,165.48 | 785.58 |
| 122 | 4/ 1/16 | 4.62 | 1,843.48 | 275,322.00 | 790.20 |
| 123 | 5/ 1/16 | 4.59 | 1,843.51 | 273,478.49 | 794.79 |
| 124 | 6/ 1/16 | 4.56 | 1,843.54 | 271,634.95 | 799.35 |
| 125 | 7/ 1/16 | 4.53 | 1,843.57 | 269,791.38 | 803.88 |
| 126 | 8/ 1/16 | 4.50 | 1,843.60 | 267,947.78 | 808.38 |
| 127 | 9/ 1/16 | 4.47 | 1,843.63 | 266,104.15 | 812.85 |
| 128 | 10/ 1/16 | 4.44 | 1,843.66 | 264,260.49 | 817.29 |
| 129 | 11/ 1/16 | 4.40 | 1,843.70 | 262,416.79 | 821.69 |
| 130 | 12/ 1/16 | 4.37 | 1,843.73 | 260,573.06 | 826.06 |
| Subtotal: | | 54.52 | 22,122.68 | 260,573.06 | 826.06 |
| 131 | 1/ 1/17 | 4.34 | 1,843.76 | 258,729.30 | 830.40 |
| 132 | 2/ 1/17 | 4.31 | 1,843.79 | 256,885.51 | 834.71 |
| 133 | 3/ 1/17 | 4.28 | 1,843.82 | 255,041.69 | 838.99 |
| 134 | 4/ 1/17 | 4.25 | 1,843.85 | 253,197.84 | 843.24 |
| 135 | 5/ 1/17 | 4.22 | 1,843.88 | 251,353.96 | 847.46 |
| 136 | 6/ 1/17 | 4.19 | 1,843.91 | 249,510.05 | 851.65 |
| 137 | 7/ 1/17 | 4.16 | 1,843.94 | 247,666.11 | 855.81 |
| 138 | 8/ 1/17 | 4.13 | 1,843.97 | 245,822.14 | 859.94 |
| 139 | 9/ 1/17 | 4.10 | 1,844.00 | 243,978.14 | 864.04 |

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 140 | 10/ 1/17 | 4.07 | 1,844.03 | 242,134.11 | 868.11 |
| 141 | 11/ 1/17 | 4.04 | 1,844.06 | 240,290.05 | 872.15 |
| 142 | 12/ 1/17 | 4.00 | 1,844.10 | 238,445.95 | 876.15 |
| Subtotal: | | 50.09 | 22,127.11 | 238,445.95 | 876.15 |
| 143 | 1/ 1/18 | 3.97 | 1,844.13 | 236,601.82 | 880.12 |
| 144 | 2/ 1/18 | 3.94 | 1,844.16 | 234,757.66 | 884.06 |
| 145 | 3/ 1/18 | 3.91 | 1,844.19 | 232,913.47 | 887.97 |
| 146 | 4/ 1/18 | 3.88 | 1,844.22 | 231,069.25 | 891.85 |
| 147 | 5/ 1/18 | 3.85 | 1,844.25 | 229,225.00 | 895.70 |
| 148 | 6/ 1/18 | 3.82 | 1,844.28 | 227,380.72 | 899.52 |
| 149 | 7/ 1/18 | 3.79 | 1,844.31 | 225,536.41 | 903.31 |
| 150 | 8/ 1/18 | 3.76 | 1,844.34 | 223,692.07 | 907.07 |
| 151 | 9/ 1/18 | 3.73 | 1,844.37 | 221,847.70 | 910.80 |
| 152 | 10/ 1/18 | 3.70 | 1,844.40 | 220,003.30 | 914.50 |
| 153 | 11/ 1/18 | 3.67 | 1,844.43 | 218,158.87 | 918.17 |
| 154 | 12/ 1/18 | 3.64 | 1,844.46 | 216,314.41 | 921.81 |
| Subtotal: | | 45.66 | 22,131.54 | 216,314.41 | 921.81 |
| 155 | 1/ 1/19 | 3.61 | 1,844.49 | 214,469.92 | 925.42 |
| 156 | 2/ 1/19 | 3.57 | 1,844.53 | 212,625.39 | 928.99 |
| 157 | 3/ 1/19 | 3.54 | 1,844.56 | 210,780.83 | 932.53 |
| 158 | 4/ 1/19 | 3.51 | 1,844.59 | 208,936.24 | 936.04 |
| 159 | 5/ 1/19 | 3.48 | 1,844.62 | 207,091.62 | 939.52 |
| 160 | 6/ 1/19 | 3.45 | 1,844.65 | 205,246.97 | 942.97 |
| 161 | 7/ 1/19 | 3.42 | 1,844.68 | 203,402.29 | 946.39 |
| 162 | 8/ 1/19 | 3.39 | 1,844.71 | 201,557.58 | 949.78 |
| 163 | 9/ 1/19 | 3.36 | 1,844.74 | 199,712.84 | 953.14 |
| 164 | 10/ 1/19 | 3.33 | 1,844.77 | 197,868.07 | 956.47 |
| 165 | 11/ 1/19 | 3.30 | 1,844.80 | 196,023.27 | 959.77 |
| 166 | 12/ 1/19 | 3.27 | 1,844.83 | 194,178.44 | 963.04 |
| Subtotal: | | 41.23 | 22,135.97 | 194,178.44 | 963.04 |
| 167 | 1/ 1/20 | 3.24 | 1,844.86 | 192,333.58 | 966.28 |
| 168 | 2/ 1/20 | 3.21 | 1,844.89 | 190,488.69 | 969.49 |
| 169 | 3/ 1/20 | 3.17 | 1,844.93 | 188,643.76 | 972.66 |
| 170 | 4/ 1/20 | 3.14 | 1,844.96 | 186,798.80 | 975.80 |
| 171 | 5/ 1/20 | 3.11 | 1,844.99 | 184,953.81 | 978.91 |
| 172 | 6/ 1/20 | 3.08 | 1,845.02 | 183,108.79 | 981.99 |
| 173 | 7/ 1/20 | 3.05 | 1,845.05 | 181,263.74 | 985.04 |
| 174 | 8/ 1/20 | 3.02 | 1,845.08 | 179,418.66 | 988.06 |
| 175 | 9/ 1/20 | 2.99 | 1,845.11 | 177,573.55 | 991.05 |
| 176 | 10/ 1/20 | 2.96 | 1,845.14 | 175,728.41 | 994.01 |
| 177 | 11/ 1/20 | 2.93 | 1,845.17 | 173,883.24 | 996.94 |
| 178 | 12/ 1/20 | 2.90 | 1,845.20 | 172,038.04 | 999.84 |
| Subtotal: | | 36.80 | 22,140.40 | 172,038.04 | 999.84 |
| 179 | 1/ 1/21 | 2.87 | 1,845.23 | 170,192.81 | 1,002.71 |
| 180 | 2/ 1/21 | 2.84 | 1,845.26 | 168,347.55 | 1,005.55 |
| 181 | 3/ 1/21 | 2.81 | 1,845.29 | 166,502.26 | 1,008.36 |
| 182 | 4/ 1/21 | 2.78 | 1,845.32 | 164,656.94 | 1,011.14 |
| 183 | 5/ 1/21 | 2.74 | 1,845.36 | 162,811.58 | 1,013.88 |
| 184 | 6/ 1/21 | 2.71 | 1,845.39 | 160,966.19 | 1,016.59 |
| 185 | 7/ 1/21 | 2.68 | 1,845.42 | 159,120.77 | 1,019.27 |
| 186 | 8/ 1/21 | 2.65 | 1,845.45 | 157,275.32 | 1,021.92 |
| 187 | 9/ 1/21 | 2.62 | 1,845.48 | 155,429.84 | 1,024.54 |
| 188 | 10/ 1/21 | 2.59 | 1,845.51 | 153,584.33 | 1,027.13 |
| 189 | 11/ 1/21 | 2.56 | 1,845.54 | 151,738.79 | 1,029.69 |
| 190 | 12/ 1/21 | 2.53 | 1,845.57 | 149,893.22 | 1,032.22 |

| ## | Date | Inter. This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| Subtotal: | | 32.38 | 22,144.82 | 149,893.22 | 1,032.22 |
| 191 | 1/ 1/22 | 2.50 | 1,845.60 | 148,047.62 | 1,034.72 |
| 192 | 2/ 1/22 | 2.47 | 1,845.63 | 146,201.99 | 1,037.19 |
| 193 | 3/ 1/22 | 2.44 | 1,845.66 | 144,356.33 | 1,039.63 |
| 194 | 4/ 1/22 | 2.41 | 1,845.69 | 142,510.64 | 1,042.04 |
| 195 | 5/ 1/22 | 2.38 | 1,845.72 | 140,664.92 | 1,044.42 |
| 196 | 6/ 1/22 | 2.34 | 1,845.76 | 138,819.16 | 1,046.76 |
| 197 | 7/ 1/22 | 2.31 | 1,845.79 | 136,973.37 | 1,049.07 |
| 198 | 8/ 1/22 | 2.28 | 1,845.82 | 135,127.55 | 1,051.35 |
| 199 | 9/ 1/22 | 2.25 | 1,845.85 | 133,281.70 | 1,053.60 |
| 200 | 10/ 1/22 | 2.22 | 1,845.88 | 131,435.82 | 1,055.82 |
| 201 | 11/ 1/22 | 2.19 | 1,845.91 | 129,589.91 | 1,058.01 |
| 202 | 12/ 1/22 | 2.16 | 1,845.94 | 127,743.97 | 1,060.17 |
| Subtotal: | | 27.95 | 22,149.25 | 127,743.97 | 1,060.17 |
| 203 | 1/ 1/23 | 2.13 | 1,845.97 | 125,898.00 | 1,062.30 |
| 204 | 2/ 1/23 | 2.10 | 1,846.00 | 124,052.00 | 1,064.40 |
| 205 | 3/ 1/23 | 2.07 | 1,846.03 | 122,205.97 | 1,066.47 |
| 206 | 4/ 1/23 | 2.04 | 1,846.06 | 120,359.91 | 1,068.51 |
| 207 | 5/ 1/23 | 2.01 | 1,846.09 | 118,513.82 | 1,070.52 |
| 208 | 6/ 1/23 | 1.98 | 1,846.12 | 116,667.70 | 1,072.50 |
| 209 | 7/ 1/23 | 1.94 | 1,846.16 | 114,821.54 | 1,074.44 |
| 210 | 8/ 1/23 | 1.91 | 1,846.19 | 112,975.35 | 1,076.35 |
| 211 | 9/ 1/23 | 1.88 | 1,846.22 | 111,129.13 | 1,078.23 |
| 212 | 10/ 1/23 | 1.85 | 1,846.25 | 109,282.88 | 1,080.08 |
| 213 | 11/ 1/23 | 1.82 | 1,846.28 | 107,436.60 | 1,081.90 |
| 214 | 12/ 1/23 | 1.79 | 1,846.31 | 105,590.29 | 1,083.69 |
| Subtotal: | | 23.52 | 22,153.68 | 105,590.29 | 1,083.69 |
| 215 | 1/ 1/24 | 1.76 | 1,846.34 | 103,743.95 | 1,085.45 |
| 216 | 2/ 1/24 | 1.73 | 1,846.37 | 101,897.58 | 1,087.18 |
| 217 | 3/ 1/24 | 1.70 | 1,846.40 | 100,051.18 | 1,088.88 |
| 218 | 4/ 1/24 | 1.67 | 1,846.43 | 98,204.75 | 1,090.55 |
| 219 | 5/ 1/24 | 1.64 | 1,846.46 | 96,358.29 | 1,092.19 |
| 220 | 6/ 1/24 | 1.61 | 1,846.49 | 94,511.80 | 1,093.80 |
| 221 | 7/ 1/24 | 1.58 | 1,846.52 | 92,665.28 | 1,095.38 |
| 222 | 8/ 1/24 | 1.54 | 1,846.56 | 90,818.72 | 1,096.92 |
| 223 | 9/ 1/24 | 1.51 | 1,846.59 | 88,972.13 | 1,098.43 |
| 224 | 10/ 1/24 | 1.48 | 1,846.62 | 87,125.51 | 1,099.91 |
| 225 | 11/ 1/24 | 1.45 | 1,846.65 | 85,278.86 | 1,101.36 |
| 226 | 12/ 1/24 | 1.42 | 1,846.68 | 83,432.18 | 1,102.78 |
| Subtotal: | | 19.09 | 22,158.11 | 83,432.18 | 1,102.78 |
| 227 | 1/ 1/25 | 1.39 | 1,846.71 | 81,585.47 | 1,104.17 |
| 228 | 2/ 1/25 | 1.36 | 1,846.74 | 79,738.73 | 1,105.53 |
| 229 | 3/ 1/25 | 1.33 | 1,846.77 | 77,891.96 | 1,106.86 |
| 230 | 4/ 1/25 | 1.30 | 1,846.80 | 76,045.16 | 1,108.16 |
| 231 | 5/ 1/25 | 1.27 | 1,846.83 | 74,198.33 | 1,109.43 |
| 232 | 6/ 1/25 | 1.24 | 1,846.86 | 72,351.47 | 1,110.67 |
| 233 | 7/ 1/25 | 1.21 | 1,846.89 | 70,504.58 | 1,111.88 |
| 234 | 8/ 1/25 | 1.18 | 1,846.92 | 68,657.66 | 1,113.06 |
| 235 | 9/ 1/25 | 1.14 | 1,846.96 | 66,810.70 | 1,114.20 |
| 236 | 10/ 1/25 | 1.11 | 1,846.99 | 64,963.71 | 1,115.31 |
| 237 | 11/ 1/25 | 1.08 | 1,847.02 | 63,116.69 | 1,116.39 |
| 238 | 12/ 1/25 | 1.05 | 1,847.05 | 61,269.64 | 1,117.44 |
| Subtotal: | | 14.66 | 22,162.54 | 61,269.64 | 1,117.44 |

TAB J
RR VOL 3 OF 4 AT 14-86
Page 35 of 86

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 239 | 1/ 1/26 | 1.02 | 1,847.08 | 59,422.56 | 1,118.46 |
| 240 | 2/ 1/26 | 0.99 | 1,847.11 | 57,575.45 | 1,119.45 |
| 241 | 3/ 1/26 | 0.96 | 1,847.14 | 55,728.31 | 1,120.41 |
| 242 | 4/ 1/26 | 0.93 | 1,847.17 | 53,881.14 | 1,121.34 |
| 243 | 5/ 1/26 | 0.90 | 1,847.20 | 52,033.94 | 1,122.24 |
| 244 | 6/ 1/26 | 0.87 | 1,847.23 | 50,186.71 | 1,123.11 |
| 245 | 7/ 1/26 | 0.84 | 1,847.26 | 48,339.45 | 1,123.95 |
| 246 | 8/ 1/26 | 0.81 | 1,847.29 | 46,492.16 | 1,124.76 |
| 247 | 9/ 1/26 | 0.77 | 1,847.33 | 44,644.83 | 1,125.53 |
| 248 | 10/ 1/26 | 0.74 | 1,847.36 | 42,797.47 | 1,126.27 |
| 249 | 11/ 1/26 | 0.71 | 1,847.39 | 40,950.08 | 1,126.98 |
| 250 | 12/ 1/26 | 0.68 | 1,847.42 | 39,102.66 | 1,127.66 |

| Subtotal: | | 10.22 | 22,166.98 | 39,102.66 | 1,127.66 |
|---|---|---|---|---|---|

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 251 | 1/ 1/27 | 0.65 | 1,847.45 | 37,255.21 | 1,128.31 |
| 252 | 2/ 1/27 | 0.62 | 1,847.48 | 35,407.73 | 1,128.93 |
| 253 | 3/ 1/27 | 0.59 | 1,847.51 | 33,560.22 | 1,129.52 |
| 254 | 4/ 1/27 | 0.56 | 1,847.54 | 31,712.68 | 1,130.08 |
| 255 | 5/ 1/27 | 0.53 | 1,847.57 | 29,865.11 | 1,130.61 |
| 256 | 6/ 1/27 | 0.50 | 1,847.60 | 28,017.51 | 1,131.11 |
| 257 | 7/ 1/27 | 0.47 | 1,847.63 | 26,169.88 | 1,131.58 |
| 258 | 8/ 1/27 | 0.44 | 1,847.66 | 24,322.22 | 1,132.02 |
| 259 | 9/ 1/27 | 0.41 | 1,847.69 | 22,474.53 | 1,132.43 |
| 260 | 10/ 1/27 | 0.37 | 1,847.73 | 20,626.80 | 1,132.80 |
| 261 | 11/ 1/27 | 0.34 | 1,847.76 | 18,779.04 | 1,133.14 |
| 262 | 12/ 1/27 | 0.31 | 1,847.79 | 16,931.25 | 1,133.45 |

| Subtotal: | | 5.79 | 22,171.41 | 16,931.25 | 1,133.45 |
|---|---|---|---|---|---|

| ## | Date | Interest This Period | Principal This Period | Principal New Balance | Interest To Date |
|---|---|---|---|---|---|
| 263 | 1/ 1/28 | 0.28 | 1,847.82 | 15,083.43 | 1,133.73 |
| 264 | 2/ 1/28 | 0.25 | 1,847.85 | 13,235.58 | 1,133.98 |
| 265 | 3/ 1/28 | 0.22 | 1,847.88 | 11,387.70 | 1,134.20 |
| 266 | 4/ 1/28 | 0.19 | 1,847.91 | 9,539.79 | 1,134.39 |
| 267 | 5/ 1/28 | 0.16 | 1,847.94 | 7,691.85 | 1,134.55 |
| 268 | 6/ 1/28 | 0.13 | 1,847.97 | 5,843.88 | 1,134.68 |
| 269 | 7/ 1/28 | 0.10 | 1,848.00 | 3,995.88 | 1,134.78 |
| 270 | 8/ 1/28 | 0.07 | 1,848.03 | 2,147.85 | 1,134.85 |
| 271 | 9/ 1/28 | 0.04 | 1,848.06 | 299.79 | 1,134.89 |
| 272 | 10/ 1/28 | 0.00 | 299.79 | 0.00 | 1,134.89 |

| Subtotal: | | 1.44 | 16,931.25 | 0.00 | 1,134.89 |
|---|---|---|---|---|---|

Final payment amount:     299.79

Total payments:   501,134.89   Principal:   500,000.00   Interest:   1,134.89

Settings:   360 Arr PrePd 1950 12 perYr



CLIENTS LEDGER

SAFEGUARD     FORM NO. 514

# MARTIN & MILLICAN
ATTORNEYS AT LAW

512 E FOURTH STREET
LAMPASAS, TEXAS 76550
(512) 556-6228
(512) 556-8621

MR. & MS. JOHNNY WADE
REDACTED
REDACTED  REDACTED REDACTED
REDACTED

RE:  MODIFICATION OF NOTE

| Date | Description | HOURS | |
|------|-------------|-------|---|
| 04/16/2009 | OFFICE CONFERENCE WITH CLIENT | 0.40 | 68.00 |
| 04/30/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.03 | 5.10 |
| | TELEPHONE CALL FROM CLIENT | 0.06 | 10.20 |
| 05/06/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.03 | 5.10 |
| 05/13/2009 | TELEPHONE CALL TO LORI GRAHAM | 0.06 | 10.20 |
| 05/14/2009 | TELEPHONE CALL FROM AMANDA WADE | 0.03 | 5.10 |
| 05/26/2009 | TELEPHONE CALL FROM AMANDA WADE | 0.06 | 10.20 |
| | PREPARED MODIFICATION AGREEMENT | | 125.00 |
| 06/15/2009 | PREPARED LETTER TO CLIENT; COPY TO HOLDER | 0.12 | 20.40 |
| | FOR CURRENT SERVICES RENDERED | 0.79 | 259.30 |
| 06/02/2009 | PAID TO BURNET CO. CLERK CK #18984 | | 40.00 |
| | TOTAL EXPENSES | | 40.00 |
| | TOTAL CURRENT WORK | | 299.30 |
| | BALANCE DUE | | $299.30 |
| | Please Remit | | $299.30 |

THANK YOU

REDACTED

# MODIFICATION AGREEMENT

**Date:** May 1, 2009

**Holder of Note and Lien:** EDELL WADE

**Holder's Mailing Address:**

REDACTED
REDACTEDREDACTED
Burnet County

**Obligor:** JOHNNY WADE and AMANDA WADE, husband and wife

**Obligor's Mailing Address:**

REDACTED
REDACTEDREDACTED
Lampasas County

**Note**

**Date:** February 6, 2004

**Original principal amount:** $500,000.00

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife

**Lender:** EDELL WADE

**Maturity date:** February 1, 2036

**Unpaid Principal and Interest on Note:** $227,528.00

**Lien Documents:** Deed of Trust dated February 6, 2004 from JOHNNY WADE and AMANDA WADE to PAT E. CAVNESS, Trustee, recorded as Document 002424, Volume 1223, page 503, Official Public Records of Burnet County, Texas

**Property (including any improvements):**

That certain real property in Burnet County, Texas, more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes.

**Extended Maturity Date of Note:** March 1, 2025

**Modified Terms:** The interest rate on this Modification and Extension shall be zero (0%) percent per annum. Principal shall be due and payable in monthly installments of ONE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($1,200.00) each beginning June 1, 2009 and continuing regularly on the first date of each succeeding month until paid.

**\*THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN.\***

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

-1-

REDACTED

When the context requires, singular nouns and pronouns include the plural.

_Edell Wade_
EDELL WADE

_Johnny Wade_
JOHNNY WADE

_Amanda Wade_
AMANDA WADE

STATE OF TEXAS       §

This instrument was acknowledged before me on _June 2_____, 2009, by EDELL WADE.

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-30-12_

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 30, 2012

STATE OF TEXAS       §

This instrument was acknowledged before me on _June 2_____, 2009, by JOHNNY WADE.

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-30-12_

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 30, 2012

STATE OF TEXAS       §

This instrument was acknowledged before me on _June 2_____, 2009, by AMANDA WADE.

_Diane G. Varner_
Notary Public, State of Texas
My commission expires: _10-30-12_

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 30, 2012

PREPARED IN THE OFFICE OF:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6226
FAX: (512) 556-8821

AFTER RECORDING RETURN TO:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6226
FAX: (512) 556-8821

bp/18,163/real/wade

-2-



EXHIBIT A

THE STATE OF TEXAS | KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF LAMPASAS |

That we, Manual Delbert Sylvester and Chester Horace Sylvester, individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manual Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ... in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand, paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to assure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby, except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O vrs N 9¼ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs at md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor. of the said Berry sur. is marked by a st md from which a Large L. O. marked H brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No 60 on the S line of the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor. of the R. F. Kissier Sur., St. Md. In S 19 E at 75 vrs. forked Elm the SE cor of the said Kissier Sur. at 1130 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. W. cor of this Sur. Thence N 71 E 445 vrs. a st md the Southernmost SE cor. of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed out by Dan W. Taylor, Jr.

Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas, this patent is No. 593, Vol. 29, 160 acres, being Survey No. 2489, on the waters of Mesquite Cr a tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

A
PAGE 1 OF 3 PAGES

Occupants of Public lands, approved May 26th, 1873. Beginning at at md 582 vrs. N 19 W.from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th. N 19 W 950 vrs a st md whence a L O brs N 42½ W 250. vrs a Mesquite brs 3½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9¼ E. 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked R.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from _____ to A.H. Berry containing 44 acres M. Berry, dated May 29, 1901, recorded in Deed Records Burnet County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey, from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Butler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. Thc S 19 E with the original line 480 vrs to the beginning cor, containing two hundred acres, more or less, SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock ball in said Mesquite Cr. Th thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. B. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, Pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pn pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Joel Alexander as the East boundary and the R. B. F. Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less, and being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 67 pages 376-81 of the Deed Records of Burnet County, Texas, to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corsin Sylvester Stewart, Chester Horace Sylvester, and O. Boll Sylvester Phillips and the grantee Edell Sylvester were all collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

2 A5

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade their heirs and assigns forever; and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the Said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Delbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

Lenora Sylvester Butler

Don M. Stewart

Corrine Sylvester Stewart

O. Zell Sylvester Phillips

Gilbert Phillips

Manuel Delbert Sylvester
Individually and as Independent executor of will of A. H. & Emma Sylvester, both deceased

Chester Horace Sylvester
Individually and as Independent executor of will of A. H. & Emma Sylvester, both deceased

Millie Sylvester

Melba Sylvester

Austin M. Butler

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public in and for _____ County, Texas, on this day personally appeared Manuel Delbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Delbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, Travis County, Texas

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public, in and for _____ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, _____ County, Texas

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public, in and for _____ County, Texas, on this day personally appeared Manuel Delbert Sylvester, independent executor of the wills and estates of A. N. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, _____ County, Texas

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public, in and for _____ County, Texas, on this day personally appeared Chester Horace Sylvester, individually and as independent executor of the wills and estates of A. N. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, _____ County, Texas





**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

*Janet Parker*

200905193

June 09, 2009   10:01:48 AM

FEE: $48.00

Janet Parker, County Clerk

Burnet County,  Texas

MARTIN & MILLICAN
ATTORNEYS AT LAW
512 E FOURTH STREET
LAMPASAS, TEXAS 76550
PHONE (512) 556-6228
FAX (512) 556-9621

MS EDELL WADE
REDACTED REDACTED
REDACTED    REDACTED REDACTED
            REDACTED

ACCOUNT NO    01/30/2007
STATEMENT NO    15707-00

WILL, COMB DIR TO PHYS STAT POA H PPA RELEASE

|  |  | HOURS |
|---|---|---|
| 01/23/2007 | OFFICE CONFERENCE WITH CLIENT JOHNNY AND AMANDA | 100 00 |
| 01/23/2007 | PREPARED LETTER TO CLIENT | 19 20 |
| 01/29/2007 | PREPARED AND SIGNED WILL | 150 00 |
|  | PREPARED AND SIGNED COMBINATION DIRECTIVE TO PHYSICIANS AND MEDICAL POA | 70 00 |
|  | PREPARED AND SIGNED STATUTORY DURABLE POA | 70 00 |
|  | PREPARED AND SIGNED HIPPA RELEASE | 20 00 |
|  | FOR CURRENT SERVICES RENDERED | 429 20 |
|  | TOTAL CURRENT WORK | 429 20 |
|  | BALANCE DUE | $429 20 |
|  | Please Remit | $429.20 |

N & MILLICAN
ORNEYS AT LAW
ST FOURTH STREET
, TEXAS 76550-291

$0.390
US POSTAGE
FIRST-CLASS
062S00057347 8
755 0

Wade 2791 1-000952

REDACTED

REDACTED ... 2413 ... Date Dec. 16, 06
Pay to the Order of Farm Bureau Senior Health ... $660.00
Six Hundred, sixty dollars and 00/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTED
REDACTED Check #2413, 1/25/2007, $660.00

REDACTED ... 2428 ... Date Jan 29, 07
Pay to the Order of H.E.B. ... $99.10
Ninety-Nine dollars and no/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTEDREDACTED
REDACTED Check #2428, 1/29/2007, $99.10

REDACTED ... 2429 ... Date Feb 1, 07
Pay to the Order of Martin Jr. Williams ... $429.20
Four Hundred, twenty-Nine dollars and 20/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTED
REDACTED Check #2429, 2/5/2007, $429.20

REDACTED ... ✓ 2430 ... Date 2/1/07
Pay to the Order of Star Propane Inc. ... $345.00
Two hundred, forty five dollars and no/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTED
REDACTED Check #2430, 2/7/2007, $345.00

REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED Check #2431, 2/7/2007, $351.57

REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED
REDACTED Check #2432, 2/5/2007, $14.00

REDACTED ... 2433 ... Date 2/1/07
Pay to the Order of H.E.B. ... $56.80
Fifty-six dollars and 80/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTEDREDACTED
REDACTED Check #2433, 2/8/2007, $56.80

REDACTED ... 2434 ... Date Feb. 5, 07
Pay to the Order of Star Propane, Inc. ... $348.25
Three hundred, forty eight dollars and 25/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTEDREDACTED
REDACTED Check #2434, 2/14/2007, $348.25

REDACTED ... 2436 ... Date 2/9/07
Pay to the Order of NEAL LEAVELL, DDS ... $65.00
Sixty-three dollars and no/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTEDREDACTED
REDACTED Check #2436, 2/13/2007, $63.00

REDACTED ... 2437 ... Date 2/9/07
Pay to the Order of H.E.B. ... $85.44
Eighty-Nine dollars and 44/100 Dollars
FIRST TEXAS BANK
Edell Wade
REDACTEDREDACTEDREDACTEDREDACTEDREDACTED
REDACTED Check #2437, 2/13/2007, $85.44

Jew000683

REDACTED



Jew000693

REDACTED



Jew000733

REDACTED

| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| EDELL WADE | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## RECORD OF EXAMINATION ON WRITTEN QUESTIONS

Following is a record of the testimony given at the deposition of MICHAEL MARTIN taken on behalf of AMANDA WADE pursuant to Rule 200 of the Texas Rules of Civil Procedure, at 512 East Fourth St., Lampasas, Texas 76550, which commenced at 9:00 a.m. and which was taken by the undersigned, Elizabeth Watson, duly appointed to take the Deposition on Written Questions in the notice. There were no appearances by the parties or their counsel. MICHAEL MARTIN, the deponent, was duly sworn on oath, and the testified, a true record of which is as follows:

Direct examination:

Question 1. Are you a licensed attorney in the state of Texas?

ANSWER: Yes

Question 2. How many years have you been licensed to practice law in the State of Texas?

ANSWER: 42 years

Question 3. Where is your practice located?

ANSWER: Lampasas, Texas

Question 4. Did you, at any time, represent Edell Wade?

ANSWER: Yes.

Question 5. Please state the dates that you represented Edell Wade?

ANSWER: January 2007, March 2007, December 2007, April and May 2009

Question 6. What documents did you prepare for Edell Wade?

ANSWER: Combination Directive to Physicians and Family or Surrogates and

-1-

Medical Power of Attorney dated January 29, 2007

HIPAA Release and Authorization dated January 29, 2007

Statutory Durable Power of Attorney dated January 29, 2007

Statutory Durable Power of Attorney dated March 21, 2007

Will of Edell Wade dated January 29, 2007;

Modification Agreement dated May 1, 2009

Question 7. In regard to the Loan Modification dated May 1, 2009 attached hereto as Exhibit No. 1, did you prepare this document?

ANSWER: Yes

Question 8. Were you present when Edell Wade signed the document listed in Question No. 7?

ANSWER: I am not sure whether I was but I believe I was not.

Question 9. Were you satisfied that Edell Wade was signing the document, listed in Question No. 7, of her own volition?

ANSWER: I had no reason to think she was not.

Question 10. Did each of the documents that you prepared to Edell Wade represent the wishes of Edell Wade as you understood her wishes?

ANSWER: Yes.

Question 11. Do you believe that Edell Wade understood each of the documents you prepared for her when she signed them?

ANSWER: Yes.

_____          January 31, 2012
Michael Martin                            Date

-2-

Before me, the undersigned Notary Public, on this day appeared Michael Martin, who, after being duly sworn by me, testified under oath that the answers given in response to the questions propounded in the foregoing Deposition by Written Questions are true and correct to the best of his knowledge. **SUBSCRIBED AND SWORN TO BEFORE ME on** January 31, 2012_____, by Michael Martin.

*Elizabeth Watson*
Notary Public, State of Texas

bp/15,707/litigation/wade

-3-

CAUSE NO.: <u>P 9127</u>

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE COUNTY COURT AT LAW |
| | § | |
| EDELL WADE | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## <u>NOTICE OF INTENTION TO TAKE WRITTEN DEPOSITION</u>

TO:   MICHAEL MARTIN, at 512 E. Fourth Street, Lampasas, Texas 76550

Please take notice that pursuant to Rule 199 of the Texas Rules of Civil Procedure, MICHAEL MARTIN will provide his testimony in this Cause in this deposition by written questions.  The deposition will take place on or after January 30, 2012 at 9:00 a.m. pursuant to Rule 200 of the Texas Rules of Civil Procedure, at 512 E. Fourth Street, Lampasas, Texas 76550.  The direct questions to be propounded during the deposition are attached to this Notice and incorporated herein by reference.

This deposition on written questions will be taken by a person authorized under CPRC § 20.001.

Your attention is directed to the penalties set forth in Rule 215 of the Texas Rules of Civil Procedure for failure of the deponent to appear or to comply with the discovery requested.

Respectfully submitted,

By: _____
Evan Stubbs
Texas Bar No. 24039198
202 North Porter Street
Lampasas, Texas   76550
Tel. (512) 556-8970
Fax. (512) 556-8975
Attorney for Defendant
AMANDA WADE

1

## CERTIFICATE OF SERVICE

I certify that on January 17, 2012, a true and correct copy of Defendant's Notice of Written Deposition was served by certified mail, return receipt requested on DON WALDEN at 7200 North Mopac. Suite 300. Austin, Texas 78731.

Evan Stubbs

2

## WRITTEN QUESTIONS TO MIKE MARTIN

1. Are you a licensed attorney in the state of Texas?

   ANSWER: _____

2. How many years have you been licensed to practice law in the State of Texas?

   ANSWER: _____

3. Where is your practice located?

   ANSWER: _____

4. Did you, at any time, represent Edell Wade?

   ANSWER: _____

5. Please state the date(s) that you represented Edell Wade?

   ANSWER: _____

6. What documents did you prepare for Edell Wade?

   ANSWER: _____

7. In regard to the Loan Modification dated May 1, 2009 attached hereto as Exhibit No. 1, did you prepare this document?

   ANSWER: _____

8. Were you present when Edell Wade signed the document listed in Question No. 7?

   ANSWER: _____

3

9.      Were you satisfied that Edell Wade was signing the document, listed in Question No. 7, of her own volition?

        ANSWER: _____

10.     Did each of the documents that you prepared for Edell Wade represent the wishes of Edell Wade as you understood her wishes?

        ANSWER: _____

11.     Do you believe that Edell Wade understood each of the documents you prepared for her when she signed them?

        ANSWER: _____


_____          _____
Michael Martin                               Date


        Before me, the undersigned Notary Public, on this day appeared Michael Martin, who, after being duly sworn by me, testified under oath that the answers given in response to the questions propounded in the foregoing Deposition by Written Questions are true and correct to the best of his knowledge. **SUBSCRIBED AND SWORN TO BEFORE ME** on _____, by Michael Martin.


                                    _____
                                    Notary Public, State of Texas


4

 

**LAW & ORDER RECORD RETRIEVAL**
PO Box 461745, San Antonio, TX 78246
Phone: 800-736-9105  Fax: 800-335-4002

L.O.R.R./Dallas
5541 Club Crest
Mesquite TX 75150
Tel (800) 736-9105 ( ) -
Fax (800) 335-4002 ( ) -

L.O.R.R./Houston
10878 Westheimer Suite 234
Houston TX 77042
Tel (800) 736-9105
Fax (800) 335-4002

05/06/2013

MARTIN & MILLICAN N/K/A MARTIN,MILLICAN,HENDERSON & SHRUM
ATTN: RECORDS
512 E. 4TH STREET
LAMPASAS, TX 76550

RE: Records Pertaining to: *EXHIBIT "A"*

Dear Custodian of Records,

The attorney for the PLAINTIFF has commissioned us to obtain records specified in the enclosed Subpoena in reference to a litigated matter.

The Subpoena is issued in accordance with Rule 200 T.R.C.P. and falls under the exception to confidentiality law (Rule 509(d)(4) T.R.C.E. Exceptions....) as to the communication or record relevant to an issue of the physical, mental or emotional condition of a patient in any proceeding in which any party relies upon the condition as a part of the party's claim or defense.....

Listed below are the necessary steps to complete the legal papers, please see the following instructions:

1.   Please provide a COMPLETE copy of the records requested.
2.   There is a Deposition by Written Questions to be answered by the custodian of records.  The Custodian must answer and SIGN on the WITNESS LINE.    This signature of the custodian MUST be notarized.
3.   The Custodian must also sign the Affidavit (if one is enclosed) on the Affiant line and have this signature notarized also.
4.   Please have the Notary stamp with a Notary Seal, the questions and the Affidavit which they just notarized.
5.   ANSWERS:  Answer <u>ALL</u> questions, leave <u>NO</u> blanks, and you cannot answer N/A.
6.   NOTARY:  If you need a notary, and do not have one, no matter what state you are located in, PLEASE CALL, and we will provide a Notary.
7.   Please include an explanation for a No-Record Deposition.
8.   ON THE AFFIDAVITS:  When you are counting pages, a double sided page actually counts as two pages.  We prefer the page count blank, and our deposition officer will fill this in.  IF YOU MAKE A MISTAKE, we have to Redo the Affidavit.
9.   Please call if your fee for the production of your documents is over $150.00

IF YOU HAVE QUESTIONS OR COMMENTS TO COMPLETE THIS REQUEST, PLEASE CALL (210) 366-0800 OR (800) 736-9105.

Respectfully,

Jamie Condra
jcondra@lorr.com

Stephanie Cantu
scantu@lorr.com

***Please note the email address for sending invoices, correspondence, questions or anything else needed.

57996.2                                    EXHIBIT "A"                                    JC



# SUBPOENA DUCES TECUM
## THE STATE OF TEXAS

**COUNTY OF BURNET**

To the Sheriff, Constable or any other person authorized to serve and execute a Subpoena as provided in Rule 176, T.R.C.P.

**Greetings,**
You are hereby commanded to Subpoena and Summon the following witness:
Custodian of Records for : **MARTIN, MILLICAN, HENDERSON & SHRUM**

to be and appear before a commissioned Officer of the State of Texas, a Notary Public with **L.O.R.R. RECORD RETRIEVAL, 503 E. Ramsey, Suite 201, San Antonio TX 78216**, or their designated agent ON OR BEFORE __Friday, May 31, 2013__ at __11 AM__, AT THE OFFICE OF THE CUSTODIAN, or at another agreed upon time as the Officer may designate, then and there to give evidence by Deposition by Written Questions.

The witness is also to produce for inspection and photocopying (to be attached to the Deposition):

**ALL DOCUMENTS AND/OR ITEMS AS REFERENCED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF**

pertaining to: : **EXHIBIT "A"**

This Subpoena is being issued at the instance of the PLAINTIFF in that certain Cause NO. P9127 pending on the docket IN THE COUNTY COURT AT LAW OF BURNET COUNTY, TEXAS, Styled:

**ESTATE OF EDELL WADE, DECEASED          VS**

and there to remain from day to day and time to time until discharged by me according to Law. T.R.C.P. Rule 176.8(a) states:

**Enforcement of Subpoena. (a) Contempt.** Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed in contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

This subpoena is issued in accordance to Rule 200 and Rule 176, T.R.C.P

**REQUESTED BY: SHELDON E. RICHIE, PATRICIA M. OVIATT**
**ATTORNEY(S) FOR THE PLAINTIFF**



**SHAWN S. SELVIDGE**
Notary Public, State of Texas
My Commission Expires
October 10, 2015

Witness my hand on this, the __06__ day of __May__, 20 __13__.

_____
Officer of the State of Texas
As provided in Rule 200 and 176
T.R.C.P.

**Officer's Return**
CAME TO HAND ____ day of _____, 20____, and executed the ____ day of _____, 20____ by delivering to _____ a true copy of this subpoena together with the accompanying deposition by written questions, and tendering the lawful witness fee of $_____.

_____
Authorized person under Rule 176 T.R.C.P

57996.2                                   EXHIBIT "A"                                   JC

**NO. P9127**

| ESTATE OF EDELL WADE, DECEASED | § | IN THE COUNTY COURT AT LAW |
|---|---|---|
| | § | |
| VS | § | OF |
| | § | |
| | § | BURNET COUNTY, TEXAS |
| | § | |

## NOTICE OF INTENTION TO TAKE DEPOSITION
### BY WRITTEN QUESTIONS

TO:
DON E. WALDEN          DENNIS BUJNOCH

You will take notice that after 20 days from the service of a copy hereof with attached questions, a deposition by written questions will be taken of the CUSTODIAN OF RECORDS for:

MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM
512 E. 4TH STREET
LAMPASAS, TX 76550

at the offices of LORR, or at another agreed upon time and/or place before a Notary Public, an Officer of the State of Texas and employee of LORR, 503 E. Ramsey, Suite 201, San Antonio TX 78216, or their designated agent. Which deposition, with attached questions, may be used in evidence upon the trial of the above styled and numbered cause pending in the above named Court.

Notice is further given that request is here made as authorized under Rule 200, Texas Rules of Court, to the Officer authorized to take this deposition to issue a SUBPOENA DUCES TECUM and cause to be served on the witness to produce for inspection and photocopying: ALL DOCUMENTS AND/OR ITEMS AS REFERENCED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

pertaining to: EXHIBIT "A", and turn all such records over to the Officer authorized to take this deposition for inspection and photocopying, the same may be made by him and attached to said deposition.

*Sheldon E. Richie* wp

SHELDON E. RICHIE, SBID: 16877000
PATRICIA M. OVIATT, SBID: 24046571
RICHIE & GUERINGER, PC
100 CONGRESS AVE SUITE 1750
AUSTIN, TX 78701
Ph: (512) 236-9220  Fax: (512) 236-9230
ATTORNEYS FOR THE PLAINTIFF

### CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing Notice of Intention to Take Deposition by Written Questions was provided to the respective parties or attorneys of record, pursuant to Rule (21a), by registered mail, postage prepaid, hand delivered or telephonic document transfer.

Date:_____05/08/2013_____          By:  *Sheldon E. Richie* wp.
                                                      SHELDON E. RICHIE

57996.1                              EXHIBIT "A"                              JC

TAB J
RR VOL 3 OF 4 AT 14-86
Page 60 of 86



## DOCUMENTS/INFORMATION REQUESTED

1. All fee and/or engagement agreements between you and Amanda Wade entered into between January 1, 2003 and December 31, 2010.

2. All fee and/or engagement agreements between you and Edell Wade entered into between January 1, 2003 and December 31, 2010.

3. All documents reviewed by you in preparing the Modification Agreement. *—or.g...l noted*

4. All documents reviewed by you in preparing the Will of Edell Wade. *deed of trust —Old will*

**Definitions:**

1. "**You,**" as used herein shall refer to Armbrust & Brown, PLLC, and its officers, members, representatives, employees, agents, and/or all other persons acting on or purporting to act on its behalf.

2. "**Amanda Wade**" as used herein shall refer to Amanda Wade, her representatives, agents, and/or all other persons acting on or purporting to act on her behalf.

3. "**Edell Wade**" as used herein shall refer to Edell Wade, her representatives, agents, and/or all other persons acting on or purporting to act on her behalf.

4. "**Documents**" shall have the meaning intended by Rules 192.3(b) and 196 of the Texas Rules of Civil Procedure, includes, by way of illustration only and not by way of limitation, the following, whether printed or reproduced by any process, or written or produced by hand, and whether or not claimed to be privileged or otherwise excludable from discovery, namely: computer tapes, disks, drums, memory cores, hard drives or other computer media; CD Rom disks; DVD disks; computer printouts; statistical compilations or printouts or other lists; itineraries; correspondence; communication of any nature; telegrams; memoranda including internal memoranda and memoranda to the file, notebooks of any character; charts; summaries or records of personal conversations; notes or records of telephone conversations, voice mail or telephone messages; scratch pad notes; e-mail messages; documents sent or received via the Internet or other computer on-line service; calendars; diaries or excerpts therefrom; logs; routing slips or memoranda; reports; publications; photographs; minutes or records of meetings; transcripts of oral testimony or statements; reports or summaries of interviews; written statements; affidavits; reports or summaries of investigations, agreements and contracts, including all modifications or revisions thereof; reports or summaries of negotiations; court papers; brochures; pamphlets; press releases; drafts of, revisions of drafts, or translations of any document; tape recordings; dictation recordings and belts; videotapes; data compilations; or all other tangible items. Any document with marks on any sheet or side thereof, including by way of illustration only and not by way of limitation, initials, stamped indicia, fax notations, any comment or any notation of any character and not a part of the original text, or any reproduction thereof, is to be considered a separate





document for purposes of this request. "Document" also includes any copy of an original document if the original is unavailable.

5. **"Modification Agreement"** shall mean the Modification Agreement dated May 1, 2009, between Edell Wade as Holder, and Johnny Wade and Amanda Wade, as Obligors, and modifying the Promissory Note dated February 6, 2004, in the principal amount of $500,000.00.

6. **"Will of Edell Wade"** shall mean that certain Will executed by Edell Wade on January 29, 2007, and witnessed by Barbara Potts and Liz Watson, and notarized by Diane Varner.

7. **"Property"** means the +/- 475 acres made the subject of this suit, more commonly known as REDACTEDREDACTEDREDACTEDREDACTED

8. **"Or"** means **"and/or."**

REDACTED

NO. P9127

| | | |
|---|---|---|
| ESTATE OF EDELL WADE, DECEASED | § | IN THE COUNTY COURT AT LAW |
| VS | § | OF |
| | § | BURNET COUNTY, TEXAS |

## QUESTIONS TO BE PROPOUNDED TO THE WITNESS, THE CUSTODIAN OF RECORDS FOR: MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM

1. Please state your full name, occupation, and/or official title.

ANSWER_____

2. Did you receive a Subpoena Duces Tecum for the production of: ALL DOCUMENTS AND/OR ITEMS AS REFERENCED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF pertaining to EXHIBIT "A"?

ANSWER_____

3. Are you able to identify these records as the original or true and correct photostatic copies of the originals?

ANSWER_____

4. Were these records made and kept in the regular course of your business? (Business means any kind of regularly organized activity, whether conducted for profit or not).

ANSWER_____

5. In the regular course or your business, did the person who signed or otherwise prepared these records either have personal knowledge of the entries on these records or obtain the information to make such records from sources who have such personal knowledge?

ANSWER_____

6. Are these records under your care, supervision, direction, custody or subject to your control?

ANSWER_____

7. Are these records made at or near the time of the act, event or condition recorded on the records, or reasonably soon thereafter pertaining to the incident in question?

ANSWER_____

8. Were these records kept as described above?

ANSWER_____

57996.1                    EXHIBIT "A"                    JC

9. Have you been requested, directed, or has it ever been suggested by any person (whether doctor, lawyer or anyone.else) that any part of the records subject to this deposition be withheld or protected from discovery for any reason? If so, please state the name and address of the person who conveyed this information to you and when such event occurred.

ANSWER_____

10. Are there any other locations where MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM would keep records or documents pertaining to EXHIBIT "A"? If yes, please identify the name and address of that location, if known.

ANSWER_____

11. Please hand all such records.as outlined in the Subpoena Duces Tecum to the Officer taking your deposition for inspection and photocopying. (These will be at no expense to you, and the Officer will return the originals of your records to you after they have been both inspected and copied). Have you done as requested? If not, why not?

ANSWER_____

12. Have any records of any kind been destroyed or are any records missing? If yes, why? Please describe those records that have been destroyed or are missing by MARTIN & MARTIN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM.

ANSWER:_____

13. In the event that no records can be found, are there document archives (i.e. microfiche) or document retention policies which explain their absence? If yes, please explain your archiving and/or retention policy. Please identify who has knowledge of those archives and/or retention policies for MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM.

ANSWER:_____


_____
WITNESS CUSTODIAN OF RECORDS_

I,_____,A Notary Public in and for the State of Texas do hereby certify that the foregoing answers of the witness were made by the said witness and sworn to and subscribed before me. The records attached hereto are exact duplicates of the original records.

GIVEN UNDER MY HAND AND SEAL on this the _____ day of_____20____.


_____
Notary Public in and for the State of Texas


57996.1                                    EXHIBIT "A"                                    JC

**NO. P9127**

| | | |
|---|---|---|
| ESTATE OF EDELL WADE, DECEASED | § | IN THE COUNTY COURT AT LAW |
| | § | |
| VS | § | FOR |
| | § | |
| | § | BURNET COUNTY, TEXAS |
| | § | |

## AFFIDAVIT

RECORDS PERTAINING TO: EXHIBIT "A"

Before me, the undersigned authority, personally appeared_____,
who being duly sworn, deposed as follows:

My name is _____. I am over 18 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the CUSTODIAN OF RECORDS OF MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM. Attached hereto are _____ pages of records from MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM. These said _____ pages of records are kept by MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM in the regular course of business and it was the regular course of business of MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM for an employee or representative of MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM, or other individual, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the originals or exact duplicates of the originals.

_____
**AFFIANT**

SUBSCRIBED AND SWORN TO BEFORE ME on this, the _____ day of _____, 20_____

_____
Notary Public in and for The State of Texas

_____
Notary's Printed Name

_____
My Commission Expires

57996.2                                                           EXHIBIT "A"                                                           JC

| | NO. P9127 | |
|---|---|---|
| ESTATE OF EDELL WADE, DECEASED | § § § | IN THE COUNTY COURT AT LAW |
| VS. | § § § § § | OF |
| | § | BURNET COUNTY, TEXAS |

### QUESTIONS TO BE PROPOUNDED TO THE WITNESS,
### THE CUSTODIAN OF RECORDS FOR: MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM

1. Please state your full name, occupation, and/or official title.

ANSWER _Greg Henderson, Lawyer, Partner_

2. Did you receive a Subpoena Duces Tecum for the production of: ALL DOCUMENTS AND/OR ITEMS AS REFERENCED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF pertaining to EXHIBIT "A"?

ANSWER _Yes_

3. Are you able to identify these records as the original or true and correct photostatic copies of the originals?

ANSWER _Yes_

4. Were these records made and kept in the regular course of your business? (Business means any kind of regularly organized activity, whether conducted for profit or not)

ANSWER _Yes_

5. In the regular course or your business, did the person who signed or otherwise prepared these records either have personal knowledge of the entries on these records or obtain the information to make such records from sources who have such personal knowledge?

ANSWER _Yes_

6. Are these records under your care, supervision, direction, custody or subject to your control?

ANSWER _Yes_

7. Are these records made at or near the time of the act, event or condition recorded on the records, or reasonably soon thereafter pertaining to the incident in question?

ANSWER _Yes_

8. Were these records kept as described above?

ANSWER _Yes_

57996.1           EXHIBIT "A"           JC

9. Have you been requested, directed, or has it ever been suggested by any person (whether doctor, lawyer or anyone else) that any part of the records subject to this deposition be withheld or protected from discovery for any reason? If so, please state the name and address of the person who conveyed this information to you and when such event occurred.

ANSWER___*No*___

10. Are there any other locations where MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM would keep records or documents pertaining to EXHIBIT "A"? If yes, please identify the name and address of that location, if known.

ANSWER___*No*___

11. Please hand all such records as outlined in the Subpoena Duces Tecum to the Officer taking your deposition for inspection and photocopying. (These will be at no expense to you, and the Officer will return the originals of your records to you after they have been both inspected and copied). Have you done as requested? If not, why not?

ANSWER___*Yes*___

12. Have any records of any kind been destroyed or are any records missing? If yes, why? Please describe those records that have been destroyed or are missing by MARTIN & MARTIN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM.

ANSWER:___*No*___

13. In the event that no records can be found, are there document archives (i.e. microfiche) or document retention policies which explain their absence? If yes, please explain your archiving and/or retention policy. Please identify who has knowledge of those archives and/or retention policies for MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM.

ANSWER:___*No*___

_____
WITNESS CUSTODIAN OF RECORDS.

I,_____,A Notary Public in and for the State of Texas do hereby certify that the foregoing answers of the witness were made by the said witness and sworn to and subscribed before me. The records attached hereto are exact duplicates of the original records.

GIVEN UNDER MY HAND AND SEAL on this the _____ day of_____20____.


_____
Notary Public in and for the State of Texas


57996.1                    EXHIBIT "A"                    JC

NO. P9127

| | | |
|---|---|---|
| ESTATE OF EDELL WADE, DECEASED | § § § | IN THE COUNTY COURT AT LAW |
| VS | § § § | FOR |
| | § § § | BURNET COUNTY, TEXAS |

## AFFIDAVIT

RECORDS PERTAINING TO: EXHIBIT "A"

Before me, the undersigned authority, personally appeared _____,
who being duly sworn, deposed as follows:

My name is _____. I am over 18 years of age, of sound mind, capable
of making this affidavit, and personally acquainted with the facts herein stated:

I · am the CUSTODIAN OF RECORDS OF MARTIN & MILLICAN N/K/A MARTIN, MILLICAN,
HENDERSON & SHRUM. Attached hereto are _____ pages of records from MARTIN & MILLICAN
N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM. These said _____ pages of records are kept by
MARTIN & MILLICAN N/K/A MARTIN, MILLICAN, HENDERSON & SHRUM in the regular course of
business and it was the regular course of business of MARTIN & MILLICAN N/K/A MARTIN,
MILLICAN, HENDERSON & SHRUM for an employee or representative of MARTIN & MILLICAN N/K/A MARTIN,
MILLICAN, HENDERSON & SHRUM, or other individual, with knowledge of the act, event, condition,
opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in
such record; and the record was made at or near the time or reasonably soon thereafter.  The records
attached hereto are the originals or exact duplicates of the originals.


_____
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME on this, the _____day of _____, 20_____


_____
Notary Public in and for The State of Texas


_____
Notary's Printed Name


_____
My Commission Expires


57996.2                                    EXHIBIT "A"                                    JC

**Promissory Note**



**Date:** February 6, 2004

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife.

**Borrower's Mailing Address:**

JOHNNY WADE and AMANDA WADE
REDACTEDREDACTEDREDACTED
REDACTED
Riverside County

**Lender:** EDELL WADE

**Place for Payment:**

REDACTED
Lampasas, Burnet County, TX 76550, or any other place that Lender may designate in writing.

**Principal Amount:** $500,000.00

**Annual Interest Rate:** Two Percent (2%)

**Maturity Date:** February 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:** Twelve Percent (12%)

**Terms of Payment (principal and interest):**

Accrued interest is payable on the 1st day of March, 2004 and on the 1st day of each succeeding month through February 1, 2006. Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1st day of each succeeding month until paid. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:**

This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated of even date herewith and by a deed of trust of even date herewith from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, Trustee, both of which cover the following real property:

That certain real property more particularly described on the attached Exhibit "A".

181323-2 02/04/2004

1

REDACTED

**Other Security for Payment:** None

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, and the default continues after Lender gives Borrower written notice of the default and ten (10) days opportunity to cure such default, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:**

Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:**

Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

181323-2 02/04/2004

2

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

_____
JOHNNY WADE

_____
AMANDA WADE



**EXHIBIT A**

THE STATE OF TEXAS }

                         KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF LAMPASAS }

     That we, Manuel Delbert Sylvester and Chester Horace Sylvester, individually and as independent executors of the wills and estates of A. R. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manuel Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ~~Millie Sylvester~~ said parties residing in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

     Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

         First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O brs N 9½ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs st md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor of the said Berry sur. is marked by a st md from which a Large L. O. marked N brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No 60 on the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor of the R. F. Kiszler Sur., St. Md., Th S 19 E at 957 vrs a forked Elm the SE cor of the said Kiszler Sur., at 1120 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. W. Cor of this Sur. Thence N 71 E 445 vrs. a st md the Southermost SE cor. of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed out by Dan W. Taylor, Jr.

         Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas this patent is No. 593, Vol. 29, 160 acres, being Survey No. 1489, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

Occupants of Public lands, approved May 26th, 1873. Beginning at st md 582 vrs. N 19 W from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th N 19.W 950 vrs a st md whence a L O brs N 42¼ W 250. vrs a Mesquite brs S½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9½ E. 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked H.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from J. W. Blair and wife A. E. Blair to Alice M. Berry, dated May 29, 1903, recorded in Deed Records Burnet County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Burtler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. The S 19 E with the original line 400 vrs to the beginning cor., containing two hundred acres, more or less, SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock fall in said Mesquite Cr. Thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. B. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pn pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Joe Alexander as the East boundary and the R. B. F. Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less.

being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 87 pages 376-81 of the Deed Records of Burnet County, Texas, to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corein Sylvester Stewart, Chester Horace Sylvester, and O. Zell Sylvester Phillips and the grantee Edell Sylvester Wade are collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester, both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Dolbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

Lenora Sylvester Butler

Ivan M. Stewart

Corrine Sylvester Stewart

O. Zell Sylvester Phillips

Gilbert Phillips

Manuel Delbert Sylvester
Individually and as independent executor of will of A. H. & Emma Sylvester, both decease

Chester Horace Sylvester
Individually and as independent executor of will of A. H. & Emma Sylvester, both decease

Millie Sylvester

Melba Sylvester

Austin M. Butler

THE STATE OF TEXAS |

COUNTY OF Lampasas |

Before me, the undersigned authority, a Notary Public in and for Lampasas County, Texas, on this day personally appeared Manuel Dolbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Dolbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January ', A. D. 1952.

J. V. HAMMETT
Notary Public, Travis County, Texas
Lampasas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Lampasas~~ County, Texas, on this day personally appeared Chester Horace Sylvester, and Melba Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same ~~for the purposes and consideration therein expressed, and the said~~ Melba Sylvester, wife of the said Chester Horace Sylvester, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Melba Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, Hamilton County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Lampasas~~ County, Texas, on this day personally appeared Austin M. Butler and Lenora Sylvester Butler, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Lenora Sylvester Butler, wife of the said Austin M. Butler, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Lenora Sylvester Butler acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, ~~Lampasas~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Lampasas~~ County, Texas, on this day personally appeared Ivan M. Stewart, and Corein Sylvester Stewart, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Corein Sylvester Stewart, wife of the said Ivan M. Stewart, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Corein Sylvester Stewart acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.

J. V. HAMMETT

THE STATE OF TEXAS |

COUNTY OF ~~Kampbea~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Kampbea~~ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, ~~Kampbea~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Kampbea~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Kampbea~~ County, Texas, on this day personally appeared Manuel Delbert Sylvester, Independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Kampbea~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Kampbea~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Kampbea~~ County, Texas, on this day personally appeared Chester Horace Sylvester, individually and as independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Kampbea~~ County, Texas



TAB J
RR VOL 3 OF 4 AT 14-86
Page 77 of 86

## MARTIN & MILLICAN
### ATTORNEYS AT LAW
### 512 EAST FOURTH STREET
### LAMPASAS, TEXAS 76550·

MICHAEL M. MARTIN
PAT MILLICAN

TEL 512-556-8228
FAX 512-556-8621
E-MAIL icac@n-link.com

DATE: *3-14-11* , 20

I, *EVAN STUBBS* , hereby certify that I have on the date named

above received from File # *16143* , the following items:

_A copy of file_

being from the law firm of MARTIN & MILLICAN, Attorneys at Law, 512 East Fourth Street,

Lampasas, Texas 76550.

*Cassie Langdon for Evan Stubbs*

ACKNOWLEDGED BY:

*Diane Varner*

## MODIFICATION AGREEMENT

**Date:** May 1, 2009

**Holder of Note and Lien:** EDELL WADE

**Holder's Mailing Address:**

REDACTED
REDACTEDREDACTED
Burnet County

**Obligor:** JOHNNY WADE and AMANDA WADE, husband and wife

**Obligor's Mailing Address:**

REDACTED REDACTED
REDACTED
REDACTEDREDACTED
Lampasas County

**Note**

Date: February 6, 2004

Original principal amount: $500,000.00

Borrower: JOHNNY WADE and AMANDA WADE, husband and wife

Lender: EDELL WADE

Maturity date: February 1, 2036

**Unpaid Principal and Interest on Note:** $227,528.00

**Lien Documents:** Deed of Trust dated February 6, 2004 from JOHNNY WADE and AMANDA WADE to PAT E. CAVNESS, Trustee, recorded as Document 002424, Volume 1223, page 503, Official Public Records of Burnet County, Texas

**Property (including any improvements):**

That certain real property in Burnet County, Texas, more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes.

**Extended Maturity Date of Note:** March 1, 2025

**Modified Terms:** The interest rate on this Modification and Extension shall be zero (0%) percent per annum. Principal shall be due and payable in monthly installments of ONE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($1,200.00) each beginning June 1, 2009 and continuing regularly on the first date of each succeeding month until paid.

**\*THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN.\***

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received. Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

-1-

Exhibit "A"

REDACTED

When the context requires, singular nouns and pronouns include the plural.

*Edell Wade*
EDELL WADE

*Johnny Wade*
JOHNNY WADE

*Amanda Wade*
AMANDA WADE

STATE OF TEXAS §

This instrument was acknowledged before me on *June 2*, 2009, by EDELL WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct 20, 2012

*Diane G. Varner*
Notary Public, State of Texas
My commission expires: *10-20-12*

STATE OF TEXAS §

This instrument was acknowledged before me on *June 2*, 2009, by JOHNNY WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct 20, 2012

*Diane G. Varner*
Notary Public, State of Texas
My commission expires: *10-20-12*

STATE OF TEXAS §

This instrument was acknowledged before me on *June 2*, 2009, by AMANDA WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct 20, 2012

*Diane G. Varner*
Notary Public, State of Texas
My commission expires: *10-20-12*

PREPARED IN THE OFFICE OF:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX: (512) 556-6621

AFTER RECORDING RETURN TO:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX (512) 556-6621

bpf16.163/real/wade

-2-



**EXHIBIT A**

THE STATE OF TEXAS |       KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF LAMPASAS |

That we, Manuel Delbert Sylvester and Chester Horace Sylvester individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manuel Delbert Sylvester, Malba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ~~residing in Travis County, Texas, except Chester Horace Sylvester and wife~~ Malba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and Direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any ~~lien on the land and premises conveyed hereby, except such Vendor's Lien~~ and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O brs N 9½ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs at md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor of the said Berry sur. is marked by a st md from which a Large L. O. marked H brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No. 60 on the S line of the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor of the R. F. Kiszier Sur., St. Md., Th S 19 E at 957 vrs a forked Elm the SE cor of the said Kiszier Sur., at 1120 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. W Cor of this Sur. Thence N 71 E 445 vrs. a st md the Southermost SE cor. of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed out by Dan W. Taylor, Jr.

Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas, this patent is No. 593, Vol. 29, 160 acres, being Survey No. 489, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N-16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

Occupants of Public lands, approved May 26th, 1873. Beginning at st md 582 vrs. N 19 W from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th, N 19 W 950 vrs a st md whence a L O bra N 42½ W 250 vrs a Mesquite bra S½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9½ E 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked M.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from J. W. Blair and wife to Alice M. Berry, dated May 29, 1901, recorded in Deed Records Burnet County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey from which a Live Oak bra N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak bra N 50 W 75 vrs. Thence N 19 W with George Burtler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm bra S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite bra N 35 W 20 vrs. and Elm bra N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. The S 19 W with the original line 400 vrs to the beginning cor., containing two hundred acres, more or less, SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock call in said Mesquite Cr. Thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. E. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pn pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Joe Alexander as the East boundary and the R. E. F. Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less, being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 87 pages 376-81 of the Deed Records of Burnet County, Texas, to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corein Sylvester Stewart, Chester Horace Sylvester, and C. Bell Sylvester Phillips and the grantee Edell Sylvester Wade are collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester, both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

2 A.

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the Said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Delbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

Lenora Sylvester Butler     Manuel Delbert Sylvester
                  Individually and as independent executor of will of A. H. & Emma Sylvester, both deceased

Dan M. Stewart     Chester Harvey Sylvester

Corein Sylvester Stewart     Individually and as independent executor of will of A. H. & Emma Sylvester, both deceas.

O. Zell Sylvester Phillips     Millie Sylvester

Gilbert Phillips     Melba Sylvester

Austin M. Butler

THE STATE OF TEXAS |

COUNTY OF Lampasas |

Before me, the undersigned authority, a Notary Public in and for Lampasas County, Texas, on this day personally appeared Manuel Delbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Delbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT     J. V. Hammett
              Notary Public, Lampasas County, Texas

OFFICIAL PUBLIC RECORDS BURNET COUNTY

THE STATE OF TEXAS |

COUNTY OF ~~Burnet~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Burnet~~ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, ~~Burnet~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Burnet~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Burnet~~ County, Texas, on this day personally appeared Manuel Delbert Sylvester, Independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Burnet~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Burnet~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Burnet~~ County, Texas, on this day personally appeared Chester Menace Sylvester, individually and as Independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Burnet~~ County, Texas

A
4 5



C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF BURNET      )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $834 and has been paid for by Mr. Don Richie, Attorney at Law.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of March, 2015.

/s/Vicki K. Kanewske
VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16
Official Court Reporter, Burnet County Court at Law
220 S. Pierce, Burnet, Texas  78611
512-715-5244; Fax: 512-715-5226; Email Vkaykan@live.com

Supplemental REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF           )           IN THE COUNTY COURT

THE ESTATE OF              )           AT LAW

EDELL WADE                 )           BURNET COUNTY, TEXAS

EXCERPT TRIAL TESTIMONY OF

NANCY BURNS AND MICHAEL MARTIN

On the 30th day of September, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas 78701

512-236-9220

    BY:  MR. DON RICHIE

       MS. EMILY SEIKEL

    APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas 78731

512-349-9595

    BY:  MR. DON E. WALDEN

    APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas 78701

512-480-5600

    BY:  MS. KATHRYN ALLEN

AND

                A P P E A R A N C E S    C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas 76550

512-556-8970

     BY:  MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas 78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Nancy Burns | | 7,35 | | | 2 |
| Michael Martin | | 78,109 | 115,129 | | 2 |

**DEFENDANT'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|

**Court Reporter's Certificate**        Page 131    2

REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Nancy Burns | | 7,35 | | | 2 |
| Michael Martin | | 78,109 | 115,129 | | 2 |

REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|---|---|---|---|---|
| 87 | Safe deposit box lease | 127 | 127 | 2 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|---|---|---|---|---|
| 2 | Copy of check | 26 | 26 | 2 |
| 3 | Handwritten will | 36 | 37 | 2 |
| 4 | Copies of bank information | 44 | 44 | 2 |
| 5 | Copies of checks to Nancy | 77 | 77 | 2 |
| 6 | Invoices from Bill & Nancy | 77 | 77 | 2 |
| 7 | Receipts from Edell Wade | 77 | 77 | 2 |
| 8 | Copies of checks to Weldon | 110 | 110 | 2 |
| 9 | order approving first inventory | 111 | 111 | 2 |
| 10 | Order approving 1st amended inventory | 111 | 111 | 2 |

****** 

MICHAEL MARTIN

Having been previously sworn, testified as follows:

CROSS EXAMINATION

BY MR. STUBBS:

Q    Mr. Martin, you said you've been practicing law for 44 years; is that right?

A    Well, I would say 42 probably.

Q    And during that time frame how many files do you think you've dealt with?

A    Several thousand of them, I'm sure.

Q    I mean, by several thousand, we're talking 16, 17, 18,000, something like that?

A    I would guess.

Q    Okay.  How many people worked for you when it was you and Pat Millican when it was Martin & Millican?

A    We had three secretaries.

Q    And did you also have a title company?

A    Yes.

Q    Were there also employees at the title company?

A    Like two or three normally there.

Q    But how is it that you don't remember every single conversation that you've had with everybody who came in your office?

A     I'm getting awful old.

Q     My point is on a regular week did you deal with one file individually and that was it, or did you have a busy practice?

A     I was just a typical small town practitioner doing everything that came in the door, and we were busy.

Q     And I think from all of this three or four hours of testimony it all really boils down to one question, and that is were you in cahoots with Johnny and Amanda Wade to somehow try to take money or take land or take advantage of Edell Wade?

A     No.

Q     In your 42 years of practice, were you ever sanctioned by the State Bar for anything unethical?

A     No.

Q     And obviously in 42 years of practice if you had done something such as trying to work with one client to embezzle something or take advantage of another client, that would be where the complaint would go; wouldn't it?

MR. RICHIE:  Your Honor, I'm going to object.  We've not sued Mr. Martin or suggested that he embezzled anything.  It's just irrelevant.

MR. STUBBS:  Well, they spent three hours

79

on him trying to --

THE COURT: I'm going to overrule the objection and let him answer.

A    Could you repeat that?

Q    (By Mr. Stubbs)  In your 42 years of practice, had you ever tried to conspire with a client to embezzle or take advantage of some other client, the State Bar would be where that complaint would be filed?

A    Correct.

Q    And in your 42 years you have never been sanctioned for anything unethical, correct?

A    That's correct.

Q    Now, if we start with this $80,000 in the safe deposit box, are you familiar with the way certain accounts at institutions can be held?

A    I think so.

Q    And by that what I'm getting at is you can have an account that is solely owned by one person, it can be held as a pay on death beneficiary or it can be held with the rights of survivorship?

A    Correct.

Q    And in the event of this safe deposit box that is at issue, do you know how it was held?

A    No, I don't.

Q    Okay.  If it were held with a right of

survivorship to Johnny Wade, then would there be any obligation for him to turn that money over as an estate asset?

A   No.

Q   So with that right of survivorship, then upon Edell's passing the contents of that safe deposit box became his sole property; didn't it?

A   I would agree.

Q   If the safe deposit box was held as joint tenants can you tell this jury what that means?

A   I would call it co-ownership.  Two persons having equal ownership of one account.

Q   So was that the -- would that have the same effect upon her passing if it were joint tenants?

A   No.  If it's not with survivorship I'd say no.

Q   But if it did have the right of survivorship it would be the same?

A   It would.

Q   Okay.  Now, recently you were asked some questions about a life estate and whether or not a life estate is enforceable and so forth.  And I believe that Mr. Richie showed you what's been marked as Plaintiff's Exhibit No. 5.  Do you still have that up there?

A   I do.

Q   And under number 2, does that seem to be clear

to you that there was an intention for Edell Wade to have a right of survivor -- I'm sorry. To have a life estate or effectively the ability to remain in her home until she passed away?

A    Yes.

Q    Even though she was selling, I'm going to say the ranch, this appears to show that there was a meeting of the minds that she could stay in her house until she passed away?

A    Yes.

Q    Now, do you know where she lived when she passed away?

A    No, I don't.

Q    Are you aware of any time when Johnny or Amanda Wade tried to force her off of that property?

A    No.

Q    If the evidence in this case showed that she actually passed away in her bedroom in her house and was Star Flighted back simply so she could, would that surprise you?

A    No.

Q    So all this question about whether it was a life estate or not, if she never was asked to leave her property and in fact passed away in her own bedroom, it's really just smoke and mirrors; isn't it?

A    I would think.

Q    You were asked a bunch of questions about various documents and whatnot, and the effect of that was to make some implication that Amanda Wade abused the power of attorney that she held for Edell Wade.  Do you recall those questions?

A    I do.

Q    To the best of your knowledge did she ever use that power of attorney in any way?

A    I wouldn't have any way of knowing.  Nothing came to my attention.

Q    Well, in the modification that Mr. Richie would ask you all these questions about, she didn't go in and sign it on behalf of Edell wade; did she?

A    Oh, no.

Q    On the power of attorney, the various power of attorney documents, she never went in and signed granting someone else somehow or on behalf of Edell Wade; did she?

A    No.

Q    As far as going back to the question about the life estate, you were kind of led into questions to imply that Johnny Wade or Amanda Wade could have then sold that ranch but in that let's just assume that Johnny or Amanda or both were trying to sell that ranch

while Edell were still living, Johnny and Amanda would have been aware that there was this agreement for a life estate, correct?

A    Correct.

Q    So they could not have signed off on a contract saying there were no liens, no tenants and so forth on the property, could they, to enter into a contract to sell it?

A    Well, with Mrs. Wade living in her house, practically I can't see how you could do that.

Q    So again just smoke and mirrors?

A    I would agree.

Q    In your representation of Edell Wade in doing her will, power of attorney, HIPAA documents and the modification, was it ever your understanding that you were representing anyone other than Edell Wade?

A    No.

Q    Now, I don't know if Mr. Richie has ever practiced law in a small town, but you said at the beginning that you have represented whatever walks in the door.  You mentioned criminal cases for instance.  So in representing criminal cases you have somebody that's 17, 18 years old.  Is it odd for them to come in with a relative?

A    No.

Q   Is it odd for you to put the contact information for that relative in your file?

A   Certainly not.

Q   Is it odd for you to send the bill to the relative?

A   No.

Q   Is it odd for you to send correspondence to the relative?

A   No.  Especially criminals frequently don't have an address you can use anyway.

Q   Sure.  Now, does any of that change who your actual client is?

A   No.

Q   So just because you're talking to a parent or a grandparent and you're calling the parent or the grandparent and you're sending the correspondence to the parent or the grandparent, your client is still the kid, right?

A   Of course.

Q   And isn't that similar to a situation to where you may be doing work for someone who is older?

A   Very common to be in that situation.

Q   So if we're dealing with someone who's 80 years old or above and they live on the same property with the child, or a grandchild for that matter, would

it be uncommon for you to have that child or grandchild's contact information in your file?

A    No.

Q    Would it be odd for you to deliver the documents to the child or grandchild?

A    No.

Q    Would it be odd for you to contact or have communications with that child or grandchild?

A    No.

Q    Would it be odd for you to send the bill to the child or grandchild?

A    No.

Q    Does any of that change the fact that the older person involved is actually your client?

A    Not in my opinion.

Q    And at the end of the day, and upon his question and you agreed, that you as the attorney had a fiduciary duty to Edell Wade?

A    Yes.

Q    And can you explain to this jury what that means, what your duty was for Edell Wade?

A    Well, I think I owed her a duty to look out for her business just plainly stated, and, you know, if I thought someone was trying to take advantage of her, I think I would have needed to have told her and would

have.

Q   In this instance did you ever tell her that you thought someone was trying to take advantage of her?

A   No.

Q   Now, as far as all these documents and all these questions about how we came up with the number and where the interest came from or whatnot, your file clearly shows that you had communication with Lori Graham, correct?

A   Right.

Q   And in your file I believe you have some line items where you say, Communication with client.  And then separate from that you have some lines that say, Communication with Amanda.  Right?

A   Yes.

Q   That distinction of having lines that say, Communication with client, versus lines that say, Communication with Amanda, would show that you never viewed Amanda as your client in that case, right?

A   True.

Q   And in your drafting of the documents does it really matter who communicates numbers to you?

A   No.  It looked like to me that it was kind of a joint project so I wasn't particularly concerned knowing that they were going to get to read it over and

come sign it, and if either side didn't like it they had every opportunity to say so.

Q    Now, obviously you can't represent both sides in that, right?

A    Correct.

Q    And were you ever representing both sides?

A    I felt like I was representing Edell Wade.

Q    Okay.  Now, in your 42 years of practice how odd is it for an older person to just flat give property to a kid?

A    It's quite common.

Q    And so in fact, I mean the numbers really don't even matter, do they?

A    Well, I could tell they had a close enough relationship that I didn't think anyone was trying to get it down to the gnat's ear and would have been surprised if they were.  I really didn't know what was going on.  It changed two or three times.  I really didn't know and hoped that with the accountant they would work it out to where everybody was happy and the IRS hopefully would be happy.

Q    I'm sorry.  Go ahead.

A    And I didn't see any particular reason for me to get into that discussion especially in a family deal. I didn't imagine they wanted my input.

Q   Is your job as a lawyer, when somebody comes into your office, is your job to tell people what other people normally do or is your job to do what they want?

A   I think it's to do what they want.  Nobody asked me should they do it.  They came and said they're doing it.

Q   Have you ever drafted a will that left property to a charity?

A   Sure.

Q   Have you ever drafted a will that left property to a charity or excluded a child?

A   Yes.

Q   Is it your job to tell them they can't exclude a child?

A   No.

Q   Is it your job to tell them they need to leave their property to one child or another?

A   No.

Q   Is it your job to tell them that they need to charge interest or that they need to not reduce principal?

A   No.  And the only reason I would discuss the interest is like I would want them to be aware that the IRS may penalize them.

Q   Right.  And then you were asked questions

about 1099s and you were asked questions about estate tax returns and those sorts of things. Do you generally send out 1099s?

A    I never do.

Q    Never have?

A    Never.

Q    Do you generally file estate tax returns?

A    We did file estate tax returns, yes.

Q    Is that something that you require any time you have some sort of transaction that might involve an estate tax return?

A    Is what required?

Q    Well, what I'm saying is if somebody comes in and they want to do any type of transaction, I mean, you're not under any duty to file their estate tax return; are you?

A    Oh, no.

Q    Okay. Ultimately that decision is left up to the client, isn't it; whether or not they file an estate tax return?

A    Well, yeah. I mean, you may be obligated by law to file one but whether they actually do it, they don't want to do it, that's kind of their business.

Q    Right. That's my point. You're not, as the attorney, obligated to do anything?

A    No.

Q    And so sometimes you have people who you tell them this may be an estate tax or a gift tax event, but ultimately they're the ones who decide whether or not they're going to file a return?

A    Correct.

Q    And if we pare this down, I mean, you worked for Edell Wade starting back in 2007, correct?

A    Correct.

Q    So you doing the modification wasn't like the first time you ever met her, right?

A    No.

Q    And I believe you said earlier she was clearly lucid?

A    Yes.

Q    Or very lucid or something along those lines?

A    Yes, sir.

Q    Didn't have any concerns that she was under duress?

A    No.

Q    Didn't have any concerns that she was out of her right mind?

A    Not at all.

Q    Didn't have any concerns that she wasn't doing exactly what she wanted to do?

A    No concern at all.

Q    In fact, if you did, based on what you told this jury about your fiduciary duty you wouldn't have participated; would you?

A    That's true.

Q    You had an active practice, right?

A    I did.

Q    Did you need her $200 or $300 to make ends meet?

A    No.  And certainly don't want to get involved in a squabble like that for some pittance.

Q    So any of your communications, whether they were with Lori Graham, Amanda Wade, Edell Wade, Johnny Wade, no matter who relayed the information you always felt like what you were doing was what Edell wanted, correct?

A    That's correct.

Q    Because she was your client?

A    Right.

Q    Now, you were asked some questions about paragraph 25 of the prior power of attorney that Edell gave to Nancy, and I believe it had something about talking to some of the other siblings?

A    Yes.

Q    Now, at the time that was entered Johnny and

Amanda still lived in California; didn't they?

A    I really don't know.

Q    If I --

A    I assume so.  My vague recollection of when they came back I believe it was right.

Q    Couldn't you also gain from that that Edell really didn't trust Nancy and that she wanted her to communicate with the others because she didn't have full trust in her?

MR. RICHIE:  Your Honor, objection.  Calls for speculation.

THE COURT:  If you know from discussions with your client you may answer that question.  If you don't, then I'll sustain the objection.

A    I don't have any knowledge of that.

THE COURT:  All right.  I'll sustain the objection.

Q    (By Mr. Stubbs)  As far as the sale of the ranch is it your understanding that Edell was the owner of that property whenever the sale took place?

A    Yes.

Q    She wasn't a co-owner; was she?

A    Not to my knowledge.

Q    And at that time did any of her kids have any legal interest in that property?

A   I don't believe so.

Q   So had she, instead of selling it to one of her kids and keeping it in the family, had she decided to sell it to the neighbor, could she have done that?

A   Sure.

Q   Did she have to get permission from her kids?

A   No.

Q   Did she have to tell the kids?

A   No.

Q   Did the kids have any say in what the terms would be?

A   No.

Q   She could have sold it for cash.  She could have sold it on a note.  She could have just given it to the neighbor; couldn't she?

A   True.

Q   You were asked some questions about the various powers of attorney and one was filed and one wasn't filed, whatnot.  There's no legal requirement that a power of attorney be filed; is there?

A   That's correct.

Q   And you can file one of record if you choose to, but you don't have to, correct?

A   Right.

Q   All these questions about whether or not you

communicated directly with Edell while the documents were being proven up, you ultimately were perfectly comfortable that she knew what the documents said, she knew what the documents meant and it was what she wanted to do when she signed them, correct?

A     That's true.

Q     Now, Mr. Richie made a big deal about, Well, I just got this file today and so forth. I believe that he requested to take your deposition back in May. Does that sound accurate?

A     It does.

Q     And in his request we made the legal decision that we felt like he was asking for stuff outside what all was allowed. And ultimately we filed a motion for a protective order.

MR. RICHIE: Your Honor, can we approach?

THE COURT: Yes.

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE: This is a clear violation of the motion in limine. We're not supposed to talk about motions with the Court and orders from the Court. They never set their motion for protection. I never got an order.

THE COURT: Well, the door was open when

you asked this lawyer certain questions about the file and not being able to receive the information he was instructed not to deliver. I think they have the right to cross examine.

MR. RICHIE: Sure.

(The following was in the presence and hearing of the jury.)

Q (By Mr. Stubbs) Mr. Martin, what I was talking about was back in May when Mr. Richie asked to take your deposition and he sent you documents telling you that you had to come to the deposition and you had to bring a bunch of stuff with you. Now, in that we felt like he was asking for more than what was allowed, and we filed what is called a motion for protective order. And do you remember getting a copy of that?

A I'm not sure.

Q Okay. Well, I'll just represent to you that we did file that motion.

A Okay.

Q And my recollection prior to you going to the deposition was that I did not want you to take any of Johnny and Amanda's personal files and I believe that Ms. Allen was there as well. Is that in line with your recollection for the most part?

A Yes.

Q   And so I believe also in your deposition you were very clear with Mr. Richie and you said you would be happy to produce it with a Court order, referring to various documents?

A   Yes.

Q   Do you possess that memory?

A   Yes.

Q   Did you ever receive anything from Mr. Richie's office after that time?

A   Not to my recollection.

Q   Is it possible that you had some confusion about what you were supposed to bring and what you weren't supposed to bring

A   Certainly possible

Q   But obviously at that time you still had an attorney/client privilege with Johnny and Amanda Wade as for work you did for them, correct?

A   Yes.

Q   And you still had an attorney/client privilege with Edell Wade or the Estate of Edell Wade, correct, for the work that you had done for Edell?

A   Well, she was dead.  So I don't know that I had it with Edell, but I would have with the estate I guess.

Q   Well, if I came in and asked you about someone

that you had done work for who has now passed away, I can't just come in and look at your file; can I?

A    No.

Q    I mean, there's still some level of privilege there where you're not authorized to just release that information, right?

A    Right.

Q    You were asked something about some documents previously being sent to the County Road address where Edell and Johnny and Amanda lived and then later some documents went to the hardware store address?

A    Yes.

Q    Because someone had run over their mailbox?

A    Could be.

Q    Well, if the evidence showed that someone ran over their mailbox --

A    Certainly possible.

Q    And I mean there wasn't anything egregious or evil about trying to send that to the hardware store, was it?

A    No.  I just wanted to be sure that she got it.

Q    And you knew that Johnny and/or Amanda would make sure she did?

A    Right.  I knew where I could find them.

Q    Then you were asked some questions about some

paragraphs in some various documents and I believe you mentioned to Mr. Richie that you thought those might be Pro Doc forms. Can you tell this jury what Pro Doc forms are?

A    It's a computerized set of legal documents that was promulgated by a company here for use on computers where you can insert different names, addresses, et cetera, et cetera, just kind of streamline preparation of documents.

Q    In effect are those just standardized forms for the most part?

A    Yes.

Q    So when you use standardized forms in your 42 years of practice have you ever inadvertently left a paragraph in that didn't apply?

A    Well, many, many times there are many paragraphs that don't apply that nobody much worries about because it's more trouble to take them out than to leave them in, as long as they're not harmful.

Q    Have you ever inadvertently had a paragraph that didn't get into the document even though you intended it to?

A    Yes.

Q    You were asked some questions about your amortization schedule and I still don't know what

they're trying to make a point with on that, but your amortization schedule doesn't have -- did not take into account the $150,000 payment that was made by Johnny and Amanda; did it?

A No, and I don't know that I knew about that. I don't know that they mentioned it. And I might say on the amortization schedule I probably told my secretary, Take this note and go run an amortization schedule on it, without much other input just to give me a place to kind of start. So I didn't intend for it to be a finished product.

Q It wasn't any part of a thought-out scheme to try to deceive anybody; was it?

A No.

Q In fact, the loan date was 2004 instead of 2006, and it didn't include the zero percent interest for a period of time?

A I'm sure my secretary did the best she could. That's what I got back.

Q Okay. Along those lines I think I understood your testimony to be when we were trying to figure out what the correct principal amount was for the modification, it could have been any number that got put in there so long as Edell agreed to it, right?

A Yes.

Q    And so long as that's what she wanted?

A    Correct.

Q    And I believe your notes show that you had multiple communication with Lori Graham, and Mr. Richie is trying to say that didn't happen.

A    Yes, sir.

Q    And are you comfortable that you talked to Lori Graham?

A    Oh, I know I talked to Lori Graham.

Q    If you have an older person who wants to give property to just -- an easiest example is a child. Wouldn't it be proper to simply say there's no benefit to the older person; is there?

A    Well, emotional benefit is the benefit I would see.

Q    So there is clearly a difference between a financial benefit and an emotional benefit?

A    Certainly.

Q    And in your 42 years of practice is it odd for someone to give up a financial benefit in exchange for the emotional benefit of knowing they're helping their kid?

A    No.

Q    Happens every day?

A    Happens every day.

Q    You were asked these questions about the actual probate of the will and Mr. Richie tried to imply that somehow you had done something wrong, although he said, No, I'm not saying you did anything wrong.  The fact is there is no legal requirement to send anyone notice that you filed an application to probate a will; is there?

A    There is not.

Q    Can you tell the jury what happens, just as a general sense, when -- if I come in your office and I say, My dad passed away.  Can you tell the jury just logistically how that process starts?

A    Well, initially we would do an application to probate, get it signed by the person who is the applicant, usually also the executor.  We would accompany that with a check, send it and the original will and the application to the County Clerk.  In this instance, Burnet County.  The Clerk would post notice on the county bulletin board that an application for probate had been filed.  In roughly two weeks there would be a probate hearing, which is usually a very simple, brief matter where the Court hears testimony about when the decedent died, where they died and so forth.  The Court usually then signs the order on the same day.  The Clerk files it.  We send out notices to

the beneficiaries to notify them that they are a beneficiary. We then work on the inventory, usually get with the executor and find out what property the decedent owned, what it's worth. Usually some back and forth about the value of properties and that sort of thing.

Once we've got that nailed down, within at least 90 days you're supposed to file the inventory, get that signed by the executor, send it to the Burnet County Clerk, in this instance with an order. The Court will review it, sign the order usually approving the inventory. Once that's done you go about paying any debts that are outstanding. And frequently with elderly folks like this, there are not debts. Would then go about distributing the assets to the beneficiaries of the will. And once all of that is done, we typically would get a release from the beneficiaries that they've been paid their proper amount and they were happy with it. And that would be the end of the process.

Q So all the questions you were asked, you didn't send notice. Nowhere in the legal requirements is it that you're -- I mean, you're not supposed to send notice; are you?

A Well, nothing requires it and we hardly ever did, although I would frequently ask an executor, you

know, do you want me to write Uncle Bill and tell him he got the car, or you know, if they said yes, I did. If they said no, I didn't.

Q And ultimately right after Amanda was appointed as the executrix of this estate you notified everyone just as you normally would, correct?

A Right.

Q You did everything just the same as you would if I came in or anybody else came in?

A That's true.

Q Now, as far as that document goes, that will, it had in it an in terrorem clause. Are you familiar with that?

A I am.

Q Will you tell this jury what an in terrorem clause is?

A Well, it's a clause that people sometimes insert to disinherit anyone who contests the will. Some folks are concerned that one of their children, kinfolk, whoever is a beneficiary, will be unhappy with the will and will want to contest it on whatever grounds, and the in terrorem clause --

MR. RICHIE: Let me interrupt. I'm sorry, Mr. Martin.

May we approach, Your Honor?

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE: I'm going to object to him asking this witness about an in terrorem clause and interpreting it when this was already ruled on summary judgment that the in terrorem clause is not implicated in this matter in any way, shape or form.

MR. DUCLOUX: That wasn't the ruling.

MR. RICHIE: It was. He granted summary judgment.

MR. DUCLOUX: Yeah. He denied summary judgment, so --

MR. RICHIE: Excuse me, you're right.

MR. DUCLOUX: We're allowed to have him explain it. He was used as an expert. We're just explaining what it is that shows her motivation that she put this in the will so that these people didn't fight.

MR. RICHIE: We didn't contest this one.

THE COURT: Well, the will has been admitted to probate. The will contains the in terrorem clause. I think either one of you all would have the right to go into the contents of the will and discuss this term and what the legal implications are.

MR. RICHIE: But I think it's very important if they are going to ask this witness whether

or not the filing of this lawsuit invokes that in terrorem clause --

MR. STUBBS: I'm not going to ask that.

MR. RICHIE: That invades the province of this Court.

MR. STUBBS: I have no intention of asking that.

MR. DUCLOUX: It just shows her mental state. We're not asking about --

THE COURT: Limit the inquiry to only what an in terrorem clause is.

MR. STUBBS: Yes, sir.

MR. RICHIE: Thank you.

(The following was in the presence and hearing of the jury.)

Q (By Mr. Stubbs) Mr. Martin, I apologize exactly where you were in explaining to this jury what the in terrorem clause does and the fact that there was one in Edell Wade's will that you prepared for her back in whatever year that was, several years before her passing. Can you continue with your explanation, please.

Q I think I was saying some people put that in their will so that if one of the beneficiaries is badly unhappy and wants to contest the will based on

106

incompetency of the decedent or undue influence or whatever, that they're at risk of getting nothing if they lose. So it kind of makes it risky to contest it.

Q So in a general sense the purpose is to hopefully prevent a fight?

A Yes.

Q In fact, Edell Wade had that in the will that she asked you to prepare for her?

A Yes.

Q Now, in your 42 years of practice you've done wills for people who had real estate, done wills for people who didn't have real estate. You've done, I'm assuming, you've done wills for people who have families where everyone got along and you've done wills for families that didn't; is that accurate?

A Accurate. Yes.

Q Is real estate sometimes one of the assets that is really hard to split up if your family doesn't get along?

A Yes.

Q And so if you can convert that real estate into cash is it easier to split

A It is.

Q And is that basically just because it's hard to value, it's hard to draw lines, it's hard to put

fences, hard to get people to agree?

A    Right.  Access, all sorts of things make real property hard to divide.

Q    So if you had someone who thinks that there may be a fight between their kids or that they don't get along, is liquidating the real estate and selling it and converting it into either cash or a note or some sort of tangible something that can be split evenly, is that a common practice?

A    I'd say so.

MR. STUBBS:  Your Honor, if I could have just a moment to go over my notes.

Q    (By Mr. Stubbs)  Mr. Martin, just to make sure that it's accurate and clear to this jury, you never saw any indication that Edell Wade suffered from any mental issues; did you?

A    I did not and I saw her, say in the hardware store after whatever the last dealings were I had with her with some of her family, I believe it was family. And she was getting around good, looked normal and seemed to be doing fine.

Q    You don't owe Johnny and Amanda anything in this case; do you?

A    Unless I owe a bill at the lumber yard -- I mean the hardware store.  I'm not sure if I do or not.

Q But you don't have -- you're not out to take one side or the other. You simply want this jury to know what you know, correct?

A That's correct.

Q And Edell was your client; it wasn't Johnny or Amanda, right?

A True.

Q And everything you did you're comfortable that that's what Edell wanted?

A I am comfortable.

MR. STUBBS: I'll pass the witness.

MR. DUCLOUX: I have a few questions on the probate, and as you said this morning I can ask those questions.

THE COURT: All right. Limit your questions to probate.

CROSS EXAMINATION
BY MR. DUCLOUX:

Q Mr. Martin, I am the attorney for Amanda in her capacity of probate, so let me just ask you a few more questions and I'll be done with you in five or six minutes.

You have told us -- let me show you what's been marked as Defendant's 8, 9 and 10. Eight is a copy of all of your letters, aren't they, to the heirs?

A    Looks to be, uh-huh.

Q    And that's where you tell them the probate is in session, you give the number, who the executor is, et cetera?

A    Correct.

MR. DUCLOUX:  Offer Defendant's Exhibit 8.

MR. RICHIE:  No objection, Your Honor.

THE COURT:  Defendant's Exhibit 8 will be received into evidence.

MR. DUCLOUX:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Ducloux)  And then when you filed the sworn inventory, that's not the end of it.  The Judge has to approve that inventory?

A    Certainly.

Q    And does that happen with an order?

A    Yes.

Q    And under the law you have to do that within 90 days?

A    Correct.

Q    And even if there is an amendment it still has to be done within 90 days unless it's something you couldn't know about, right?

A    Right.

110

Q    So on this you actually had a court order signed.  I'm going to show you Defendant's Exhibit 9. Does that appear to be a true and correct copy of the Court's order?

A    It does.

Q    Let me show you No. 10.  When you amended it, you had the phone call and I don't know who it was, but somebody said, Wait a minute, that cash has to be in there.

A    Right.

Q    And both of those were approved by the Judge, weren't they?

A    They were.

MR. DUCLOUX:  These are court orders. I'm offering Defendant's Exhibits 9 and 10 being the orders of October 5th and November 23rd.

THE COURT:  Give them to counsel.

MR. RICHIE:  No objection.

THE COURT:  All right.  Defendant's Exhibits No. 9 and 10 will be received into evidence.

Q    (By Mr. Ducloux)  Now, as to attorney for the estate, after that date did you receive any notice of challenge to one penny that was on those inventories?

A    No.

Q    Did Amanda follow your instructions in

administering this estate?

A    Yes.

Q    Did she take her job very seriously?

A    It seemed to me she did.

Q    Did she get you information on a timely basis?

A    She did.

Q    Did she consult with you if she thought there was an error on anything?

A    Yes.

Q    Did she ask your advice on making sure it was done correctly?

A    I believe so.

Q    Let me also say in her capacity as executor, we call everybody executor now, don't we.  In her capacity she and Johnny had this executory contract, this contract to buy the land.  Does Texas law allow an executor to complete the purchase of something from the decedent?

A    Yes.

Q    In fact, that's written in the law.  It doesn't violate the law or create a conflict of interest for her to continue to make the payments even though she's serving as the independent executor?

A    Correct.

Q    Just two or three questions generally about

estate planning in this case. We normally, as I told the jury yesterday, those of us who do general practice do four things for everybody. We do a will, power of attorney, medical power of attorney and directive. Is that the typical package you would see typically in the State of Texas?

A    It is.

Q    And what you have in Edell Wade's file is that typical package; isn't it?

A    It is.

Q    Is there anything unusual or abnormal about the estate planning of Edell Wade?

A    I would say it's just run-of-the mill typical.

Q    Did you see or notice or advise Amanda at any time that she was doing something improper in her capacity as the executor of the estate?

A    No.

Q    Did you ever see or notice anything suspicious or diabolical about this estate?

A    No. I don't know if I know what a diabolical estate is. It seemed pretty normal to me.

Q    Okay. And then my last question is you were asked some questions about after she was serving whether they were in default, if somebody makes two payments in a row ahead of time, they're not in default the next

month; are they?

A   You mean if they skip --

Q   No.  Let's say I owe you a thousand dollars a month.  I'm going to be out of town so this month I'm sending you $2,000.  So the next month --

A   No, no.

Q   You don't understand, do you, how much Johnny and Amanda have paid towards this note over time?

A   I don't know.

Q   In fact, they could be way ahead of the original schedule?

A   Could have paid it off for all I know.

Q   Right.  So you were just saying generally there could be a default without knowing the specifics of this case?

A   Correct.

Q   So you're not trying to say that you have made a judgment in this case that there is any sort of default under either the original note, the modification or anything like that?

A   I don't know anything about any defaults.

Q   Were you asked to investigate whether there were any defaults?

A   No.

MR. DUCLOUX:  I think that's all the

114

questions I have.

THE COURT: Redirect?

MR. RICHIE: Yes, sir.

REDIRECT EXAMINATION

BY MR. RICHIE:

Q    If in fact there is an executor and there's a note and there have been payments skipped or there have been payments that have been made but they are below what is required under the note, is the executor required to enforce that note and declare a default?

A    I don't know that they're required.  I would think they're certainly entitled to in their judgment if that's the proper course of action to protect the estate.

Q    If there were an event of skipped payments, for example, or late payments or a modification that shouldn't have taken place and the executor is the same person as the maker of the note, wouldn't that executor then have a conflict of interest with respect to the enforcement of the original note?  That would be a conflict; wouldn't it?

A    Well, I would say it would be a problem, yes.

Q    So let me now talk about this question of who was your client.

MR. RICHIE: And I apologize, Judge.  I

need to get up.

Q   Let me show you -- you might check your own file, it might be the easiest.  It's from Exhibit 38 and I'm going to ask you, please, I want you to look at in your file if you don't mind and I'm going to show you what I'm looking at.  We went over this earlier but there was a file for Edell Wade in 2007 and that file had on it the file number.

A   Yes.

Q   And that file number was unique to Edell Wade?

A   Yes.

Q   And you could have used that same category of file numbers in 2009, right?

A   Yes.

Q   But you didn't?

A   Yes.

Q   And your file says Johnny and Amanda Wade are the clients?

A   Yes.

Q   And then you were asked by Mr. Stubbs, Well, isn't it true that really even though you put that on the file you're really representing Edell Wade.  I'm gong to show you your payment ledger in the file.  Who paid for the modification work?

A   It says it was paid for by Amanda Wade.

116

Q    And who does it show as the client on that money ledger that shows who's paying?

A    Johnny Wade, et ux.

Q    That would be Amanda?

A    Correct.

Q    Then if we go back to the file contents, Mr. Martin -- and again I apologize for standing over you, but there is a transmittal in here where your office sends some paper work to Johnny and Amanda.  And I'm trying to go fast because I want to end and get everybody out of here today like the Judge suggested.  Or maybe he just wants me out of here.  In any event, here's this little slip of paper and I need to show the jury what it looks like.  Who's it addressed to?

A    Mr. And Mrs. Johnny Wade.

Q    Is it you -- are you the author of this?

A    Yes.

Q    And you say, Enclosed are the copy of the recorded modification agreement, the original of which has been sent to Edell Wade and your file regarding this matter which you left with us.  That's what it says; doesn't it?

A    Uh-huh.

Q    And that's what you sent them was Johnny and Amanda's file; didn't you?

A    Uh-huh.

Q    I mean, it's pretty clear that you were representing Johnny and Amanda Wade.  That's what your file says and that's what your letters say and your billing says.  And I know that you want to tell us that you weren't, but that file has Johnny and Amanda Wade's name on it; doesn't it?

A    It does.  What I would say about that is especially in a family situation I wasn't real careful about exactly whose name went on the file and in view of the fact that I had done this other work for Mrs. Wade I felt like I was obligated to see that I did what she wanted done.  And I think I did what she wanted done.

Q    And Mr. Stubbs asked you with older people that's sometimes the way you communicate, with their family members?

A    Yes.

Q    In 2007 you opened a file with Edell Wade's name on it, Exhibit 88.  She was 92 years old?

A    I'm surprised, but I'm sure that's right.

Q    That's old, isn't it?  It's older than me.

A    It's a little older than me.

Q    And in it one of the first things is a letter to Edell Wade, not Johnny, right?

A    Right.

Q   You could have opened the file in Edell Wade's name, sending Edell Wade the correspondence and communication.  You just told us that after all of this was done -- so this would be before -- 2009 would be before you saw her in the hardware store and she was getting around just fine; wasn't she?

A   Yes.

Q   I don't know if you know the answer to this, but if you do help me out.  We were talking about fiduciary relationships earlier, do you know under Texas law whether a fiduciary relationship can exist in the context of a family relationship where a mother for example places trust and confidence in her son to take care of her financial issues and health issues?

A   I'm sure it can, sure.

Q   That can happen, can't it?

A   Yes.

Q   And you told me earlier that it looked like when you met with Johnny and his mom and Amanda, it looked like she was placing trust and confidence in Johnny and Amanda?

A   They seemed to be getting along great.

Q   She was placing her trust and confidence in them?

A   Or vice -- I guess that's why she brought them

along.

Q    Had power of attorney in Amanda's name, right?

A    Uh-huh.  Yes.

Q    Named Amanda and Johnny in the will as heirs?

A    Sure.

Q    And Amanda as executor?

A    Yes.

Q    But Amanda on healthcare directive?

A    Yes.

Q    That was trust and confidence?

A    Yes.

Q    You had some notes in that 2007 file from your first meeting.  We kind of agreed that must have been around January 9th of '07 and you're writing notes about what Mrs. Wade wants in her estate planning.  May I take this from you?

A    Yes.

Q    You don't see anything in there about a gift; do you?

A    No.

Q    Because she didn't mention that, that she wanted to make a gift; did she?

A    No.

Q    In fact, she didn't make a gift?

A    No.

Q    Mr. Stubbs asked you did it really matter to you what the principal balance was on the note, and you said you wanted to hit within a gnat's ear and that's why you were doing an amortization schedule; do you remember that?

A    I think what I said was I didn't think they wanted to get it within the gnat's ear, and I didn't.

Q    Did you have any idea what they wanted to get it within?

A    Well, not really.  They were going to change it and I was just waiting for them to tell me how they wanted to change it.

Q    You really don't know what Mrs. Wade was trying to do with respect to those changes other than what you wrote in your notes, and remember we saw that as disjunctive.  There was going to be an interest reduction or --

A    Right.  Whether they adhered to that or not I don't know.

Q    But you do recall when you wrote the modification you took the time to write in bold, This is about interest only.

A    Right.  I wanted to make that clear.  And it may have been my mistake.  I may not have remembered at that time that they even talked about reducing the

balance. And to this day I don't know if or how much they reduced it.

Q   And that's not what you thought you were doing?

A   No.

Q   You were reducing the interest to zero?

A   That's -- at this point that's all I can remember.

Q   Does $50,000 sound quite a substantial amount of money when it's compared to $400,000?

A   Yes.

Q   Do you remember that math that I did with you a minute ago?

A   Yes.

Q   If your secretary got it right, that note debt was at $426,000 is where she started?

A   Something like that.

Q   And you're right at -- the modification was a hundred twenty -- that's a $200,000 difference. That's not a gnat's ear; is it?

A   No.

Q   That ain't close to a gnat's ear. Right?

A   That's correct.

Q   You were asked did I do anything more after May to try to get your file. I subpoenaed you here

today; didn't I?

A    Yes.

Q    And I came before then with a court order to instruct you to ignore them and to bring me the file; didn't I?

A    I don't know anything about that.

Q    Did you bring the file?

A    Yes.

Q    Were you ordered to bring it?

A    I was subpoenaed three times to bring it.

Q    So Mr. Stubbs didn't tell you that the judge instructed him to tell you to bring that file?

A    Yes.

Q    And you know that's the first time I've seen that file is this morning?

A    I don't know.

Q    Well, you didn't get it to me; did you?

A    To be honest, at the deposition I don't know what I've given copies of to Mr. Stubbs.  I don't know what I gave to Don Walden.

Q    Mr. Stubbs wanted to ask you about the in terrorem clause in the will, the don't-fight-with-me clause.  In your notes of 2007 you don't see anything in there about Mrs. Wade telling you she's worried about a dispute among her children; do you?

A    That's correct.

Q    It's correct that she did not say that?

A    That's correct.

Q    Let me show you the will.

A    It may have gotten set aside.

Q    88-B.  Would you look at 88-B.

A    Okay.

Q    And would you look at what is known as the in terroreum clause.  Tell me when you've seen that.

MR. RICHIE:  Would you put up the will, please, Ms. Stevenson, and go to paragraph 6-C on page 2.

Q    (By Mr. Richie)  That in terrorem clause is that just kind of a standard in terrorem  clause that's not unique to her will.  It's one that you would put into anyone's will, right?

A    True.

Q    It doesn't say anything about ranch sale; does it?

A    Huh-uh.

Q    Doesn't say if anybody contests the ranch sale that that would be a problem?

A    No.

Q    You could have put that in there, right?

A    If they told me to.

124

Q  And they didn't.  And it didn't say anything about a note, a promissory note, a contest on a note?

A  Correct.

Q  But you could have put that in there?

A  Sure.

Q  And just as you said if they had told you to?

A  Right.

Q  And they didn't?

A  No.

Q  Not Johnny Wade, not Amanda Wade, but most importantly not Edell Wade, correct?

A  Right.

Q  That clause has to do with contesting the will; doesn't it?

A  Yes.

Q  Do you know whether or not this is a will contest?  I will represent to you it is not.  Nobody has challenged the will.

A  I won't argue with you.

Q  In fact, my client, Nancy Burns and others, they actually want the estate to have more money in it so they would get more under the will.  That's what this suit is about; isn't it?

A  I'm really not involved in the suit.  I haven't looked at your pleadings.

Q All right. Fair enough.

MR. RICHIE: Give me one minute, Judge. I'm close.

Q (By Mr. Richie) I'm sorry. I've been practicing 43 years and I graduated the same year you did, but you're retired and I'm not and I'm jealous.

In all that time, in all the work you've done, have you ever seen a 32 year old -- I'm sorry, an 89 year old seller take a 32 year note to finance the sale of real estate?

A You know, I have no idea. I have seen a number of people including myself take notes that I never ever hoped to live to collect, if that's what you mean.

Q I want to know in your estate planning work, your real estate work, do you recall any other situation where an 89 year old received a 32 year 2% interest note?

A I can't point you to any but I'm going to say there are some.

Q You don't know of any and you can't recall one in your 42 years that you've seen, other than this one?

A No, I don't recall any. As I say, I have taken notes myself that I don't hope to live long enough to collect.

Q   I'm going to show you -- there was a question about safe deposit boxes and who owns the contents of safe deposit boxes; do you recall that?

A   Yes.

Q   Let me hand you Exhibit No. 87 and just ask you generally can you see what that is; not if you've ever seen it before but do you recognize what that form is?

A   I do.

Q   Would you tell the jury what it is?

A   Safe deposit box lease.

Q   And on this one who does it show as the parties that own the safe deposit box?

A   Edell Wade or Johnny Wade.

            MR. RICHIE:  I would offer Exhibit 87 into evidence.

            MR. DUCLOUX:  No objection, Your Honor.

            THE COURT:  87 will be received into evidence, Plaintiff's 87.

            MR. RICHIE:  Thank you, Your Honor.

Q   (By Mr. Richie)  I want to turn to the part that you see it says on a joint tenant?

A   Yes.

Q   Is that a co-ownership?

A   Yes.

Q    And then you turn over here to joint owners on page 2.

A    Yes.

Q    And would you read to the jury the second sentence where it says, "Joint owners".  It's real small.

A    The ownership of the lease will not affect the title to any contents of the safe deposit box.

Q    So if there was things in that box that belonged to Johnny Wade and things that belonged to the estate, even if there was a right of survivorship that paragraph would mean that the estate would still own its assets, wouldn't it?

A    I haven't read the whole thing, but assuming something else doesn't vary it, I would agree with that.

Q    All right.  And in any event we know that $80,000 from that safe deposit box got on the amended inventory and the executor said it is the estate's property?

A    Correct.

Q    And you prepared that inventory and submitted it for court approval?

A    Sure.

Q    So you're not telling this jury that the contents of that box, the $80,000, somehow belonged to

Johnny Wade simply because it was co-owned; are you?

A     No.

Q     Thank you, Mr. Martin.

MR. RICHIE:  I pass the witness.

THE COURT:  Anything further?

*******

MR. RICHIE:  I have one question.

THE COURT:  Okay.

FURTHER REDIRECT EXAMINATION

BY MR. RICHIE:

Q     I want to ask you about 87 which is the safe deposit box form, and I think I understood your answer. He could have gone and removed.  What those two sentences together means is if the box doesn't get sealed upon death, but the right to the box is still accessible by the other owner, but that the contents of it are not affected by the right of survivorship?

A     Correct.

Q     Isn't that what that means?

A     That's the way I read it.

Q     And so if there were estate assets in there, they still belonged to the estate?

A     Right.

MR. RICHIE:  I pass the witness.

(End of excerpt testimony of Michael Martin.)

* * * * * *

                       C E R T I F I C A T E

STATE OF TEXAS          )

COUNTY OF BURNET        )

        I, VICKI K. KANEWSKE, Official Court Reporter in
and for the County Court at Law of Burnet, Burnet
County, State of Texas, do hereby certify that the above
and foregoing contains a true and correct transcription
of all portions of evidence and other proceedings
requested by counsel to be included in this volume of
the Reporter's Record in the above-styled and numbered
cause, all of which occurred in open court or in
chambers and were reported by me.

        I further certify that this Reporter's Record of
the proceedings truly and correctly reflects the
exhibits, if any, requested to be included.

        I further certify that the total cost for the
preparation of this Reporter's Record is $3,937.50 and
has been paid for by Graves Dougherty Hearon & Moody.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE this the
12th day of May, 2015.

                        /s/Vicki K. Kanewske
VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16
  Official Court Reporter, Burnet County Court at Law
     220 S. Pierce Street, Burnet, Texas  78611
512-715-5244; Fax: 512-715-5226 Email:Vkaykan@live.com

REPORTER'S RECORD

VOLUME 3 OF 4 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 10:35:27 AM
JEFFREY D. KYLE
Clerk

| IN THE MATTER OF | ) | IN THE COUNTY COURT |
| THE ESTATE OF | ) | AT LAW |
| EDELL WADE | ) | BURNET COUNTY, TEXAS |

EXHIBITS

On the 11th day of April, 2014, the foregoing proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding at Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

1

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 1 of 86

```
                    EXHIBIT INDEX

Plaintiff's Trial Exhibits:

NUMBER    DESCRIPTION            OFFERED  RECEIVED  VOL

7         Payments made         (trial not transcribed)

9         Power of Attorney     (trial not transcribed)

11        Modification Agreement (trial not transcribed)

38        File from Michael Martin(trial not transcribed)
```

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 2 of 86

# MODIFICATION AGREEMENT

**Date:** May 1, 2009

**Holder of Note and Lien:** EDELL WADE

**Holder's Mailing Address:**

REDACTED
REDACTEDREDACTED
Burnet County

**Obligor:** JOHNNY WADE and AMANDA WADE, husband and wife

**Obligor's Mailing Address:**

REDACTED
REDACTEDREDACTED
Lampasas County

**Note**

**Date:** February 6, 2004

**Original principal amount:** $500,000.00

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife

**Lender:** EDELL WADE

**Maturity date:** February 1, 2036

**Unpaid Principal and Interest on Note:** $227,528.00

**Lien Documents:** Deed of Trust dated February 6, 2004 from JOHNNY WADE and AMANDA WADE to PAT E. CAVNESS, Trustee, recorded as Document 002424, Volume 1223, page 503, Official Public Records of Burnet County, Texas

**Property (including any improvements):**

That certain real property in Burnet County, Texas, more particularly described in Exhibit "A" attached hereto and made a part hereof for all purposes.

**Extended Maturity Date of Note:** March 1, 2025

**Modified Terms:** The interest rate on this Modification and Extension shall be zero (0%) percent per annum. Principal shall be due and payable in monthly installments of ONE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($1,200.00) each beginning June 1, 2009 and continuing regularly on the first date of each succeeding month until paid.

**"THE PARTIES STATE HEREBY THAT THIS MODIFICATION IS FOR THE SOLE PURPOSE OF ELIMINATING THE OBLIGATION OF OBLIGOR TO PAY TO HOLDER INTEREST ON THIS LOAN."**

The Note is secured by liens against the Property. Whether Obligor is primarily liable on the Note or not, Obligor nevertheless agrees to pay the Note and comply with the obligations expressed in the Lien Documents.

For value received, Obligor renews the Note and promises to pay to the order of Holder of Note and Lien, according to the Modified Terms, the Unpaid Principal and Interest on Note. All unpaid amounts are due by the Extended Maturity Date of Note. Obligor also extends the liens described in the Lien Documents.

The Note and the Lien Documents continue as written, except as provided in this agreement.

Obligor warrants to Holder of Note and Lien that the Note and the Lien Documents, as modified, are valid and enforceable and represents that they are not subject to rights of offset, rescission, or other claims.

-1-

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 39 of 86

REDACTED

When the context requires, singular nouns and pronouns include the plural.

_Edell Wade._
EDELL WADE

_Johnny Wade_
JOHNNY WADE

_Amanda Wade_
AMANDA WADE

STATE OF TEXAS §

This instrument was acknowledged before me on ___June 2___, 2009, by EDELL WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 26, 2012

Notary Public, State of Texas
My commission expires: 10-26-12

STATE OF TEXAS §

This instrument was acknowledged before me on ___June 2___, 2009, by JOHNNY WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 26, 2012

Notary Public, State of Texas
My commission expires: 10-26-12

STATE OF TEXAS §

This instrument was acknowledged before me on ___June 2___, 2009, by AMANDA WADE.

DIANE G. VARNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 26, 2012

Notary Public, State of Texas
My commission expires: 10-26-12

PREPARED IN THE OFFICE OF:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX: (512) 556-8821

AFTER RECORDING RETURN TO:

MARTIN & MILLICAN
512 EAST FOURTH ST.
LAMPASAS, TX 76550
TEL: (512) 556-6228
FAX: (512) 556-8821

bpf18,163/real/wade

-2-

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 40 of 86



EXHIBIT A

THE STATE OF TEXAS      KNOW ALL MEN BY THESE PRESENTS:

COUNTY OF LAMPASAS

That we, Manuel Delbert Sylvester and Chester Horace Sylvester, individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manual Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ................................................................ in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand, paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby, except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade, of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O vrs N 9¼ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs a st md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor. of the said Berry sur. is marked by a st md from which a Large L. O. marked H brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No 60 on the S line of the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor. of the R. F. Kissier Sur. St. Md., brs 19 E at 75 ...... of the R. F. Kissier Sur. St. Md., brs 19 E at 75 ...... forked Elm the SE cor of the said Kissier Sur., at 1130 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. .. cor of this Sur. Thence N 71 E 445 vrs. a st md the Southernmost SE cor. of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed out by Dan W. Taylor, Jr.

Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas this patent is No. 593, Vol. 29, 160 acres, being Survey No. 2489, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

PAGE 1 of 3 PAGES

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 41 of 86

Occupants of Public lands, approved May 26th, 1873. Beginning at st md 582 vrs. N 19 W.from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th. N 19 W 950 vrs a st md whence a L O brs N 42 W 250 vrs a Mesquite brs S½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9½ E. 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked R.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from J. W. Blair and wife contains 40 acres M. Berry, dated May 29, 1903, recorded in Deed Records Burnet County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Burtler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. The S 19 W with the original line 480 vrs to the beginning cor, containing two hundred acres, more or less. SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock pall in said Mesquite Cr. Th thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. B. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, Pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pn pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson now owned by Joel Alexander as the East boundary and the R. B. F. Berry Land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less, being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 67 pages 376-81 of the Deed Records of Burnet County, Texas, to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corein Sylvester Stewart, Chester Horace Sylvester, and O. Bell Sylvester Phillips and the grantee Edell Sylvester were all collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

2 A 5

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 42 of 86

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns forever. And we hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the Said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Delbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

_Lenora Sylvester Butler_  
_Iva M. Stewart_  
_Coeim Sylvester Stewart_  
_O. Zell Sylvester Phillips_  
_Gilbert Phillips_  

_Manuel Delbert Sylvester_  
Individually and as Independent executor o. will of A. H. & Emma Sylvester, both deceas  
_Chester Horace Sylvester_  
Individually and as Independent executor o. will of A. H. & Emma Sylvester, both deceas.  
_Millie Sylvester_  
_Melba Sylvester_  
_Austin M. Butler_

THE STATE OF TEXAS |
COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public in and for _____ County, Texas, on this day personally appeared Manuel Delbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Delbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT _____  
Notary Public, Travis County, Texas

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 43 of 86

THE STATE OF TEXAS |

COUNTY OF ~~Kampers~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Kampers~~ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of ~~January~~, A. D. 1952.

J. V. HAMMETT

Notary Public, ~~Harris~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Kampers~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Harris~~ County, Texas, on this day personally appeared Manuel Delbert Sylvester, independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Harris~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Kampers~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Harris~~ County, Texas, on this day personally appeared Chester Horace Sylvester, individually and as independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated..

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Harris~~ County, Texas

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 44 of 86





TAB L
RR VOL. 3 OF 4 AT 39-46
Page 45 of 86

**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

*Janet Parker*

200905193

June 09, 2009   10:01:48 AM

FEE: $48.00

Janet Parker, County Clerk

Burnet County,  Texas

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 46 of 86

CERTIFICATE

STATE OF TEXAS          )

COUNTY OF BURNET        )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $834 and has been paid for by Mr. Don Richie, Attorney at Law.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of March, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226; Email Vkaykan@live.com

TAB L
RR VOL. 3 OF 4 AT 39-46
Page 86 of 86

Supplemental REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CAUSE NO:  P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF           )        IN THE COUNTY COURT

THE ESTATE OF              )        AT LAW

EDELL WADE                 )        BURNET COUNTY, TEXAS

EXCERPT TRIAL TESTIMONY OF LORI GRAHAM

AND

TRIAL TESTIMONY OF AMANDA WADE

On the 1st day of October 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas  78701

512-236-9220

    BY:  MR. DON RICHIE

       MS. EMILY SEIKEL

    APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas  78731

512-349-9595

    BY:  MR. DON E. WALDEN

    APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas  78701

512-480-5600

    BY:  MS. KATHRYN ALLEN

AND

          A P P E A R A N C E S   C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas  76550

512-556-8970

     BY:  MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas  78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Voir Dire | Vol |
|---|---|---|---|---|---|---|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

**DEFENDANT'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | | Vol |
|---|---|---|---|---|---|---|
| | | | | | | |

**Court Reporter's Certificate     Page 231          3**

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Voir Dire | Vol |
|---|---|---|---|---|---|---|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 91 | Checking account statement/Edell Wade | 150 | 150 | 3 |
| 92 | Checking account statement/Amanda/Johnny Wade | 155 | 155 | 3 |
| 93 | Checking account statement/Blacksheep | 155 | 155 | 3 |
| 94 | Amortization chart | 228 | 228 | 3 |
| 95 | Edell Wade taxes chart | 228 | 228 | 3 |
| 96 | Payment reduction chart | 229 | 230 | 3 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 11 | Amortization schedule | 132 | 132 | 3 |
| 21 | Handwritten chart | 226 | 226 | 3 |

P R O C E E D I N G S

\*\*\*\*\*\*

(Jury present.)

LORI GRAHAM

Having been previously sworn testified as follows:

CROSS EXAMINATION

BY MS. ALLEN:

Q   Ms. Graham, I want to get hold of all of your amortization schedules so that we have them all before the jury and have you talk about them while you're here with us, all right.  So let me get that exhibit and I'll bring it up to you and maybe a couple of others as well.

Ms. Graham, can you identify for us the Defendant's Exhibit 11 as a set of amortization schedules that you prepared in connection with the loan that Mrs. Wade made to Johnny and Amanda?

A   Yes.

Q   Can you confirm, because I want to be sure, that all of those pages are your amortization schedules. I know one of them has that Post-it note on it.  I want to be sure though that those are yours and that you're comfortable with that.

A   Yes, this was prepared in 2004.

Q   Okay.  And so Mr. Richie showed you a sample

page just a little while ago and I apologize that I don't remember the number of that.

MS. ALLEN:  Do you?

MR. RICHIE:  Seven.

MS. ALLEN:  Seven?

Q    (By Ms. Allen)  Exhibit 7.  Exhibit 7, that amortization schedule --

A    Yes.

Q    -- the basic -- the document itself, the schedule itself that's your schedule, right?

A    Yes.

Q    You didn't mean for the ladies and gentlemen of the jury to think that Amanda Wade gave you that schedule, right?

A    No.  The schedule is in my file.  That note came in Ms. Wade's information.

Q    That was a Post-it note, bright green I believe, that came like stuck on the 1099 for Mrs. Wade?

A    Her other documents, yes.

Q    Okay.  So we can rest assured that Amanda Wade never gave any amortization schedules to you, right?

A    No.  This was part of my work papers and that's where I put the note so I would have that documentation in my file.

Q    Okay.  Is it a -- what is it that the banks

use to tell Mrs. Wade how much interest she should be reporting?

A    A 1098.

Q    A 1098?

A    A 1099-INT.

Q    1099.  Okay.  And so if I understand the process, whoever brought -- let's say it was Amanda who brought you the 1099s that Mrs. Wade had received so that you could prepare Mrs. Wade's tax returns, the Post-it note would have been stuck on that?

A    Yes.

Q    Okay.  And I just want to be sure I'm clear because Mr. Richie uses the phrase, Was Amanda acting on behalf of.  Is that a phrase that has significance to you?

A    Well, I know she was our contact.  She was our source of contact for Mrs. Wade.

Q    Right.  She gathered her information and brought it to you, right?

A    Yes.

Q    Did you mean to suggest to these ladies and gentlemen that Amanda was making decisions for Mrs. Wade?

A    I don't guess -- no, not making decisions for her.

Q    Mrs. Wade --

A    She was just providing us her information in order to get her return done.

Q    Mrs. Wade, as far as you know, was making her own decisions, right?

MR. RICHIE:  Objection.

A    I haven't spoken --

MR. RICHIE:  Calls for speculation.

THE COURT:  All right.  I'll sustain the objection.

Q    (By Ms. Allen)  Ms. Graham, as a certified -- well, am I right that Mrs. Edell Wade was your client?

A    Yes.

Q    Not Amanda, not Johnny, right?

A    Correct.

Q    You never did any tax work for Johnny or Amanda, right?

A    No, ma'am.

Q    Okay.  So no doubt about it your client was Mrs. Wade?

A    Yes.

Q    And as a certified public accountant with a license you certainly have certain duties and responsibilities to your client, Mrs. Wade, right?

A    Yes.

Q   Can you tell the jury what those are?

A   What my duties are to Mrs. Wade?

Q   Well, in general of course wouldn't you agree that as her CPA you have a duty to act in her best interest?

A   Yes.

Q   You have a duty to obtain all of the information from her that you need in order to prepare the returns or other documents she's asking you to prepare so that they're accurate, right?

A   Yes.

Q   And you certainly would never ask her to sign a tax return if you thought she didn't know what she was doing; would you?

A   I prepare returns based on information provided to me.  I don't audit the return.  I prepare it based on what the client provides me.

Q   Ms. Graham, I'm not trying to be critical but you're a professional, right?

MR. RICHIE:  Your Honor, I'm going to object to Ms. Allen interrupting her answers.  Ms. Graham should be allowed to finish her answer.

THE COURT:  All right.  Let her answer the question before you ask another one.

Q   (By Ms. Allen)  If there's anything else you

feel you need to share, Ms. Graham, please feel free to do that.

You are a professional, right?

A    Yes, ma'am.

Q    And you would not ask a client or suggest that a client sign a tax return if you thought that your client did not know what she was doing; would you?

A    No.

Q    In fact, you take steps to try to make sure that the people you do work for understand what you're doing for them; don't you?

A    Yes.

Q    And that is what you did with Mrs. Wade, right?

A    I don't recall Mrs. Wade actually coming in to get her return.  It was picked up for her, so at that point a lot of times I don't see the client.  I assume they review it, they sign it and it gets mailed off.

Q    But you wouldn't indulge that assumption if you thought she didn't know what she was doing; would you?  You wouldn't assume that she read it if you really thought she didn't know what she was doing; would you?

A    I guess I don't understand what you're -- I mean.

Q    You never thought Mrs. Wade did not know what

12

she was doing; did you?

A  I haven't spoken to Mrs. Wade in quite a few years.

Q  Ms. Graham, if you had had the belief in your mind that Mrs. Wade was incompetent or didn't know what she was doing, you would not have suggested she sign the tax return; would you?

MR. RICHIE:  Your Honor, I'm going to object to this as asked and answered, but also speculative.  She said she hasn't seen her in a few years, so she obviously couldn't have reached that conclusion.

THE COURT:  I'll sustain the objection.

Q  (By Ms. Allen)  Ms. Graham, I think in walking through the tax return information it's clear, but I just want to confirm, is it accurate that Mrs. Wade had, apart from any money from Johnny and Amanda, she had way more money coming in than she needed to live the way she chose to live?

A  I don't know the amount of Mrs. Wade's income.

Q  Well, you did her tax return.

A  I know what her interest was.  I -- the amount she has in the banks is not on the statements.

Q  Yes, ma'am.  I do understand that.  But you do know the income she was receiving because that was the

13

number that you had to know in order to do her returns, right?

A    Her taxable interest, yes, ma'am.

Q    Well, you would --

A    That's all I had privy to, her taxable interest.  I don't know her income as far as her amount of money she has, no.

Q    Wouldn't you report all of her income on her income tax return?

A    Yes.  Her taxable income, yes,

Q    Okay.  So you didn't know all of her income, right?

A    Her taxable income, yes.  Which was interest and Social Security.

Q    And so you can tell from looking at the tax returns that you prepared and the kind of expenses that she's asking you to deduct, you do know that she had during this time, setting aside any money from Johnny and Amanda, she had way more income than she required to live the way she wanted to live, right?

MR. WALDEN:  I'm going to object, Your Honor.

MR. RICHIE:  It's speculative.

MR. WALDEN:  Well, on top of that, unfortunately not all living expenses are tax

14

deductible. So Ms. Graham may know about tax deductible and expenses, but not about all the far greater portion that are not tax deductible. She didn't know how Mrs. Wade lived at the time or whether she had enough money to do whatever she wanted to do. That's what she's being asked.

MS. ALLEN: Your Honor, I believe this could be explored.

THE COURT: This is cross.

Q    (By Ms. Allen)  Do you remember my question, Ms. Graham?

A    Could you please repeat it.

Q    Yes, ma'am. As her tax preparer and knowing her income sources and her expenses in preparing her tax returns, can you confirm for us that given the way that Mrs. Wade chose to live and her lifestyle, she had way more income than she needed to maintain the lifestyle that she chose?

MR. RICHIE: Objection. That calls for speculation.

THE COURT: Sustained.

Q    (By Ms. Allen)  Would you agree that oftentimes people choose to make gifts or do other things with their money besides leave it in the bank?

MR. RICHIE: Your Honor, I'm going to

object. She has not been designated as an expert in this case. Besides, I don't think what other people do is relevant. She can't render an opinion on whether or not this is usual or customary because she has not been designated as an expert.

THE COURT: Is that correct, counsel?

MS. ALLEN: No, he's not, Your Honor. We designated protectively Ms. Graham and Mr. Martin simply because it was anticipated that they might have testimony that was of an expert nature, so we did designate them.

MR. RICHIE: All right.

THE COURT: Overruled.

Q (By Ms. Allen) Do you remember my question, Ms. Graham?

A Repeat it, please.

Q Yes, ma'am. You would agree that people frequently choose to do other things with their money, not just leave it in the bank?

A Yes.

Q And it's not uncommon that parents have a relationship of trust and confidence with their child, right?

A I would assume so, yes.

Q And sometimes those parents even make gifts to

those children with whom they have relationships of trust and confidence; don't they?

A    I would assume so.

Q    Well, you've seen that, right, in your practice?

A    Yes.

Q    That's what I'm really asking is you've seen that?

A    Yes.

Q    And it's not uncommon, right?

A    No.

Q    And there's nothing wrong or illegal with that because if there were you would be sounding the alarm; wouldn't you?

A    Correct.

Q    And you didn't sound any alarms with regard to Mrs. Wade; did you?

A    Not necessarily.  What are you asking?

Q    You didn't raise any alarms, there were no red flags waved for you or bells went off when you saw that there was at least an elimination of interest in favor of Johnny and Amanda; that wasn't something that you perceived was wrong or illegal or needed to be reported, right?

A    Illegal, no.

Q    Did it need to be reported somewhere?

A    I think it probably should have been done.

Q    Explain to --

A    Go ahead.

Q    No, no.  If you need to finish your answer, by all means go ahead.

A    It depends on the situation where you have a forgiveness of debt or a gift, you know, there are other various things.

Q    There you go.  It's right to say that if you're going to properly report the results of a loan restructure you need to understand exactly what was done, right?

A    Yes.

Q    And so did you interview Mrs. Wade or ask her what exactly did you do, I need to understand exactly what you did in order to report this properly?

A    No.  I just went off the information provided to me.

Q    So you didn't feel it was necessary to delve further into the matter, right?

MR. RICHIE:  Your Honor, I'm going to object because it calls for facts not in evidence.  Ms. Graham said she didn't even know there was a reduction in principal.  I don't know how she would have commented

on it or reported it.  Assumes facts not in evidence.

THE COURT:  I'm going to overrule that objection and let her answer the question.

A    I prepared the return based on the information provided to me.

Q    (By Ms. Allen)  Isn't it accurate that so long as Johnny and Amanda were paying interest to Mrs. Wade she was having to turn around and pay part of that to the IRS?

A    Yes.

Q    And it wouldn't surprise you if she did not like to take money from her son and turn around and pay it to, or part of it to the IRS, right?

MR. RICHIE:  Objection.  That calls for facts not in evidence and speculation.

THE COURT:  Sustained.

Q    (By Ms. Allen)  There has been a suggestion on your direct examination that one could not save tax money by refusing to take income; do you remember that? That is that you don't have a net savings there because your income is going to be X and your tax is going to be Y and there is always going to be a positive there, right?  Well, wasn't that the point Mr. Richie was making?

A    Yes.

Q   Wasn't the point he was making is that nobody would say I'm not going to take this money from you in order to save on taxes, right?

A   That was the assumption, yes.

Q   Okay.  I want to understand is it fair to say, when we look at those figures, that if Mrs. Wade's decision was I don't want to take money from Johnny and pay part of it to the IRS, that would be a valid reason for her to make the decision not to take the money, right?

MR. RICHIE:  Objection, Your Honor. Calls for speculation and assumes facts not in evidence.

THE COURT:  Sustained.

Q   (By Ms. Allen)  You never perceived that there was a default under either the promissory note or the modification agreement; did you?

MR. RICHIE:  Objection, Your Honor.  This witness is not qualified to interpret defaults and she has not been called upon to render an opinion on that.

THE COURT:  You may rephrase your question and ask if she's aware of any missed payments.

Q   (By Ms. Allen)  Ms. Graham, are you aware that a single payment was ever not paid that was due under the note or the modification?  Do you understand my question?

A    I was not aware of anything, no, as I was going by what the client provided me. I wasn't privy to when payments were actually received or paid.

Q    Mrs. Wade certainly never said to you, Ms. Graham, there's been a default on the note. Right?

A    No.

Q    You never gained any independent knowledge on your own nor her to suggest there was ever a default on the note or the modification, right?

A    No.

Q    Just to be clear, we're asking about someone else's handwritten notes. Don't want to go back through that. Mr. Martin has already explained his own notes, but is it fair to say you're not suggesting to the ladies and gentlemen that conversations didn't occur?

A    No. I probably spoke with Mr. Martin on numerous occasions.

Q    And probably even on the occasions he recalls even though you can't recall them, right?

A    I don't recall the specifics of the conversation. I do know that the modification was not my recommendation. Now, maybe we discussed her sources of income and what was causing her to pay tax, which was 99 percent interest income.

MS. ALLEN: Pass the witness, Your Honor.

C E R T I F I C A T E

STATE OF TEXAS            )

COUNTY OF BURNET          )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226;Email:Vkaykan@live.com

REPORTER'S RECORD

VOLUME 3 OF 4 VOLUMES

CAUSE NO:  P9127/COURT OF APPEALS NO:  03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 10:35:27 AM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| IN THE MATTER OF | ) | IN THE COUNTY COURT |
| THE ESTATE OF | ) | AT LAW |
| EDELL WADE | ) | BURNET COUNTY, TEXAS |

EXHIBITS

On the 11th day of April, 2014, the foregoing proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding at Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

                    EXHIBIT INDEX

**Plaintiff's Trial Exhibits:**

NUMBER    DESCRIPTION              OFFERED  RECEIVED   VOL

7         Payments made           (trial not transcribed)

9         Power of Attorney       (trial not transcribed)

11        Modification Agreement (trial not transcribed)

38        File from Michael Martin(trial not transcribed)

ODELL WADE –JOHNNY WADE

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 29 | 05/08/2008 | 1,849.00 | 476.17 | 1,372.83 | 284,331.32 |
| 30 | 06/08/2008 | 1,849.00 | 473.89 | 1,375.11 | 282,956.21 |
| 31 | 07/08/2008 | 1,849.00 | 471.59 | 1,377.41 | 281,578.80 |
| 32 | 08/08/2008 | 1,849.00 | 469.30 | 1,379.70 | 280,199.10 |
| 33 | 09/08/2008 | 1,849.00 | 467.00 | 1,382.00 | 278,817.10 |
| 34 | 10/08/2008 | 1,849.00 | 464.70 | 1,384.30 | 277,432.80 |
| 35 | 11/08/2008 | 1,849.00 | 462.39 | 1,386.61 | 276,046.19 |
| 36 | 12/08/2008 | 1,849.00 | 460.08 | 1,388.92 | 274,657.27 |
| 2008 Totals | | 22,188.00 | 5,672.62 | 16,515.38 | |
| 37 | 01/08/2009 | 1,849.00 | 457.76 | 1,391.24 | 273,266.03 |
| 38 | 02/08/2009 | 1,849.00 | 455.44 | 1,393.56 | 271,872.47 |
| 39 | 03/08/2009 | 1,849.00 | 453.12 | 1,395.88 | 270,476.59 |
| 40 | 04/08/2009 | 1,849.00 | 450.79 | 1,398.21 | 269,078.38 |
| 41 | 05/08/2009 | 1,849.00 | 448.46 | 1,400.54 | 267,677.84 |
| 42 | 06/08/2009 | 1,849.00 | 446.13 | 1,402.87 | 266,274.97 |
| 43 | 07/08/2009 | 1,849.00 | 443.79 | 1,405.21 | 264,869.76 |
| 44 | 08/08/2009 | 1,849.00 | 441.45 | 1,407.55 | 263,462.21 |
| 45 | 09/08/2009 | 1,849.00 | 439.10 | 1,409.90 | 262,052.31 |
| 46 | 10/08/2009 | 1,849.00 | 436.75 | 1,412.25 | 260,640.06 |
| 47 | 11/08/2009 | 1,849.00 | 434.40 | 1,414.60 | 259,225.46 |
| 48 | 12/08/2009 | 1,849.00 | 432.04 | 1,416.96 | 257,808.50 |
| 2009 Totals | | 22,188.00 | 5,339.23 | 16,848.77 | |
| 49 | 01/08/2010 | 1,849.00 | 429.68 | 1,419.32 | 256,389.18 |
| 50 | 02/08/2010 | 1,849.00 | 427.32 | 1,421.68 | 254,967.50 |
| 51 | 03/08/2010 | 1,849.00 | 424.95 | 1,424.05 | 253,543.45 |
| 52 | 04/08/2010 | 1,849.00 | 422.57 | 1,426.43 | 252,117.02 |
| 53 | 05/08/2010 | 1,849.00 | 420.20 | 1,428.80 | 250,688.22 |
| 54 | 06/08/2010 | 1,849.00 | 417.81 | 1,431.19 | 249,257.03 |
| 55 | 07/08/2010 | 1,849.00 | 415.43 | | 247,823.46 |
| 56 | 08/08/2010 | 1,849.00 | 413.04 | | |
| 57 | 09/08/2010 | 1,849.00 | 410.65 | | |
| 58 | 10/08/2010 | 1,849.00 | 408.26 | | |
| 59 | 11/08/2010 | 1,849.00 | 405.85 | | |
| 60 | 12/08/2010 | 1,849.00 | 403.4 | | |
| 2010 Totals | | 22,188.00 | 4,999.1 | | |
| 61 | 01/08/2011 | 1,849.00 | 401.0 | | |
| 62 | 02/08/2011 | 1,849.00 | 398. | | |
| 63 | 03/08/2011 | 1,849.00 | 396. | | |
| 64 | 04/08/2011 | 1,849.00 | 393 | | |
| 65 | 05/08/2011 | 1,849.00 | 391 | | |
| 66 | 06/08/2011 | 1,849.00 | 388 | | 1 |
| 67 | 07/08/2011 | 1,849.00 | 38 | | 0 |
| 68 | 08/08/2011 | 1,849.00 | 38 | | .6 |
| 69 | 09/08/2011 | 1,849.00 | 381.51 | | 17 |
| 70 | 10/08/2011 | 1,849.00 | 379.17 | 1,469.63 | 94 |
| 71 | 11/08/2011 | 1,849.00 | 376.72 | 1,472.28 | 224,568.66 |

2365.57

Principal Only Per Client



Lori – We paid Mrs. Wade house payments w/ interest through May. She then relieved us of our interest and changed our note to principal only. So she only us for 5 months. from

Did not make last estimated pymt 4760

PLAINTIFF'S
EXHIBIT
7

B5

Jew000321

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF BURNET      )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $834 and has been paid for by Mr. Don Richie, Attorney at Law.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of March, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226; Email Vkaykan@live.com

3

Supplemental REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CAUSE NO:  P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF          )          IN THE COUNTY COURT

THE ESTATE OF             )          AT LAW

EDELL WADE                )          BURNET COUNTY, TEXAS


EXCERPT TRIAL TESTIMONY OF LORI GRAHAM

AND

TRIAL TESTIMONY OF AMANDA WADE


On the 1st day of October 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

                    A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas  78701

512-236-9220

        BY:  MR. DON RICHIE

             MS. EMILY SEIKEL

        APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas  78731

512-349-9595

        BY:  MR. DON E. WALDEN

        APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas  78701

512-480-5600

        BY:  MS. KATHRYN ALLEN

AND

            A P P E A R A N C E S    C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas  76550

512-556-8970

     BY:  MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas  78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Voir Dire | Vol |
|-------|-----|-------|-------|---------|-----------|-----|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

**DEFENDANT'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | | Vol |
|-------|-----|-------|-------|---------|--|-----|

**Court Reporter's Certificate          Page 231          3**

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Voir Dire | Vol |
|---|---|---|---|---|---|---|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 91 | Checking account statement/Edell Wade | 150 | 150 | 3 |
| 92 | Checking account statement/Amanda/Johnny Wade | 155 | 155 | 3 |
| 93 | Checking account statement/Blacksheep | 155 | 155 | 3 |
| 94 | Amortization chart | 228 | 228 | 3 |
| 95 | Edell Wade taxes chart | 228 | 228 | 3 |
| 96 | Payment reduction chart | 229 | 230 | 3 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 11 | Amortization schedule | 132 | 132 | 3 |
| 21 | Handwritten chart | 226 | 226 | 3 |

of 6 and 6A and I want them back.

Q    (By Mr. Richie)  You went to Pat Cavness's office.  Who did you go with?

A    Nancy, Edell, Johnny and myself.

Q    And you understood Pat Cavness was Edell Wade's lawyer that had been Charles Otto's lawyer as well; didn't you?

A    Yes.

Q    Why did you go to the office of Pat Cavness?

A    To arrange the sale of this property.

Q    And that was in January of 2004?

Q    I believe so.  I don't have an independent recollection of the date but it would have been around that time.

Q    And after meeting with Pat Cavness and after he drafted some documents, the representation of Pat Cavness was terminated; wasn't it?

A    We ceased using him.  He wasn't called up and fired.

Q    He was representing Edell Wade; wasn't he?

A    Yes, he was.

Q    But you decided not to use him any more, right?

A    I did decide not to use Pat any more.

Q    Can you tell the jury why you decided not to

Honor. We object.

THE COURT: Overruled.

You may answer what you saw.

A    I know he checked Otto's will, which is Edell's husband, to make sure that Edell had the ability to sell the property and I believe he questioned the price.

Q    And then you left that meeting?

A    Yes.

Q    And Ms. Nancy Wade reported to you that he had made a derogatory comment. What was the derogatory comment?

A    She reported that sometime later on to me. Nancy said, Hey, Pat said something about you.

Q    What was it that she reported to you?

A    She kind of did an impersonation of Pat, with a little bit of a country twang, and my memory is she said something like that he said to her, Do y'all like her? And it was obvious to me based on her interpretation of the comment that Pat did not like me. And my understanding from Nancy was that Nancy said, Yes, we love her.

Q    So based upon that representation from Nancy Burns, you hired a new law firm to document this deal; didn't you?

A     There was another law firm brought in.

Q     You hired them?

A     Okay.

Q     You went to Austin; didn't you?

A     No, I didn't.

Q     Did you call the David Armbrust firm in Austin, Armbrust & Brown?

A     I contacted Armbrust & Brown.

Q     Mrs. Edell Wade did not do that; did she?

A     Not as far as I know.

Q     Did you ever take Mrs. Wade to the office of Armbrust & Brown in Austin?

A     No, I did not.

Q     Did one of the lawyers from that firm come out to Burnet or Lampasas to meet with Edell Wade?

A     Not that I know of.

Q     Again, let's just cut to the chase here.  No lawyer from that firm talked to Edell Wade, met with Edell Wade, explained the transaction to Edell Wade or got any information from Edell Wade about the sale of the ranch, the 475 acres and all the farm implements and livestock to you and Johnny for $500,000, right?

A     Not that I know of.

Q     In fact, the communications from Armbrust & Brown are to you?

58

A    Well, I have their communications to me, yes.

Q    And the bill from Armbrust & Brown is to you?

A    Yes.

Q    And you paid their legal fees?

A    I did.

Q    Had you formed an opinion in your own mind about that time whether Edell Wade -- and I'm talking about the time that this transaction is actually getting signed, had you formed in your mind an understanding that Edell Wade trusted you?

A    I don't know that I ever had thought about that.

Q    Did she have confidence in you?

A    I don't know.

Q    Well, you know that by 2007 she granted a power of attorney in your favor.  You know that, right?

A    Yes, I know that.

Q    That would be a pretty clear indication that she had trust and confidence in you in 2007, right?

A    I suppose so.

Q    As an attorney would you ever give a power of attorney, a statutory power of attorney to anybody that you didn't have trust and confidence in?

A    No.

Q    Let me show you Exhibit 2, a warranty deed

to argue that you had a default because of the delay in payments. And the reason for it is because of the reasons I've stated. The consequences of going into those areas would be more devastating than the error of my instruction, in my opinion.

All right. Bring the jury back in.

(Jury in.)

THE COURT: You may proceed.

MR. RICHIE: Thank you, Your Honor.

Q (By Mr. Richie) Ms. Wade, at some point after you moved on to the ranch there was a lock put on the gate, a chain and a lock; is that correct?

A Yes.

Q Can you tell the jury when that gate became locked?

A I don't know.

Q Was it after 2005?

A I don't recall when it got a lock on it.

Q Did you give keys to Bud Wade?

A Did I give Bud a key? No.

Q Did you give Gwen a key?

A No.

Q Did you give anybody a key other than Nancy Wade?

A Edell had numerous copies of the key in her

house. Emma and John had keys when they came. Heidi, Charles and Kim, the propane guy, the diesel guy, the trapper.

Q    But not Bud Wade?

A    No, Bud didn't have a key.

Q    Not Gwen Wade?

A    No.

Q    And not Sue?

A    No.

Q    And not Charlene?

A    No.  Weldon had gotten a key one day.

Q    When I'm talking about the gate I'm actually talking about a swinging gate, had a lock put on it and a chain, right?

A    You're asking me if I did it?

Q    No.  Have you seen it though?

A    Yes.

Q    In addition to that there's something that is referred to as the gap.  Have you heard that reference?

A    Yes.

Q    What do you understand the reference to the gap to mean?

A    There was a gap next to the gate.

Q    So there's a gate, a fence post and then there's a length of fence between that fence post and

117

the next one that's called the gap?

A    Yes.

Q    And a lock was placed on that as well; wasn't it?

A    I don't know.

Q    Let me show you Exhibit 50 and ask you if you can identify that as a chain and lock on this gap at the ranch?

A    If you're telling me that that's what this is, then I'm not going to dispute it.  It looks like a fence post with a lock on it to me.  I can't say that that's on our place.

Q    Have you seen a lock and a chain on the gap at the ranch?

A    Not that I recall, no.

Q    If there is one did you give a key to Bud?

A    No.

Q    Did you give a key to Nancy?

A    No.

Q    Did you --

A    I'm sorry.  Nancy had a key.  I don't know if it was to this or a key to the gate.

Q    Did Weldon have a key?

A    I know Weldon came and got keys.

Q    Well, he came to visit at one point and he had

to get a key to get on the land. Do you remember Nancy talking about that?

A    I know Nancy talked about that.

Q    That's what you're talking about, right?

A    I remember Weldon coming to the hardware store and picking up a key, yes.

Q    And that is what he had to do to get on the place. He had to come to a hardware store and get a key?

A    No, not necessarily.

Q    How would he have gotten in?

A    There were keys hanging on the fence post that anybody who had asked could have taken the key off the fence post.

Q    And that fence post is actually behind the fence; wasn't it, so there's a road then a fence blocking the entry to the ranch and then a fence post between that fence and the property. And that's where you're talking about keys hanging on a fence post?

A    I don't really have any idea what you just said. There was a fence post then the fence.

Q    Was it a fence post inside the fence, in front of the fence or behind the fence?

A    The fence post was the fence.

Q    You believe the fence post, the fence itself,

had keys hanging right off of it. That's your testimony?

A    On the fence post, yes.

Q    And that anybody walking up the road could get those keys?

A    Yes.

Q    If Bud Wade says that isn't true, that he had to actually open the gap and get in, or climb over the fence to get those keys, you're going to tell the jury that's not accurate?

A    Can you tell me what Bud is going to say again?

Q    That the keys were inside the fence, not outside the fence and not on the fence.

A    Well, maybe it's semantics. If this is the fence and this is the street side, this is the house side. Just say this whole thing is a fence post, the key hung on the inside of the fence post, but it wasn't where you would have to climb over the fence to get to it. You could just pick them up.

Q    Well, what was the purpose of giving anybody a key like Emma or her children if in fact that key was just hanging right there on the fence post. Why did you give them a key?

A    It's certainly more convenient.

Q What was?

A To have a key in your hand as opposed to walking to the fence post and picking it up.

Q Was there a sign that said, Hey, there's a key over here anybody that needs to get in?

A No.

Q So if EMS rolled up there because mama fell and hurt herself and set off her alarm while you and Johnny were at the stores, would they have to use a bolt cutter to get in?

A They probably could have rolled over the fence pretty easily and gotten in there without using a bolt cutter over the maybe four or five wire barbed fence, or they could have cut the bolt cutter on the lock on the gate.

Q But the emergency unit didn't know there was a key on the fence post; did they?

A Not that I know of.

Q Would you agree that Edell Wade turned 90 somewhere around 2005, 2006?

A It would have been 2005.

Q When was her birthday?

A March 30th.

Q Okay. So March 30th, 2005 she became 90 years old?

A    I believe so.

Q    Was there a birthday party for her?

A    I believe so.

Q    And did someone ask you -- Bud Wade, Nancy Wade -- somebody ask you if they could use the ranch to have the birthday party?

A    Nobody asked me.  I became aware of it but nobody asked me.

Q    Did you tell them they could not have the party at the ranch?

A    Ultimately yes.

Q    Family gatherings had been at that ranch before you moved on it; hadn't they?

A    Yes.

Q    And now is this the first time that you know of where somebody had been told, You can't have a family gathering on the ranch?

A    I don't know.

Q    You don't know of one before that; do you?

A    No, I don't know of one before that.

Q    Was there a 90th birthday party?

A    Yes.

Q    Did you go to it?

A    I believe so.

Q    Did Johnny go to it?

A    I believe so.

Q    And Edell went to it?

A    Yes.

Q    She could not have her 90th birthday party at home even though she had a life estate, right?

A    That's not exactly correct.

Q    You told the family members, I don't want you to have a birthday party on the ranch; didn't you?

A    That's not exactly correct.

Q    Well, what did you tell them?

A    What did I --

Q    What did you tell the family members who wanted to have a party at the ranch?

A    I told them that they couldn't have it there.

Q    That actually happened again on her 95th birthday, the year of her death; didn't it?

A    No.

Q    Wasn't there another birthday party that year?

A    Yes, there was.

Q    Was it at the ranch?

A    No, it was not.

Q    Did you go to the 95th birthday party?

A    No, I did not.

Q    Did Johnny go to the 95th birthday party?

A    No, he did not.

Q   Did Edell go to the 95th -- I'm sorry.  Did Emma go to the 95th birthday party?

A   I don't know.

Q   Do you know Emma was in town; don't you?

A   I don't remember.

Q   You know Kim was in town; don't you?

A   I don't remember.

Q   Well, in March of 2010 did Emma and Kim stay at the ranch when they came to town in March?

A   If they had come to town they would have stayed at the ranch.  Whether they were there I don't independently remember.

Q   I want to now ask you -- we talked about the fact that you agree with me that there was a relationship of trust and confidence between you and Edell Wade at least as early as 2007; do you remember that testimony?

A   Yes.

Q   There was also a relationship of trust and confidence between Edell Wade and Johnny Wade?

A   I believe so.

Q   And that was in place since at least 2007?

A   I'm sorry.  I didn't hear you.

Q   Was that in place as of at least 2007?

A   I believe so.

Q   And continued up until the time of her death?

A   The relationship with Johnny?

Q   The relationship of trust and confidence between you and Edell Wade?

A   Yes.

Q   And the relationship between Edell Wade and Johnny Wade, the trust and confidence relationship, that continued through the date of her death?

A   Yes.

Q   And you acted on that relationship of trust and confidence.  You took information to Lori Graham for example, right?

A   I don't know if that's acting on the relationship of trust and confidence.  That is helping Mrs. Wade.

Q   What did you help her do with respect to Lori Graham?

A   I took Mrs. Wade's tax items to Lori Graham.

Q   Did you help Mrs. Wade gather the information to take to Lori Graham?

A   I may have.

Q   And then you took her to Lori Graham?

A   I believe I did.

Q   And you picked up the tax returns from Lori Graham?

A    No.

Q    You don't recall that.  Were you there?

A    I don't recall it.

Q    In 2009 did you have an occasion again to talk with Michael Martin about preparing a modification to the note?

A    I made -- I know I spoke with him and I made an appointment with his office.

Q    To modify the note?

A    Yes.

Q    And that's the promissory note we've been talking about that you and Johnny gave Edell Wade back in 2004 to pay for the ranch?

A    Yes.

Q    The one that had 2 percent interest?

A    Right.

Q    And had payments -- here is a copy of the note, Exhibit 4.  Do you see on the front page it says the payments will be $1,848.10 each?

A    Yes.

Q    That's the note we're talking about?

A    I guess that's it.

Q    Is that he one you wanted to modify?

A    That was the note to be modified, yes.

Q    What were you seeking the modification to

Q Johnny Wade, et ux. That would be you, right?

A Yes.

Q And inside on his worksheet at the back is his work order that says: The client.

It says "client" doesn't it?

A Yes.

Q Johnny Wade, et ux. That's you; isn't it?

A Yes.

Q And at this time Mrs. Wade would have been, in 2009, 94 years old; wouldn't she?

A I believe so.

Q Did you talk with Mr. Martin about the modification?

A At any time?

Q Yes.

A Yes.

Q You knew it was happening, right?

A Yes.

Q And you had that relationship with her of trust and confidence was still in place. Mrs. Wade still trusted you, right?

A Yes.

Q And she had confidence in you?

A As far as I know.

Q Did you know before the modification was

signed that the principal was going to be reduced on the note?

A   I knew that Mrs. Wade had expressed wanting to give Johnny a gift.  I did not know what or how much.

Q   Did you consider when you heard about it, did you consider whether or not the modification would be fair to Edell Wade?

A   I don't think I ever thought of it in terms of fairness.  It was something that she expressed that she wanted to do.

Q   When she was 94?

A   Yes.

Q   Did you consider whether or not that modification would benefit you?

A   It obviously benefited me.

Q   You would be paying less, right?

A   Yes.

Q   Therefore you would have more money?

A   Yes.

Q   And the price of the ranch, the original price would be reduced by the amount of this principal reduction, right?

A   The amount of the note was going to be reduced.

Q   And the amount paid for the ranch therefore

would be less?

A    I guess you could put it that way.

Q    Would that also benefit Johnny Wade?

A    Yes.  The gift was really to him.

Q    And Mrs. Wade would be getting les money than if you paid the full principal on the note as set forth in 2004?

A    Yes.

Q    And there would be less in the estate to divide to my clients, Nancy Wade, Sue Meuth, than if you paid the full amount on the note?

A    Yes.

Q    You wrote a note.  You saw Lori Graham this morning and you wrote a note to her.  She says it was 2010.

MR. RICHIE:  Can you put that up, please. Do you know what exhibit this is?  Seven.  Okay.

Q    (By Mr. Richie)  I don't know if you can see it, but let me show you up close what it looks like.  Is that your handwriting where it says:  Lori, we paid Mrs. Wade house payments with interest through May.  She then relieved us of our interest and changed our note to principal only.  She only has interest income from us for five months.

Is that your handwriting?

131

A   Yes.

Q   Below that it says, Did not make last estimated payment.

Is that your handwriting?

A   It doesn't look like it, no.

Q   Everything above that is yours?  I'm not talking about what's on the left.  Just this part from the line up.

A   Yes.

Q   And there's no mention in there of a principal reduction; is there?

A   That's correct.

Q   And there's no mention of a gift?

A   That's correct.

MR. RICHIE:  Now would you go to the bottom of the modification agreement, please.

As part of Exhibit 38, Your Honor, I'm going to go ahead and mark it as Exhibit 11 and offer it.

THE COURT:  Any objection to Plaintiff's Exhibit 11?

MR. DUCLOUX:  No objection.

THE COURT:  Defendant's Exhibit 11 will be received into evidence.

Q   (By Mr. Richie)  Do you have that modification agreement in front of you?

Q   Reviewed.  Reviewed.  You read them?

A   I recall being sent one draft.

Q   And commenting, talking with Mr. Martin about it?

A   I did not talk with Mr. Martin about it.

Q   The number that the note is modified to is $227,528.  Do you see that number?

A   Yes.

Q   Do you know where that number came from?

A   Not necessarily, no.

Q   Well, did you give Mr. Martin that number?

A   No.

Q   Did Johnny give Mr. Martin that number?

A   Not that I know of.

Q   Did you do a calculation that resulted in $227,528?

A   I don't think so.

Q   If I want you to assume with me -- you will hear this later from some other witnesses -- but I want you to assume with me that the difference between the unpaid balance of the note in May of 2009 -- I'm sorry, the balance on the original note after applying the $150,000 prepayment was somewhere around $267,000.  Just assume that.

A   Okay.

Q   If that's true, about a $40,000 difference.  I think it comes up to like $39,800 -- $848.  Did you know that the amount of what you call a gift and I call a principal reduction, was almost $40,000 before it happened?

A   I don't think I knew the amount, the exact amount, no.

Q   Did you know the magnitude, did you know it was $ 40,000?

A   I just said I didn't know the amount, so, no.

Q   And you didn't consider whether or not it would be fair to Mrs. Wade, Edell Wade?  I'll rephrase it.

Did you consider it to be beneficial to Mrs. Wade, financially beneficial?

A   I can't say that I did.

Q   Did you talk to Bud Wade about it?

A   No.

Q   Did you talk to Nancy Wade Burns about it?

A   No.

Q   Did you talk to any of the Wade children about it?

A   I certainly talked at some point to Johnny about it.

Q   Fair enough.  Other than Johnny, anyone else?

Q It would be kind of hard to miss; wouldn't it, when you're looking at the document?

A If you say so.

Q Well, can you miss it?

A I certainly didn't understand or realize that that's what that said. It's hard for me to say what I thought five years ago. If I had seen it and noticed it and realized it was a reduction in principal, I'm sure I would have called it out to Mike Martin. I would have certainly reminded him to make sure these were right.

Q Do you recall what other things you called out to Mike Martin when you talked to him about a previous draft of this modification?

A The one thing I remember talking to Mike Martin about regarding this, and I don't remember at what point in time this was, but he informed me for some reason they were lowering the payment from the 1,848.10 to 1,200. That's the only conversation I remember having with Mike Martin.

Q $1,200 a month?

A Yes.

Q From $1,848 a month?

A Yes.

Q So about a one-third reduction in the monthly payment?

A   Approximately, yes.

Q   And you would agree with me that is a benefit to you and Johnny?

A   Yes.

Q   Lower payments, more money for you?

A   Sure.

Q   Could you have said to Edell Wade or Mike Martin, I will not accept a modification that reduces interest to zero.  Could you have said that?

A   Of course I could.

Q   Could you have said, I will not accept a reduction in payments from $1,848 a month to $1,200 a month?

A   Of course I could.

Q   And you told us today, and I think you said previously in your testimony, you didn't consider fairness with respect to this transaction, fairness to Mrs. Wade or the other children, the other Wade children; did you?

A   I certainly didn't consider the other Wade children.  I'm not saying that I thought this was unfair to Mrs. Wade.  It just was never a factor that entered my mind.

Q   Just didn't consider it at all; did you?

A   I didn't.  I didn't think if Mrs. Wade wanted

Q   And it would be out of character for Johnny Wade to send information like this to his siblings; wouldn't it?

A   Mrs. Wade would have hung us out to dry.

Q   Was it out of character for Johnny Wade to send this type of information to his siblings?

A   Ever?

Q   Well, with respect to transactions with Mrs. Wade.  Y'all didn't send a note -- the warranty deed to any of the other siblings; did you?

A   I disagree with that.

Q   Who did you send it to?

A   I believe it went to Nancy.

Q   At the time that it was signed?

A   I believe I sent it to Nancy to take Mrs. Wade to have it signed.

Q   All right.  With the exception of Nancy did you send the warranty deed to Bud Wade?

A   No.

Q   Any of the other Wade children at all?

A   Did I send the warranty deed to any of the other children?

Q   Right.

A   No.

Q   Did you send the promissory note, a copy of

that to the other children?

A    With the exception of Nancy?

Q    Let's leave Nancy and Johnny out of this.  The Wade children I'm talking about Emma, Charlene, Sue and Bud and Weldon.

A    No.

Q    And you didn't send them the closing agreement?

A    That's correct.

Q    You just didn't send them any information about the sale; did you?

A    That's correct.

Q    And neither did Johnny?

A    As far as I know.

Q    And neither did Edell Wade, as far as you know?

A    As far as I know Edell did not send any paper work to any of them.

Q    And your lawyers in Austin, Armbrust & Brown, they didn't send this information to any of the other Wade children; did they?

A    As far as I know, no.

Q    After this modification was signed you continued to make payments but they are $1,200 a month?

A    Yes.

C E R T I F I C A T E

STATE OF TEXAS          )

COUNTY OF BURNET        )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226;Email:Vkaykan@live.com

# Clerk's Record

## VOLUME 1 OF 2

Trial Court Cause Number P9127
In the County Court
Of Burnet County, Texas
W. R. SAVAGE, Judge Presiding

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

IN THE MATTER OF THE ESTATE OF
EDELL WADE

Appealed to the
Court of Appeals for the Third District of Texas,
at Austin, Texas

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Attorney for Appellant: SHELDON E. RICHIE
Address: 100 CONGRESS AVE, SUITE 1750 – AUSTIN, TEXAS 78701
Telephone No.: 512-236-9220
Fax No.: 512-236-9230
E-mail address: srichie@rg-austin.com
State Bar No.: 16877000
Attorney for: JAMES E. WADE, Appellant(s)

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

CAUSE NO. P9127

ESTATE OF EDELL WADE, DECEASED      §      IN THE COUNTY COURT AT LAW

                                      §      OF

                                        §      BURNET COUNTY, TEXAS

## INDEX

| Name | Volume 1 | Page |
|---|---|---|
| Defendants' Johnny and Amanda Wade's Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>    *Filed March 20, 2014* | | 5 |
| Defendants Johnny Wade's and Amanda Wade's Traditional and No Evidence Motion for Partial Summary Judgment on Plaintiff James Wade's Claims for Attorney's Fees Against Defendants in their Individual Capacities<br>    *Filed March 20, 2014* | | 166 |
| Plaintiff's Motion For Continuance And, In The Alternative, Response To Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale<br>    *Filed April 7, 2014* | | 279 |
| Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>    *Filed April 14, 2014* | | 611 |
| Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning The 2004 Sale or Alternatively, To Sever Plaintiff's Claims Concerning The 2004 Sale Or For Permission To Appeal Interlocutory Order<br>    *Filed April 23, 2014* | | 612 |
| Supplement to Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, To Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission To Appeal Interlocutory Order<br>    *Filed April 24, 2014* | | 675 |
| Order<br>    *Filed April 29, 2014* | | 762 |
| Plaintiff's Third Amended Original Petition<br>    *Filed May 2, 2014* | | 765 |
| Motion for Exclusion of Evidence (For Plaintiff's Failure to Respond to Discovery Requests)<br>    *Filed May 7, 2014* | | 820 |

Defendants' Hearing Presentation in Support of Motion for Exclusion of Evidence      848
    *Filed May 20, 2014*

Defendants' Motion for Partial Summary Judgment (as to all claims for relief based      950
on: default" on loan)
    *Filed May 22, 2014*

Defendants' Motion for Partial Summary Judgment (as to All Tort Claims, based      963
on Economic Loss Rule)
    *Filed May 22, 2014*

Defendants' Response to Plaintiffs' Traditional and No-Evidence Motion for Summary      975
Judgment on their Claims for Breach of Fiduciary Duty and Conspiracy with Exhibits A-G
    *Filed June 5, 2014*

Amanda Wade's Response (in her capacity as Independent Executor) to Nancy Burns'      1063
No-Evidence Summary Judgment Motion on Affirmative Defenses
    *Filed June 5, 2014*

Volume 2

Response in Opposition to Plaintiff's No-Evidence Motion for Partial Summary      1122
Judgment and Nancy Burns' Joinder (as to Affirmative Defenses and Couterclaims)
with Exhibits 1-25
    *Filed June 5, 2014*

Sixth Amended Answer To Plaintiff James E. Wade's Third Amended Original Petition      1263
and Second Amended Counterclaim of Johnny and Amanda Wade
    *Filed July 15, 2014*

Sixth Amended Answer to Plaintiff James E. Wade's Third Amended original      1275
Petition and Third Amended Couterclaim of Johnny and Amanda Wade
    *Filed July 15, 2014*

Fifth Amended Answer to Plaintiff Nancy Burns' Amended Petition for Damages      1296
for Breach of Fiduciary Duty and Second Amended Counterclaim
    *Filed July 15, 2014*

Order      1314
    *Filed July 29, 2014*

Response to James Wade's Motion for Continuance, and Motion for Leave to      1315
Supplement Summary Judgment Proof
    *Filed July 24, 2014*

Verification Pages for Sixth Amended Answer and Third Amended Counterclaim      1420
    *Filed August 4, 2014*

Consolidated Response of Johnny and Amanda Wade to Plaintiff's Motion for      1422
Traditional Summary Judgment on Defendants' Counterclaims and Plaintiff's Motion
to Dismiss Under Rule 91a
    *Filed September 9, 2014*

Response of Johnny and Amanda Wade to Plaintiff's Motion for Show Cause Order for Contempt and to Levy Sanction Award    1534
*Filed September 26, 2014*

Charge Of The Court    1539
*Filed October 6, 2014*

Verdict    1541
*Filed October 6, 2014*

Plaintiff James E. Wade's Motion For Judgment Non Obstante Verdicto    1559
*Filed October 15, 2014*

Request For Denial Of Plaintiff's Motion For Judgment Non Obstante Verdicto and Defendants' Motion For Entry Of Judgment    1589
*Filed October 22, 2014*

Final Judgment    1599
*Filed November 17, 2014*

Order Denying Plaintiffs' Motion For Judgment Notwithstanding The Verdict    1602
*Filed November 17, 2014*

Plaintiff's Motion For New Trial    1603
*Filed December 12, 2014*

Order Denying Motion For New Trial    1633
*Filed January 26, 2015*

James E. Wade's Notice Of Appeal    1634
*Filed February 12, 2015*

Plaintiff's Letter To Vicki Kanewske Requesting The Reporter's Record    1637
*Filed February 20, 2015*

Plaintiff's Request for Preparation of Clerk's Record    1640
*Filed February 20, 2015*

Defendant's Request for Preparation of Clerk's Record    1644
*Filed March 11, 2015*

Defendant's Letter to Vicki Kanewske Requesting Reporter's Record    1647
*Filed April 3, 2015*

Bill of Cost    1649

Clerk's Certification that Appellate Record is True and Correct    1650

## 1

CAUSE NO. P 9127

IN THE ESTATE OF     *IN THE COUNTY COURT AT LAW
                   *
EDELL WADE            *OF
                   *
DECEASED           *BURNET COUNTY, TEXAS

\* \* \* \* \* \* \* \* \* \* \* \*
ORAL DEPOSITION
OF
AMANDA WADE
AUGUST 4, 2011
\* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF AMANDA WADE, produced as a witness at the instance of the Petitioner, and duly sworn, was taken in the above-styled and numbered cause on the 4th of August, 2011, from 9:00 a.m. to 10:58 a.m., before RHONDA HOWARD, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Stubbs Law Office, 202 N. Porter Street, Lampasas, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

## 3

INDEX

Appearances                     2
Change Page               92

EXAMINATION
Examination by Mr. Walden       4
Examination by Mr. Stubbs       90

SIGNATURE SHEET         93
REPORTER'S CERTIFICATION     94

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | FIRST AMENDED NOTICE OF INTENT TO TAKE ORAL DEPOSITION | 4 |
| 2 | WARRANTY DEED WITH VENDOR'S LIEN | 24 |
| 3 | PROMISSORY NOTE | 24 |
| 4 | DEED OF TRUST | 24 |
| 5 | STATUTORY DURABLE POWER OF ATTORNEY | 41 |
| 6 | MODIFICATION AGREEMENT | 60 |
| 7 | AMORTIZATION SCHEDULE | 66 |
| 8 | RESPONDENT'S RESPONSES TO PETITIONER'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS | 70 |

## 2

APPEARANCES

FOR THE PETITIONER:
Mr. Don E. Walden
ATTORNEY AND COUNSELOR AT LAW
7200 North Mopac, Suite 300
Austin, Texas 78731
(512) 349-9595

FOR THE RESPONDENT:
Mr. Evan Stubbs
STUBBS LAW OFFICE, P.L.L.C.
202 N. Porter Street
Lampasas, Texas 76550
(512) 556-8970

ALSO PRESENT:
Ms. Nancy Burns

## 4

(9:08 a.m.)

AMANDA WADE, having been duly sworn, testified as follows:

THE REPORTER: Thank you. We're on the record, 9:08.

EXAMINATION

BY MR. WALDEN:

Q Would you state your name, please.

A Amanda Wade.

Q And, Ms. Wade, I'm Don Walden. And do you understand that I represent Nancy Burns today?

A Yes.

Q Okay. And I am going to start by asking you to take a look at what I'll have the court reporter mark as Exhibit 1, which I'll represent to you is the First Amended Notice of Deposition, and ask if you have seen that.

(Deposition Exhibit No. 1 marked)

MR. STUBBS: I'm going to get those documents for you.

MR. WALDEN: Okay. Okay.

A I don't think I have.

Q (By Mr. Walden) Did — I'll wait until your attorney is back in the room.

Ms. Wade, can I direct your attention to





EXHIBIT E

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

buying property, but we weren't receiving full use and whatnot of it.

Q    Did anybody suggest getting an appraisal done?

A    Not that I recall.

Q    Okay.

A    I don't recall one way or the other.

Q    Okay. And how did you arrive at the interest rate that is reflected in the promissory note?

A    We had originally gone to Mrs. Wade's attorney that she used.

Q    Was that Pat Cavness?

A    Yes.

Q    And --

A    And to Mrs. Wade's accountant. And I don't remember what Pat had put in there, but it was, you know, a regular interest rate, as far as like if we had gone to the bank.

Q    Okay.

A    And -- I'm trying -- I'm trying -- I don't remember exactly what happened, but the -- ultimately, the -- Mrs. Wade's CPA said it needed to be one thing. And then I checked with the -- with my CPA and he said, "No, there's a farm purchase

## 30

exception." And the 2 percent came up.

Q    Do you recall who Ms. Wade's CPA was?

A    Lori Graham.

THE REPORTER:  I'm sorry?

THE WITNESS:  Lori Graham.

Q    Is that -- Ms. Graham in Lampasas, I take it?

A    Yes.

Q    (By Mr. Walden)  And are you talking about a CPA you used would be in California?

A    Yes.

Q    And do you -- in your opinion did any negotiation take place between you and your husband, on the one hand, and Ms. Wade on the other hand, Edell Wade?

A    Define negotiation for me.

Q    In terms of was there any sort of counterproposals made?

A    No.  Mrs. Wade gave us a price, and we agreed to pay that.

Q    And her attorney, your testimony is, came up with the interest rate?

A    Cavness had done the documents.  And then he made a comment to Nancy about me, and Nancy was still on good speaking terms with me at that time.

## 31

And the comment was rude.

Q    What was it?

A    He -- he did not like me and he --

Q    Mr. Cavness didn't?

A    Yes.  And what Nancy told me that he said was, "Do you all like her?"

That's what Pat said to Nancy, and Nancy had related this to me.  And she said, "Well, yes, we love her," meaning me.  And then based on that I didn't want to continue with using him.  And so we just had the documents re-done by a different attorney in Austin.

Q    And I take it, if I can direct you to Exhibit 2, the warranty deed, the third page of that down at the bottom left-hand corner, would that be the law firm of Armbrust & Brown?

A    Yes.

Q    And so you and your husband, then, retained the law firm of Armbrust & Brown to draw these documents?

A    I suppose you could say it was me and my husband.  I mean, we would -- we all went -- we being Mrs. Wade and all of us, went to Pat Cavness and then he made his comments.

Q    Do you have an opinion about why

## 32

Mr. Cavness didn't like you?  Did he ever say?

A    Well, oddly enough, I would consider him a friend or acquaintance now.

But I don't think he liked the fact that I had -- well, a couple things came up.  He had done Mrs. Wade's Will, and that did not, as it turned out, reflect what her wishes were at the time.  And I had pointed that out, and I don't think he liked being second guessed about that.  But, then, he also didn't like it when my CPA had found the farm exception rule.

Q    So I take it you mean that he didn't like that somebody -- your CPA knew something he didn't?

A    Well, I don't --

Q    Is that what you're saying?

A    Yeah.  Yes.

Q    Okay.  And did you or your husband know about the law firm of Armbrust & Brown?

A    I don't recall how I found them, but they were recommended by somebody.

Q    And did you -- you and your husband still lived in California at this time.  Right?

A    Yes.

Q    Okay.  Now, Ms. Cav -- Mr. Cavness had helped Edell Wade for quite a number of years.



Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

407

95

CAUSE NO. P 9127

IN THE ESTATE OF                    *IN THE COUNTY COURT AT LAW
                                    *
EDELL WADE                          *OF
                                    *
DECEASED                            *BURNET COUNTY, TEXAS

REPORTER'S CERTIFICATION
DEPOSITION OF AMANDA WADE
AUGUST 4, 2011

I, Rhonda Howard, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, AMANDA WADE, was duly sworn by the deposition officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the transcript was submitted on _8-25-11_ to Mr. Evan Stubbs, STUBBS LAW OFFICE, P.L.L.C., 202 N. Porter Street, Lampasas, Texas 76550, (512) 556-8970, for the witness's examination, signature and return to me by _9-20-11_, (20 days) per agreement of counsel;

That the time used by attorneys is as follows:
Mr. Don Walden - 1:39
Mr. Evan Stubbs - :02

That pursuant to information given to the deposition officer at the time testimony was taken,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

96

the following includes counsel for all parties of record:

Mr. Don Walden, Attorney for Petitioner

Mr. Evan Stubbs, Attorney for Respondent

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me, this 22nd day of August, 2011.



RHONDA HOWARD, Texas CSR No. 4136

Expiration Date 12/31/12

FIRM REGISTRATION NO: 283

ESQUIRE DEPOSITION SERVICES

3101 Bee Caves Road, Suite 220

Austin, Texas   78746

(512) 328-5557

Job No. 259054RH

ESQUIRE
an Alexander Gallo Company

Toll Free: 800.880.2546
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

97

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition ( ) was (X was not) returned to the deposition officer on 9-20-11.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned the original deposition was delivered to Mr. Evan Stubbs, Custodial Attorney;

That $328.47 is the deposition officer's charge to the PETITIONER for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of the certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this 26th day of September, 2011.



Rhonda Howard, Texas CSR No. 4136

Expiration Date: 12/31/12

FIRM REGISTRATION NO. 283

ESQUIRE DEPOSITION SERVICES

3101 Bee Caves Road, Suite 220

Austin, Texas 78746

(512) 328-5557

Job No. 259054RH

Toll Free: 800.880.2546
Facsimile: 512.328.8139

ESQUIRE
an Alexander Gallo Company

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

# CLERK'S CERTIFICATE THAT APPELLATE RECORD
## IS TRUE AND CORRECT

THE STATE OF TEXAS      §

                                      §

COUNTY OF BURNET     §

I, Janet Parker, Clerk of the County Court of Burnet County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rules of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rules of Appellate Procedure 34.5(b).

GIVEN UNDER MY HAND AND SEAL at my office in Burnet County, Texas on this the 16th day of April, 2015.

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

By: _____
Jayme Ingram

1650

# Clerk's Record

## VOLUME 1 OF 2

Trial Court Cause Number P9127
In the County Court
Of Burnet County, Texas
W. R. SAVAGE, Judge Presiding

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

IN THE MATTER OF THE ESTATE OF
EDELL WADE

Appealed to the
Court of Appeals for the Third District of Texas,
at Austin, Texas

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Attorney for Appellant: SHELDON E. RICHIE
Address: 100 CONGRESS AVE, SUITE 1750 – AUSTIN, TEXAS 78701
Telephone No.: 512-236-9220
Fax No.: 512-236-9230
E-mail address: srichie@rg-austin.com
State Bar No.: 16877000
Attorney for: JAMES E. WADE, Appellant(s)

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

CAUSE NO. P9127

ESTATE OF EDELL WADE, DECEASED     §       IN THE COUNTY COURT AT LAW

                                        §       OF

                                        §       BURNET COUNTY, TEXAS

## INDEX

| Name | Volume 1 | Page |
|---|---|---|
| Defendants' Johnny and Amanda Wade's Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>*Filed March 20, 2014* | | 5 |
| Defendants Johnny Wade's and Amanda Wade's Traditional and No Evidence Motion for Partial Summary Judgment on Plaintiff James Wade's Claims for Attorney's Fees Against Defendants in their Individual Capacities<br>*Filed March 20, 2014* | | 166 |
| Plaintiff's Motion For Continuance And, In The Alternative, Response To Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale<br>*Filed April 7, 2014* | | 279 |
| Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>*Filed April 14, 2014* | | 611 |
| Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning The 2004 Sale or Alternatively, To Sever Plaintiff's Claims Concerning The 2004 Sale Or For Permission To Appeal Interlocutory Order<br>*Filed April 23, 2014* | | 612 |
| Supplement to Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, To Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission To Appeal Interlocutory Order<br>*Filed April 24, 2014* | | 675 |
| Order<br>*Filed April 29, 2014* | | 762 |
| Plaintiff's Third Amended Original Petition<br>*Filed May 2, 2014* | | 765 |
| Motion for Exclusion of Evidence (For Plaintiff's Failure to Respond to Discovery Requests)<br>*Filed May 7, 2014* | | 820 |

Defendants' Hearing Presentation in Support of Motion for Exclusion of Evidence     848
     *Filed May 20, 2014*

Defendants' Motion for Partial Summary Judgment (as to all claims for relief based     950
on: default" on loan)
     *Filed May 22, 2014*

Defendants' Motion for Partial Summary Judgment (as to All Tort Claims, based     963
on Economic Loss Rule)
     *Filed May 22, 2014*

Defendants' Response to Plaintiffs' Traditional and No-Evidence Motion for Summary     975
Judgment on their Claims for Breach of Fiduciary Duty and Conspiracy with Exhibits A-G
     *Filed June 5, 2014*

Amanda Wade's Response (in her capacity as Independent Executor) to Nancy Burns'     1063
No-Evidence Summary Judgment Motion on Affirmative Defenses
     *Filed June 5, 2014*

                 Volume 2
Response in Opposition to Plaintiff's No-Evidence Motion for Partial Summary     1122
Judgment and Nancy Burns' Joinder (as to Affirmative Defenses and Couterclaims)
with Exhibits 1-25
     *Filed June 5, 2014*

Sixth Amended Answer To Plaintiff James E. Wade's Third Amended Original Petition     1263
and Second Amended Counterclaim of Johnny and Amanda Wade
     *Filed July 15, 2014*

Sixth Amended Answer to Plaintiff James E. Wade's Third Amended original     1275
Petition and Third Amended Couterclaim of Johnny and Amanda Wade
     *Filed July 15, 2014*

Fifth Amended Answer to Plaintiff Nancy Burns' Amended Petition for Damages     1296
for Breach of Fiduciary Duty and Second Amended Counterclaim
     *Filed July 15, 2014*

Order     1314
     *Filed July 29, 2014*

Response to James Wade's Motion for Continuance, and Motion for Leave to     1315
Supplement Summary Judgment Proof
     *Filed July 24, 2014*

Verification Pages for Sixth Amended Answer and Third Amended Counterclaim     1420
     *Filed August 4, 2014*

Consolidated Response of Johnny and Amanda Wade to Plaintiff's Motion for     1422
Traditional Summary Judgment on Defendants' Counterclaims and Plaintiff's Motion
to Dismiss Under Rule 91a
     *Filed September 9, 2014*

Response of Johnny and Amanda Wade to Plaintiff's Motion for Show Cause Order     1534
for Contempt and to Levy Sanction Award
    *Filed September 26, 2014*

Charge Of The Court     1539
    *Filed October 6, 2014*

Verdict     1541
    *Filed October 6, 2014*

Plaintiff James E. Wade's Motion For Judgment Non Obstante Verdicto     1559
    *Filed October 15, 2014*

Request For Denial Of Plaintiff's Motion For Judgment Non Obstante Verdicto and     1589
Defendants' Motion For Entry Of Judgment
    *Filed October 22, 2014*

Final Judgment     1599
    *Filed November 17, 2014*

Order Denying Plaintiffs' Motion For Judgment Notwithstanding The Verdict     1602
    *Filed November 17, 2014*

Plaintiff's Motion For New Trial     1603
    *Filed December 12, 2014*

Order Denying Motion For New Trial     1633
    *Filed January 26, 2015*

James E. Wade's Notice Of Appeal     1634
    *Filed February 12, 2015*

Plaintiff's Letter To Vicki Kanewske Requesting The Reporter's Record     1637
    *Filed February 20, 2015*

Plaintiff's Request for Preparation of Clerk's Record     1640
    *Filed February 20, 2015*

Defendant's Request for Preparation of Clerk's Record     1644
    *Filed March 11, 2015*

Defendant's Letter to Vicki Kanewske Requesting Reporter's Record     1647
    *Filed April 3, 2015*

Bill of Cost     1649

Clerk's Certification that Appellate Record is True and Correct     1650

Sale

1/6/04

Ebell Wade

REDACTED

to
Johnny Wade and wife,
Amanda Wade

REDACTED / Close by
mail!

Property: Being 473.28 acres out of the West One Quarter
of Sec. 60, out of the Texas Central Railroad Company
Survey, the A. M. Barry Survey, A-1645, and the Thomas
Blair Survey, #-69 and being the same ... (See
Otto Wade Estate File). Also includes BIS on cattle, John Deere
tractor and shredder, chisel and posthole digger, hay cubes, salt etc. *

Price: $150,000 allocated to house and $350,000 (Hundred thousand (approxim04))
allocated to balance. Nothing down. Balance at 2%
interest payable monthly on 1st day of month for 2 years *²
thereafter, monthly payments at 2% amortized over 30
years. Full Right to pre-pay.

165.28
160.00
150.00
310
165
475.2

Other:
1. OVO Survey
2. NOTP
3. Closing by mail ASAP
4. Closing Agreement on possession,
allocations, etc. Buyers assume
2004 taxes. Seller has right to
occupy house as long as she wishes

* No allocation on P.P.
in S/S or Closing Agreement

*² Amanda will sell with
Wade and monthly payment.

but no reserved LIE.

**EXHIBIT**
A-4

REDACTED

347

414 South LiveOak
P. O. Box 409
Lampasas, TX 76550
(512) 556-3639
FAX: 556-0423



# Fax

| | | | |
|---|---|---|---|
| **To:** | JOHNNY & AMANDA WADE | **From:** | CAVNESS LAW OFFICE |
| REDACTED REDACTED | REDACTED | **Pages:** | 19 INCLUDING TRANSMITTAL) |
| REDACTEDREDACTED | | **Date:** | 1/16/2004 |
| **Re:** | CLOSING PAPERS | **CC:** | |

☐ **Urgent**      x **For Review**      ☐ **Please Comment**      ☐ **Please Reply**      ☐ **Please Recycle**

● **Comments:**

ATTACHED PLEASE FIND FOR YOUR REVIEW/SIGNATURES/AND RETURN OF THE DOCUMENTS AS OUTLINED IN THE ATTACHED LETTER.

THANKS,

REDACTED

348

# CAVNESS LAW OFFICE
414 South Liveoak
P.O. Box 409
Lampasas, Texas 76550
(512) 556-3639

Pat E. Cavness
Attorney at Law

FAX (512) 556-3608

January 16, 2004

Johnny and Amanda Wade
REDACTEDREDACTEDREDACTED
REDACTED

Re:  Purchase from EDELL WADE

Dear Johnny and Amanda:

Enclosed with this letter are the following documents for your review and signature:

1. Warranty Deed with Vendor's Lien to be signed in the designated places before a Notary Public.
2. Promissory Note to be signed in the designated places.
3. Deed of Trust to be signed in the designated places before a Notary Public.
4. Closing Agreement for you to duplicate and sign both originals in the designated places.
5. Non-representation letter for you to sign in the designated places.
6. Settlement Statement for you to sign in the designated places.

If the enclosed documents are satisfactory, please sign as indicated and return them with your check in the amount of $536.00.  I will then get Mrs. Wade to sign; record the appropriate documents; and forward to you your recorded deed and a copy of the Settlement Statement.

Please let me know if you have any questions.

Thank you.

Very truly yours,

PAT E. CAVNESS

6 Enclosures
PEC/laf
File No. W-109.5

Documents Sent by FAX to:     REDACTED

REDACTED                349

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## Warranty Deed with Vendor's Lien

**Date:** January _____, 2004

**Grantor:** EDELL WADE, a widow

**Grantor's Mailing Address:**

EDELL WADE
REDACTED
Lampasas County

**Grantee:** JOHNNY WADE and AMANDA WADE, husband and wife

**Grantee's Mailing Address:**

JOHNNY WADE and AMANDA WADE
4 REDACTED REDACTED
REDACTED
REDACTEDREDACTEDREDACTED County

**Consideration:**

Cash and a note of even date executed by Grantee and payable to the order of Grantor in the principal amount of FIVE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($500,000.00). The note is secured by a first and superior vendor's lien and superior title retained in this deed and by a first-lien deed of trust of even date from Grantee to Pat E. Cavness, Trustee.

**Property (including any improvements):**

Being 475.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1645, and the A.M. Berry Survey, Abstract No. 1678, in Burnet County, Texas, and being the same property conveyed in deed dated January 26, 1952, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-425, Deed Records of Burnet County, Texas, to which instrument and the record thereof reference is here made for a more particular description of such property and for all other purposes.

**Reservations from Conveyance:**

None

1

REDACTED 350

**Exceptions to Conveyance and Warranty:**

Liens described as part of the Consideration and any other liens described in this deed as being either assumed or subject to which title is taken; validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property; and taxes for 2004, which Grantee assumes and agrees to pay, and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

The vendor's lien against and superior title to the Property are retained until each note described is fully paid according to its terms, at which time this deed will become absolute.

When the context requires, singular nouns and pronouns include the plural.

_____
EDELL WADE

ACCEPTED:

_____
JOHNNY WADE

_____
AMANDA WADE

2

STATE OF TEXAS §

COUNTY OF LAMPASAS §

This instrument was acknowledged before me on _____ , 2004, by EDELL
WADE.

_____
Notary Public, State of Texas


STATE OF TEXAS §

COUNTY OF LAMPASAS §

This instrument was acknowledged before me on _____ , 2004, by
JOHNNY WADE.

_____
Notary Public, State of Texas


STATE OF TEXAS §

COUNTY OF LAMPASAS §

This instrument was acknowledged before me on _____ , 2004, by
AMANDA WADE.

_____
Notary Public, State of Texas


PREPARED IN THE OFFICE OF:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550

3

## Promissory Note

**Date:**   January _____, 2004

**Borrower:**    JOHNNY WADE and AMANDA WADE, husband and wife.

**Borrower's Mailing Address:**

> JOHNNY WADE and AMANDA WADE
> REDACTEDREDACTEDREDACTED
> REDACTED
> _____ County

**Lender:**    EDELL WADE.

**Place for Payment:**

> **1**  REDACTED
> Lampasas, Lampasas County, TX   76550, or any other place that Lender may designate in writing.

**Principal Amount:**   $500,000.00

**Annual Interest Rate:**        Two Percent (2%)

**Maturity Date:**        January 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:**      Eighteen Percent (18%)

**Terms of Payment (principal and interest):**
Accrued interest is payable on the 1st day of February, 2004 and on the 1st day of each succeeding month through January 1, 2006.  Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1st day of each succeeding month until paid.   Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:**        This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated January _____, 2004 and by a deed of trust of even date from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, trustee, both of which cover the following real property:

Being 475.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1645, and the A.M. Berry Survey, Abstract No. 1678, in Burnet County, Texas, and being the same property conveyed in deed dated January 26, 1952, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-425, Deed Records of Burnet County, Texas, to which instrument reference is here made for all purposes.

1

REDACTED

**Other Security for Payment:** None.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any installment becomes overdue for more than fifteen days, at Lender's option a late payment charge of $50.00 may be charged in order to defray the expense of handling the delinquent payment.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any

2

Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; and (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

Notwithstanding any other provision of this note, in the event of a default, before exercising any of Lender's remedies under this note or any deed of trust or warranty deed with vendor's lien securing it, Lender will first give Borrower written notice of default and Borrower will have ten days after notice is given in which to cure the default. If the default is not cured ten days after notice, Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.


_____
JOHNNY WADE


_____
AMANDA WADE


3

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## Deed of Trust

### Terms

**Date:** January _____, 2004

**Grantor:** JOHNNY WADE and AMANDA WADE, husband and wife

**Grantor's Mailing Address:**

JOHNNY WADE and AMANDA WADE
REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED
REDACTED REDACTED
_____ County

**Trustee:** Pat E. Cavness

**Trustee's Mailing Address:**

P.O. Box 409
Lampasas, TX 76550
Lampasas County

**Lender:** EDELL WADE

**Lender's Mailing Address:**

1 REDACTED
REDACTED REDACTED
Lampasas County

**Obligation**

Note

**Date:** January _____, 2004

**Original principal amount:** $500,000.00

**Borrower:** JOHNNY WADE and AMANDA WADE

~~**Lender:** EDELL WADE~~

**Maturity date:** January 1, 2036

1

REDACTED

356

Terms of Payment: As provided in the note.

Other Debt: None.

## Property (including any improvements):

Being 475.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1645, and the A.M. Berry Survey, Abstract No. 1678, in Burnet County, Texas, and being the same property conveyed in deed dated January 26, 1952, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-425, Deed Records of Burnet County, Texas, to which instrument and the record thereof reference is here made for a more particular description of such property and for all other purposes.

**Prior Lien:** None

**Other Exceptions to Conveyance and Warranty:** Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property; and taxes for 2004, and subsequent assessments for that and prior years due to change in land usage, ownership, or both.

For value received and to secure payment of the Obligation, Grantors convey the Property to Trustee in trust. Grantors warrant and agree to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantors' expense.

## Clauses and Covenants

### A. Grantors' Obligations

Grantors agree to-

1. keep the Property in good repair and condition;

2. pay all taxes and assessments on the Property before delinquency;

3. defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4. maintain, in a form acceptable to Lender, an insurance policy that-

    a. covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Lender approves a smaller amount in writing;

    b. contains an 80 percent coinsurance clause;

2

357

c.  provides all-risk coverage;

d.  protects Lender with a standard mortgage clause;

e.  provides flood insurance at any time the Property is in a flood hazard area; and

f.  contains such other coverage as Lender may reasonably require;

5.  comply at all times with the requirements of the 80 percent coinsurance clause;

6.  deliver the insurance policy to Lender within ten days of the date of this deed of trust and deliver renewals to Lender at least fifteen days before expiration;

7.  obey all laws, ordinances, and restrictive covenants applicable to the Property;

8.  keep any buildings occupied as required by the insurance policy; and

9.  if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments.

**B.  Lender's Rights**

1.  Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2.  If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.  Lender may apply any proceeds received under the insurance policy either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantors' primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantors for repairs.

4.  Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantors with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5.  If Grantors fail to perform any of Grantors' obligations, Lender may perform those obligations and be reimbursed by Grantors on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6.  If there is a default on the Obligation or if Grantors fail to perform any of Grantors' obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

a.  declare the unpaid principal balance and earned interest on the Obligation

3

immediately due;

    b.     direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    c.     purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7.     Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

## C.    Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will-

1.     either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.     sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantors, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.     from the proceeds of the sale, pay, in this order-

    a.     expenses of foreclosure, including a reasonable commission to Trustee;

    b.     to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.     any amounts required by law to be paid before payment to Grantors; and

    d.     to Grantors, any balance; and

4.     be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

## D.    General Provisions

1.     If any of the Property is sold under this deed of trust, Grantors must immediately surrender possession to the purchaser. If Grantors fail to do so, Grantors will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.     Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.     Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4

4.    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.    If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.    Grantors assign to Lender all amounts payable to or received by Grantors from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property.  After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantors or apply such amounts to reduce the Obligation.  Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts.  Grantors will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.    Grantors assign to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property.  Grantors warrant the validity and enforceability of the assignment.  Grantors may as Lender's licensee collect rent and other income and receipts as long as Grantors are not in default with respect to the Obligation or this deed of trust.  Grantors will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and deed of trust, Grantors may retain the excess.  If Grantors default in payment of the Obligation or performance of this deed of trust, Lender may terminate Grantors' license to collect rent and other income and then as Grantors' agent may rent the Property and collect all rent and other income and receipts.  Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property.  Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property.  Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantors' obligations with respect to the Obligation and this deed of trust in the order determined by Lender.  Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.  If Grantors become a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.    Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law.  Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded.  On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded.  This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.    In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.    When the context requires, singular nouns and pronouns include the plural.

11.    The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

5

12. Grantors agree to furnish on Lender's request evidence satisfactory to Lender that all taxes and assessments on the Property have been paid when due.

13. If Grantors transfer any part of the Property without Lender's prior written consent, Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default. If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home occupied by Grantors, exceptions to this provision are limited to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantors or between co-Grantors; (f) transfer to a relative of Grantors on Grantors' death; and (g) transfer to an inter vivos trust in which Grantors are and remain beneficiaries and occupants of the Property.

14. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

15. If Grantors and Borrowers are not the same person, the term Grantors includes Borrowers.

16. Grantors and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

17. Grantors agree to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

18. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

19. Grantors represent that this deed of trust and the Note are given for the following purposes:

The debt evidenced by the Note is in payment of the purchase price of the Property; the debt is secured both by this deed of trust and by a vendor's lien on the Property, which is expressly retained in a deed to Grantors of even date. This deed of trust does not waive the vendor's lien, and the two liens and the rights created by this deed of trust are cumulative. Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both.

_____
JOHNNY WADE

_____
AMANDA WADE

6

361

STATE OF TEXAS                    §

COUNTY OF LAMPASAS               §

This instrument was acknowledged before me on _____ , 2004, by JOHNNY WADE.


_____
Notary Public, State of Texas


STATE OF TEXAS                    §

COUNTY OF LAMPASAS               §

This instrument was acknowledged before me on _____ , 2004, by AMANDA WADE.


_____
Notary Public, State of Texas


PREPARED IN THE OFFICE OF:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550
Tel: (512) 556-3639
Fax: (512) 556-3608


AFTER RECORDING RETURN TO:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550
Tel: (512) 556-3639
Fax: (512) 556-3608

7

# CAVNESS LAW OFFICE
### 414 South Liveoak
### P.O. Box 409
### Lampasas, Texas 76550
### (512) 556-3639

Pat E. Cavness
Attorney at Law

FAX (512) 556-3608

January _____, 2004

JOHNNY WADE and AMANDA WADE
REDACTED      REDACTEDREDACTED
REDACTED

Re:    Edell Wade sale to Johnny Wade and wife, Amanda Wade

Dear Mr. and Mrs. Wade:

I have represented EDELL WADE in the preparation of legal documents for use in closing the above-referenced transaction.

While I have acted solely on behalf of EDELL WADE, you, the Buyers, acknowledge that the legal fees incurred in preparing the legal documents will be paid by you even though I have not in any manner undertaken to assist or render legal advice to you, except in the preparation of the legal documents. You further acknowledge and understand that you may retain independent legal counsel to represent your individual interests in the referenced transaction.

Please sign below to acknowledge that you have been advised of my representation of EDELL WADE and that you understand that I am not your attorney.

Sincerely yours,


Pat E. Cavness

Buyers:


_____
        JOHNNY WADE


_____
        AMANDA WADE

1

363
REDACTED

# fax cover sheet

## Amanda Wade

REDACTEDREDACTEDREDACTED
REDACTEDREDACTED
REDACTED
REDACTED

**Date:** January 23, 2004
**To:** Pat Cavness
**From:** Amanda Wade
**RE:**

Please make the following changes and return for review/signature.

Thanks,

Amanda Wade

1/27/04

Amanda –
I fully understand the changes of substance in the documents, but I am at a loss to understand the changes of form. Perhaps you can fill me in.
Thanks.

Pat

364

REDACTED

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**Warranty Deed with Vendor's Lien**

**Date:**   January _____, 2004

**Grantor:**    EDELL WADE, a widow

**Grantor's Mailing Address:**

EDELL WADE
REDACTED
Lampasas County

**Grantee:**    JOHNNY WADE and AMANDA WADE, husband and wife

**Grantee's Mailing Address:**

JOHNNY WADE and AMANDA WADE
REDACTEDREDACTED
_____ County

(the "N.G")

**Consideration:**

Cash and a note of even date executed by Grantee and payable to the order of Grantor in the principal amount of FIVE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($550,000.00). The note is secured by a first and superior vendor's lien and superior title retained in this deed and by a first-lien deed of trust of even date from Grantee to Pat E. Gauness, Trustee.

*(Insert #1)*

**Property (including any improvements):**

Being 475.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1846, and the A.M. Berry Survey, Abstract No. 1876, in Burnet County, Texas, and being the same property conveyed in deed dated January 28, 1962, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 705, Page 421-425, Deed Records of Burnet County, Texas, to which instrument and the record thereof reference is here made for a more particular description of such property and for all other purposes.

**Reservations from Conveyance:**

None

365

REDACTED

## INSERT #1

The vendor's lien, together with superior title remaining in Grantor, as vendor, is retained against the Property in favor of the holder of the Note ("Lender") for the security of and until the full and final payment of the Note, when and whereupon this deed shall become absolute.

Payment of the Note is additionally secured by a deed of trust lien on the Property created in the deed of trust ("Deed of Trust") of even date herewith from Grantee to Pat E. Cavness, Trustee, and in the event of default in the payment of the Note, or in the event of default in the performance of any of the covenants or conditions contained in the Deed of Trust which on the part of the grantor therein are to be kept and performed, then Lender shall have the option to mature the Note and to foreclose the vendor's lien herein retained or the Deed of Trust lien which secures the payment of the Note, or both of said liens, either under the power of sale contained in the Deed of Trust or by court proceedings, as Lender may elect.

366

Exceptions to Conveyance and Warranty:

Liens described as part of the Consideration and any other liens described in this deed as being either assumed or subject to which title is taken; validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property; and taxes for 2004, which Grantee assumes and agrees to pay, and subsequent assessments for that and prior years due to change in land usage, ownership, or both, the payment of which Grantee assumes.

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

The vendor's lien against, and superior title to, the Property, are retained until each note described is fully paid according to its terms, at which time this deed will become absolute.

When the context requires, singular nouns and pronouns include the plural.

_____
EDELL WADE

ACCEPTED:


_____
JOHNNY WADE


_____
AMANDA WADE

REDACTED    367

STATE OF TEXAS                        §

COUNTY OF LAMPASAS                    §

    This instrument was acknowledged before me on _____ _____ , 2004, by EDELL WADE.

_____
Notary Public, State of Texas

STATE OF TEXAS                        §

COUNTY OF LAMPASAS                    §

    This instrument was acknowledged before me on _____ , 2004, by JOHNNY WADE.

_____
Notary Public, State of Texas

STATE OF TEXAS                        §

COUNTY OF LAMPASAS                    §

    This instrument was acknowledged before me on _____ , 2004, by AMANDA WADE.

_____
Notary Public, State of Texas

PREPARED IN THE OFFICE OF:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550

3

REDACTED
368

01/15/2004   17:11   REDACTED REDACTED          COUNTY LAND TITLES                      PAGE   85

## Promissory Note

**Date:**  January _____, 2004

**Borrower:**   JOHNNY WADE and AMANDA WADE, husband and wife,

**Borrower's Mailing Address:**

JOHNNY WADE and AMANDA WADE
REDACTED  REDACTED      REDACTED
Murrieta, CA 92563
_____ County

**Lender:**   EDELL WADE.

**Place for Payment:**

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED less County, TX   78890, or any other place that Lender may designate in writing.

**Principal Amount:**   $600,000.00

**Annual Interest Rate:**        Two Percent (2%)

**Maturity Date:**        January 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:**       Eighteen Percent (18%)   ~~Twelve~~ 12

**Terms of Payment (principal and interest):**
Accrued interest is payable on the 1st day of February, 2004 and on the 1st day of each succeeding month through January 1, 2006.  Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1st day of each succeeding month until paid.   Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:**       This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated January _____, 2004 and by a deed of trust of even date from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, trustee, both of which cover the following real property:

Being 476.28 acres out of the West One Quarter of Section 60, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1645, and the A.M. Berry Survey, Abstract No. 1679, in Burnet County, Texas, and being the same property conveyed in deed dated January 26, 1922, from Manuel Calbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-426, Deed Records of Burnet County, Texas, to which instrument reference is here made for all purposes.

1

369

REDACTED

*and the default continues after Lender gives Borrower written notice of the default and ten (10) days opportunity to cure such default,*

**Other Security for Payment:** None.

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:** Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:** Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be cancelled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any installment becomes overdue for more than fifteen days, at Lender's option a late payment charge of $50.00 may be charged in order to defray the expense of handling the delinquent payment.

A default exists under this note if (1) (a) Borrower or (b) any other person liable on any part of this note or who grants a lien or security interest on property as security for any part of this note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Lender and Borrower or any Other Obligated Party; (2) any warranty, covenant, or representation in this note or in any other written agreement between Lender and Borrower or any

2

REDACTED

Other Obligated Party is materially false when made; (3) a receiver is appointed for Borrower, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved, begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Borrower, a partnership of which Borrower is a general partner, or an Other Obligated Party; and (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

Notwithstanding any other provision of this note, in the event of a default, before exercising any of Lender's remedies under this note or any deed of trust or warranty deed with vendor's lien securing it, Lender will first give Borrower written notice of default and Borrower will have ten days after notice is given in which to cure the default. If the default is not cured ten days after notice, Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.


JOHNNY WADE


AMANDA WADE


2

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

### Deed of Trust

#### Terms

Date:  January _____, 2004

Grantor:    JOHNNY WADE and AMANDA WADE, husband and wife

Grantor's Mailing Address:

JOHNNY WADE and AMANDA WADE
REDACTEDREDACTEDREDACTED
REDACTED    REDACTED
____ _____ County

Trustee:    Pat E. Cavness

Trustee's Mailing Address:

P.O. Box 408
Lampasas, TX 76550
Lampasas County

Lender:    EDELL WADE

Lender's Mailing Address:

REDACTED
Lampasas, TX 76550
Lampasas County

Obligation

Note

Date:  January _____, 2004

Original principal amount:    $500,000.00

Borrower:    JOHNNY WADE and AMANDA WADE

Lender:    EDELL WADE

Maturity date:  January 1, 2036

**Terms of Payment** .  As provided in the note.

**Other Debt:** None.

**Property (including any improvements):**

Being 475.25 acres out of the West One Quarter of Section 90, out of the Texas Central Railroad Company Survey, A.M. Berry Survey, Abstract No. 1245, and the A.M. Berry Survey, Abstract No. 1575, in Burnet County, Texas, and being the same property conveyed in deed dated January 28, 1962, from Manuel Delbert Sylvester et al to Charles Otto Wade and wife, Edell Sylvester Wade, recorded in Volume 108, Page 421-425, Deed Records of Burnet County, Texas, to which instrument and the record thereof reference is here made for a more particular description of such property and for all other purposes.

**Prior Lien:**     None

**Other Exceptions to Conveyance and Warranty:**  Validly existing easements, rights-of-way, and prescriptive rights, whether of record or not; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property; and taxes for 2004, and subsequent assessments for that and prior years due to change in land usage, ownership, or both.

For value received and to secure payment of the Obligation, Grantors convey the Property to Trustee in trust.  Grantors warrant and agree to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty.  On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantors' expense.

**Clauses and Covenants**

**A.     Grantors' Obligations**

Grantors agree to–

1.     keep the Property in good repair and condition;

2.     pay all taxes and assessments on the Property before delinquency;

3.     defend title to the Property subject to the Other Exceptions to Conveyance and Warranty, and preserve the lien's priority as it is established in this deed of trust;

4.     maintain, in a form acceptable to Lender, an insurance policy that–

a.     covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Lender approves a smaller amount in writing;

b.     contains an 80 percent coinsurance clause;

2

*fire and extended coverage*

    c.    provides all-risk coverage;

    d.    protects Lender with a standard mortgage clause;

    e.    provides flood insurance at any time the Property is in a flood hazard area; and

    f.    contains such other coverage as Lender may reasonably require;

  5.    comply at all times with the requirements of the 80 percent coinsurance clause;

  6.    deliver the insurance policy to Lender within ten days of the date of this deed of trust and deliver renewals to Lender at least fifteen days before expiration;

  7.    obey all laws, ordinances, and restrictive covenants applicable to the Property; *to the best of their knowledge.*

  8.    keep any buildings occupied as required by the insurance policy; and

  9.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments.

**B.    Lender's Rights**

  1.    Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

  2.    If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

  3.    Lender may apply any proceeds received under the insurance policy either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantors' primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantors for repairs.

  4.    Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantors with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

  5.    If Grantors fail to perform any of Grantors' obligations, Lender may perform those obligations and be reimbursed by Grantors on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

  6.    If there is a default on the Obligation or if Grantors fail to perform any of Grantors' obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

    a.    declare the unpaid principal balance and earned interest on the Obligation

3

374

REDACTED

immediately due;

  b. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

  c. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7. Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

8. ~~...~~

C. **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will·

1. either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2. sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantors, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3. from the proceeds of the sale, pay, in this order-

  a. expenses of foreclosure, including a reasonable commission to Trustee;

  b. to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

  c. any amounts required by law to be paid before payment to Grantors; and

  d. to Grantors, any balance; and

4. be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

D. **General Provisions**

1. If any of the Property is sold under this deed of trust, Grantors must immediately surrender possession to the purchaser. If Grantors fail to do so, Grantors will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2. Recitals in any trustee's deed conveying the Property will be presumed to be true.

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4

## INSERT #2

8.     Notwithstanding anything to the contrary contained herein or in the Note, prior to exercising any rights or remedies hereunder or under the Note (including acceleration of the Note) Lender will give Grantor 10 days prior written notice and opportunity to cure any default in making a payment under the Note, and 30 days prior written notice and opportunity to cure any other default hereunder or under the Note. However, with regard to any default other than a failure to make a payment under the Note, such 30 day time period will be extended so long as Grantor commenced to cure such default during the initial 30 day period and thereafter diligently prosecutes such cure to completion.

190395-1 01/22/2004

4.      This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5.      If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6.      Grantors assign to Lender all amounts payable to or received by Grantors from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantors or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantors will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7.      Grantors assign to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantors warrant the validity and enforceability of the assignment. Grantors may as Lender's licensee collect rent and other income and receipts as long as Grantors are not in default with respect to the Obligation or this deed of trust. Grantors will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and deed of trust, Grantors may retain the excess. If Grantors default in payment of the Obligation or performance of this deed of trust, Lender may terminate Grantors' license to collect rent and other income and then as Grantors' agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantors' obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantors become a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8.      Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9.      In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10.     When the context requires, singular nouns and pronouns include the plural.

11.     The term Note includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

5

377

REDACTED

12.   Grantors agree to furnish on Lender's request evidence satisfactory to Lender that all taxes and assessments on the Property have been paid when due.

13.   If Grantors transfer any part of the Property without Lender's prior written consent, Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default.  If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home, occupied by Grantors, exceptions to this provision are limited to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantors or between co-Grantors; (f) transfer to a relative of Grantors on Grantors' death; and (g) transfer to an inter vivos trust in which Grantors are and remain beneficiaries and occupants of the Property.

14.   This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

15.   If Grantors and Borrowers are not the same person, the term Grantors includes Borrowers.    ~ Subject to any right to cure;

16.   Grantors and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

17.   Grantors agree to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

18.   If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

19.   Grantors represent that this deed of trust and the Note are given for the following purposes:

The debt evidenced by the Note is in payment of the purchase price of the Property; the debt is secured both by this deed of trust and by a vendor's lien on the Property, which is expressly retained in a deed to Grantors of even date.  This deed of trust does not waive the vendor's lien, and the two liens and the rights created by this deed of trust are cumulative. Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both.

_____
JOHNNY WADE

_____
AMANDA WADE

5

378

REDACTED

STATE OF TEXAS            §

COUNTY OF LAMPASAS        §

     This instrument was acknowledged before me on _____, 2004, by
JOHNNY WADE.

                                        _____
                                        Notary Public, State of Texas


STATE OF TEXAS            §

COUNTY OF LAMPASAS        §

     This instrument was acknowledged before me on _____, 2004, by
AMANDA WADE.

                                        _____
                                        Notary Public, State of Texas


PREPARED IN THE OFFICE OF:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550
Tel: (512) 556-3630
Fax: (512) 556-3606

AFTER RECORDING RETURN TO:

Cavness Law Office
P.O. Box 409
414 S. Live Oak
Lampasas, TX 76550
Tel: (512) 556-3630
Fax: (512) 556-3606

7

REDACTED   379

## Closing Agreement

THE STATE OF TEXAS                      §

COUNTY OF LAMPASAS                      §

Effective the 1st day of January, 2004, Edell Wade ("Seller") and Johnny Wade and wife, Amanda Wade ("Buyer") closed the sale from Seller to Buyer of 475.25 acres of land in Burnet County, Texas, and further agreed as follows:

1.  For tax and accounting purposes the parties have allocated the $500,000.00 sales price as follows:
    a.  To the house and one acre - $150,000.00
    b.  To the balance of the land - $350,000.00

2.  Buyers shall have immediate possession of all the property except the house of which Seller may retain possession and use as long as she wishes.

3.  Seller also transfers, sells and delivers to Buyer upon the execution hereof all cattle on the premises, the John Deere tractor and shredder, chisel and post hole digger, all hay, cubes, salt, and cattle feed and supplies.

*You want a bill of sale for these. Ask Pat for one, or I can draft one pretty quickly.*

_____
EDELL WADE

_____
JOHNNY WADE

_____
AMANDA WADE

*Pat — Please prep a bill of sale for personal property*

REDACTED

380

414 South LiveOak
P. O. Box 409
Lampasas, TX 76550
(512) 556-3639
FAX: 556-0423



# Fax

| To: | JOHNNY & AMANDA WADE | From: | CAVNESS LAW OFFICE |
|---|---|---|---|
| Fax: | REDACTED | Pages: | 2  (IINCLUDING TRANSMITTAL) |
| Phone: | REDACTED | Date: | 2/18/2004 |
| Re: | STATEMENT OF ACCOUNT | CC: | |

☐ Urgent     x For Review     ☐ Please Comment     ☐ Please Reply     ☐ Please Recycle

• Comments:

ATTACHED PLEASE FIND A COPY OF YOUR STATEMENT OF ACCOUNT WITH REFERENCE
TO THE EDELL WADE SALE.

THANKS,

*Pat E. Cavness*

PAT E. CAVNESS

REDACTED

381

# Cavness Law Office

414 S. Live Oak
Lampasas, Texas 76550

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/18/2004 | 1947 |

| Bill To |
|---------|
| Edell Wade<br>C/O Amanda Wade<br>REDACTED<br>REDACTED |

| Project | File Number |
|---------|-------------|
| Sale to Son | W-109.5 |

| Description | Amount |
|-------------|--------|
| Services rendered in reference to Edell Wade Sale including telephone and office conferences with client; preparation of Warranty Deed, Promissory Note, Deed of Trust, Closing Agreement, Settlement Statement, correspondence and related matters. | 500.00 |
| Sales Tax Computed in Quicken | 0.00 |

**PAID**

Thank you for your business.

| | |
|---|---|
| **Total** | $500.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $500.00 |

REDACTED

382

# Cavness Law Office

414 S. Live Oak
Lampasas, Texas 76550

# Invoice

| Date | Invoice # |
|------|-----------|
| 2/18/2004 | 1947 |

**Bill To**

Edull Wade
C/O Amanda Wade
REDACTEDREDACTED
    REDACTED

| Project | File Number |
|---------|-------------|
| Sale to Son | |

| Description | Amount |
|-------------|--------|
| Office conference with Edell Wade, et al. | 150.00 |
| Office conference with Edell Wade, et al. | 150.00 |
| Sales Tax Computed in Quicken | 0.00 |

Thank you for your business.

| | |
|---|---|
| **Total** | $300.00 |
| **Payments/Credits** | $0.00 |
| **Balance Due** | $300.00 |

REDACTED

383

Prof —

services rendered re Edell/Wade sale including office and telephone conferences, preparation of W/D, P/N, D/T, C/A and B/S, correspondence and related matters.
$500.00

Amanda Wade

Edell Wade

Johnny Wade

REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED REDACTED

REDACTED

Amanda Wade wanted updated Bill. This is the only time in the computer (for January) I know is this all you of?

4. ☐ VA  5. ☐ Conv. Ins.

C. Note: This form is furnished to give you a s̶̶nt of actual settlement costs. Amounts paid to an̶̶e settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closin̶̶ are shown here for informational purposes and a̶̶ included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Johnny Wade | Edell Wade | Edell Wade |
| Amanda Wade | REDACTED | REDACTED |
| REDACTEDREDACTED | REDACTED | REDACTED |
| REDACTED | | |

| G. Property Location: | H. Settlement Agent: | Tax ID: |
|---|---|---|
| 475.28 acres out of several surveys | Pat E. Cavness | |
| | Place of Settlement: | I. Settlement Date: |
| | 414 S. Live Oak Street | |
| | Lampasas, Texas 76550 | January ___, 2004 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | 500,000.00 | 401. Contract sales price | 500,000.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 536.00 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. **Buyer assumes 2004 taxes | | 409. **Buyer assumes 2004 taxes | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 500,536.00 | **420. Gross Amount Due to Seller** | 500,000.00 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 500,000.00 | 502. Settlement charges to seller (line 1400) | 0.00 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. Seller financing/Note payable to Seller | 500,000.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 500,000.00 | **520. Total Reduction Amount Due Seller** | 500,000.00 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | 500,536.00 | 601. Gross amount due to seller (line 420) | 500,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | ( 500,000.00) | 602. Less reductions in amt. due seller (line 520) | ( 500,000.00) |
| 303. Cash ☒ From ☐ To Borrower | 536.00 | 603. Cash ☐ To ☐ From Seller | 0.00 |

You are required by law to provide the SETTLEMENT AGENT with your correct taxpayer identification number. If you do not provide the SETTLEMENT AGENT with your correct taxpayer identification number, you may be subject to civil or criminal penalties imposed by law.

CERTIFICATION

Under penalty of perjury, I certify that the number shown on this statement is my correct taxpayer identification number.

REDACTED

385

704.

| | | | | P.O.C. | | |
|---|---|---|---|---|---|---|
| **800. Items Payable In Connection With L** | | | | | | |
| 801. Loan Origination Fee | % | | | | | |
| 802. Loan Discount | % | | | | | |
| 803. Appraisal Fee to | | | | | | |
| 804. Credit Report to | | | | | | |
| 805. Lender's Inspection Fee | | | | | | |
| 806. Mortgage Insurance Application Fee to | | | | | | |
| 807. Assumption Fee | | | | | | |
| 808. | | | | | | |
| 809. | | | | | | |
| 810. | | | | | | |
| 811. | | | | | | |
| 812. | | | | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | | |
| 901. Interest from | to | @ $ | /day | | | |
| 902. Mortgage Insurance Premium for | | months to | | | | |
| 903. Hazard Insurance Premium for | | years to | | | | |
| 904. | | years to | | | | |
| 905. | | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | | |
| 1001. Hazard Insurance | | months @ $ | per month | | | |
| 1002. Mortgage Insurance | | months @ $ | per month | | | |
| 1003. City property taxes | | months @ $ | per month | | | |
| 1004. County property taxes | | months @ $ | per month | | | |
| 1005. Annual assessments | | months @ $ | per month | | | |
| 1006. | | months @ $ | per month | | | |
| 1007. | | months @ $ | per month | | | |
| 1008. Aggregate accounting adjustment | | | | | | |
| **1100. Title Charges** | | | | | | |
| 1101. Settlement or closing fee | to Pat E. Cavness | | | | 150.00 | |
| 1102. Abstract or title search | to | | | | | |
| 1103. Title examination | to | | | | | |
| 1104. Title insurance binder | to | | | | | |
| 1105. Document preparation | to | | | | | |
| 1106. Notary fees | to | | | | | |
| 1107. Attorney's fees | to Pat E. Cavness | | | | 350.00 | |
| (includes above items numbers: | | | | ) | | |
| 1108. Title insurance | to Pat E. Cavness | | | | | |
| (includes above items numbers: | | | | ) | | |
| 1109. Lender's coverage | $ | | | | | |
| 1110. Owner's coverage | $ | | | | | |
| 1111. | | | | | | |
| 1112. | | | | | | |
| 1113. | | | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | | |
| 1201. Recording fees: Deed $ | ; Mortgage $ | ; Releases $ | | | 36.00 | |
| 1202. City/county tax/stamps: Deed $ | ; Mortgage $ | | | | | |
| 1203. State tax/stamps: Deed $ | ; Mortgage $ | | | | | |
| 1204. | | | | | | |
| 1205. | | | | | | |
| **1300. Additional Settlement Charges** | | | | | | |
| 1301. Survey to | | | | | | |
| 1302. Pest inspection to | | | | | | |
| 1303. | | | | | | |
| 1304. | | | | | | |
| 1305. | | | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | | 536.00 | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.
WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

BORROWERS:_____     SELLERS:_____
JOHNNY WADE                                          EDELL WADE

AMANDA WADE

2. CROSS-INDEX: *Johnny Wade*

3. RELATED FILE: *Other Wade files*

4. DATE: *1/15/04*

5. SUBJECT: *Sale to Johnny Wade*

## I. ASSOCIATIONS:

| 1. EMPLOYMENT CONTRACT | | 3. PARTNERSHIP | |
|---|---|---|---|
| 2. INCORPORATION | | a) Dissolution | |
| a) Regular | | b) General | |
| b) Dissolution | | c) Limited | |
| c) Merger | | 4. AGREEMENTS | |
| d) Amendments | | | |

## II. ESTATES & ESTATE PLANNING:

| 1. ADMINISTRATION | | 6. PROBATE | |
|---|---|---|---|
| a) Independent Title Only | | a) Muniment of | |
| b) Regular | | b) Regular | |
| c) With Will Annexed | | 7. SMALL ESTATES | |
| 2. AFFIDAVIT OF HEIRSHIP | | 8. TAX RETURN | |
| 3. GIFT | | 9. WILL | |
| 4. GUARDIANSHIP | | 10. TRUST | |
| 5. GEN. POWER OF ATTORNEY | | | |

## III. MISCELLANEOUS

| 1. ASSUMED NAME | | 15. WAIVER OF AGE AGMT | |
|---|---|---|---|
| 2. CLAIMS | | 16. UNUSUAL FORMS | |
| 3. CRIMINAL | | 17. CAVNESS - PERSONAL | |
| 4. GENERAL FILE MENT AGREEMENT | | 18. PROPERTY SETTLE- | |
| 5. MISCELLANEOUS LIMITATIONS | | 19. AFFIDAVIT OF | |
| 6. AD LITEMS | | 20. CIVIL SUIT | |
| 7. SUSPENSION - D.L. | | 21. CONTRACT FOR TITLE | |
| 8. EVICTION NOTICE | | | |
| 9. HOLD HARMLESS AGMT. | | | |
| 10. LISTING AGREEMENT | | | |
| 11. MEDICAL CONSENT | | | |
| 12. NUNC PRO TUNC | | | |
| 13. TAX SUIT | | | |
| 14. EMINENT DOMAIN | | | |

## IV. PERSONAL PROPERTY

| 1. GIFT | | 5. OPTION | |
|---|---|---|---|
| 2. FORECLOSURE | | 6. POWER OF ATTORNEY | |
| 3. LEASE | | 7. PURCHASE | |
| 4. LOAN | | 8. RIGHT OF REFUSAL | |
| a) Regular | | 9. SALE | |
| b) Renewal | | a) Contract | |
| | | b) Regular | |

## V. REAL PROPERTY:

| 1. EASEMENT | | 10. MINERAL DEED | |
|---|---|---|---|
| 2. EXCHANGE | | 11. OPTION | |
| 3. FORECLOSURE | | 12. PARTITION | |
| 4. GIFT | | 13. POWER OF ATTORNEY | |
| 5. HUD | | 14. PURCHASE | |
| 6. JOINT VENTURE | | 15. RELEASE | |
| 7. LEASE | | 16. RIGHT OF REFUSAL | |
| 8. LOAN | | 17. SALE | |
| a) Regular | | a) Contract | |
| b) Renewal | | b) Regular | X |
| c) Title One | | 18. SUBDIVISION | |
| 9. MECHANIC'S LIEN | | 19. TRANSFERS | |
| a) Const. Contracts | | 20. TAX MATTERS | |
| b) Regular | | | |

## VI. FAMILY LAW:

| 1. ADOPTION | | 7. MODIFICATION | |
|---|---|---|---|
| 2. CHANGE OF NAME | | 8. TERMINATION | |
| 3. DIVORCE | | 9. PROTECTIVE ORDERS | |
| 4. ANNULMENT AGREEMENT | | 10. MARITAL PROPERTY | |
| 5. PATERNITY SUIT | | | |
| 6. VOLUNTARY LEGITIMATION | | | |

# CLERK'S CERTIFICATE THAT APPELLATE RECORD
## IS TRUE AND CORRECT

THE STATE OF TEXAS      §
                                  §

COUNTY OF BURNET      §

I, Janet Parker, Clerk of the County Court of Burnet County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rules of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rules of Appellate Procedure 34.5(b).

GIVEN UNDER MY HAND AND SEAL at my office in Burnet County, Texas on this the 16th day of April, 2015.

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

By: _____

**Jayme Ingram**

Supplemental REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF            )            IN THE COUNTY COURT

THE ESTATE OF              )            AT LAW

EDELL WADE                 )            BURNET COUNTY, TEXAS

EXCERPT TRIAL TESTIMONY OF LORI GRAHAM

AND

TRIAL TESTIMONY OF AMANDA WADE

On the 1st day of October 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

                  A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas  78701

512-236-9220

     BY:  MR. DON RICHIE

          MS. EMILY SEIKEL

     APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas  78731

512-349-9595

     BY:  MR. DON E. WALDEN

     APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas  78701

512-480-5600

     BY:  MS. KATHRYN ALLEN

AND

A P P E A R A N C E S    C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas   76550

512-556-8970

     BY:   MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas   78701

512-474-7054

     BY:   MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Voir Dire | Vol |
|-------|-----|-------|-------|---------|-----------|-----|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

**DEFENDANT'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | | Vol |
|-------|-----|-------|-------|---------|--|-----|

**Court Reporter's Certificate        Page 231          3**

| **WITNESSES:** | **Dir** | **Cross** | **Redir** | **Recross** | **Voir Dire** | **Vol** |
|---|---|---|---|---|---|---|
| Lori Graham | | 7 | | | | 3 |
| Amanda Wade | 22/56 | 168 | 200 | 228 | 54 | 3 |

REPORTER'S RECORD

VOLUME 3 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 91 | Checking account statement/Edell Wade | 150 | 150 | 3 |
| 92 | Checking account statement/Amanda/Johnny Wade | 155 | 155 | 3 |
| 93 | Checking account statement/Blacksheep | 155 | 155 | 3 |
| 94 | Amortization chart | 228 | 228 | 3 |
| 95 | Edell Wade taxes chart | 228 | 228 | 3 |
| 96 | Payment reduction chart | 229 | 230 | 3 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 11 | Amortization schedule | 132 | 132 | 3 |
| 21 | Handwritten chart | 226 | 226 | 3 |

back door what he can't get in the front door.

THE COURT: The situation is that you all are allowed to go into the issues regarding the initial sell and purchase of the property. As far as whether or not that was a fair sale or not a fair sale is barred by limitations. So we can't go into the specific fats of the sale other than to allow the plaintiff to show part of a plan or scheme to defraud her from the beginning.

MR. RICHIE: That's where I'm heading.

THE COURT: So with that in mind I'm going to go ahead and allow some questions in that regard to show the fairness of the transaction, but as far as what money the plaintiffs got out of the sale of their California property I don't find that that is going to be relevant unless you can tie it into a plan or scheme to defraud Mrs. Edell Wade.

MR. RICHIE: And, Judge, fraud is something that is always proved by circumstantial evidence. People don't come in and admit I defrauded somebody. What we're trying to show here is that they sold their California property. They took the cash. They came here and they did not make a down payment and then they used that cash to go out and buy other properties in town, and that was the plan and scheme that they not only planned but implemented, and the fact

C E R T I F I C A T E

STATE OF TEXAS          )

COUNTY OF BURNET        )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226;Email:Vkaykan@live.com

Supplemental REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

| | | |
|---|---|---|
| IN THE MATTER OF | ) | IN THE COUNTY COURT |
| THE ESTATE OF | ) | AT LAW |
| EDELL WADE | ) | BURNET COUNTY, TEXAS |

EXCERPT TRIAL TESTIMONY OF

NANCY BURNS AND MICHAEL MARTIN

On the 30th day of September, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas 78701

512-236-9220

    BY:  MR. DON RICHIE

       MS. EMILY SEIKEL

    APPEARING ON BEHALF OF JAMES(BUD)WADE

LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas 78731

512-349-9595

    BY:  MR. DON E. WALDEN

    APPEARING ON BEHALF OF NANCY BURNS

GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas 78701

512-480-5600

    BY:  MS. KATHRYN ALLEN

AND

A P P E A R A N C E S    C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas 76550

512-556-8970

    BY:  MR. EVAN STUBBS

    APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

    WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas 78701

512-474-7054

    BY:  MR. CLAUDE DUCLOUX

    APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Nancy Burns | | 7,35 | | | 2 |
| Michael Martin | | 78,109 | 115,129 | | 2 |

**DEFENDANT'S WITNESSES:**

| NAME: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|

**Court Reporter's Certificate**                    Page 131        2

REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Nancy Burns | | 7,35 | | | 2 |
| Michael Martin | | 78,109 | 115,129 | | 2 |

REPORTER'S RECORD

VOLUME 2 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 87 | Safe deposit box lease | 127 | 127 | 2 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 2 | Copy of check | 26 | 26 | 2 |
| 3 | Handwritten will | 36 | 37 | 2 |
| 4 | Copies of bank information | 44 | 44 | 2 |
| 5 | Copies of checks to Nancy | 77 | 77 | 2 |
| 6 | Invoices from Bill & Nancy | 77 | 77 | 2 |
| 7 | Receipts from Edell Wade | 77 | 77 | 2 |
| 8 | Copies of checks to Weldon | 110 | 110 | 2 |
| 9 | order approving first inventory | 111 | 111 | 2 |
| 10 | Order approving 1st amended inventory | 111 | 111 | 2 |

P R O C E E D I N G S

\*\*\*\*\*\*

(Jury present.)

NANCY BURNS

Having been previously sworn, testified as follows:

CROSS EXAMINATION

BY MR. DUCLOUX:

Q   Let's talk first about your $10 a day.  It wasn't $10 a day.  It was $10 an hour and 42 cents a mile.  That's what you charged your mother to come and take care of her place; isn't that right?

A   Mother insisted that she --

Q   This is a yes or no question.  You charged her $10 an hour and 42 cents a mile to take her around?

A   She insisted that she pay.

Q   Fine.  But it wasn't just $10 a day even if you were there for six hours or eight hours.  It's $10 an hour and 42 cents a mile, right?

A   (No audible response.)

Q   All right.  Let me move on.

Your mother was old.  She was terrified of ending up in a nursing home; wasn't she?

A   I don't think she was.

Q   Really?  You don't remember all the conversations about how she hated the fact that your

father ended up in a nursing home and what it smelled like and what it was like and everything. She wanted to die in her own home; didn't she?

MR. RICHIE: I don't know -- we're --

A    The --

MR. RICHIE: May we approach?

THE COURT: Excuse me just a second.

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE: We have a motion in limine on the Dead Man's statute, Your Honor. It's still in force as far as I know.

MR. DUCLOUX: I'm asking about her understanding.

MR. RICHIE: No, you asked her what did she say --

MR. WALDEN: That she didn't like the smell.

MR. RICHIE: Did she tell you she didn't --

MR. WALDEN: The question was, "Don't you remember".

MR. DUCLOUX: I'll stay away from it.

MS. ALLEN: It might be helpful for his Honor to review 601 which is the rule that Mr. Richie's

referring to. What it speaks to is statements about the very transaction at issue. It doesn't prohibit you from, even from talking about those statements. But certainly it doesn't prohibit oral statements about other things at all.

THE COURT: Well, I'm going to allow this line of questioning. I think it's proper cross examination.

MR. RICHIE: All right. Thank you.

THE COURT: These issues were brought up during direct.

(The following was in the presence and hearing of the jury.)

Q   (By Mr. Ducloux)  So are you telling the jury that your mother wasn't terrified of ending up in a nursing home?

A   When mother fell in 2008 she was able to get to a phone.

Q   I didn't ask you anything about a fall in 2008 that you claimed originally that the gate was locked but that somehow you got through it anyway. But we'll get to that. My question was, wasn't your mother terrified of ending up in a nursing home?

MS. SEIKEL: Objection, Your Honor. That's putting testimony in her mouth that she never

stated.

MR. DUCLOUX:  This is cross examination.

THE COURT:  It is.  You may ask her the question.

Just answer the question that's asked.

Q    (By Mr. Ducloux)  How did your mother feel about nursing homes?

A    She thought there could be better care for my dad.

Q    Great.  Now, you also told us about how your mother was so fair minded that everything had to be split equally.  Your mother was very active with what she did with her will, and as things changed she made several different wills over and changed the way she had distributed things among the children; didn't she?

A    She did.

Q    Thanks.  And as far as this was heritage land, in fact she had six siblings:  Manual, Homer, Lenore, Corrine, Ozell, Chester -- not one of them got one-tenth of 1 percent of this land, because she was the daughter who could make it heritage and she could buy it from the parents and keep it in the family, right?

A    They agreed.

Q    They all agreed.  And maybe your mother, do you think she came up with the idea that Johnny is the

son who can keep this in the family, he has the ability to pay for it and the ability to take care of me, and this is a great idea of how to keep this land in the family?

A They didn't do it in secret. They were wide open and every one was to participate. It was not like our --

Q Of course you're not going to answer my question. Do you get the possibility that your mother might have thought this was actually the best estate plan to keep this land owned by your family to sell it to Johnny who would invest in it and make it better and improve it?

A She may have thought it was a good idea, but I don't think she realized --

Q Oh, wait, wait. You don't know what she thinks. She actually did it, right?

A She did.

Q And she was very affirmative about it, wasn't she?

A (No audible response.)

Q And you enthusiastically --

MR. SEIKEL: Objection, Your Honor. He's interrupting her and asking questions before she answers the first one.

MR. DUCLOUX: I'm trying to get through before the end of the day.

THE COURT: Well, just give her an opportunity to answer the question asked.

Q  (By Mr. Ducloux)  That's what your mother did; didn't she?

A  Ask the question again, please.

Q  What your mother did is decide the best thing to keep this in the family is to sell it to one child and have a note that would be payable to the whole family after her death?

A  And she did.

Q  And you enthusiastically supported that; didn't you?

A  I was pleased that Johnny was going to be coming back and basically the property would be kept within the family.

Q  Right.  But then that -- by the way, I want to make sure since you're talking about all of this.  You don't want this jury to think that you're here representing any of your other three siblings who say they don't want any part of this case, right; you're not here on their power of attorney saying, Go get something for me; are you?

MR. RICHIE: May we approach again, Your

Honor.  I'm sorry.

MS. SEIKEL:  We have a motion in limine.

MR. RICHIE:  Yes.  There's a motion in limine on file that is talking about what people who are not here would testify to.

MR. DUCLOUX:  I'm not saying --

MR. RICHIE:  Excuse me.  What he just said was they don't want any part of this and they've told you they don't want any part of this.  That's what I'm --

MR. DUCLOUX:  I did not say --

MR. RICHIE:  We can get it read back. That's exactly what you said.

THE COURT:  Re-ask your question.

MR. DUCLOUX:  I'll re-ask my question.

Q    (By Mr. Ducloux)  Let's just confirm for the jury that neither you nor your -- Bud, the three of you are not here in any representative capacity for the other siblings?

A    No, we are not representing our other siblings.

Q    Okay.  Now, you have now experienced this litigation for four years now, right?

A    Yes.

Q    Do you really think that your family, if your

13

mom left it to all six, could have decided on fence lines when each person got 60 acres? You know that Weldon would have sold his 60 acres so that wouldn't have been part of the estate any more, would it?

A    I don't know what Weldon would have done.

Q    Yeah, but anybody was free to do whatever they wanted; weren't they?

A    Yes, I suppose.

Q    And the very strong likelihood is that this land wouldn't be heritage and in the family, it wouldn't be kept in the family except under your mother's plan?

MR. WALDEN: Objection. Calls for speculation.

THE COURT: Sustained.

Q    (By Mr. Ducloux) Now, after Johnny got here your income sort of dried up and that was unpleasant for you, wasn't it; that $10 an hour? As they came in and started doing it you weren't needed any more; isn't that right?

A    We -- Bill and I chose to pull away because we were showing up when asked to help with jobs and we would get there, we would set aside our plans and all of a sudden they would say, We don't need you any more, go home.

Q    By the way, do you know as part of this plan

Johnny promised your mother she would be able to live in her house for the rest of her life, right?

A    That was part of the plan.

Q    How did your mother feel about her own father in general?  She adored her father, right?

A    Yes.

Q    And isn't it true that she got to die in the same room that he died in?

A    I don't know exactly what room she died in.

Q    Well, I'm just asking you based upon your knowledge of your mom, would that have been a significant event?

A    Mother had opportunities to write on some of the documents that -- for her POA medical, anything that she -- special wishes.  And she never did write those down there.

Q    I'm not sure I understand what you're talking about.  That wasn't my question.

By the way, on your power of attorney it made you consult with others.  There was nothing on the power of attorney with Amanda that made her consult with others; did she?

A    There was none.

Q    That's fine.  Now, you told us that you encouraged the sale, you were happy about it, you helped

15

them move when they finally sold their property in California, right?

A    Correct.

Q    And the first thing that Johnny did for your mother is he installed air conditioning in her house so that the last six and a half years of her life would be pleasant in an air conditioned home for the first time in her life, right?

A    Bill and I installed that air conditioning system.

Q    Johnny hired you because that's what you would do if he paid you to do that; didn't he?

A    Correct.

Q    So it was not a gift from you and Bill.  It was a job that you were paid for?

A    Correct.

Q    And Johnny and Amanda, let's make sure the jury understands, they lived in a 20 by 20 concrete floor room for five years 20 feet away so that they could make sure they were there, but not invade her space in her 1,600 square foot house?

A    I think they did invade her space.

Q    By living in a concrete room appended to the garage for five years?

A    When they came they said they were going to

build a new house, and they did not.

Q   Oh.   When -- that's the first we're hearing about that.   When did that occur?

A   They talked plans -- we were in good standing, we loved each other, we had good conversations, and they talked about plans.   They were going to build a new house.

Q   Isn't it fair to tell this jury that your mother adored Johnny and Johnny adored Edell; they were very close?

A   They were close.

Q   Now, let's talk about how your -- that 2007 meeting.   As the jury will hear later, as part of this note when they sold it they voluntarily sent $150,000 in August of 2004, four months after the sale, to put towards this $500,000 note.   They didn't have to pay it.   Got a chunk of money, sent it to Edell to apply towards the note, right?

A   Yes.

Q   And the jury will see it later on but basically they were supposed to pay 1,848.10 a month, but instead four months in they put a big chunk of one hundred and fifty and sent it to her, right?

A   Correct.

Q   And under your paid chauffer-ship you brought

her down to the bank. And let's just -- this is an easy question. Somehow that $150,000 CD ended up with you as co-owner, right?

A    Yes, sir, it did.

Q    Which means you could have -- you didn't have time to put six other names on that CD. It was just you as co-owner with your mother, right?

A    Glenda Chapman was sitting --

Q    I'm not asking about Glenda.

A    She was the one that suggested --

Q    I'm not --

MR. DUCLOUX: Objection. Nonresponsive.

THE COURT: Sustained.

Just answer the question asked.

Q    (By Mr. Ducloux) So that was a 30 month CD. When would that expire, February 2007?

A    Probably so.

Q    So let's tell the jury what happened. The reason you had that confrontation was that that day you told us about yesterday, you went down to the bank to see if that CD had rolled over again solely in your name; didn't you?

A    I did not.

Q    You did exactly that and when the banker told you, You better check and see about it, you went

screaming out to your mother's house furious that she had taken you off. You had been found out. You got caught with your hand in the cookie jar.

A No, sir. I --

Q In fact, if Amanda testifies that you were screaming so loud she could hear you 100 feet away and ran in there to make sure Edell was all right, that's --

MR. WALDEN: Your Honor, I'm going to object. He's assuming facts not in evidence. And he can cross examine without badgering the witness. This really ought to be more of a discussion instead of brow-beating. She can answer the questions and he can ask them without brow-beating her or badgering her.

THE COURT: This is cross examination. He's allowed to conduct the sort of examination he's conducting. You're overruled.

Q (By Mr. Ducloux) So in fact you had a yelling match at your mother; didn't you?

A I respected my mother and did not have a yelling match, sir.

Q And that's why Amanda came. You stood in the door and tried to block her from coming in the door while you were having this argument; didn't you?

A We met in the doorway but it was not trying to block her.

Q   Did you tell her not to come in?

A   There was information that -- you know, Johnny was upset.  Mother was trying to calm him down.

Q   But your mother was in tears because you were yelling at her, right?

A   I was not yelling at my mother.

Q   Then you said the mailbox was moved.  You knew that the mailbox was hit by a truck.  It was run over by some vehicle.  They didn't remove the mailbox.

A   I don't know how it was removed, but it was.

Q   So if they say it was hit by a truck, you don't have any way to counter that; do you?

A   I really don't.

Q   All right.  As far as the jury has heard and the voir dire panel heard how they locked the gate.  There were keys everywhere.  It was locked for your mother's protection; wasn't it?

A   I don't think it was for her protection.

Q   Okay.  So you're guessing.  That's your guess that it wasn't for her protection.  She's 88, 89, but if they have to go in, everybody had a key or knew where a key was.  It was hanging on a chain.  Everybody had access to that at any time; didn't they?

A   Except EMS if they needed to get there.

Q   Pardon me?

A   EMS.   Emergency vehicles couldn't have gotten in there.

Q   That's why they have bolt cutters on the EMS trucks, right?

A   They carry bolt cutters, yes.

Q   Very good.   So interestingly your mother then -- Amanda ends up as your mother's executor because your mother put her in the will, right?

A   Yes.

Q   Okay.   And let's go back a little further. Your mother was very attached to that property; is that fair to say?

A   Yes.

Q   And do you, in your own mind -- I won't ask you anything about your mother's opinion -- don't you think it was significant that she got to die in her own house in that same room?

A   (No audible response.)

Q   You won't even admit that, huh?

MR. WALDEN:   Your Honor, I'm going to object.   He's putting words into the witness' mouth. She hasn't had a chance to answer yet.

THE COURT:   Just give her an opportunity to answer the question.

A   It's a passing thought that maybe mother

wanted to die there, but --

Q    (By Mr. Ducloux) And when Amanda, to achieve that purpose, to arrange that she could have a Star Flight back while she was at the hospital, so she could --

A    That was not --

Q    -- pass away at her own house, the family said, That's too expensive, why are you wasting that money?  Right?

A    It was not a life or death.  It was not going to save mother's life.  It was like a dog grabbing a bone and taking it and hiding it from the rest of us.  It was a power trip for them to control mother's last few hours.

Q    Okay.  So your mom passes away.  Amanda is appointed as the executor.  You all got notices, didn't you, that there was a probate pending, right; the normal, You are hereby notified as an heir of the estate that probate has been filed, blah blah blah; right?

A    Yes.

Q    You have all the records.

A    Yes.

Q    Let's see what objection did you make to Amanda being appointed?  None, right?

A    I didn't

Q    When she files her first inventory, what objection did any member of the family make to the correctness of the inventory?  None, right?

A    Right.

Q    So let's talk about this story of yours where you save the day about the money.  Do you recall meeting at the -- first of all, wasn't your mother's plan for personal property anybody who gave her something got that back, number one, right?

A    Correct.

Q    So if there was in fact a ring you gave to your mother, Amanda gave it back to you because it had come to you and you get all the stuff back that you gave to your mom, right?

A    Right.

Q    And then for the other miscellaneous stuff, her plan, to be fair, was anybody can bid on it, anybody can buy it.  Amanda's to save the money and split it up among the seven heirs, right?

A    That was the plan.

Q    By the way, your mother also appointed Amanda as the trustee of Weldon's trust; didn't she?

A    Yes.

Q    Okay.  And when the trust was transferred by agreement by the parties to you, there was no objection.

Everything was completely 100 percent in order for that trust?

A    Yes.

Q    So everybody was supposed to buy stuff.  If someone wanted the red rocking chair, they could make a bid for $10 for the rocking chair, they would buy it from the estate and the money would be split seven ways, right?

A    If they were given that opportunity, which they were not.

Q    Now, did you remember --

THE COURT:  Excuse me, counselor.  It's 10:00 now, and in keeping with my promise to the jury we're going to take a bathroom break for 10 minutes.  Be back in the jury room at ten minutes after 10.

(A break ensued.)

(Jury present.)

THE COURT:  Be seated.

Mr. Ducloux, you may continue your cross examination.

MR. DUCLOUX:  Thank you.

Q    (By Mr. Ducloux)  I direct your attention back to the time you were talking about where you brought to everyone's attention the money.  Do you recall that was a visit you made to the hardware store and Gwen was with

you during that visit when you talked about the money?

A    Bud and Gwen were with me.

Q    Pardon me?

A    Bud and Gwen.

Q    And one of the things that happened at the time of that meeting is that Gwen wrote a check for --

THE COURT:  Excuse me.  Would you ask your associate to be seated while we're having examination.  It's distracting to the jury for you to be gathering documents while we're going through the trial.

Go ahead and proceed.

Q    (By Mr. Ducloux)  And one of the things that happened is that Gwen wrote her check for the things that she was getting from the estate that day; do you recall?

A    Correct.

Q    Okay.  So that was the meeting where you talked about the money and later on you think that that encouraged them to declare the 80,000; right?

A    I do.

Q    All right.  Let me show you what's been marked as Defendant's 2.  And the purpose of this is this is Gwen's check and it's dated November 19.  So does that refresh your memory; was that the date that the conversation occurred about the money, isn't it?

A    November the 19th, yes.

Q    All right.  Let's look at Exhibit 32 together.  She actually swore to this, the 80,000, earlier than that conversation.  Tell the jury what day she swore about having added that $80,000 back in.

A    Fifteenth of November.

Q    Four days earlier than your conversation.  So do you still think you're the one who prompted her to put the money back in there?

A    We had that conversation and afterwards the money appeared.

Q    Right.  And four days earlier she swore that it was in there.

MR. DUCLOUX:  We offer Defendant's Exhibit 2, Your Honor.

THE COURT:  Any objection?

MR. SEIKEL:  No, Your Honor.

THE COURT:  Defendant's 2 will be received into evidence.

MR. DUCLOUX:  May I publish one copy to the jury?

THE COURT:  You may.

Q    (By Mr. Ducloux)  All right.  Do you recall that I guess the only one who never paid for their share of the estate was you.  You never paid a check; did you?

A    I did not pay for the items that I picked up because time was running out and Amanda said we'll do this at a later date.  That later day never appeared.

Q    Now it's four years later and apparently you can't send a check by mail or anything.

A    We didn't come to an agreement on what I had gotten.

Q    Okay.  No one has made a demand on you, right?

A    No.

Q    In fact, the jury is not going to decide anything about that you didn't get a rocking chair or that somebody didn't get some piece.  That's not what this case is about, is it?

A    It's not.  I would have gladly paid that day.

Q    That's fine.

A    I was prepared to pay for anything that I had gotten.

Q    That's fine, but I just want the jury to understand they're not really facing the question about what was the value of personal property or that it didn't get -- there's nothing about that?

A    No.

Q    And there's still stuff out there if somebody wants to go through it, right?

A    I don't know where it is

Q Now, let's talk again just briefly about the relationship between Johnny and Edell. They brought your mother out three times to visit in California; didn't they?

A I didn't keep count, but she did visit.

Q And they always paid her way, right?

A I don't know that.

Q And they brought family members. They brought siblings, cousins, sisters out sometimes too and they always paid their way?

A I don't know.

Q You had complained in your testimony yesterday that Amanda had power of attorney. Can you tell us what act of Amanda using a power of attorney you're complaining about? Do you even know if Amanda ever used that power of attorney for anything?

A I don't recall.

Q And then I asked you a few months ago when your deposition was taken --

MS. SEIKEL: Objection, Your Honor. The deposition --

MR. DUCLOUX: I'm sorry. I'll just ask the question fresh, Your Honor.

Q (By Mr. Ducloux) Can you tell me a single act of Amanda in her capacity as executor that you are

complaining of some financial act?

A   I didn't --

Q   Let me rephrase the question.  Let me ask it again.  Can you show us that Amanda took $10 of your mother's money and bought herself a T-shirt or anything that she used your mother's money improperly for any purpose; a penny, a dime, a dollar, anything?

A   I don't know that.

Q   All right.  So she qualified as the executor and you didn't object, did you?

MR. WALDEN:  Your Honor, I'm going to object.  This is assuming facts not in evidence.  Mr. Ducloux supplied an answer for the witness previously.

MR. DUCLOUX:  This is cross examination.  I'm allowed to ask leading questions.

MR. WALDEN:  May we approach?

THE COURT:  I'm going to overrule your objection.

Q   (By Mr. Ducloux)  Did you object to her appointment?

A   I didn't know that she was executor until after mother had passed.

Q   And I'm not trying to make you a lawyer, I'm not trying to ask you legal questions.  Are you aware that she filed any documents in an untimely fashion in

association with her executorship?

A   I don't know.

Q   All right.  Have you heard from any source that she filed anything in an untimely fashion?

A   I don't know.

Q   Did you object in any way to her recounting of the sworn inventory of what's in the estate?

A   No.

Q   And in fact you got distributed over $84,000 in cash as your share of cash, right?

A   Correct.

Q   And there is, as these payments are coming in, there's more pending in the estate account that you have a one-seventh share of?

A   Right.

Q   And, again, can you tell the jury that there is a payment that she was supposed to put in there that she didn't put in there?

A   I have a suspicion that there's some cash missing.

Q   Okay.  We're four years out.  Are we going to hear from an auditor that there's cash missing?

A   We'll let the auditor speak for it.

Q   But you're not aware of any?

A   Not offhand.

MR. DUCLOUX: I think I want to save some time and pass the witness over to Ms. Allen.

THE COURT: All right. You may proceed with your redirect -- oh, Ms. Allen. I'm sorry. Go ahead.

If I could, approach counsel and let me talk to you all for just a second.

(The following was in the presence but out of the hearing of the jury.)

THE COURT: Normally in my experience you do not switch counsel when you're examining a witness on cross examination. One of you begins, one of you finishes. You don't sit here and split it. Is this going to be a common practice where we go ahead and share examination of the witnesses?

MR. DUCLOUX: Well, we weren't aware of that for this. We're going to try to streamline it, and the things that are involved, the documents, she's going to do. And that's really her role. But we'll do it whatever way the Court wants to do it from now on.

MS. ALLEN: Well, Your Honor, I'm only going to talk --

THE COURT: I can't hear you.

MS. ALLEN: I'm sorry. I'm trying to not speak to the jury. I'm not going to talk at all about

31

any executor duties. That's what Mr. Ducloux is handling. I'm just going to handle the individual issues.

MR. RICHIE: Okay. Well, he's been talking about the individual issues and he just now shifted --

MS. ALLEN: Well, I'm not going to be denied my right --

THE COURT: What I would like for you all to do is to follow the normal rule that when one of you begins a cross examination, then that person finishes the cross examination and that we not violate it or spread it out between -- where everybody gets to -- unless there are different parties. Like you have the right to examine and ask questions because you're representing her in a different capacity.

MS. ALLEN: He is.

MR. DUCLOUX: I'm representing Amanda.

THE COURT: Yes. So as long as you limit your questions only to the areas that you're involved in, then I'll go ahead and allow you all to do it that way.

MR. RICHIE: That's the way I would understand it too, but it's not what happened. Mr. Ducloux just questioned her about her relationship with

her mom, going to the bank, what happened with -- things other than --

MR. WALDEN: It was far beyond executor issues.

MR. DUCLOUX: We'll follow your rule from now on. How's that?

THE COURT: I'm going to go ahead and allow you to carry on with cross examination. But in the future let's go ahead and have the attorney that's representing a particular interest only ask the questions regarding that issue and that we not overlap. Now, if you all basically one of you wears out and the other one takes over.

MS. SEIKEL: He brought up some stuff about the executorship and the inventory, things that were done after the administration of the estate. We were hoping to respond to --

MR. WALDEN: I was planning on doing the redirect.

THE COURT: That's fine. What we're going to do with this particular witness is I'm going to let you all have free hand to go ahead and do this as far as spreading it out between you. But in the future let's try to have each side examine your witness unless there is an issue that involves just one of the

33

attorneys that's representing one of the parties in a different capacity.

MR. RICHIE: Yes, sir.

MR. DUCLOUX: Absolutely, Your Honor. I just want to point out that I took 20 minutes after three hours of direct.

MR. WALDEN: He's not complaining about the time. He's talking about the way y'all are doing it.

THE COURT: I understand. I'm saying that I really don't want you all to divide the job as far as cross examination of witnesses or direct examination. I want one attorney to run the lead on that so that we don't have the possibility of overlapping with the same sort of questions styled again.

MR. RICHIE: While we're up here I would like to address one other issue. My understanding of cross examination is he can ask a tough question, but he needs to allow the witness to answer the question. He can object that it's nonresponsive.

THE COURT: There's a certain latitude in cross examination that the old-school lawyers like me understand because that's the way we used to do it. And I know there's different practices now that --

MR. DUCLOUX: Are you calling me old school?

THE COURT: I'm just saying you're the same generation I am.

MR. DUCLOUX: Yes, sir.

THE COURT: All right. Thank you.

MR. RICHIE: Thank you, Judge.

THE COURT: Ms. Allen is now going to cross examine this witness.

MS. ALLEN: Thank you, Your Honor. May I approach the witness, please?

THE COURT: Yes.

(The following was in the presence and hearing of the jury.

CROSS EXAMINATION

BY MS. ALLEN:

Q    Ms. Burns, let me hand you Exhibit 3 and once you have had a chance to look at that, let me know.

MR. WALDEN: Can we have a copy?

MS. ALLEN: Yes.

Q    (By Ms. Allen)  Ms. Burns, are you ready to proceed, ma'am?  I don't want to cut you off.

A    Yes.

Q    That is a letter in your mom's hand, right; that is that your mom wrote?

A    Yes.

MS. SEIKEL:  We're going to object to this as non-authenticated and it's subject to the Dead Man's statute in our motion in limine.

THE COURT:  Overruled.  You may proceed.

Q    (By Ms. Allen)  And it is your mom's explanation about what her intentions are about dividing up her property?

MS. SEIKEL:  Objection.  Hearsay.

A    Yes, there's a few --

MS. SEIKEL:  Could we get a ruling on the hearsay?

A    -- things laid out.

THE COURT:  Overruled.

Q    (By Ms. Allen)  And it is exactly consistent with what she did, is it not?

MS. SEIKEL:  Is this in evidence yet?

MS. ALLEN:  I'm trying to just lay the predicate, Your Honor.  I'm asking just a yes or no. It's exactly consistent with what she did.

A    Yes.

MS. ALLEN:  Your Honor, I offer Defendant's 3.

THE COURT:  Now you may make an objection.

MS. SEIKEL: We object.

THE COURT: On what basis?

MS. SEIKEL: It's hearsay. It's not authenticated. Dead Man's statute and she was asking her to interpret it without it being admitted.

THE COURT: Overruled. What was that number?

Q (By Ms. Allen) Ms. Burns, you can hang on to that for a moment, if you would. If you need it. You might not.

THE COURT: Let me rule on this.

MS. ALLEN: I'm sorry, Your Honor. I thought you did.

THE COURT: What's the number on that?

THE WITNESS: Number 3.

THE COURT: Defense Exhibit 3 will be received into evidence.

Q (By Ms. Allen) Ms. Burns, as your mom wrote out, her -- first off, she confirmed in that letter, and you knew it to be true, that she sold the ranch to Johnny and Amanda, right?

A Yes.

Q And that was off the table, right?

A Yes.

Q You knew that to be the truth?

A   Yes.

Q   And that the shop and its contents just as she and your dad, Otto, had bought the place previously and bought the shop and its contents, that was passing on to Johnny and Amanda in the same way because they had bought the ranch, right?

A   Right.

Q   And you knew that, right?

A   Right.

Q   And you knew that your mom had given Johnny the old green Chevy pickup, right?  It was like a 1960 model, wasn't it?

A   I didn't never see any transaction that she had transferred the title.

Q   I'm sorry.  If you'll look there at the corner you'll see her note, don't you, where she's kind of tongue-in-cheek saying she gave Johnny that old pickup and boy is he going to have to spend a pile of money fixing it up.  Do you see that in her hand in the right-hand corner?

A   I see it.  Yes.

Q   And that's what she did, right?

A   Yes.

Q   And while you may or may not have seen a title transfer, you knew that that is what she did, didn't

you?

A    I didn't ever see this paper.

Q    You knew your mom gave Johnny the old pickup; didn't you?

A    I did not.

Q    You knew that your mom intended and did sell the ranch, the cattle and some equipment to Johnny and Amanda in 2004; correct?

A    Right.

Q    You knew it before it happened, didn't you?

A    I was at a meeting.  I did not ever see any finished documents.  I didn't know what had transpired.

Q    You knew before it happened that your mom was planning to sell the ranch to Johnny and Amanda, right?

A    I knew that they were talking about it, yes.

Q    You knew that because in your own words Johnny had insisted that you go to the meeting, right?

A    Yes.  And I did attend a meeting.

Q    Johnny wasn't hiding it from you or anybody else, was he?

A    Whenever I suggested that the other children be involved by a registered letter, just let them know that this is happening, Johnny said no, that the place would not ever sell if they ever found out.

Q    Lets talk about that.  This is a time when you

have power of attorney, right?

A    Right.

Q    And it's a special power of attorney because we've looked at paragraph 25 that obligated you to consult with the siblings, right?

MS. SEIKEL:  Objection.  The document speaks for itself.

THE COURT:  I'm sorry.  What?

MS. SEIKEL:  The document speaks for itself and does not state that.

THE COURT:  Overruled.

Q    (By Ms. Allen)  Ms. Burns, would you answer, please.  Do I need to re-ask it?

A    Please do.

Q    We've looked at the special paragraph 25 that the plaintiff's lawyer showed you yesterday and you remember that, right, it has it in there about you consulting with your siblings on things?

MS. SEIKEL:  Objection.  It's a mischaracterization of the document.

THE COURT:  The document will speak for itself.  Overruled.

Q    (By Ms. Allen)  Do you remember my question, Ms. Burns?

A    Yes.  Charlene and Bud were listed on there

that I could speak with them if I had any questions.

Q    What I'm trying to get to is this.  At the time that you say Johnny told you not -- or that he wasn't going to send a letter.  And that's what you said, right?  That he wasn't going to send a letter?

A    That's what he said.

Q    And that's what you're telling the jury is that Johnny said he wasn't going to send a letter, right?

A    He advised that it not happen because he was afraid that somebody would object and that the place would not sell.

Q    Okay.  You at this time, I'm just trying to make sure, that at this time when Johnny said he wasn't going to send a letter you were the one with the power of attorney with the special paragraph 25, right?

A    Yes.

Q    All right.  And you certainly had paper and envelopes and postage money; didn't you?

A    I did.

Q    And you never notified anybody, did you?

A    I did not notify anyone.

Q    You knew that Johnny was not going to notify anyone, according to your story, correct?

A    Correct.

Q  You do not quarrel with the idea that your mom had every right in the world to dispose of any of her property or all of it any way she saw fit, do you?

A  I don't quarrel with it, but I don't know that she knew what the results would be.

Q  I know you don't know.  We'll get to that. You never, you never quarrelled with your mom and suggested to her that she wasn't able to dispose of her property as she saw fit, did you?

A  No.

Q  Not when you were getting paid to take her to the grocery store and take her to the doctor and mow her yard and clean her house.  You didn't quarrel then with the idea that she could dispose of her property any way she saw fit; did you?

A  I did not.

Q  And when you put the $150,000 CD in the name of just you, instead of you and Charlene and Emma and Bud and Johnny and Weldon --

MR. WALDEN:  I'm going to object, Your Honor.  It's mischaracterizing the evidence.  There's no testimony that Nancy Burns put the CD in any one way or another.  There's testimony that Edell Wade did that.

THE COURT:  I'll overrule the objection. I'll allow this line of questioning.

Q   (By Ms. Allen)  At the time that was done --
how about that -- at the time that was done, the CD put
just in the name of one child and not all of them, when
that happened you never said to your mom any quarrel
about her right to dispose of her property as she saw
fit; did you?

A   As I stated before she didn't want to take the
time to sit there and they had to fill out seven
different documents.  It was a suggestion of Glenda
Chapman, the bank officer, to put this in, what I
considered in my mind a temporary set up.  It was not my
money to deal with.  It was just to get it in there.
Mother wanted to deposit it that day.

Q   But it was only temporary, right?

A   It was temporary in my mind.  It was going to
eventually, you know, as CDs, whatever they're set up to
be, they're going to mature.

Q   Ms. Burns, let me show you Defendant's Exhibit
4.

MS. ALLEN:  Your Honor, I apologize.  I
did not ask permission to approach.  May I please
approach the witness?

THE COURT:  You may.

I'll just say as a standing rule I'll allow you all
to approach the witness without consent.  If I get upset

43

about it I'll tell you to go sit down.

MS. ALLEN: Thank you, Your Honor.

Q (By Ms. Allen) Ms. Burns, I apologize for that. Would you look at that Exhibit 4 for us and confirm that these are pages that have to do with the very CD we're talking about, the $150,000 CD?

A Yes, they are.

MS. ALLEN: Your Honor, I offer Defendant's Exhibit 4.

MS. SEIKEL: May we have a moment to review.

No objection.

THE COURT: All right. Defendant's Exhibit 4 will be received in evidence.

Q (By Ms. Allen) Ms. Burns, if you will look at Defendant's Exhibit 4, could you confirm for us the very top two pages are -- well, the top page is Johnny and Amanda's check to Mrs. Wade August 1, 2004, for 150,000 that was a payment on this promissory note, right?

A It says payment on house.

Q And you understood that was a payment on the promissory note that was done in 2004, right?

A I didn't ask what it was for. I just knew that they had paid that amount.

Q So you didn't ask your mom payment on house,

what house?  Or anything like that?

A   She was in charge of her check.  I just went with her.

Q   Well, you were her trusted advisor and her power of attorney with ability to handle her financial transactions; were you not?

A   Right.  But I was not -- she was going to do -- she went there to do her own business.  I was just with her.

Q   Okay.  And on the back is her signature endorsing this check.  On your copy, on that second page of Exhibit 4, do you see where it gets negotiated at the bank; is it there?  If it's not there, just tell me it's not there and we'll move right along.

A   I see her endorsement.

Q   Her endorsement.  I'm not saying it right. Her endorsement where she signs it and puts it in the bank, right?

A   Yes.

Q   So there's no doubt but that she got the money and she put it in there, right?

A   Oh, I'm not doubting that she didn't put it there.  She did.

Q   And then if you'll flip with me to about the fourth page back and you'll see a little number in the

bottom that says, JDW. That means Mr. Bud Wade produced this, 001039. Do you see that one?

A    Okay. Yes.

Q    What was the temporary term -- you said it was temporary. What was the temporary term of this CD?

A    The term was 30 months.

Q    Thirty months; three, zero?

A    Correct.

Q    And it was in the name, just to be clear, of Edell Wade or Nancy Burns with right of survivorship, correct?

A    Correct.

Q    Okay. And so was it within a week or so that the CD was purchased, did you suggest to your mom, Hey, you know, we ought to just square that away and get that in the name of all the kids?

A    No, I did not.

Q    About two weeks, it's only temporary?

A    No, I did not.

Q    Three weeks?

A    No.

Q    To make sure that your siblings would be fairly treated if your mom passed away, at what point in time did you suggest to your mom, You know, we were in a hurry, it was only temporary and we really ought to fix

that?

A   If mother had passed this would have been divided equally.

Q   So at no point did you suggest to your mom she really ought to fix that?

A   No, I did not.  I don't know what the -- if there would have been some sort of penalties for doing so.  I don't know.

Q   You went to the bank when this matured in February of 2007, didn't you?

A   I was at that bank, but I did not go there for that specific reason.  I went there because Bill and I had some CDs that had matured.  I went there because mother had asked -- had suggested that I go talk to Glenda, get the latest interest rates.  I went there and I was talking to Glenda.  While I was there I thought about this and I remember that there were -- there was this rate that could be bought if it wasn't a set rate.  If it went up in the amount, mama could have bumped it to that.  And I just asked has she been in there to take care of that, if it had.  I didn't know whether it had -- whether the rates had changed.  Whenever I did Glenda Chapman just professionally said, Nancy, you need to find out if you're still power of attorney, POA.

Q   Ms. Burns, I'm sorry.  You just go right on.

I don't want to cut you off.

A   I was puzzled, confused as to why mother had changed -- taken me off as power of attorney, and I went home.  I called mother to find out if she was at home.  I needed to talk with her about this power of attorney.  I wanted to find out what I had done to offend my mother, to hurt my mother, whatever made her change her mind.  I needed to find that out.

Q   Ms. Burns, you told us and made it abundantly clear that your mom had changed her power of attorney at this time, right?

A   I did not really find out a lot of things until after mother had passed.  I'm not sure that I even found out.  I just -- I don't know that Amanda actually told me that she was power of attorney that day.  I don't know how far we got into the discussion on that part.

Q   Oh, Ms. Burns.

A   Pardon?

Q   Ms. Burns, let's be fair now.  Isn't it true that you went flying out to your mom's house and one of the things that y'all talked about was the fact that she had removed you as her power of attorney; isn't that a fact?

A   I was going to pursue that conversation until

48

Johnny and Amanda came in the house eventually.

Q  Are you saying it is a fact or it is not a fact?

MR. WALDEN:  Your Honor, she's testifying that that's what she went to ask her mother about, why she had been removed as power of attorney, and I don't see the reason for the brow-beating.

THE COURT:  The question is whether or not that question was actually asked mother and whether or not she actually gave a response.  I haven't heard that line of testimony yet.

Q  (By Ms. Allen)  Isn't it a fact that you went flying out to your mom's house.  You were mad.  And one of the things that you and she discussed was the fact that she had removed you, at some point you did not know, as her power of attorney?

A  First of all, I called.  If I were angry I wouldn't have even called.  I would have just, as y'all described it, gone out there.  I called politely to find out if she was there, I needed to talk with her.  I got out there and mother was not angry.  I was not going in there screaming as it's been implied.  I went in there to have a conversation with mother.  Pretty soon Amanda was in the presence.  I didn't want to talk with mother with someone listening on.  And it wasn't long until

49

Johnny came in the house extremely furious. So I didn't even really pursue too much on that because it was just all -- it was such a shock to me that I was being treated this way.

Q   Ms. Burns, will you have an agreement with me right now that whether you and I have a difference of opinion about what the facts lead to, that it's important that these ladies and gentlemen know the true facts in order to sort out what's right. Would you agree with me?

A   They need to know the truth, yes.

Q   Then let's get to it. Isn't it true that when you talked to your mom that day she told you she had removed you as power of attorney?

A   I'm not sure --

Q   Yes or no?

MR. RICHIE:  Your Honor, may we approach?

(The following was in the presence but out of the hearing of the jury.)

THE COURT:  The court reporter has advised that she cannot put it on the record unless you speak right into that little microphone right there. So if you need to voice an objection or make a statement, make sure that she can pick it up. Okay. Go ahead.

MR. RICHIE:  We have a motion in limine

with respect to the Dead Man's statute. That was an absolute question about a material fact in this case. "Isn't it true that your mother told you she removed you from the power of attorney". That's the question. That's what brought me to my feet. That's a violation of the Dead Man's statute.

THE COURT: Now, hang on a second, folks. We have ignored the Dead Man's statute throughout all of the questions that you all asked about mama said and mama did this and mama did that. I didn't hear any objections. I'm assuming that you all had satisfied yourselves that all of these things are corroborated and were admissible.

MR. RICHIE: I have not heard any corroboration to whether or not -- we can take her on voir dire and ask her whether or not there was anyone in the room when mama made the statement about taking her off the power of attorney and who was in the room. We can do that.

MS. ALLEN: Your Honor, the power of attorney is not what this lawsuit is about. But the circumstances of this meeting are important for the jury to know the truth about, and I just want them to know the truth about what was said. It's abundantly corroborated that mama changed the power of attorney

51

because we have it in evidence from the plaintiffs. It's in writing, it's signed and it's acknowledged. There's a new power of attorney. They showed them both and they put them both in evidence. There's all the corroboration that you need. But this witness needs to own up about this meeting and she said that it was the beginning of the downfall of the entire thing, and we need to know the truth about it. So it's not a question of whether or not mama changed the power of attorney. We know she did. They even told us she did. It's in evidence. But we need to know the truth about all of this.

MR. RICHIE: Judge, first of all this is about undue influence and we're trying to show control over Edell Wade that caused her to act in a certain way and act against what otherwise would have been her interests.

THE COURT: What I'm going to do is this. I'm going to go ahead and allow you to ask that question to get that answer. If it turns out that it cannot be corroborated by your witnesses then I'll instruct the jury to disregard.

MR. WELDON: It has to be corroborated by a disinterested witness.

MR. RICHIE: That's right.

Can we take this witness on voir dire? If there was nobody present when she was talking to her mother about the power of attorney it can't be corroborated.

MR. DUCLOUX: She even testified yesterday she asked her mom why did you remove me. I don't think this is a secret. None of this is a secret.

MR. RICHIE: But this is a question about what did mom say in response.

MS. ALLEN: Your Honor, they have been allowed to put on testimony through this witness that she went out there to say what did I do wrong to offend you that you changed me from power of attorney. It doesn't matter. It's not an issue in the case. But the truth is important. We know that Mrs. Wade changed the power of attorney.

THE COURT: Yes, we know that.

MS. ALLEN: That's corroborated right here in the Plaintiff's Exhibit 9. So we know that. And it's not an issue of dispute. The Dead Man's statute says we don't do he said/she said about the transaction at issue in the lawsuit. I understand. I'm not trying to do that. But if you'll allow it, what she said in her deposition is we had a conversation about it. I told mama that she couldn't have two powers of attorney and --

THE COURT: You may ask her about her previous testimony in the deposition.

MS. ALLEN: Okay.

THE COURT: And you can cross examine her on that particular issue.

MR. RICHIE: And it's subject to our objection.

THE COURT: All right. I'm overruling our objection and allowing her to make that inquiry.

MR. RICHIE: Thank you.

(The following was in the presence and hearing of the jury.)

Q (By Ms. Allen) Ms. Burns, I'm going to ask you to revisit some conversation that you and I had in your deposition testimony, and for the moment I'm going to try to confine it to that, okay?

A Okay.

Q Do you need, by the way, a copy of your deposition handy for you; would that be helpful for you or not?

A Yes.

MR. RICHIE: Judge, I'm sorry, but may we approach?

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE: My understanding of the Court's ruling is that she's allowed to examine her about the same thing she examined her in the deposition. She hasn't denied saying it yet, so the way the depositions get used is you first say -- you ask the same question. If she denies it then you use it to impeach her. But right now --

THE COURT: Right now she has not admitted that she had a discussion with mom about the power of attorney being changed.

MR. RICHIE: Or denied it.

THE COURT: She's admitting in here that she did have that conversation. I'm going to allow them to go ahead and impeach her based upon the testimony that she gave in her prior deposition.

MR. RICHIE: And I simply wanted to raise the objection and I'm trying to not raise it in front of the jury that until she denies that she had that conversation, it's not impeachment. She has not answered yet whether she had that conversation or not.

THE COURT: At this particular juncture she has not admitted that she had a discussion with mom about the power of attorney. She said that she was interrupted by Johnny and Amanda and was not able to talk to her mother about it.

MR. RICHIE: All right. Thank you.

THE COURT: It is for that reason I'm going to allow them to impeach her.

(The following was in the presence and hearing of the jury.)

Q    (By Ms. Allen)  Ms Burns, what I am asking you about is your testimony to this jury that you were somehow interrupted in an effort to have a discussion with your mom about what you had done to offend her so that she had removed you as power of attorney.  Are you with me on the topic that we're discussing?

A    Yes.

Q    All right.  And you know that what happened is that you went out to talk to your mom about that very topic and your view of it is that her response to you was she told you that she had -- first she told you that she had given power of attorney to Amanda, right?

A    I don't remember her saying that exact statement.  I did revisit -- after I left the place that day, went back home, I went and revisited mother on a Sunday, the following Sunday.

Q    Yes, ma'am.  And we'll get to that.  We will.  I promise you.  But can we just stay on topic for a moment so that we can get to this issue of whether you got to have the full discussion that you went out there

to have. That's what I'm trying to get to a fair answer on, okay?

A Correct.

Q And you did get to have a fair discussion on that topic, didn't you, with your mom?

A I don't really remember our discussion. I was kind of in shock because of --

Q Was your memory better at the time your deposition was given than it is here today?

A Probably so.

Q Okay. Can you look with me, let's start on page 49. When you're there, let me know. Actually we might go back to page 48. Do you see there at the bottom of 48, we're talking about this very meeting that we're talking about at your mom's house, right?

A I'm not sure that it was exact, that exact visit. I said that I revisited her the following day. I don't even remember some of the conversation --

Q Ms. Burns, just read up -- if we need to back all the way up to page 47. You know that you're talking about this meeting occurred. Do you see that on page 47 in February of 2007. That's what I'm asking you about. Are you with me?

A I see page 47, yes.

Q And the question about this meeting in

February of 2007, right? In fact, I want to be sure I nailed it down in time. Do you see that? Page 47 at lines 7 and 8.

A    Right.

Q    And if you'll just keep dropping down you'll see that what you told me then was that you were the power of attorney, right, and you went to check on the CD. Do you see that testimony right here? Because if I'm mischaracterizing it you feel free to tell me.

A    No, I see it.

Q    You went to check on that CD and it even says here, $150,000 CD, right?

A    Yes.

Q    And you said when you went to check on your mom's CD you said Glenda Chapman told you that you needed to find out if you were still the power of attorney, right?

A    That's what it says.

Q    I just want to make sure we've got the context. And then you say, I called mother. Which you have told us here today, correct? This is the same incident is what I want to make clear.

A    Yes.

Q    Same incident, right?

A    Yes.

Q   Yes, ma'am.  Okay.  And you went out there and you had a discussion, and I asked you what did your mom tell you about whether you were still needed as a power of attorney.  Do you remember that?

A   Yes.

Q   And you know what you told me don't you?  You told me that y'alls discussion was that you were talking about with her whether she could have two powers of attorney, right?

A   She wasn't clear on that.  She thought she could have two.

Q   And that whole discussion occurred because she told you that she had named Amanda as her power of attorney, right?

A   That's what it says here.

Q   And that is the truth, right?  That your mom told you that day she had changed the power of attorney, Amanda was the power of attorney and that was very clear to you, right?

A   That's what it says.

Q   And it's the truth.  I mean, it was your sworn testimony.  It's true?

A   Yes.  Yes.  Okay.

Q   Okay.  It wasn't ever you, but it was Johnny who talked to your mom about we need to get this

$150,000 CD done the way mama intended with all the children on it, not just one, right?

A    Right.

Q    And you knew that, right?

A    I didn't know he had done that.

Q    Well, he didn't do it.  You've got the documents in front of you that would tell you your mama did it just like you said she made this $150,000 CD in your name.  Do you see that?  It's right here.  You've looked at these documents, haven't you?

A    I have.

Q    You got these documents, didn't you, from the bank?

A    After mother's death.

Q    Yes.  You've had them for about four years now?

A    Yes,

Q    And you've looked at them and you know your mama did that change, right, to make it into all the children's names?

A    I don't know whether she was with someone or whether she was by herself.  I wasn't there.

Q    You know she's the one that did the change; don't you?

A    Yes.

Q You know that.

A But I don't know that she was by herself.

Q All right. Well, she wasn't by herself when she made the change with you?

A No. I was with her.

Q You have told Mr. Ducloux that what is at issue here is the note modification agreement; is that right?

A Yes.

Q Isn't it true that you don't know of any payments that didn't get made under either the note or the loan modification agreement. Isn't that true?

A I don't know.

Q You have said in sworn testimony that to the best of your knowledge monthly payments were made and you know about the $150,000 payment in August, right?

A I know there were payments made but I'm not sure they were all made.

Q Your lawyer is, isn't he?

A Pardon?

Q Your lawyer is, isn't he? He did the schedule that shows that, didn't he?

A I don't know who authored that schedule.

MR. WALDEN: Objection. Assuming facts not in evidence.

THE COURT: Sustained.

MS. ALLEN: I'll ask him. They're telling me to ask him about that.

Q (By Ms. Allen) After four years you're looking at all these bank records, to the best of your knowledge there are no missing payments from the loan in the loan modification, correct; all the payments have been made?

A I don't know. I haven't gone through them myself.

Q You haven't gone through them in four years?

A No.

Q So you're not trying to persuade the ladies and gentlemen of this jury that the note hasn't been paid, right?

A I am not relying on my ability to find that out.

Q Okay. You do know that under the promissory note the payment that was provided for was $1,849, right?

A Right.

Q And you do know that under the modification agreement, the monthly payment that was provided for was $1,200, right?

A Correct.

Q   And that is a difference of $649, right?

A   Yes.

Q   Is it accurate that you believe you're entitled to one-seventh of whatever is remaining to be paid on the loan and loan modification?

A   Yes.

Q   When Amanda had mostly completed her work, you remember that Michael Martin sent out distribution checks to all of the beneficiaries that distributed to you the money that your mom had left you?

A   Yes.

Q   Let me show you Defendant's Exhibit 5, and let's make sure that we know -- have documentation about what your mom left to you through her will.  Exhibit 5 reflects a check.

MR. WALDEN:  Your Honor, I object.  May we approach?

THE COURT:  Yes.

(The following was in the presence but out of the hearing of the jury.)

MR. WALDEN:  I knew this was going to be stated incorrectly because it has been for months.  What we're talking about is not through Mrs. Wade's will.  It was through POD certificates of deposit.  I just want counsel to state it correctly and not deliberately

mislead the witness by confusing her. She's -- Nancy Burns has never received one dollar of cash under the will. She's received the POD beneficiaries.

MS. ALLEN: Let me -- can I try that question again? I don't even exactly understand your point, but I'll try again.

MR. WELDON: Well, I think the Judge does.

THE COURT: He says that there has not been any testamentary assets distributed --

MR. WELDON: Other than maybe personal items.

THE COURT: It's only been non-testamentary assets.

MS. ALLEN: Okay. I think I get it.

MR. WELDON: That's critical.

(The following was in the presence and hearing of the jury.)

Q    (By Ms. Allen)  Ms. Burns, we -- and the jury can look at their leisure if they wish -- to see how it looks when you have a certificate of deposit POD, pay on death, to a bunch of beneficiaries as your mom did in this case. You know the one I'm talking about, right?

A    Yes.

Q    And a lot of the money that you got when your

mom passed away came to you in that way, correct?

A   Yes.

Q   Of the amounts Mr. Martin distributed which of them came to you in that way?  What were the amounts that came to you in that way?  Do you understand what I'm asking because I'm told it's an important distinction.

A   I am not sure what you're wanting me --

Q   I wasn't either, but here's what I'm looking for.  You know that your mom had a bunch of certificates of deposit and that you got the benefits of that when she died, right?

A   Right.

Q   And so there's a number of amounts in Mr. Martin's letter that total up to about $90,000 to you; am I right?  I hate to do math.  That's why I just gave you the check.

Mr. Ducloux says it's $84,096.  Does that sound about right?

A   Yes, it does.

Q   That you received after your mom's death, right?

A   Correct.

Q   From either these assets that she had accumulated and held in certificates of deposit or bank

accounts and other parts of things that came through her estate, right?

A    Yes.

Q    All right.  And there's no doubt that she left that in cash and you got it, right?

A    Yes.

Q    Is it true that you spent many times that in this lawsuit?

MR. WALDEN:  Objection.  Assumes facts not in evidence.

THE COURT:  Overruled.

You may answer.

A    Have I spent, myself -- by myself spent more than 84,000?

Q    (By Ms. Allen)  I want to know if it's true that you've spent everything that your mom gifted to you and then some to pursue this lawsuit; isn't that true?

A    Yes.

Q    You said a moment ago you and Bill Burns chose to withdraw from your mom.  Do you remember that?  You chose to.  That's what you said.  Do you remember it?

A    I didn't chose to withdraw from mother, no.

Q    You had a key to the lock on the front gate; didn't you?

A    I had a key but after I was terrified of what

happened when Johnny came into the house that day I did not want to go back on that place by myself. And whenever I did I had someone with me.

Q   Ms. Burns, you had a key to any lock that was ever on that front gate so far as you know; isn't that true?

A   I didn't never try it, so I don't know.

Q   You had a key, did you not?

A   I --

Q   You had a key?

A   I had a key but I didn't know whether it would even -- I didn't have any desire to even try it.

Q   Now, there you go. You didn't have any desire. Let's set that aside. Johnny gave you a key; didn't he?

A   I had a key but I didn't want to go back on there and be arrested or --

Q   Johnny never threatened to arrest you; did he?

A   I was so unwelcomed that I didn't know what was going to happen.

Q   Okay. Let's just stick with the facts. Johnny never threatened to arrest you; did he?

A   Not to arrest me.

Q   And he never threatened to file trespass charges against you; did he?

A No, he did not.

Q And you weren't scared enough that you didn't come back the very next Sunday, because you were just about to tell us about that. You did come back the very next Sunday; didn't you?

A I did come back because I was --

Q You got right in the gate, right?

A I came back because I knew whenever I left there that mother was extremely upset. That is one thing that I did not ever want to do is to upset mother. I wanted to --

Q A week later after you were terrified, you came back and you got right in the gate; didn't you?

A Whenever I came back Johnny and Amanda weren't even there.

Q You got right in the gate; didn't you?

A I'm not sure when the actual lock -- sometimes the gates were locked, and I'm not sure how --

Q There was never a time that you didn't get right in the gate if you wanted in; was there? Never.

A Because after -- after that incident, yes, I went back --

Q Ms. Burns --

A -- the following Sunday.

Q Ms. Burns, there was never a time that you

68

could not get in the gate if you wanted to get in the gate to see your mom; was there?

 A I'm not sure that my key would have even fit if I had tried it.

 Q Are you understanding what I'm asking you?

 A I understand what you're saying, but I also do not know whether that key would actually fit.

 Q Well, you hadn't tried to find that out?

 A Right.

 Q You never had to try because you always got right in; didn't you?

 A I felt threatened.  I felt --

 Q Johnny never threatened you?

 A Whenever he came in that day I did feel threatened.

 Q Oh, he was mad.

 A Yes, he was.

 Q Yes, ma'am.  I bet he was.

 A Yes, he was.

 Q But he never threatened you; did he?

 A I'm not sure if I had not walked off and mother was there saying, Johnny, Johnny -- calming him down.  She saw how --

 Q Ms. Burns, he never threatened you; did he?

 A He didn't try to hit me, but his presence, his

-- that was a threat to me. His presence was anger.

Q Oh, yes. He was mad. I'll give you that. When you came back the next Sunday you were visiting with your mom in the house and Amanda came in just to see who was at Mrs. Wade's house, right?

A Yes.

Q And she saw it was you and it was fine. She went right away, right?

A I guess she did.

Q Well, you know she did, right?

A I didn't go follow her out and see where she went. She may --

Q She didn't interrupt, right? She didn't tell you to get out?

A No, she didn't.

Q She didn't say, I'm going to call the cops, nothing like that. None of that ever happened; did it?

A No.

Q You chose not to spend time with your mom; isn't that true?

A I didn't feel comfortable any more.

Q And you chose not to spend time with your mom because of that, right?

A I don't -- I guess, yes, I chose -- I made that decision but I felt it was for my safety. And I

didn't want to go out there and have another upsetting time with mother. That was just -- I respected mother. I didn't go screaming at her like y'all have insinuated. I respected her. She taught us to respect.

Q Ms. Burns, I don't mean to cut you off. If there's more you'd like to say about that --

THE COURT: Counsel, how much longer?

MS. ALLEN: I would like for her to identify these two exhibits and then I would like to pass her.

THE COURT: Okay. Let her go ahead and identify her because we're running a little bit past the time we said we would normally take breaks.

MS. ALLEN: Your Honor, I'm told that if she is able to, and I expect she is because she has identified these two exhibits that I have, a couple of questions about them, that it's better to --

THE COURT: All right. We'll take a recess now for 10 minutes. Be back in Court -- back in the jury room at 11:24.

(A break ensued.)

(Jury present.)

THE COURT: Please be seated.

Ms. Allen, you may proceed with your cross examination.

MS. ALLEN:  Thank you, Your Honor.

Q   (By Ms. Allen)  This is 6 and 7, Ms. Burns. I'm going to show you Defendant's 6 and 7.

Ms. Burns, when you have a moment to look at those I would like to ask you about them.  Do you recognize those as your records, Ms. Burns?

A   Some of them are not.

Q   Some of them are receipts that you collected, right?  Not records you generated but receipts you collected?

A   No.

Q   What is there that is not your record or a receipt that you collected?  You're looking at 7 now, correct?

A   In the one that's not --

Q   It's not stapled.

A   Right.  This Moresco Roofing and Remodeling --

Q   When the cedar was cleared, is that what that is?

A   I'm not sure what it is.

Q   You can't see --

A   Okay.  Cut cedar at ranch per agreement.  I didn't have anything to do with that.

Q   You didn't have anything to do with that. Would you take that off.

MR. RICHIE: What page was that?

MS. ALLEN: She'll tell us.

Q (By Ms. Allen) If you'll just tell us the number of the page there on the bottom that's being taken off because I want to be sure the record is complete.

A 138.

Q Is there anything else you need to take out so that we know we have your record?

A I haven't looked at all of it yet.

Q You recognize Exhibits 6 and 7 as reflective of hours, mileage, charges that you made. In the case of Exhibit 6 there's examples of mileage charges and hours you charged to your mom, right?

MS. SEIKEL: Pardon me. We don't have 138. Isn't it 138 that you just took out?

MS. ALLEN: It may have been because it was inadvertently included, but it's not in it any more.

Q (By Ms. Allen) Ms. Burns --

A It says AJW 00138 at the bottom.

MS. SEIKEL: Just to confirm, we have AJW 0096.

A That's for Exhibit 7?

Q (By Ms. Allen) Yes, ma'am.

MS. SEIKEL: Well, hold on.

Q   (By Ms. Allen)  Ms. Burns, I want you to be satisfied about these records.  Isn't it true that Exhibit 6 is your records or Bill Burns' records about hours and mileage and things like that that you charged your mom to do the things that you and Mr. Ducloux talked about.  And we don't need to repeat that.

A   These are the records, yes.

Q   They're examples of that but not all of them, right?

A   Yes.

Q   All right.  And Exhibit 7 are examples of the charges that you and Mr. Bill Burns made to Johnny and Amanda after they purchased the ranch in February of 2004, right?

A   Correct.

Q   So you charged them on an hourly basis and mileage basis for doing the things you used to charge your mom for, right?

A   There was a different agreement.

Q   You did similar things for Johnny and Amanda that you used to do for your mom, right?

A   We hauled off trash and things that mother didn't never ask us to do.  We cleaned up -- they were taking down old fences.  We even went over on the hilltop and picked up beer cans and beer bottles because

Johnny wanted us to.

Q   Yes, ma'am.  I am not suggesting that you were not asked to do what you did, but is it accurate that after Johnny and Amanda bought the ranch they directed you to take certain maintenance and repair and clean up and that sort of thing because they owned the place; and you did that, right, that's what these records reflect?

A   Right.

Q   And you charged them for it, right?

A   Yes, because we had an agreement that they would pay us.

Q   Yes, ma'am.  I'm not being critical.  And they paid you, right?

A   They did.

Q   Everything that you asked them?

A   Right.

Q   Okay.  Ms. Burns, isn't it true that you don't quarrel with the idea that your mom had the absolute right if she chose to do it to make a gift to her son Johnny in the form of a reduction of principal on the promissory note?

MS. SEIKEL:  Assumes facts not in evidence.

THE COURT:  Overruled.

Q   (By Ms. Allen)  Do you remember my question?

A    It's about a gift, if she wanted to give a gift that she could.

Q    Yes, ma'am.

A    If she wanted to, yes.

Q    And you don't quarrel with her right to do that; do you?

A    I do not.

Q    If Johnny says that's exactly what she did, you don't have any reason to dispute that; do you?

A    I don't think that mother realized what she was doing.

Q    Ms. Burns, page 47 -- no, 67 of your deposition -- and this is the end of this examination -- Page 67.  If you will look at line 21.  The question I asked you that day when you were under oath is this:

"If Johnny says that's exactly what she did, you don't have any reason to dispute that; do you?"

What did you say?

A    I said I don't.

Q    And that was true, wasn't it?

A    Yes.

MS. ALLEN:  Pass the witness.

MS. SEIKEL:  Objection.  Optional completeness.

THE COURT:  They've passed the witness.

You may redirect in those areas.

By the way, did you offer those two exhibits?

MS. ALLEN: Your Honor, you are exactly right. I don't know that I did, but I certainly didn't get a ruling on it. So I would like to offer 6 and 7. Thank you very much.

THE COURT: Do you have any objections to 6 and 7?

MS. SEIKEL: None, Your Honor.

THE COURT: All right. Defendant's 6 and 7 will be received into evidence.

MS. ALLEN: Your Honor, also before I get too far away from it, I didn't get a ruling on Exhibit 5 and I would appreciate just getting a ruling on that.

Ms. Burns, if you would like to remind the Court what you have there as Exhibit 5 so that the record is very clear. My recollection, Your Honor, is that it's the letter and the checks from Mr. Martin.

MR. RICHIE: No objection, Your Honor.

THE COURT: Well, he just said he doesn't object to 5 coming in. So 5, 6 and 7 will be received into evidence.

MS. ALLEN: Thank you, Your Honor.

(End of cross examination of Nancy Burns.)

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF BURNET      )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226 Email:Vkaykan@live.com

Supplemental REPORTER'S RECORD

VOLUME 5 OF 6 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF          )          IN THE COUNTY COURT

THE ESTATE OF             )          AT LAW

EDELL WADE                )          BURNET COUNTY, TEXAS


CONTINUATION OF TRIAL TESTIMONY OF JOHNNY WADE

AND

REBUTTAL TESTIMONY OF AMANDA WADE


On the 3rd day of October, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas  78701

512-236-9220

        BY:  MR. DON RICHIE

             MS. EMILY SEIKEL

        APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas  78731

512-349-9595

        BY:  MR. DON E. WALDEN

        APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas  78701

512-480-5600

        BY:  MS. KATHRYN ALLEN

AND

                    A P P E A R A N C E S    C O N T ' D

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas  76550

512-556-8970

     BY:  MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas  78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 5 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| **NAME:** | **Dir** | **Cross** | **Redir** | **Recross** | **Vol** |
|---|---|---|---|---|---|
| Amanda Wade | | | 75 | 83 | 5 |

**DEFENDANT'S WITNESSES:**

| **NAME:** | **Dir** | **Cross** | **Redir** | **Recross** | **Vol** |
|---|---|---|---|---|---|
| Johnny Wade | 7 | 25 | 69 | 73 | 5 |

**Court Reporter's Certificate**              **Page 85    5**

REPORTER'S RECORD

VOLUME 5 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Amanda Wade | | | 75 | 83 | 5 |
| Johnny Wade | 7 | 25 | 69 | 73 | 5 |

REPORTER'S RECORD

VOLUME 5 OF 6 VOLUMES

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|---|---|---|---|---|
| 102 | Copies of checks | 48 | 48 | 5 |
| 103 | Copies of checks | 50 | 50 | 5 |
| 104 | Copy of check | 76 | 76 | 5 |

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|---|---|---|---|---|
| 31 | Bill of Sale | 8 | 8 | 5 |
| 32 | Closing document | 23 | 23 | 5 |
| 33 | Pat Cavness's file | 71 | 72 | 5 |

P R O C E E D I N G S

(Jury in.)

JOHNNY WADE

Having been previously sworn, testified as follows:

DIRECT EXAMINATION CONTINUED

BY MS. ALLEN:

Q    So Mr. Wade, just to kind of reorient us, when we broke yesterday you had spoken with us about your mama naming her price and your decision that you could deal with that.  You then talked a little bit about some cattle and farm equipment being included in the sale; do you remember that?

A    I do.

Q    We've seen some of the closing documents but let me show you Exhibit 31.  Just look that over.  I'll need to identify and have it admitted before we talk about it.

Mr. Wade, are you familiar with Defendant's Exhibit 31?

A    I am familiar with it.

Q    Does that have your signature on it?

A    It does.

Q    Okay.  Just tell us what it is just for identification purposes.

A    It's a bill of sale and assignment describing

basically personal property, cattle warranties. Kind of a, I guess a transaction and documentation.

Q   Does this correspond to the farm equipment and animals that you were talking about yesterday?

A   I believe so, yes.

MS. ALLEN:  Your Honor, I'll offer Exhibit 31.

MR. WALDEN:  No objection.

THE COURT:  Defendant's Exhibit 31 will be received into evidence.

Q   (By Ms. Allen)  Mr. Wade, if you were going to come here and just take care of your mom, why didn't you ask her if she would just give you the ranch?

A   I didn't feel like that would have been the right thing to do.

Q   Did you ever ask her that?

A   No, never did.

Q   How did you plan to pay for the place at your mom's asking price?

A   When my mother said, Meet my price, we already had property in escrow in California and she said, I want $1,000 an acre. I said, I accept that. And I was going to pay her cash.

Q   Now, we know that didn't end up being a cash deal. How did that change?

A    At that point I didn't really get involved in any of the details.  That was more between Pat Cavness and I think it was through Lori Graham through the accounting firm that she was working for at the time.

Q    Did it really matter to you as long as your mom was satisfied with it?

A    As long as she was satisfied, that pleased me.

Q    Now, it's been discussed in the courtroom over this week that you were very happy and interested and you sometimes use the word insisted on having Nancy involved in the meetings and whatnot.  Do you remember that?

A    Yes, ma'am.

Q    Okay.  Why were you interested in keeping Nancy in the loop?

A    It was a normal -- she was taking care of mother and assisting mother and I just thought it was the right thing to do.

Q    Can you tell us whether you believed that you and she were working together on this project for your mom?

A    We were working together on it.

Q    Did your mom ask you to notify other people about the deal?

A    No.  That was -- she didn't ask and she just

merely stated that she would take care of that, of calling other -- the siblings and informing them.

Q Did you respect her wishes and her decision to do that?

A Yes, I did.

Q To the best of your knowledge did Nancy do the same?

A To the best of my knowledge she was involved in informing others along with mother.

Q Okay. Now, you talked yesterday just a little bit about what was involved in the transition, the move from California back to Lampasas. And I don't want to get into great details, but I do want the jury to understand the time that it took and the project that it was. So can you just give them an understanding about that.

A I had a number of projects that were under construction at the time that required me to be there for approximately the next -- took 10 months for me to wrap up the physical portion of the construction business we had in California.

Q How was your property getting moved -- property that you decided to move from California to Lampasas; how was that getting moved?

A We were having trucks to haul it back.

Q   Who was helping on the scene here in Lampasas during the time of that transition?

A   When Amanda would come back and would be assisted with Nancy and Bill on a number of occasions but Nancy and Bill helped with all of the -- continued to help with the farm duties and whatever else may need to be done.

Q   We have seen through Ms. Nancy her invoices that she sent you.  Did you mind paying and reimbursing her for expenses and things like that?

A   No, not at all.

Q   We have heard about the room that you and Amanda lived in when you first came her.  Who built the room, by the way?

A   I did.

Q   When did you do that?

A   I started on it probably late 1982 continued into '83 and had to build it on the weekends.

Q   Was it in one of those metal buildings that you had built on the property?

A   Repeat that, please.

Q   Was it in one of the metal buildings that you had built, the room, was it inside one of those?

A   Yes.

Q   There has been talk about two metal buildings

you built; do you remember that?

A   Yes, ma'am.

Q   Okay.  By the way, when did you build those?

A   Again, the one we call the room was, let's say it was completed in 1983.  The other shop building was completed approximately in I believe late '87, possibly earlier, '88.

Q   Why did you build those on your parents' place?

A   To help make their lives better.

Q   Did it appear t you after you got them built and in place, did it appear to you that you accomplished your goal?

A   Very much so.

Q   When did you start on the construction at the ranch in Lampasas on a real home for you and Amanda?

A   I got back in 2005 or it could have been December of 2004, January of 2005, and almost immediately we started plans initially to build a new home.  We met with the design firm to come up with plans and we couldn't quite agree on what we wanted to do.  Amanda and I couldn't agree on it.  And so we retracted from that and started this -- I suggested to her that we remodel the old white house and live in that for a period of time until we built another house.  And then

12

as that plan started we decided to go on and make that our permanent residence.

Q   So you started on it about, what did you say, 2005?

A   Correct.

Q   Okay.  Were Nancy and Bill coming to the ranch during that time?

A   Yes, they were.

Q   When they came -- well, first, did they help with the house you and Amanda were building?

A   They did.  At this point you have to understand the nature of the house was in such a poor condition that basically it almost had to be disassembled and essentially as I got into it more and more had to be taken down, but they did come and help. So it was -- Bill was much more -- he was smaller than me and accessing underneath the house I couldn't get to some of the areas, so he helped there and a number of different projects in the primary -- preliminary work on the house.

Q   How about Bud and Gwen, were they still coming to the ranch?

A   They were.

Q   When they would come to the ranch did you give them the grand tour, show them what you were doing?

A    They would ask to see and when some of their children would come up I had built an elevator, goes down in the basement. I remember on one occasion the kids wanted to ride on the elevator up and down, but, yeah, they would -- it was always a point of interest to see what -- how things had been progressing along.

Q    How long did it take you to build the home you live in now; in other words, how long was it that you and Amanda lived in the room?

A    We lived in that room for five years.

Q    Would it have made any sense for you to have built the home that you have now on the property if you didn't own it?

A    No.

Q    Now let me fast forward in time to the time of the loan modification. So are you with me?

A    Yes, ma'am.

Q    Okay. Did you suggest that they loan be modified or changed?

A    No.

Q    Who did?

A    My mother.

Q    Did you have conversations with your mom about the idea of changing the loan?

A    We had a conversation and she -- she initially

had had a conversation with Amanda that she wanted --

Q    I need to know --

MR. WALDEN:  Your Honor, I'm going to object.  This is the heart of the matter and it's about what Edell Wade said by an interested party.  Dead Man's statute and hearsay.

THE COURT:  All right.  I'm going to have to sustain the objection as far as that conversation goes, what Amanda and Johnny talked about.

Q    (By Ms. Allen)  Based upon whatever conversation you had with your mom, what did you do?

A    I took her to Mike Martin's office and since she had suggested to me that she wanted to not pay the interest on the note and that -- see what I could do about it.  So I took her to Mike Martin's office.

Q    What happened when you got to Mr. Martin's office?

A    I basically got introduced but kind of set the tone as far as with Mike as far as what my mother wanted to do, and at the point that I kind of conveyed her thoughts and kind of -- so that he would understand the situation.  He said, You need to leave the room.

Q    Did you?

A    I did.  And waited in the lobby until they finished their conversation.

Q    Did you eavesdrop outside the door?

A    No.

Q    Did you have any further conversations with Mr. Michael Martin?

A    Not about that, no.

Q    Who was Mr. Martin representing in that transaction?

A    My mother.

Q    Was there any doubt in your mind about that?

A    No.

Q    Did you involve yourself in any of this decision making about that?

A    No.

Q    Did you know what the unpaid balance on the original note was at that time?

A    No, ma'am.

Q    Did you know what decisions got made behind that closed door about the modification of the loan?

A    No, ma'am.

Q    Who did you look to or believe would make whatever changes and whatever paperwork there needed to be so that your what your mama wanted to do got done?

A    Mike Martin was the one who was representing my mother and I had full confidence that he was taking care of my mother's best interest.

Q   Did it bother you to foot the bill for that?

A   No, not whatsoever.

Q   Did -- setting aside of course the commencement of this lawsuit after your mom's passing -- but during your mom's lifetime did anybody ever suggest that the document you guys ended up signing wasn't what your mom wanted to do?

A   It was -- she never suggested that or anybody else.

Q   You did sign the modification, right?

A   Correct.

Q   And she signed it, correct?

A   Yes.

Q   Do you know the circumstances of her signing it?

A   I had taken her -- whenever we got notice that the papers were ready I would always, or for the most part, you know, pick her up and drive her to, in this case, drive her to Mike Martin's office.  And we went in on this particular occasion, walked into the office and into the lobby.  There was Ms. Varner, I believe was the one that came to and presented the paper and there were little Sign Here stickets on it.  And I don't know if mother signed first or if I signed first, but I just saw where it said for me to sign and I signed the paper.

Q   So did you do that?

A   I did.

Q   Did you read it?

A   No, I did not.

Q   Did it really matter if it made your mom happy?

A   It was just a piece of paper to me.

Q   Did you know whether or not that piece of paper would be recorded in the official records?

A   I had no idea.

Q   Did it bother you that it might be an official record?

A   No, it did not.

Q   Now, if you just looked in terms of dollars in your pocket would the elimination of interest all by itself, that is going from the 2 percent to the zero percent, would that end up with you paying less and having dollars in your pocket?

A   I understood that is what happened.

Q   Did you ever have concern that your mama's not having the 2 percent increment of interest there would put her in a bind?

A   It never -- no, that didn't occur to me that it would create any hardship on her.

Q   What if it had?

A    If it had I would have taken care of her.  I would have reinstated or whatever was required.  The paper didn't matter to me of the care that I was giving to my mother.

Q    If she needed more money than that, more money than that 2 percent, would you have given it to her?

A    I would have.  If it meant liquidating the property I would have liquidated the property to take care of my mother.  It didn't matter.

Q    Did your mom ever indicate that not having that 2 percent interest after June of 2009 put her in a bind?

MR. WALDEN:  Objection, Your Honor.  Dead Man's, hearsay.

THE COURT:  Overruled.

You may answer the question.

A    Would you repeat the question again?

Q    (By Ms. Allen)  Did you have any -- did anything happen to indicate to you that by your mom not having that 2 percent increment of interest there for the months after June, 2009, that that actually put her in a bind; did that ever -- did you ever think that?

A    No, I did not.

Q    I want to turn now to -- oh, on the day your mom signed the modification was she having any health

issues that you can recall?

A    No.

Q    Was she any different to you from your observations in the way that she responded to folks or conducted herself?

A    Not that I had seen or been aware of.

Q    I want to switch gears now and ask just a couple of question about this whatever it was that happened in February 2007 when Nancy came from the bank out to the ranch.  Are you with me about the incident I'm asking?

A    Yes, ma'am.

Q    Okay.  Is it true that you were not a happy camper?

A    I was angry.

Q    Why?

A    It appeared to me that there was, that what Nancy was doing there at the house with her demeanor it was not something I was -- I would say I didn't approve of it.

Q    What is it that Nancy was doing?

A    She was argumentative with me whenever I asked what was going on and was being kind of aggressive with mother and not in a physical way but in a dominating way.

Q    Well, if Nancy read your demeanor to say that she needed to cut that out, did she read you right?

A    Oh, absolutely.

Q    And I need to turn to another topic and it is the safe deposit box that was in your name and your mom's name.  Are you with me what I'm talking about?

A    I understand.

Q    Okay.  Did you open that box shortly after your mom's death?

A    I did.

Q    Why?

A    I don't recall.  I don't remember exactly why.  It could ave been to get the will.  I have no explanation or memory of why I opened that box.

Q    When you opened the box was there cash in it?

A    Yes.

Q    What did you do with that cash?

A    I left it.

Q    All of it?

A    All of it.

Q    Was there a time when you took it out?

A    Yes.

Q    When was that?

A    When Amanda told me I needed to clear out the safety deposit box.

Q    Was that before or after she was appointed independent executor?

A    It was after she was appointed.

Q    So Amanda as independent executor asked you to go and clean out the box?

A    Yes.

Q    Did you do that?

A    I did.

Q    Was there cash in it at that time?

A    There was.

Q    What did you do with it?

A    I put it in a bank bag and took it to her.

Q    All of it?

A    All of it.

Q    Did you deliver that cash to Amanda as independent executor?

A    She was independent executor, yes.

Q    Did you deliver the cash to her?

A    Yes, I did.

Q    All of it?

A    All of it.

Q    Mr. Wade, let me show you Defendant's Exhibit 32.  There was a mention either yesterday or the day before, remember we looked at some bank records of yours and Amanda's and it had a deposit for a 30,000 -- hang

22

on. We saw a deposit for $30,452.63 into your personal account right around the first of April, 2009; you remember that?

A    Yes, ma'am.

Q    And it referenced on that deposit slip an item number 27020; do you remember we looked at that?

A    Yes, ma'am.

Q    What is Exhibit 32?

A    It's from the Lampasas County Abstract Company for the sale of the property.

Q    What item number is that?

A    27020.

Q    So is it a check stub?

A    It appears to be, yes.

MS. ALLEN:  Your Honor, I offer Exhibit 32.

THE COURT:  Have you all seen 32?

MR. DUCLOUX:  We gave them a copy.

MR. WALDEN:  No objection.

THE COURT:  Defendant's Exhibit 32 will be received into evidence.

Q    (By Ms. Allen)  Mr. Wade, what was this check from the Lampasas County Abstract Company to you and Mrs. Wade; what was that for?

A    To sell the property that we had at 215 Landon

Drive in Lampasas.

Q    Is this the money that was deposited into your bank account and the deposit slip that Mr. Richie was talking to Amanda about?

A    It would appear so.

Q    Mr. Wade, are you satisfied that you did the best that you could for your mom right up until the moment that she passed away?

A    I am.

Q    Was there ever a time when you believed your mom and you were at cross purposes?

A    No, never.

Q    Setting aside the little things that maybe boys don't always tell their moms, were you truthful with your mom?

A    Absolutely.

Q    Did you believe that she said what she meant and she meant what she said right up until the time that she could not speak?

A    Yes, ma'am.

Q    Did you do your level best to be worthy of the trust that she placed i you?

A    Yes, ma'am.

MS. ALLEN:  Pass the witness, Your Honor.

//////////  NOTHING OMITTED //////

CROSS EXAMINATION

BY MR. WALDEN:

Q    Good morning, Mr. Wade.  I'm going to start with just a couple of follow-up questions.  You were just talking about the safe deposit box and the cash that was located in it?

A    Yes, sir.

Q    Prior to your mother's death do you recall when was the last time you accessed the safe deposit box?

A    Prior to her death, I do not recall.

Q    Had you accessed it at all prior to her death?

A    Yes.

Q    And do you recall prior to her death when you accessed it seeing this large amount of cash in it?

A    There was cash in there, yes, sir.

Q    Did you know how much it was?

A    No, sir.

Q    Do you recall approximately how long before your mother's death it was that you saw that kind of cash in there?

A    No.  I couldn't give you a time line of when it was, but I'm thinking if I had to guess it would be somewhere around 2009.

Q    Do you know why that amount of cash was in the

safe deposit box?

A     My mother wanted to put it in there.

Q     Do you know when it was placed in the safe deposit box?

A     The date, no I do not.

Q     Was it like your mother to have $80,000 in cash in bills in a safe deposit box as opposed to being invested somewhere?

A     I don't know that.  I can't speak for her as far as exactly what her purposes were.

Q     Do you know where it came from?

A     One of them was -- part of it was a $40,000 withdrawal from I believe her money market account.

Q     Is that -- do you know any more than that?

A     (No audible response.)

Q     That would account for half of that, correct?

A     Correct.

Q     Do you know where the other 40,000 came from?

A     I don't have a recollection of where it came from.

Q     When was it that your mother ceased being able to drive a vehicle?

A     I don't recall exactly.  I would have to say -- she gave me the keys, and I want to say it was in 2009.

Q    The $40,000 withdrawal from the money market account that you just testified about, were you with her when she withdrew that $40,000?

A    I believe so.

Q    You had to drive her to the bank probably?

A    Yes.

Q    Were you with her when she put it in the safe deposit box?

A    Yes, sir.

Q    You don't have an opinion on what the purpose of having that kind of cash not in an account would be?

A    I'd have to speculate.

Q    And I don't want you to speculate.  But you're telling the jury that you don't have any idea besides speculation?

A    I would -- at this point it would be speculation.

Q    Were you -- I'm sorry.  I asked you a while ago and I can't remember exactly what your answer was.  Were you with your mother when you placed the $40,000 in the safe deposit box?

A    Yes, sir.

Q    When she did or you did for her, was the other $40,000 already in there?

A    I don't recall.

Q   Was there any -- do you recall seeing any cash?

A   At that time?  I don't recall.

Q   Well, if there was $40,000 in cash, it would catch your attention; wouldn't it?

A   I know that -- I don't recall exactly the time line as far as if there were cash in there before.  I don't remember.  There was a total accumulation of $80,000.  If it was there before, I don't remember.

Q   I think your testimony is then when you were with your mother when she put, or you put it in for her, the $40,000 she withdrew from a money market account into her safe deposit box, you don't know whether the other 40,000 was already in the safe deposit box at that time?

A   I didn't put it in there for her.

Q   Oh, you said you were present, correct?

MS. ALLEN:  He said he drove her there was the testimony, Your Honor.

Q   (By Mr. Walden)  What size box was it?

A   Approximately I would say four inches tall, five inches wide, 14 inches long.

Q   Did you observe your mother place the $40,000 in the safe deposit box?

A   Yes, I did.  I mean, but as far as the amount

I don't know exactly what the amount was. She had withdrawn that, so I did not count the money. They counted it for her.

Q   In terms of -- I want to go back to what you were aware of was already in the box.

MS. ALLEN:   He said he didn't know, Your Honor.

THE COURT:   This is cross examination, counsel.

Q   (By Mr. Walden)   You don't know whether there was any other cash in the box at that time?

A   No, I do not.

Q   After that time was your mother able to drive again or did she drive a vehicle again?

A   Only to -- I guess -- I don't recall. It would only have been to the mailbox.

Q   It's likely, isn't it, that the other $40,000 was in the box at the time, correct?

A   I can't make that assumption.

Q   Did you ever go with her to the safe deposit box again before her death?

A   I don't recall how many times the safe deposit box was accessed.

Q   My question exactly was whether you went with her again?

A    Yes, I did.

Q    After that time?

A    After what time?

Q    After the time she deposited the $40,000 that we've been talking about and prior to her death?

A    I don't know what the dates were, no, sir.

Q    Well, that wasn't exactly what my question was.  Do you have a memory of whether after that time, do you have a feel for when that was about, do you have any memory of going with your mother again to the safe deposit box after she placed the $40,000 into it?

A    I don't recall the time line.  I don't recall dates.  But as far as -- it was possible that it was after.

Q    And just to make sure, you don't know where the other $40,000 in the safe deposit box came from?

A    No idea.

Q    You previously told me that prior to the time you and Amanda moved back to Lampasas that you had a good relationship with my client, Nancy Burns, correct?

A    That's what I said at the time, yes.

Q    Did you also have good relationships with your other brothers and sisters at that time?

A    There was a relationship of -- apparently it was as my brother had stated earlier a tolerable

30

relationship.

Q    Are you referring to Bud Wade?

A    Yes, I am.

Q    You have been in the courtroom the entire time of the trial, correct, and you've heard everybody testify?

A    Yes.

Q    Isn't it true that when people are talking about claims about your mother's sale of the ranch to you there hasn't been any testimony, at least that I can recall, about the fact that it as sold to you.  Rather it's been more about the manner in which it was sold and the price for which it was sold.  Do you agree with that?

A    That was a lengthy question, but --

Q    Have you heard anybody say that mom should have never sold the ranch to Johnny, period, under any circumstances for any amount?

A    Have I heard that before?

Q    In testimony during this trial?

A    No, I have not.

Q    The complaints that have been voiced have been more about the way the transaction took place and the amount of the price; isn't that correct?

A    I would agree to that.

Q   And in fact at least a couple of witnesses have testified that they were glad to hear that the property would remain in the family, correct?

A   That's what I understood and heard, yes, sir.

Q   So it wasn't the fact that you were the buyer that bothered anybody; would you agree with that?

MS. ALLEN:  Objection, Your Honor.  That calls for him to speculate about what these folks were bothered about.

MR. WALDEN:  Well, I mean what they testified about.

THE COURT:  I'm going to overrule your objection.

You may answer the question.

A   I don't know that -- repeat the question again.

Q   (By Mr. Walden)  Let me ask it a different way.  Nancy has stated she was glad to know the property would remain in the family, right?

A   She did.

Q   And so did Sue, correct?

A   She has, yes.

Q   And did Bud also say that?  He did; didn't he?

A   I don't believe he did.

Q   Did you ever tell Bud back in the 1990s that

you wanted to buy the ranch one day?

A    He stated that, but I don't recall the conversation.

Q    You're not denying it?

A    I can't say one way or the other.

Q    Now as a -- when the time came in the fall of 2004 when you first had some discussions about you were first thinking of moving to Lampasas and possibly buying the ranch, it's true, isn't it, that had you not been able to purchase or acquire the ranch from your mother you wouldn't have moved back to Lampasas, correct?

A    That wasn't -- the purchase of the property was not -- that wasn't the condition.

Q    And you heard your wife testify earlier in the week, correct?

A    I heard the deposition.

Q    Didn't you hear her -- well, in the deposition she told the truth; didn't she?

A    I haven't read it so I don't know what context it was taken from.

Q    But you heard her say, didn't you, that we wouldn't have moved to Lampasas if we were not able to buy the ranch?

                MS. ALLEN:  Objection, Your Honor.  That is a mischaracterization of the testimony.

MR. WALDEN: It's exactly what she said.

THE COURT: Overruled. The jury was here. They heard the testimony.

Q (By Mr. Walden) Isn't that the substance? Maybe I didn't get "and" or "the" correct, but isn't that the substance of what she said?

A That's basically what your take on the context of it, I suppose. I wasn't there. I wasn't in that deposition. I didn't hear what she said.

Q You were in the trial though when she testified and she acknowledged that's what she said. You were sitting on the first or second row here; is that correct?

A Correct.

Q And isn't that what she said?

A I don't know what she said in the deposition.

Q My question is what she said in the trial a couple of days ago. She acknowledged that she testified in deposition that: Let me put it this way, I wouldn't have moved back to Lampasas if we hadn't been able to get the property.

That's what she said. She said that in trial a couple of days ago?

A Yes, sir.

Q And you weren't going to divorce your wife to

come back and take care of your mother if the property sale wasn't part of the bargain?

A    No.

Q    Now, when you said -- you testified when Ms. Allen was asking you questions about you wouldn't have accepted a gift of the property because -- this may not be verbatim -- you didn't think that would have been right; is that right?

A    Correct.

Q    And would that be because it would not be right because you might think it is taking advantage of your mother?

A    No.  I wouldn't say that's taking advantage of my mother.

Q    Well, why -- tell me why you wouldn't think that would be right?

A    It just wouldn't -- it didn't seem like that would be the thing to do, and that's a speculation but --

Q    Well, and my question is why you didn't think that would be the thing to do?

A    It just wasn't characteristic of me, I suppose.

Q    I'm sorry.  Could you say that again.

A    It wasn't characteristic of me just to take,

you know, it never entered my mind.

Q    When leading up to the time that the transaction took place you never communicated with -- other than the communications you had with Nancy -- any of your other siblings about, Hey, I'm talking to mom about buying the ranch.  Anything like that?

A    With Emma.

Q    With Emma.  Was she the only other one?

A    I believe so.

Q    Why Emma and not Bud or Sue or Charlene or Weldon?

A    I didn't -- the initial part was I didn't know that she would sell it.

Q    Once it appeared that you all were going to make the transaction happen and it did appear that she was selling it, why not then?

A    she had requested that she make the announcement.

Q    Do you recall when I asked you about this before, I asked you why there wasn't communication made to your siblings?

A    When?

Q    During the time I took your deposition in this case, correct?

A    You took my deposition, yes.

Q    It has been a while, August 4th, 2011?

A    Yes, sir.

Q    And you were aware that you were under oath in that deposition?

A    Yes, sir.

Q    Do you recall when I asked you that question in your deposition?

A    Not -- no, I don't necessarily recall.  If you want to show me.

MR. WALDEN:  May I approach, Your Honor?

THE COURT:  You may.

Q    (By Mr. Walden)  I'm going to direct your attention to page 16 beginning on line 19, and, Mr. Wade, the highlighted portion I asked you the question: Did you communicate with any of your siblings about this transaction during the time it was taking place or leading up to it?

And your answer was?

A    No.

Q    Can I ask any particular reason?

And your answer was?

A    My mother stated it was her money that she -- her money and place and she could do what she pleased.

Q    So you didn't tell me at the time that your mother asked you to not tell anybody, correct?

A    I didn't say that at the time, no, sir.

Q    Okay.  And then the next question is at the top of page 17.  I asked you:  Well, that being so do you think it's something that any of your siblings might have just been interested in knowing about?

And your answer was?

A    I don't know.

Q    This was your family homestead that you all grew up on, correct?

A    Correct.

Q    And is that your testimony still today that you don't know whether they would have been interested or not in knowing about that?

A    Well, If I said anything different it would contradict my statement then.

Q    Well, you still have to answer the question though.  Do you still -- are you telling the jury today that you still don't know whether they might have been interested in knowing about a transaction involving the family homestead by their elderly mother?

A    Well, that's been four years and it's obvious that they did have a concern or issue with me buying it, and that's why I'm sitting here now.

Q    Do you still believe on August 4th, 2011 when your deposition was taken that you really didn't know at

the time whether they would have been interested in that?

A   That was my statement at the time.

Q   Wouldn't most anybody be interested in their 80-something year old elderly widowed mother talking about disposing of the family homestead?

A   Repeat that.  I'm not following you.

Q   Wouldn't most anybody be interested in knowing about a plan under which their 80-something year old elderly widowed mother is going to dispose of the family homestead?

A   Well, as far as -- that may or may not be the case.

Q   And your real concern was if they all found out about it they might tell their mother it wasn't a good idea?

A   She told them if they had a problem they should have said something then I suppose.

Q   Let me be clear.  Not that selling to you might not have been a good idea, but they might have suggested things like to get an appraisal and to make sure this is for the proper amount.  That's a real possibility; isn't it?

A   I suppose.

Q   And you heard Nancy testify that she suggested

to you after the meeting with Mr. Cavness to write a letter to let everybody know what's going on, and that you said no, because it wouldn't happen.  Do you remember that testimony?

A    I remember the testimony.

Q    And it's true that you would be concerned if they had all found out in advance and been able to talk to their mother about it that it might not have happened the way it did, correct; that's what the concern was?

A    I can't --

Q    You're saying that -- your testimony is that had you notified all of your siblings in advance you might not have -- you still would have been able to buy it for $500,000?

A    That's an assumption, so I don't know.

Q    You've owned a number of rental properties in your day; haven't you?

A    Define "a number".

Q    Well, I didn't have anything particular in mind, but you own -- how many do you own right now in Lampasas?

A    I think there may be five.

Q    And you owned one or more when you lived in California?

A    We had two rental properties.

40

Q   And when you buy a rental property you're buying just an investment asset, correct, something that you hope will appreciate in value and produce income?

A   I don't buy it for a negative.  Not to lose money.

Q   Buying it just helps you better your financial position?

A   Correct.

Q   And if I were to ask you if you wanted to buy a particular rental property and you had an idea what you thought it was worth, say you thought it was worth $200,000 and the seller of it told you, I'll sell it to you for $175,000.  You jump on that; don't you?

A   I don't know that I'd jump on it.

Q   If you wanted to buy it?

A   If I wanted to buy it.

Q   Well, I'm assuming you wanted to buy it, you could pay $200,000 and the seller comes to you and says, I need to sell this thing and I will sell it to you for $175,000.  You don't tell that guy, I think it's worth more than that.  Let's get it appraised.  You don't tell that guy that.  You take him up on his offer, right?  You jump on it.

Q   Well, I don't know what you mean by jumping on it.

Q    I mean you accept his offer immediately before he changes his mind.  That's what I would do; isn't that what you would do?

A    I don't do what you do.

Q    I understand.  But isn't that what you would do in that situation?

A    I would have to evaluate it.  You would have to be more specific.  Money is not a motivation for me.

Q    Well, I'm asking about this situation where here is a rent house that you want to purchase and you think you can pay $200,000 for it and you're willing to pay $200,000 for it, and the owner of it says, I really need to sel this thing quickly, I need the cash, I'll give it to you for -- before he knows what you would pay for it.  He doesn't know.  You're smart and you haven't told him what you would pay for it.  He says, I'll give it to you for 175,000.  Wouldn't you accept that offer pretty quickly?

A    There is more -- you're putting it just in the context of money and I would have to look at what the situation may be, the relationship to the property or what it may entail, you know, if somebody were to for instance to say -- I mean, hypothetical says, I will give you the property, just let me live there and take care of me.  Then I might in a hypothetical do that.

Q   Well, I thought the situation, the hypothetical I gave you was pretty simple.  Are you telling the jury you can't answer the question I asked you?

A   In a hypothetical situation from a monetary level somebody wants -- if the house is worth 200,000 then that's agreeable.  It may be that if they change their mind and want more then I may pay more.

Q   In the business world when somebody offers you what you believe to be a good deal, say the purchase of a rental property, you don't tell that guy, You're not getting your money's worth, you need to sell it to me for more than that.  I assume you wouldn't do that; would you?

A   Depends on the circumstances.

Q   If this is just some stranger that a realtor turns you onto that wants to sell this house real bad.

A   Okay.

Q   You're not going to tell him, You're not getting a good enough deal, I'm going to give you 200 instead of 175.

A   If it was through a realtor then anybody -- it would be open for anybody's purchase ability.

Q   And I didn't ask about anybody else's purchasing it.  I asked about you purchasing it.  You

don't tell the guy, I'm going to give you more because I want to make sure you get a fair value for this property. You don't tell that guy that; do you?

A You're kind of putting words in my mouth here.

Q Well, I'm asking you --

A You don't know what I may say or may not say.

Q I'm not asking you whether you would say that. I'm assuming that you would.

A You're making an assumption, so I don't know.

Q You don't know whether if you wanted to buy a rent house and you were prepared to pay $200,000 for it and some stranger told you, I need to sell this house and I heard you wanted to buy it, I don't know what you would pay for it, Mr. Wade, but I'll sell it to you for 175. Are you telling the jury here that you don't know what you would do under that circumstance?

A If I --

Q And you're prepared to pay 200 for it.

A If I wanted the house?

Q Yes.

A I suppose I would buy it.

Q That's the business world dealing with a stranger, getting the best deal you can on some investment asset. Wouldn't you agree that the way you

44

handled transactions in that context is a lot different than the way you handle transactions with your mother?

A    Yes.

Q    Especially an elderly widow mother who has six other children, correct, and we're talking about the family homestead; isn't that right?

A    I suppose, yes.

Q    You could have, couldn't you, told your mother, I'm going to buy this property mom, but I want to make sure I give you full value for it so why don't we get an appraiser.  And that would have been an option, correct?

A    She already set the price.

Q    And I understand what your testimony is.  But my question is you could have said, Mom, I want to make sure I'm giving you full value for it and it may be worth more than that, I don't know, but why don't we get an appraisal.  You could have said that, right?

A    I could have.

Q    And you didn't, right?

A    No, I didn't.

Q    You could have also said, Mom, this is the family homestead, I will buy it from you but I want it to be okay with all my brothers and sisters, I want them to know about it and be okay with it.  You could have

said that too, right. So I'll do it only if it's okay with everybody else.

A    I suppose I could have said that.

Q    But that didn't happen either, correct?

A    No. Everything your client sitting behind you was present at that time.

Q    Was Bud Wade there?

A    No.

Q    Was Sue Meuth there?

A    No.

Q    Was Weldon there?

A    No.

Q    Was Charlene there?

A    No.

Q    My client --  and I recognize Nancy Burns was present in the meeting with Mr. Cavness. At that meeting was the fact that there would be a 32 year payment stream discussed in the presence of my client?

A     I have no idea.

Q    Or the fact that there would be no down payment?

A    I wasn't involved in any of the details.

Q    Your mother helped y'all out financially after you moved here, right?

A    Pardon?

Q    Did your mother help you out financially after you moved here, setting aside that I'm not referring to the transaction itself but in other ways.  She paid electric bills for you, other things like that?

A    I don't know.

MR. WALDEN:  If I may approach, Your Honor.

THE COURT:  You may.

Q    (By Mr. Walden)  Mr. Wade, I'm going to show you a copy of some checks that were produced in this matter and I ask you to take a look at that.  My question is going to be, first, are those checks that are written off of your mother's bank account?

A    Appear to be.

Q    Is that your mother's signature on it?

A    Yes, sir.

Q    And I'm going to direct your attention to the check in the top right hand corner and in the bottom right hand corner.  Isn't it true that each of those checks is to Pedernales Electric Cooperative?

A    Yes, sir.

Q    And each is for an amount in excess of $300?

A    Yes, sir.

Q    And in the memo portion of each check in the lower left hand corner of the check different account

numbers are referenced on those checks; is that correct?

A   That is correct.

Q   And tell the jury what the dates of those two checks are.

A   One is September 2nd, '08.  One is September 9, '08.

Q   Thank you.

MR. WALDEN:  I'll move for the admission of Plaintiff's 102.

MS. ALLEN:  No objection, Your Honor.

THE COURT:  Plaintiff's 102 will be received into evidence.

Q   (By Mr. Walden)  It appears that your mother is paying your electric bill, correct?

A   I don't know that for a fact.

Q   She didn't have two accounts in her name at her residence; did she?

A   I didn't take care of that.  Amanda -- if it was an issue -- I didn't take care of it, so there could have been a reimbursement.

Q   To the best of your knowledge did you mother just have one account for her electric service with Pedernales Electric Cooperative?

A   I don't know.

Q   You don't know?

48

A No, sir.

Q Do you know what the square footage of her house is?

A Approximately a thousand square feet.

Q A thousand?

A Yes, sir.

Q Well, it wouldn't have cost $600, in excess of $600 a month to cool a thousand square feet; would it?

A I don't know what the -- I don't know.

MR. WALDEN: If I may approach, Your Honor?

THE COURT: You may.

Q (By Mr. Walden) Let me show you what's been marked as Plaintiff's 103.

A Okay.

Q And are those checks off your mother's account again?

A They appear to be, yes, sir.

Q Is the one in the left hand column, the third one down, that's another check to Pedernales Electric Cooperative, and it's in an amount of $720, correct?

A Correct.

Q And it's dated during the month of February; isn't it?

A It is.

Q    $700 was a lot more that it would have cost to heat or cool a 1,000 square foot residence; isn't it?

A    I'm sure it would be.

Q    The check in the top left hand corner is a check that looks like it's made out to Amanda Wade, correct?

A    That's right.

Q    And actually it's on Edell's account, your mother's account, and it's also signed by your wife, correct?

A    That's correct.

Q    In an amount of over a thousand dollars, correct?

A    Correct.

Q    And the notes written on it refer to gas and electric, correct?

A    That's correct.

Q    And it's made out to your wife?

A    Yes.

Q    Do you know what that transaction was for?

A    No idea.

MR. WALDEN:  I'll move for the admission of Plaintiff's 103.

MS. ALLEN:  No objection, Your Honor.

THE COURT:  All right.  Plaintiff's

Exhibit 1103 will be received into evidence.

MR. RICHIE: It's 103, Your Honor.

THE COURT: 103 will be received into evidence.

MR. WALDEN: May I publish these two to the jury?

THE COURT: You may.

Q (By Mr. Walden) Mr. Wade, do you recall the testimony that has been presented in Court about a meeting between you and Michael Martin in December of 2007 regarding your mother's affairs?

A You will have to refresh my memory.

Q And there was an entry on Mr. Martin's work order from December in your mother's file for December of 2007 is what I'm referring to. I'll hand you Mr. Martin's file. In particular the work order, and just direct your attention to the bottom entry on it. Isn't it true that he refers to an office conference with you?

A Correct.

Q What date does he indicate?

A At the very bottom?

Q Yes, sir.

A 12-28-07.

Q So December 28, 2007. That's your mother's file from Martin, correct?

A    Appears to be so, yes, sir.

Q    Can you tell the jury what the purpose of that meeting was?

A    I don't recall.

Q    Do you recall going to Mr. Martin's office right after Christmas during that year --

A    No, sir.

Q    -- to talk about your mother's matters?

A    No, sir.

THE COURT:  We've been going a little over an hour.  We'll go ahead and give the jury their first break this morning.  We'll be in recess for 10 minutes.

(A break ensued.)

(Jury present.)

Q    (By Mr. Walden)  Mr. Wade, it's true isn't it that after you and Amanda moved back to Lampasas that sometimes when you would leave town you would call people to help out in the looking after of your mother and running errands for her?

A    Correct.

Q    And is Mr. Harrison who testified yesterday one of those people?

A    Yes, sir.

Q    Were there any others that you called outside

the family?

A    Debbie Sloan also testified yesterday.

Q    And you chose -- it was your decision wasn't it to call these individuals outside the family instead of calling for example my client, Nancy Burns?

A    Correct.

Q    And isn't it true that the reason you chose to call these people instead of Nancy was simply because of your bad relationship with Nancy rather than anything your mother wanted?

A    That would be -- my mother's needs were minimal, but, yes, just because of the estranged relationship.

Q    So it didn't have anything to do with your mother's wants, but you didn't want to call -- Nancy is your mother's daughter, as you know, and you didn't want to call Nancy because you didn't like Nancy; is that correct?

A    There was a estranged -- there was a rift between us, yes.

Q    That doesn't mean Nancy can't still come help out her mother, right?

A    She was never stopped.  She could come at any time.

Q    Well, don't you think she might have ben the

one who was asked to come in and look out and help out. She might not have known you were going out of town.

A It's possible.

Q Don't you think that damaged Nancy's relationship with her mother?

A I can't answer that.

Q Maybe, maybe not?

A I have no answer to that.

Q Did you tell your mother for example: Chris Harrison is going to come look after you because I'm not telling nancy that we're leaving?

A Did I tell her that?

Q Yes.

A I did tell her that Chris and his wife would come by and Chris took care of my -- saw after and looked after the farm animals, and his wife would check in on my mother.

Q These were all things that Nancy was capable of doing and in fact had done for a decade and a half before, right?

A That's correct.

Q Just so that the jury understands clearly, this is not because of any concern for your mother. It's because you didn't like Nancy?

A Mother could have -- she didn't have any

problem with anybody else coming out there.

Q   I'm going to ask you a few questions about the modification.  Isn't it true that you could have said, when the modification was discussed, Mom, I'm going to pay you everything that I agreed to pay you for?

A   I could have.

Q   And that wasn't done; was it?

A   No, sir.

Q   And Ms. Allen asked you whether any of your siblings complained about the modification and you said no.  Correct?

A   I don't know if they did or not.

Q   They didn't know about it until after your mother had passed away, correct?

A   I don't know if they did or not.

Q   To your knowledge did any of your siblings know about it prior to your mother's death?

A   Do I know if they knew about it?

Q   Yes.

A   I don't know who knew about it.

Q   Did you tell anybody?

A   No.

Q   By that time your mother was how old?

A   What year?

Q   When the modification was done which was in

2009, spring of 2009.  She was 94, right?

A    Yes.

Q    Do you think that is something the rest of her children might have wanted to know about?

A    Perhaps.

Q    By then family relationship were pretty damaged, correct?

A    Correct.

Q    Did it occur to you at the time that this might just make things worse when people found out about it?

A    I don't know that I thought about it.

Q    Did you think about whether or not it was fair to your mother?

A    I don't know that I took that into consideration because it was her idea.

Q    You have heard a lot of testimony about the modification instrument, and the actual number that is on it reflects the unpaid principal balance at the time. Do you recall what that number is?

A    No, sir, I do not.

Q    If I represent to you it's $227,528 does that sound about right?

A    I wouldn't have any idea.

Q    You're aware aren't you that the loan

modification has been one of the major issues that has been raised in this lawsuit, correct?

A    Correct.

Q    And this lawsuit has been going on for a long time; hasn't it?

A    Correct.

Q    And you're telling the jury -- and one of the issues with the modification is the amount of the principal balance that is reflected on the modification; is that correct?

A    That's what I understand, yes, sir.

Q    And your testimony to the jury is you don't have any idea what that balance is?

A    What the number is, no, sir.

Q    That is your testimony, correct?  That is true that that's what you're telling the jury; you have no idea what that number is as we sit here today?

A    If I had to -- I don't know.  There's too many numbers that have been hashed around, and your balance has been one.  I've heard too many different numbers. So if you're asking me which number, whose camp, I just can't -- I don't know.

Q    Well, my question is specifically can you tell the jury today what number is in this modification instrument that Michael Martin prepared that has really

been at the heart of this matter for a long, long time. Are you telling them you don't have any idea what that is? Not what I said. Not what Ms. Allen said. Not what Ms. Clark said. But what is in the instrument that you signed?

A    I don't know what the number is, no, sir.

Q    Well, let me -- I'm just going to -- I'm showing you an exhibit from your deposition. It's the modification agreement.

A    Correct.

Q    Unpaid principal and interest on note, $227,528. Did I read that correctly?

A    Yes, sir.

Q    As we sit here today do you have any idea how this number was reached?

A    No, sir.

Q    You heard Michael Martin say he didn't know how it was reached, correct?

A    That's what he stated, yes, sir.

Q    And your wife said she didn't know how it was reached?

A    That's correct.

Q    And Lori Graham said she didn't know how it was reached?

A    I suppose.

Q   Your 94 year old mother didn't sit there with a calculator and an amortization schedule and come up with this number; did she?

A   No, I'm sure she didn't.

Q   Somebody had to.  That's not a round number; is it?

A   No, sir.

Q   Somebody had to do some math to get to that?

A   It didn't just appear.

Q   You have no idea how that was reached?

A   No, sir.

Q   When that modification was signed you testified earlier this morning that you and your mother went to Mr. Martin's office to sign it?

A   I took my mother there, yes, sir.

Q   And did -- Diane Varner was the notary?

A   I believe.

Q   Did she notarize the instrument while you were there?

A   I'm not -- I don't know if it was Diane that notarized it, but it was notarized, yes, sir.

Q   In your presence?

A   Yes, sir.

Q   Had Amanda already signed it when you and your mother were there?

A    I have no idea.  I don't recall.

Q    She was not there with you all though, correct?

A    No, sir.

Q    You heard some testimony about there was some sort of air travel from the hospital back to your mother's house to transport her back for her final hours or days; is that correct?

A    That's correct.

Q    A helicopter.  Did you consult with any of your siblings, any of Edell's -- any of your mother's other children about how her final hours and days would be spent?

A    I don't know who all was consulted, but I didn't.

Q    Do you think it would have been a good idea to?

A    I don't know who was consulted and whether or not they were.

Q    Now, you and Amanda and nobody else planned your mother's funeral, correct?

A    I don't know that to be true.

Q    And you participated in the planning of your mother's funeral; didn't you?

A    Correct.

Q   Who else was with you planning it?

A   If I had to -- if I were going back in memory or if I'm going back to my memory that most of that was probably Amanda and myself.

Q   You deliberately decided to not involve any of your siblings in the planning of your mother's funeral, correct?

A   I don't know that it was deliberate.

Q   You don't know if it was deliberate?  You didn't call anybody and say, Let's put things aside and do this for mom, plan a nice service for mom.  You didn't do that; did you?

A   It was a nice service.  I wasn't involved in all the details.

Q   Well, let me remind you of what we talked about before.  And I'm going to start -- this is your deposition, sir.  I direct your attention to the first highlighted portion.  This is page 41, line 5.  And I asked you:  Okay.  Who was it that planned your mother's funeral?

And your answer was?

A   My wife.

Q   And I asked you:  And you didn't involve any of your other siblings in that?

And your answer was?

A   No.

Q   And I'm skipping down to line 20, page 41. And I asked you:  Your mother had passed away and you're planning a funeral and you didn't, I guess you didn't feel like maybe it's time just to -- to just talk to everybody at this time and see what we can all do together in the best interest of your mother.  That wasn't the way you felt about it; was it?

And your answer was?

A   No.

Q   And I asked you then:  You thought the only way to take care of your mother's best interest was to exclude all of our other siblings?

And your answer was?

A   Yes.

Q   Mr. Wade, I think you testified yesterday that part of what prompted you to move here was the power outage that was prompted by a freeze at your mother's place?

A   That's right.

Q   Do you recall when that was?

A   No, I do not.

Q   Was it about -- was it like a few months before?

A   It was somewhere between, I would guess, 2002

to 2004, somewhere in that winter sometime. I don't recall the exact time.

Q A couple of years then before you actually --

A I don't recall.

Q I'm not asking for some specific date as much as whether it was the same year or a couple of years before, or five years before, just a general idea is all I was interested in.

And also when did you put in the air conditioning in her house?

A As soon as we moved back or either -- I should say after we purchased the farm.

Q And there was an issue with the water well?

A Correct.

Q And the power didn't get connected properly, or promptly rather?

A It took six weeks.

Q Would you agree that all of these things are things that could have been remedied and addressed without your purchasing the property?

A What things?

Q Well, for example, hire an electrician to fix the electric pump connected with the water well. The purchase of the property wasn't necessary to address these issues is what my question is.

A    No.

Q    Your mother's final time in this life was August 7?

A    When she passed away?

Q    Yes.

A    August 14.

Q    When she fell, the fall that resulted in her final hospitalization, the final short illness, was that August 7?

A    It was sometime, whatever the dates are.  I don't have a calendar in front of me.  From that Saturday night to sometime Sunday morning.

Q    And is it true that a caregiver is the one that found your mother on the floor?

A    Correct.

Q    This was a Saturday or a Sunday, did you say?

A    It was a Sunday morning.

Q    Was the caregiver scheduled to come out and assist your mother?  I guess there wasn't any call to her if the caregiver is the one who found her, correct?

A    Call to who?

Q    Well, let me strike that.

Do you know what time of day it was that the caregiver arrived?

A    Somewhere between 7:30 and 8:00.

Q   In the morning?

A   Correct.

Q   What time was the last time somebody was with your mother, present with her the evening before?

A   I was with her when she went to bed around 10:00, or prepared to go to bed around 10:00.

Q   So sometime -- her fall would have been sometime between 10:00 at night the night before and 7:30 the next morning, correct?

A   Correct.

Q   And I've heard it said and let me ask you if you agree with this.  She had a stroke and it's impossible to determine whether the stroke occurred before the fall or perhaps causing the fall or after the fall; is that correct?

A   I don't know which came first.

Q   Did she have a stroke?

A   It is my understanding.

Q   She could have had the stroke sometime during the night or when she got up that morning, correct?

A   She had gotten up during the middle of the night and was eating cookies.

Q   She had gotten up in the middle of the night and was eating cookies?

A   Sometime.

Q    And I take it you knew it because you had found some cookies out?

A    Yes.

Q    And I take it -- what is it that makes you -- that indicates that she had gone back to bed after eating some cookies?

A    No, she didn't.  She wasn't in bed.

Q    Correct.  I misstated that.  When you say the middle of the night, how do you know it was the middle of the night?  That's what I'm getting at.

A    Well, I don't know what time it was.  I would reference that would be sometime between 10:00 and sunrise.

Q    Was it your mother's habit to eat cookies for breakfast?

A    I didn't say she was eating breakfast.

Q    And I was not trying insinuate that's what you said.

A    I wasn't with her every time she ate breakfast.

Q    Nobody was with her between 10 p.m. and 7:30 in the morning, correct?

A    No, sir.

Q    And you were here yesterday when your friend, Mr. Harrison, testified.  He's an emergency medical

technician?

A    Correct.

Q    And you heard him testify about what he referred to as the golden hour?

A    Correct.

Q    If you can't get to a stroke victim within one hour then chances of survival -- I don't recall exactly how he put it, but it sounds like it decreases significantly, correct?

A    I think that could be determined in a lot of different things.

Q    Well, you heard his testimony, correct?

A    I did.

Q    Was there evidence that your mother's bedroom, that she had thrashed around on the floor before she was found?

A    It didn't appear to be, but I wasn't looking at that.

Q    It was in the bedroom; wasn't it?

A    It was.

Q    What time was it that you first came to be in your mother's presence?  I assume you got a call from the caregiver?

A    Correct.

Q    And when the caregiver called you, were you in

the house that you and Amanda lived in?

A    Yes, I was.

Q    And what time -- did you all call the ambulance or what?

A    Somebody did, yes.

Q    What time did they arrive?

A    I don't have any idea.

Q    Isn't it likely that this golden hour had come and gone before your mother was able to get attended to?

A    I have no idea.

Q    When was it that your mother started having full time care brought to the home?

A    She never had full time care.

Q    What about -- what was the greatest number of hours during the day that you hired somebody to be a caregiver for her; in other words did you hire somebody to come out between 8 and 5, or from what periods of time?

A    Whatever -- I don't remember exactly.

Q    Was there ever -- there was never overnight care for her?

A    No, sir.

Q    She was alone in the house up until the time of her death, correct?  Overnight, I mean.

A    Correct.

Q   Did you ever consider moving her into the house that you and Amanda lived in?

A   No.

MR. WALDEN:  Pass the witness, Your Honor.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MS. ALLEN:

Q   Mr. Wade, just a couple of questions.  You were asked about two meters on the property.  Do you remember those questions?

A   I do.

Q   Two meters, electric meters.

A   Correct.

Q   Was there one at your mom's house?

A   There was.

Q   The rock house that we've seen in the pictures?

A   Correct.

Q   Was there another meter on the property?

A   At the well.

Q   At the water well?

A   Yes, ma'am.

Q   Is that the water well you talked about that was put in when your mom was out in California with you

and Amanda?

A    Correct.

Q    Who put that in?

A    Harrison Well Drilling Service by Nancy.

Q    When Mr. Walden talked a little bit about the electrician who helped with the water well, who was that?

A    That would be Bill Burns and my brother, Bud.

Q    Brother Bud is an electrician?

A    Yes.

Q    Do you have instant recall of the different affidavits that your sister Nancy has filed in this lawsuit?

A    I don't know by memory.

Q    I wouldn't have thought that.  So let me show you -- do you recognize your sister's signature on it?

A    I do.

Q    Could you look to the paragraph 9, the last paragraph on it.  I just want to see if we can confirm something.  Are you with me?

A    Yes, ma'am, I am.

Q    Do you see in her affidavit she talked about Pat Cavness?

A    I do.

Q    The lawyer that we talked about in this

lawsuit?

A    Yes, ma'am.

Q    And his notes; do you see that in paragraph 9 of her affidavit?

A    I do see that.

Q    It says Exhibit A-4.  Do you see that?

A    I do see that.

Q    Is there an A-4 on the affidavit?

A    Yes, ma'am.

Q    Can you look at A-4 to your sister Nancy's affidavit and tell us whether those notes are consistent with your meeting -- your memory of the meeting with Mr. Cavness that you and Amanda and your mom and Nancy attended?

A    Yes, ma'am.

Q    Is Defendant's 33 the same as A-4 to your sister's affidavit?

A    They appear to be, yes, ma'am.

          MS. ALLEN:  Offer Exhibit 33, Your Honor.

          THE COURT:  Have you seen 33?

          MR. WALDEN:  Not today.  Let me just make sure -- if I may approach?

          THE COURT:  You may.

          MR. WALDEN:  No objection.

          THE COURT:  I think he said no objection?

MR. WALDEN: I'm sorry. No objection.

THE COURT: Defendant's 33 will be received into evidence.

Q   (By Ms. Allen)  Mr. Wade, were you here, and I have to ask you that because you sit behind me and I don't always see you, but were you here when your sister Nancy talked to the jury about holding your mom's power of attorney for 15 years?

A   Yes, ma'am.

Q   From 1993 to 2007?

A   Yes, ma'am.

Q   So she had your mom's power of attorney during the time that this whole land discussion was going on, right?

A   Yes, ma'am.

Q   Did you hear her talk about her role as your mom's trusted adviser during that time?

A   I did, yes, ma'am.

Q   Was that consistent with your memory as well?

A   Yes, ma'am.

Q   Is that the same Nancy who was sitting in your mom's living room when you and your mom had the discussion in which your mom said, Here's my price?

A   Yes, ma'am.  That's the same sister.

Q   Is that the same Nancy who was sitting in Pat

Cavness's office when he made those notes that are Exhibit 33?

A    Yes, ma'am.

Q    Did that Nancy ever say to you, Johnny, now I've got to look out for mama, you need to get an appraisal.

A    She did not.

Q    Did that Nancy ever say, Now, Johnny, this is the family homestead and I'm going to notify all of the siblings what's going on here.

A    Did she say that to me?

Q    Yes, sir.

A    She did not.

Q    Did that Nancy say, Now, Johnny, I don't know about this asking price that mom had, I think we need to go check on that.  Did she ever say that?

A    No, ma'am.

MS. ALLEN:  Pass the witness.

RECROSS EXAMINATION

BY MR. WALDEN:

Q    Mr. Wade, isn't it true that she did suggest that you notify all of your siblings about the purchase of the homestead?

A    I have no recollection of that conversation.

MR. WALDEN:  Pass the witness.

MS. ALLEN: Nothing further, Your Honor, of this witness.

THE COURT: You may step down.

******

(Jury present.)

MR. RICHIE: The first rebuttal witness we would call would be Amanda Wade.

MR. STUBBS: Your Honor, may we approach?

(The following was in the presence but out of the hearing of the jury.)

MR. STUBBS: Your Honor, she was already called at trial. She was called -- they had an opportunity -- they had five hours on the stand. I'd like to have some idea of what they're trying to rebut other than just trying to re-present their case again.

MR. RICHIE: For example, I mean, I don't think that I have to -- you can object when I ask the question, but this is purely rebuttal. So if you want an example, Mr. Harrison got on the stand yesterday and said he was not paid for his services he rendered for Edell Wade. I have a check that proves quite the opposite. And it's got Amanda Wade's signature on it and it shows what it's for. It will simply be rebuttal. It will probably take 10 minutes, maybe 15.

MR. DUCLOUX: But he had Mr. Harrison on

C E R T I F I C A T E

STATE OF TEXAS          )

COUNTY OF BURNET        )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226;Email:Vkaykan@live.com

85

**Supplemental** REPORTER'S RECORD

VOLUME 4 OF 6 VOLUMES

CAUSE NO:  P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/14/2015 2:20:39 PM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF          )          IN THE COUNTY COURT

THE ESTATE OF             )          AT LAW

EDELL WADE                )          BURNET COUNTY, TEXAS

EXCERPT TRIAL TESTIMONY OF KIM GEORGE, SUE MEUTH,

BUD WADE, CHRIS HARRISON, DEBRA SLOAN AND CHARLENE DAVIS

AND TRIAL TESTIMONY OF JOHNNY WADE

On the 2nd day of October, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas 78701

512-236-9220

BY:  MR. DON RICHIE

MS. EMILY SEIKEL

APPEARING ON BEHALF OF JAMES(BUD)WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas 78731

512-349-9595

BY:  MR. DON E. WALDEN

APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas 78701

512-480-5600

BY:  MS. KATHRYN ALLEN

AND

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas 76550

512-556-8970

     BY:  MR. EVAN STUBBS

     APPEARING ON BEHALF OF JOHNNY WADE AND AMANDA

     WADE, INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas 78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

     APPEARING ON BEHALF OF AMANDA WADE, EXECUTOR

REPORTER'S RECORD

VOLUME 4 OF 6 VOLUMES

CHRONOLOGICAL INDEX

**PLAINTIFF'S WITNESSES:**

| **NAME:** | **Dir** | **Cross** | **Redir** | **Recross** | **Vol** |
|---|---|---|---|---|---|
| Sue Meuth | | 7/25 | | | 4 |
| Bud Wade | | 30 | | | 4 |

**DEFENDANT'S WITNESSES:**

| **NAME:** | **Dir** | **Cross** | **Redir** | **Recross** | **Vol** |
|---|---|---|---|---|---|
| Kim George | 65 | | | | 4 |
| Chris Harrison | 123 | | | | 4 |
| Debra Sloan | 132 | | | | 4 |
| Charlene Davis | 137 | | | | 4 |
| Johnny Wade | 139 | | | | 4 |
| **Court Reporter's Certificate** | | | | **Page 177** | **4** |

REPORTER'S RECORD

VOLUME 4 OF 6 VOLUMES

ALPHABETICAL INDEX

| WITNESSES: | Dir | Cross | Redir | Recross | Vol |
|---|---|---|---|---|---|
| Charlene Davis | 137 | | | | 4 |
| Kim George | 65 | | | | 4 |
| Chris Harrison | 123 | | | | 4 |
| Sue Meuth | | 7/25 | | | 4 |
| Debra Sloan | 132 | | | | 4 |
| Bud Wade | | 30 | | | 4 |
| Johnny Wade | 139 | | | | 4 |

EXHIBIT INDEX

**PLAINTIFF'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|

**DEFENDANT'S EXHIBITS:**

| No: | Description | Offered | Rec'd | Vol |
|-----|-------------|---------|-------|-----|
| 22 | Copies of checks | 29 | 29 | 4 |
| 23 | Copies of checks | 49 | 49 | 4 |
| 24 | Copy of e-mail communication | 86 | 86 | 4 |
| 25 | Copy of newspaper article | 87 | 87 | 4 |
| 26 | Copies of e-mails | 123 | 123 | 4 |
| 27 | Copies of photographs | 77 | 78 | 4 |
| 28 | Copy of letter to Edell Wade | 79 | 80 | 4 |
| 30 | Newspaper Article | 81 | 82 | 4 |

back.

Q   And you had told us at the time as far as you knew people hadn't even opened up the boxes?

A   Some of them.  You're right.

MR. DUCLOUX:  That's all the questions I have.

(End of cross examination of Sue Meuth.)

******

BUD WADE

Having been previously sworn, testified as follows:

CROSS EXAMINATION

BY MR. STUBBS:

Q   Mr. Wade, you didn't know about any of the cash because you weren't here, right?

A   I didn't know about the cash?

Q   Well, you weren't here.  You're saying, Well, I didn't know about this, I didn't know about that.  You weren't here; were you?

A   I was somewhere.

Q   You were in either Buda or Kyle or Hayes, where it is, right?

A   That's right.

Q   Okay.  And when you went to Buchanan Dam or Lake Buchanan to your property, you said that was back in 2008?

A   I think that's correct.

Q   And did you go and visit your mother between that date and August 7th of 2010?

A   The date at the lake and 2010?

Q   Yes, sir.

A   Yes.

Q   Okay.  At the ranch?

A   Yes.

Q   And you never had any trouble getting in; did you?

A   I did at times.

Q   Okay.  Well, that's not what your testimony has been; has it?

A   Well, there was times we would call mother and the gate would be unlocked and we assumed, I didn't ask, but I assumed that she drove down and opened it up.

Q   That's pure speculation on your part; isn't it?

A   It is.

Q   Okay.  Now let's talk about your property. You live in, did you say Kyle?

A   It's off 1626.  It's near -- it's I'd say five miles from Manchaca and maybe five or six miles from Buda.

Q   Kind of by Hayes Consolidated School District;

is that why you refer to it as Hayes?

A    Well --

Q    That's okay.  It doesn't matter.  Just in the general area.  What kind of property do you have there?

A    There -- where we are residing now is in a subdivision, but some of the land is an Ag exemption.

Q    Okay.  How big is your house?  How many bedrooms does your house have?

A    Three.  Three bedrooms, two baths.

Q    Okay.  You and Gwen live there?

A    Yes.

Q    Anybody else live there?

A    Not at this time, no.

Q    Did anybody else live there -- when did you move there?

A    It was about eight years ago.

Q    Has anybody else lived there in that house with you in that eight years?

A    Not with me.  The daughter and her husband and children moved into the house prior to us because they were trying to build a house so they moved in for a year and a half.

Q    But that was before?

A    Before we moved in.

Q    Okay.  Then all that time you never once asked

your mom to come move in with you; did you?

A   No.

Q   I mean, you had a three bedroom, two bath house.  Obviously you had plenty of room; didn't you?

A   Yes.

Q   And you're trying to imply that somebody was supposed to be with her 24 hours a day?

A   That was here.

Q   But --

MR. RICHIE:  Your Honor, I think he should be allowed to answer without being interrupted.

THE COURT:  All right.  Go ahead and proceed with your question.

Q   (By Mr. Stubbs)  I mean, your implication to this jury is that it's somehow somebody else's fault that nobody was with her 24 hours a day, right?

A   I was referring to later on in life, you know, when she was, you know, in her 90s.  And I wouldn't have objected to somebody being there.  I really wouldn't.  She had plenty of money.  She would have been at home.  It could have been 24 hours a day with them and been no problem.

Q   Sure.  But I mean your implication to this jury is that Johnny and Amanda are a full 200 yards away, right?

A     Right.

Q     Yet, you're living in a three bedroom, two bath house.  You're retired.  Your wife's retired and you just told this jury your mom had plenty of money to hire somebody.  Why didn't you move her into your house if you're so concerned?

A     Well, it makes sense to me that she would remain in her own house with somebody caring for her than to take her away from her house.  I would rather her stay there if she could have the proper care.

Q     And she could stay there and she did have the proper care; didn't she?

A     No.

Q     No.  Okay.

Well, let's talk about that August 6th trip.  You went -- and apparently it's a big deal that you had to climb the fence to get the key.  You knew there was a key there, right?

A     I suspected because the wife said that Johnny told her there was one there.

Q     So nobody tried to hide from you where the key was; did they?

A     It wasn't there for my purpose.  It was there for their purpose.

Q     It was there for anybody's purpose, wasn't it?

It was hanging on a post and that way they can tell anybody that needs to use it, right?

A    Anybody that can climb the fence and try to get the key that way.  But it was on their side of the fence.  I thought it was there because they might forget their key and then they have another key hidden for themselves.  That's what made sense to me.  Not to have to climb the fence.

Q    If they were trying to hide the key why would your wife have known where it was?

A    Because she was asking about a key and Johnny said, Well, there's a key on the third post down from the gate.

Q    It wasn't hidden from her then; was it?

A    It wasn't what?

Q    It wasn't hidden from her.  I mean, he didn't have to tell her there was a key there if he didn't want her to know, right?

A    It was a way for him to not issue us a key.

Q    Did you ever ask him for a key and he said, No, you cannot have a key?

A    He didn't say no.  He don't have to say no.  He had plenty of times to offer me a key and didn't.

Q    And instead of offering you a key he told you where the key was, three posts down, right?

A    That was the last time that I entered the property is when I used that key.

Q    And that was the only time that the property was locked; wasn't it?

A    No.

Q    Did you ever go to the property and you couldn't get in?

A    Unless I used the gap.  I could get in through the gap.

Q    Then it wasn't really locked; was it?

A    Well, it wasn't easy to access.

Q    Well, let's explain to this jury because you're talking about a gap.  Now, a gap is basically a gate in a fence, correct?

A    That's right.

Q    It's not made out of steel or wood or something that is more permanent, correct?

A    No.

Q    It's just made out of wire?

A    Wire.

Q    And it's a gate, right?

A    Yes.  It's access to property.

Q    And at least the ones that I've dealt with generally have your strands of wire, just like a fence, and on the end you'll have a cedar post and then where

that cedar post matches up with another cedar post you'll have a wire at the top and a wire at the bottom, right?

A    That's correct.

Q    Okay.  So what you have to do is you have to stand up and you have to take that post and push it about this far, right?

A    Well, you know, it depends on the gap.  I've seen them where it would have -- they would leave a stay or something to where you would have to use that for leverage and pull it, but --

THE COURT:  Could I have counsel approach, please.

(The following was in the presence but out of the hearing of the jury.)

THE COURT:  I want you to conduct your cross examination any way that you want to however we're running out of time.  And I'm sure the jury is aware of what a gap in a fence is.

MR. STUBBS:  That's fine.

THE COURT:  You might want to move on.

MR. STUBBS:  That's fine.

(The following was in the presence and hearing of the jury.)

Q    (By Mr. Stubbs)  Mr. Wade, the point of that

is you had to take a stay, move it a matter of a couple of inches, lift the wire up and drag the gap out of the way, right?

A    Yes.

Q    And it wasn't locked?

A    It wasn't locked.

Q    Now, your testimony that that August 7, 2010 trip up there -- and you follow where I am?

A    Yes.

Q    And you actually called on August 6th and the phone wasn't working, correct?

A    My sister did.  She called and she had started I think about four days prior and the phone line was out.  She called that morning that we was on the way up and talked to Nancy and she said the phone line was down, the phone line wasn't working.

Q    So your understanding was that it had been four days yet you didn't say, Well, heck, it's only an hour and a half up there, I need to get up there and see what's going on; did you?

A    Well, I didn't know it until late that evening, and I said I've been wanting to go up.  I'll go up in the morning and see what's wrong with the phone line or check on it.

Q    But you didn't go up there when you learned

38

that there might be an issue?

A    That's right.

Q    Okay.  Now let's go back to 2004.  In 2004, and I apologize I don't know the date of the deed.  I don't know the date of that sale.  Let me ask you about that.  You were asked all of these questions about did you receive copies of various documents.  Have you ever sold any property?

A    Yes.

Q    Who all did you send documents to; did you send documents to all of the family members of the people you sold it to?

A    I didn't have anything to do with any of the papers.  I was -- the property I sold I was in partnership with and possibly they did.  I didn't get involved in it.

Q    Okay.  So going back to 2004, this 475 acres, who owned it?

A    In what year?

Q    Back in 2004?

A    2004?

Q    Yes.  Let's say January 1st of 2004, just so the record is clear.

A    Mother I think owned it at that time.

Q    And she owned it outright; didn't she?

A    Yes.

Q    You didn't have any ownership in that 475 acres; did you?

MR. RICHIE:  Your Honor, that calls for a legal conclusion.  I believe he did.  He was a beneficiary under the will.  I'm going to object to it.

MR. STUBBS:  That's a misstatement.

THE COURT:  Overruled.

You may answer the question.

Q    (By Mr. Stubbs)  Did you have any legal interest in that property?

A    Legal interest?

Q    Any -- did you have any ownership interest in that 475 acres on January 1st of 2004?

A    No.

Q    So your mother was the sole owner of that 475 acres?

A    Yes.

Q    And she could do with it anything she wanted to do, correct?

A    Legally, yes.  But --

Q    Well, I mean, there's not a distinction between legally and something else.  She could either do with it what she wanted or she couldn't.  And I want to make sure this jury understands you knew that January

1st of 2004 it was her property, correct?

A  Yes.

Q  And she could do with it anything she wanted?

A  Yes, I suppose she could.

Q  And she didn't have to ask you for permission?

A  No.

Q  Didn't have to ask your sister for permission?

A  No.

Q  Didn't have to ask Johnny for permission?

A  No.

Q  She could have sold it to some -- she could have sold it to a neighbor who was completely unrelated; couldn't she?

A  I don't think she would have done that without talking with me and then some of the other siblings.

Q  Sure.  And you can say you don't think she would have done whatever.  That's not my question.  My question for this jury to understand is that she was perfectly free to do whatever she wanted with that property and if that meant selling it to a neighbor she didn't have to get permission from anybody, correct?

A  Well, that's correct.

Q  If she wanted to give the property way, it was hers.  She could do with it what she wanted, correct?

A  That's correct.

Q   If she wanted to leave it to the Girl Scouts so they could make a camp out of it, she could do that.

A   She could donate it.

Q   She could donate it, she could sell it, she could sell part of it, she could cut it up.  She could do anything she wanted?

A   Yes.

Q   And you didn't have any say in what the price would be or what the terms would be; did you?

A   No, but I would hope that she would, before she sold anything, that she would know what the property is worth.  I would hope that she would do that.

Q   Well, your testimony is that -- and you heard Mike Martin say she was very lucid, right; you heard him say that didn't you?

A   I didn't hear much testimony because of the sound system.

Q   Well, you're not trying to tell this jury that your mom didn't know what she was doing or that she was out of her mind; are you?

A   I'm not saying she was out of her mind.  I can't say that she was -- wasn't -- I call it bamboozled when I found out that she had actually sold the property.  And I told my sister that she was bamboozled.

Q   Okay.  Well, let's talk about that.  When you

found out that she had sold the property to Johnny relatively soon after that happened, correct?

A   Yes.

Q   Was it within a couple of months?

A   Less than that.  I don't know.  Mother called and the wife answered the phone.  She told her and that was it.  She didn't tell me.  Mother never talked to me about selling the property.

Q   But she told your wife knowing that your wife would tell you, right?

A   That's correct.

Q   She didn't try to hide it from you; did she?

A   The wife didn't try.

Q   You don't have any reason to think that all documents that are supposed to be filed in the transaction of real estate weren't filed?  I apologize.  Let me rephrase that.  That's a terrible question.

To the best of your knowledge, anything that was supposed to be filed was filed, correct?

A   I understand the papers were signed in California or something.  I understand the papers were all signed and the deal was done before I knew about it.  It was all done in secret.

Q   But you just told this jury your mom didn't have to get permission to do anything, correct?

A    From me, yes.

Q    And she told you about it afterward, so it really wasn't in secret?

A    It was in secret that she sold the place.  To me.

Q    And you heard your sister testify, Nancy, that she actually went with your mother and Johnny to Pat Cavness's office before the sale ever took place, right?

A    I heard her say that.

Q    You don't have any reason to think she's lying, do you?

A    No, I don't doubt her word at all.

Q    So it wasn't really in secret; was it?

A    It was to me.  I'm talking about myself.

Q    So you find out about it within a few days after the sale?

A    Right.

Q    You had actual notice.  You knew it had happened, correct?

A    Yes.

Q    And so obviously -- well, I believe you said something like you smelled a rat; is that right?

A    Well, kind of smelled like one.

Q    Felt like she had been bamboozled?

A    Exactly.

Q    So obviously to right this wrong, as you want to tell this jury, you immediately went to mom and you said, Mom, we have to undo this deal.  Right; that's what you did?

A    No.

Q    You didn't do that?

A    I didn't go to her place at all.  I never talked to her about the place at all.  If she wanted to talk about the place, she could have talked to me.

Q    But she did.  She called your wife and told her she sold the place?

A    She said the place sold and that's all she said.

Q    And she opened up that conversation, right?

A    Well, I mean if that's what you want to call it.

Q    And since this -- since she had been bamboozled and you're so concerned about mom you did nothing, right?

A    Well, that was after the papers was signed.  It's a little bit hard to do anything.

Q    No, no, no.  That's not my question.  You didn't try to do anything; did you?

A    Well, what could I have done?

Q    You could have called her; couldn't you?

A    What for?

Q    To say, Mom, this is a mistake.  We've got to undo this.  Right?  I don't like it.  You could have done that; couldn't you?

A    Well, I did respect my mother as a person. She made a few decisions that in my personal decision it was a mistake.  It was the worst mistake she ever made in her life as far as I'm concerned.

Q    And so you waited seven years before you do anything about it, right?

A    It was after her death.

Q    So you respected her enough not to say anything to her about it, even though you had actual knowledge --

A    If she wanted to talk to me, she could have. I would have listened.

Q    But you don't have enough respect for her to not file a suit after she dies about it?

A    She didn't know anything about it.  She was passed away.

Q    So that makes it okay?

A    I found out a lot of things after her death that I didn't know.

Q    But you just told this jury that she had been bamboozled and you smelled a rat within a few days of

46

the sale, right?

A   After the sale.

Q   I thought that's what I said, but I think the point's made. Yet you wait seven years to complain about it, right?

A   I didn't think there was much need to complain.

Q   Well, let me ask you this. Did you ever go to Johnny and say, Hey, Johnny, I would really like to buy a part of this ranch?

A   I didn't have any interest in buying it for myself. I have enough property that I don't have any interest.

Q   So you don't want the ranch. You don't have any interest in having it?

A   No. That's exactly right. I didn't. First of all, in my own mind I couldn't afford it. I felt like, well if I paid what Johnny paid, yeah, I probably could have.

Q   You never went to Johnny and said you wanted to buy part of the ranch?

A   No.

Q   Whatever the terms are you got from mom I want the same terms. You never even asked?

A   I didn't have any need for it.

Q   Okay.  And never went to mom and said, Mom, I'd like to undo this or I would like for you to ask Johnny to sell the ranch to all of us.  Did you ever ask her that?

A   Why would I -- it would cause her to be upset and I didn't want to do that.

Q   Whenever she did pass away, you went ahead and accepted your part of your inheritance; didn't you?

MR. RICHIE:  Your Honor, may we approach?

THE COURT:  You may.

(The following was in the presence but out of the hearing of the jury.)

MR. RICHIE:  They had counterclaims based upon waiving because he had accepted his inheritance rights and you ruled on that.  It doesn't matter with him going into the fact that he accepted his inheritance benefits under the rule.  It's irrelevant.

MR. STUBBS:  On top of that there hasn't been any.  There's been POD beneficiary designations that have been distributed, and that is it.

MR. RICHIE:  I'm not --

MR. STUBBS:  Well, your co-counsel confused it badly and he did that on purpose.

THE COURT:  Okay.  You may ask about the -- because I assume that Amanda made those distributions

so you can go into that.

MR. STUBBS: Thank you, Your Honor.

(The following was in the presence and hearing of the jury.)

MR. STUBBS: May I approach the witness, Your Honor?

THE COURT: You may.

Q (By Mr. Stubbs) I'm handing you what has been marked as Defendant's Exhibit No. 23. Look over that, please.

MR. RICHIE: We have no objection to it being admitted into evidence. He doesn't need to prove it up.

THE COURT: All right. Defendant's Exhibit 23 will be received into evidence.

Q (By Mr. Stubbs) Mr. Wade, since 23 is already in evidence I think it will be quicker for me to basically confirm with you what it is. And this is a letter from Martin Millican Henderson and Shrum having to do with disbursements being made to you following your mother's death; is that correct?

A That's correct.

Q And it's a copy of I believe it's got the green card from being sent certified, and it has one, two, three, four, five different certified cashier's

checks, right?

A    Right.

Q    And it looks like that adds up to a little over $84,000.  Does that sound about right?

A    That's what I remember.

Q    All right.

MR. STUBBS:  Your Honor, may I publish that to the jury, please?

THE COURT:  You may.

Q    (By Mr. Stubbs)  And had you, instead of waiting until she dies to file this lawsuit, had you gone to her you said it would have upset her, right?

A    Yes.

Q    And if you upset her she has every right to change her will; didn't she?

A    Well, yes.  She could do whatever she wanted to in her will.

Q    And if she changes her will she doesn't have to leave you anything, right?

A    That would have been true.

Q    And she didn't have to and you don't get that $84,000 or whatever else you got?

MR. RICHIE:  Your Honor, that assumes facts not in evidence.  These are pay on death accounts. They didn't pass under the will.  I object.

THE COURT:  Overruled.

Q   (By Mr. Stubbs)  She could have changed her will and cut you out; couldn't she?

A   She could have.  But as I grew up it was always share and share alike.  That's what I always remember.

Q   And you testified earlier on that point, you testified earlier that you were familiar with her prior will, right?

A   Yes.  I seen it after her death.

Q   And this whole concept of share and share alike, her prior will wasn't a one-seventh distribution to each of the seven kids; was it?

A   No.  Well, she did have Weldon a little bit different as receiving one fifth.  But if you calculate the amount of money that would have been if using the 500,000, wouldn't have been that much difference.

Q   My point is it wasn't one-seventh to each of the kids in her prior will?

A   Of course I didn't know about that until after her death, and that's why I'm stating it as I grew up it was share and share alike, and that's the way I always felt.  I didn't know that she had done that, and that was her priority.

Q   And let's talk about where everybody was back

51

in 2004.  It's my understanding you were in Austin or Hays or Buda, somewhere in that area?

A    That's correct.

Q    And I believe you told this jury it's an hour and a half away or so?

A    An hour and a half, but nowadays it takes an hour to get out of Austin.

Q    Okay.  Fair enough.  You didn't have any desire to come back to Lampasas; did you?

A    Not to live.

Q    And can you go through the other siblings for me, because I'm afraid I'll get a name confused, but you had Johnny who was in California, right?

A    Right.

Q    And you had, let's see, Nancy who was in Lampasas, right?

A    Right.

Q    You had Sue who was I believe in Bastrop; is that right?

A    Bastrop, Cedar Creek.

Q    Is that also an hour and a half or so away?

A    Might be a little longer.

Q    An hour and a half to two hours then probably?

A    Yes.

Q    Who else do we have here.  I believe we have

somebody in Georgia?

A   Somebody else where?

Q   Where are your other siblings?  Don't you have another sibling that was living in Georgia at the time or maybe still living there?

A   Emma.

Q   Emma.  Okay.  And then you have Weldon who is in Oklahoma; is that right?

A   That's right.

Q   And Emma wasn't planning on moving back to Lampasas; was she?

MR. RICHIE:  Objection, Your Honor.

Q   (By Mr. Stubbs)  As far as you know?

MR. RICHIE:  Excuse me.  First of all I'm going to object to the question.  We don't know Emma's mind.  It calls for a state of mind.

THE COURT:  I'll sustain the objection.

Q   (By Mr. Stubbs)  As far as you know, did any of your siblings have any intention of moving back to Lampasas other than possibly Johnny?

A   I didn't know anybody was interested in it except Johnny had told me probably in 1996 or along those lines that he walked up to me when we was at Nancy's house.  I think that was the day of daddy's funeral.  I'm not certain about that, but it was a

family gathering and he walked up to me and said then that, I want to buy the place.  And I said, I don't care.

Q     About what year was that?

A     About 1996.

Q     Okay.  So in '96 you knew that Johnny had expressed interest in buying the place?

A     He's always had his eye on the place.

Q     Well, so even going back to '96, once you knew that Johnny had an interest in buying the place, did you talk to your mother or express any unhappiness with that idea?

A     No.  I told Johnny I didn't care.  I expected the proper sale.  I expected appraisals.

Q     Okay.  And so none of the siblings other than Johnny had expressed an interest to come back to Lampasas and the only other sibling that was in the area as far as taking care of Edell or helping her with her day-to-day needs was Nancy, right?

A     Nancy and I also, and I think Charlene.  I brought -- while daddy was still living -- he had Alzheimer's disease -- I took mother and dad several times to Austin.  I'd come pick them up and take them to Austin.  I took mother to an eye doctor in Austin.  Took her here to Burnet.

Q   Well, let me ask you about that.  You said you took her around.  Did you charge her?

A   No.

Q   Never?

A   No.  The only thing I would use her car to drive up and she would say, Let's use the car, our car.  And so I would use their car.

Q   And you don't remember taking her to Austin to a funeral and charging her for it?

A   No.

Q   A guy named Mike Stewart?

A   Right.

Q   Died in July of 2004.  Are you telling this jury you didn't charge her to take her to that funeral; is that your testimony?

A   That's my testimony I did not charge her.

Q   Now --

MR. STUBBS:  May I approach the witness, Your Honor?

THE COURT:  You may.

Q   (By Mr. Stubbs)  I'm handing you Defendant's Exhibit No. 6.  And I don't know if you've seen that before or not.

A   I don't recognize any of this.

Q   Okay.  Well, I'll represent to you that it's

been admitted into evidence and it's actually invoices that Nancy and her husband submitted to Edell for helping her. Is that what that looks like to you?

MR. RICHIE: Objection, Your Honor. That assumes facts not in evidence.

THE COURT: Hold on a second. This is a time for a break. Let's take a l0 minute recess.

(A break ensued.)

THE COURT: Bring the jury in.

(Jury present.)

THE COURT: You may continue your cross.

MR. STUBBS: Thank you, Your Honor.

Q (By Mr. Stubbs) The document that I had given you, and I apologize I forgot the number, but what that shows is that your sister Nancy was charging Edell to help her with day-to-day stuff; do you agree with that?

A I had heard that sometimes that Nancy was being paid by her mother for doing -- coming out and feeding the cattle is what I understood.

Q And so the only sibling, and you would agree with me, that the only sibling that was in Lampasas and available to help her day to day was Nancy, right?

A Yes.

Q And Nancy was charging her?

A Well, she was charging but if you're asking me

if I have any objections, no.

Q    Okay.  Now, as far as that property goes, the 475 acres, it has a garage apartment on it, correct?

A    I guess you could call it that.

Q    Well, I think that's what it has been referred to.  I don't know that that's what I would call it either, but it's a metal building, two car garage, has a living quarters with bathroom.  That sort of thing, right?

A    That's correct.

Q    Who built that?

A    I think Johnny and probably some hands.

Q    Okay.  So some of Johnny's workers?

A    Some of Johnny's workers.

Q    As far as you know, he paid for it, he built it, he paid for the labor, all of that?

A    I don't know -- if daddy felt like he owed money, he paid.

Q    You didn't pay for any of it; did you?

A    I didn't pay for any of it.

Q    Okay.  And I believe there's a shop with another metal building on the property?

A    That's correct.

Q    And who built that?

A    I think Johnny and some hands did.

Q   Same scenario.  You didn't pay for any of that; did you?

A   No.

Q   Okay.  And that was -- both of those were built before Johnny ever owned the property, correct?

A   Yes.  They were built before daddy passed away back in maybe the 80s.  I don't know for sure.

Q   Okay.  And as far as your mom was concerned, Johnny never forced her off the 475 acres; did he?

MR. RICHIE:  Your Honor, calls for state of mind of Mrs. Wade, and I will object as speculative.

THE COURT:  Overruled.  I didn't understand the question that way.  I think the question was whether or not she was ever forced off the property.

MR. STUBBS:  That was the question.

MR. RICHIE:  If I may, just for the record, what I understood him to ask was as far as your mother was concerned she was never forced off the property.  That was my objection.

THE COURT:  Okay.

MR. STUBBS:  I'll be happy to re-word the question.

THE COURT:  Rephrase your question.

Q   (By Mr. Stubbs)  As far as you know, was Edell Wade ever forced off of that 475 acres?

A   No.

Q   Not by Johnny, not by Amanda, correct?

A   No.

Q   And I apologize, but just so the record is clear, you're agreeing with me; is that right?

A   That she wasn't forced off the property, right.

Q   Okay.  When she fell and went to the hospital shortly before she passed away, did you ever go to the hospital?

A   I did not go to the hospital.  I found out that she had fallen or whatever happened to her, it was on a Saturday that I understood that she fell.  And so we weren't notified until Monday afternoon.

Q   And she was still there several days after that and you never went, right?

A   The -- what I was told is she just had fell.

Q   But --

A   It didn't sound as bad as it was.

Q   But she was 90-something years old, had fallen and was in the hospital and you knew about it and you never went to see her; did you?

A   I had just previously seen her.  The last time I seen her she was at the house and, no, I didn't.  But at that time it didn't seem urgent.  I didn't know she

might be out in three or four days.

Q   As far as the estate asset, meaning -- I think you've heard some questions about some personal property that Edell had, you're not making any claims that you haven't received anything out of the estate that you were supposed to receive; is that correct?

A   Could you restate that?

Q   Yes.  It was kind of a long question.  When I'm talking about personal property I'm talking about any of your mother's belongings or any of any items that you were supposed to receive under the will, you're not claiming that you have not received anything that you were supposed to receive; are you?

A   No.  I received what I wanted.  I know I left a few things, but it didn't bother me.

Q   And you knew that Johnny and your mother were close, right?

A   I suppose so.

Q   And they have always been close; haven't they?

A   I don't know if they're any closer than we were as far as her thinking about us, I think she cared about us all.

Q   Johnny -- you were aware that she went to California to see Johnny and Amanda I think three times?

A   I did not think -- I thought it was one time.

I didn't hear about the others.

Q   You didn't know because you weren't talking much to her, right?

A   Generally when mother called the house, which was very regular and the wife would call, they communicated regularly.  And if I answered the phone mother would say, Well, did y'all get any rain.  She was always interested in things like that.  And then, Is Gwen there?

Q   Did you ever make any improvements to the 475 acres?

A   Could you repeat that again?

Q   Yes, sir.  Did you ever make any improvements to the 475 acres that we're talking about?

A   Well, from what time?  As a kid I helped daddy fix fences.  I worked on the place.

Q   Well, that's a fair distinction.  After you -- it's my understanding once you graduated high school you left; is that right?

A   I left.

Q   So after you graduated high school and had left, did you ever come back and make any improvements to that 475 acres such as the two metal buildings that Johnny did?

A   Well, the only thing I did was re-wire the

house.

Q    When was that?

A    Oh, I guess in the 80s, early 80s.  I'm just guessing.

Q    So your dad was still alive at that time?

A    Yes.

Q    Did you charge him for that too?

MR. RICHIE:  Your Honor, I'm going to have to object to the "too" comment.  It assumes facts not in evidence.

Q    (By Mr. Stubbs)  Did you charge him for that?

A    If he paid me it was because they insisted on it.  I did it because I wanted to help him.

Q    And when you graduated high school, I'm assuming you were about 18, somewhere close to that time?

A    I had just turned 18.

Q    And you're approximately 15 years older than Johnny, right?

A    Yes.

Q    So Johnny -- when Johnny was living in the house and you were living in the house on the 475 acres, you would have been basically 15 -- I'm sorry.  16, 17, 18 years old, right?

A    When Johnny -- when I left home, or?

Q   Well, you left home when you were 18.  Let's just say that.

A   Right.

Q   And Johnny's 15 years younger.

A   Right.

Q   So he was zero, one or two basically.

A   He was three years old.

Q   Okay.  And when he -- between the time he was born and the time he was three years old, is it safe to assume for this period that that's the primary person your mom would be taking care of, right?

A   Yes.

Q   And you resented the fact that he was the baby and she was taking care of him; didn't you?

A   I didn't say that.

Q   Okay.  Well, you testified earlier that when Johnny came back to the house and your mom felt like it was uncomfortable, something to that effect; do you remember that testimony when Mr. Richie was asking you about it?

MR. RICHIE:  If you can't hear, Bud, just say, I can't hear.

THE WITNESS:  Well, I'm hearing but I'm not really understanding.

Q   (By Mr. Stubbs)  When Mr. Richie was asking

you questions here just a few minutes ago you were talking about an event with Johnny when you went and you were at your mother's house and Johnny showed up and you said she seemed like she was uncomfortable, something to that effect, right?

A    Yes.

Q    Well, I mean, it would have been clear to her that you didn't like Johnny for years, wouldn't it?

A    No.

Q    If you're in a room with two people that don't like each other, it's just uncomfortable; isn't it?

A    Well, I would think so.  I try not to harbor hate for anyone.  I try to tolerate.

Q    So your testimony to this jury is you don't have any ill will toward Johnny; is that what you're telling them?

A    I told him just recently I didn't dislike him. I dislike what he did.

Q    You don't dislike him.  You have no ill will toward him.  Yet you filed this lawsuit and it continues and we are all here today because of it, right?

A    I told him earlier that I want to make a wrong a right.

Q    The same wrong that you waited seven years when you could have made it right while your mom was

alive and she could have come and told this jury, This is what I wanted to do.

Q    I would not have --

MR. RICHIE:  Excuse me, Bud.  I just want to object.  It assumes facts not in evidence about what Mrs. Wade would have done and speculative.

THE COURT:  I will sustain the objection.

Q    (By Mr. Stubbs)  You didn't say anything until after she died, right?

A    I didn't know a lot of things until after she died.

Q    And since you didn't say anything until after she died, this jury doesn't get to hear from her; do they?

A    Well, that's correct.  But I would not have drug her into this mess.

MR. STUBBS:  Pass the witness.

(End of cross examination of Bud Wade.)

KIM GEORGE

Having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MS. ALLEN:

Q    Ms. George, can you please tell us who you are.

A    My name is Kimberly Lynn Higgins George.  I'm

65

STATE OF TEXAS        )

COUNTY OF BURNET      )

 I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

 I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, requested to be included.

 I further certify that the total cost for the preparation of this Reporter's Record is $3,937.50 and has been paid for by Graves Dougherty Hearon & Moody.

 GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 12th day of May, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

 Official Court Reporter, Burnet County Court at Law

  220 S. Pierce Street, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226; Email: Vkaykan@live.com

REPORTER'S RECORD

VOLUME 3 OF 4 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

| | | |
|---|---|---|
| IN THE MATTER OF | ) | IN THE COUNTY COURT |
| THE ESTATE OF | ) | AT LAW |
| EDELL WADE | ) | BURNET COUNTY, TEXAS |

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 10:35:27 AM
JEFFREY D. KYLE
Clerk

EXHIBITS

On the 11th day of April, 2014, the foregoing proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding at Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

```
                        EXHIBIT INDEX

Plaintiff's Trial Exhibits:

NUMBER     DESCRIPTION          OFFERED  RECEIVED   VOL

7          Payments made        (trial not transcribed)

9          Power of Attorney    (trial not transcribed)

11         Modification Agreement (trial not transcribed)

38         File from Michael Martin(trial not transcribed)
```

 **COPY**

**Date:** February 6, 2004

**Borrower:** JOHNNY WADE and AMANDA WADE, husband and wife.

**Borrower's Mailing Address:**

JOHNNY WADE and AMANDA WADE
REDACTEDREDACTEDREDACTED
REDACTED
Riverside County

**Lender:** EDELL WADE

**Place for Payment:**

1 REDACTED
Lampasas, Burnet County, TX 76550, or any other place that Lender may designate in writing.

**Principal Amount:** $500,000.00

**Annual Interest Rate:** Two Percent (2%)

**Maturity Date:** February 1, 2036

**Annual Interest Rate on Matured, Unpaid Amounts:** Twelve Percent (12%)

**Terms of Payment (principal and interest):**

Accrued interest is payable on the 1st day of March, 2004 and on the 1st day of each succeeding month through February 1, 2006. Principal and interest are due and payable in monthly installments of ONE THOUSAND EIGHT HUNDRED FORTY-EIGHT AND 10/100 DOLLARS ($1,848.10), each, beginning February 1, 2006, and continuing regularly on the 1st day of each succeeding month until paid. Payments will be applied first to accrued interest and the remainder to reduction of the Principal Amount.

**Security for Payment:**

This note is secured by a vendor's lien and superior title retained in a deed from EDELL WADE to Borrower dated of even date herewith and by a deed of trust of even date herewith from JOHNNY WADE and AMANDA WADE to Pat E. Cavness, Trustee, both of which cover the following real property:

That certain real property more particularly described on the attached Exhibit "A".

181323-2 02/04/2004

1

REDACTED

**Other Security for Payment:** None

Borrower promises to pay to the order of Lender the Principal Amount plus interest at the Annual Interest Rate. This note is payable at the Place for Payment and according to the Terms of Payment. All unpaid amounts are due by the Maturity Date. After maturity, Borrower promises to pay any unpaid principal balance plus interest at the Annual Interest Rate on Matured, Unpaid Amounts.

If Borrower defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to this note, and the default continues after Lender gives Borrower written notice of the default and ten (10) days opportunity to cure such default, Lender may declare the unpaid principal balance, earned interest, and any other amounts owed on the note immediately due. Borrower and each surety, endorser, and guarantor waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

Borrower also promises to pay reasonable attorney's fees and court and other costs if this note is placed in the hands of an attorney to collect or enforce the note. These expenses will bear interest from the date of advance at the Annual Interest Rate on Matured, Unpaid Amounts. Borrower will pay Lender these expenses and interest on demand at the Place for Payment. These expenses and interest will become part of the debt evidenced by the note and will be secured by any security for payment.

**Prepayment:**

Borrower may prepay this note in any amount at any time before the Maturity Date without penalty or premium.

**Application of Prepayment:**

Prepayments will be applied to installments on the last maturing principal, and interest on that prepaid principal will immediately cease to accrue.

Interest on the debt evidenced by this note will not exceed the maximum rate or amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the Principal Amount or, if the Principal Amount has been paid, refunded. On any acceleration or required or permitted prepayment, any excess interest will be canceled automatically as of the acceleration or prepayment or, if the excess interest has already been paid, credited on the Principal Amount or, if the Principal Amount has been paid, refunded. This provision overrides any conflicting provisions in this note and all other instruments concerning the debt.

Each Borrower is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

If any provision of this note conflicts with any provision of a loan agreement, deed of trust, or security agreement of the same transaction between Lender and Borrower, the provisions of the deed of trust will govern to the extent of the conflict.

This note will be construed under the laws of the state of Texas, without regard to choice-of-law rules of any jurisdiction.

_____
JOHNNY WADE

_____
AMANDA WADE



THE STATE OF TEXAS |

COUNTY OF LAMPASAS |

KNOW ALL MEN BY THESE PRESENTS:

That we, Manuel Delbert Sylvester and Chester Horace Sylvester, individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Millie Sylvester wife of Manuel Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin M. Butler Corein Sylvester Stewart and husband Ivan M. Stewart, O. Zell Sylvester ~~Mill~~ ... in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract: West One Quarter of Sec. 60, being one hundred sixty five and 28/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Berry Survey, a set stone from which a L O brs N 9½ E 216½ vrs. a do N 8-3/4 E 219½ vrs. Thence with the N line of the said A. M. Berry Sur. N 71 E 945 vrs st md on the said N line from which the N E cor of the said A. M. Berry Sur. brs N 71 E 5 vrs. The N. E. cor of the said Berry sur. is marked by a st md from which a Large L. O. marked H brs N 42½ W 250 vrs. Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No 60 on the S line of the Thos. Blair Sur. Thence with the S line of the said Blair Sur. S 71 W 1390 vrs the N E cor of the R. F. Kiszier Sur., St. Md., Th S 19 E at 957 vrs a forked Elm the SE cor of the said Kiszier Sur., at 1120 vrs. an inner cor of the T. C. R. R. Co. No. 59, for the S. W. Cor of this Sur. Thence N 71 E 445 vrs. a st md the Southermost SE cor. of this Survey on the W line of the said Berry Sur. Th. N 19 W 660 vrs. to the place of beginning, as Surveyed out by Dan W. Taylor, Jr.

Second Tract: 160 acres of the A. M. Berry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas this patent is No. 593, Vol. 29, 160 acres, being Survey No. 1489, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

Occupants of Public lands, approved May 26th, 1873. Beginning at at md 582 vrs. N 19 W from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; th N 19 W 950 vrs a st md whence a L O brs N 42¼ W 250 vrs a Mesquite brs S¾ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9¼ E. 216¼ vrs do brs N 8-3/4 E 219¼ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked H.

Third Tract: Out of the Thos. W. Blair Survey, described as given in deed from J. W. Blair and wife A. E. Blair to Alice M. Berry, dated May 29, 1903, recorded in Deed Records Burnet County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, Texas, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone pile, it being one of the original corners of said original survey from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Burtler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. The S 19 E with the original line 400 vrs to the beginning cor., containing two hundred acres, more or less, SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock fall in said Mesquite Cr. Thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to R. B. F. Berry by deed dated Sept. 14, 1909, recorded in Vol. 48, pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. W. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pn pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Joe Alexander as the East boundary and the R. B. F. Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less,

being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded in Vol. 87 pages 376-81 of the Deed Records of Burnet County, Texas, to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Butler, Corein Sylvester Stewart, Chester Horace Sylvester, and O. Zell Sylvester Phillips and the grantee Edell Sylvester Wade are collectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester, both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular, the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Dolbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

Lenora Sylvester Butler    Manuel Dolbert Sylvester
    Individually and as independent executor of will of A. H. & Emma Sylvester, both deceased

Ivan M. Stewart    Chester Horace Sylvester
    Individually and as independent executor of will of A. H. & Emma Sylvester, both deceased

Corein Sylvester Stewart    Millie Sylvester

O. Zell Sylvester Phillips    Melba Sylvester

Gilbert Phillips    Austin M. Butler

THE STATE OF TEXAS |

COUNTY OF Lampasas |

Before me, the undersigned authority, a Notary Public in and for Lampasas County, Texas, on this day personally appeared Manuel Dolbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Dolbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT
                Notary Public, Travis County, Texas
                Lampasas

THE STATE OF TEXAS |

COUNTY OF ~~Hampson~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Hamilton~~ County, Texas, on this day personally appeared Chester Horace Sylvester, and Melba Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Melba Sylvester, wife of the said Chester Horace Sylvester, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Melba Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.      J. V. HAMMETT

Notary Public, ~~Hamilton~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Lampasas~~ County, Texas, on this day personally appeared Austin M. Butler and Lenora Sylvester Butler, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Lenora Sylvester Butler, wife of the said Austin M. Butler, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Lenora Sylvester Butler acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.      J. V. HAMMETT

Notary Public, ~~Lampasas~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public in and for ~~Lampasas~~ County, Texas, on this day personally appeared Ivan M. Stewart, and Corein Sylvester Stewart, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Corein Sylvester Stewart, wife of the said Ivan M. Stewart, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Corein Sylvester Stewart acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This __26th__ day of January, A. D. 1952.      J. V. HAMMETT

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Lampasas~~ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. HAMMETT

Notary Public, ~~Lampasas~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Lampasas~~ County, Texas, on this day personally appeared Manuel Delbert Sylvester, Independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Lampasas~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Lampasas~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Lampasas~~ County, Texas, on this day personally appeared Chester Horace Sylvester, individually and as independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

J. V. HAMMETT

Notary Public, ~~Lampasas~~ County, Texas



FILED FOR RECORD

LAW OFFICES
HAMMETT & LYNCH
LAMPASAS, TEXAS

C E R T I F I C A T E

STATE OF TEXAS    )

COUNTY OF BURNET    )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $834 and has been paid for by Mr. Don Richie, Attorney at Law.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of March, 2015.

/s/Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226; Email Vkaykan@live.com

3

# Clerk's Record

VOLUME 1 OF 2

Trial Court Cause Number P9127
In the County Court
Of Burnet County, Texas
W. R. SAVAGE, Judge Presiding

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

IN THE MATTER OF THE ESTATE OF
EDELL WADE

Appealed to the
Court of Appeals for the Third District of Texas,
at Austin, Texas

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Attorney for Appellant: SHELDON E. RICHIE
Address: 100 CONGRESS AVE, SUITE 1750 – AUSTIN, TEXAS 78701
Telephone No.: 512-236-9220
Fax No.: 512-236-9230
E-mail address: srichie@rg-austin.com
State Bar No.: 16877000
Attorney for: JAMES E. WADE, Appellant(s)

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

CAUSE NO. P9127

ESTATE OF EDELL WADE, DECEASED      §         IN THE COUNTY COURT AT LAW

                                       §         OF

                                       §         BURNET COUNTY, TEXAS

## INDEX

| Name | Volume 1 | Page |
|------|----------|------|
| Defendants' Johnny and Amanda Wade's Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims) *Filed March 20, 2014* | | 5 |
| Defendants Johnny Wade's and Amanda Wade's Traditional and No Evidence Motion for Partial Summary Judgment on Plaintiff James Wade's Claims for Attorney's Fees Against Defendants in their Individual Capacities *Filed March 20, 2014* | | 166 |
| Plaintiff's Motion For Continuance And, In The Alternative, Response To Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale *Filed April 7, 2014* | | 279 |
| Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims) *Filed April 14, 2014* | | 611 |
| Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning The 2004 Sale or Alternatively, To Sever Plaintiff's Claims Concerning The 2004 Sale Or For Permission To Appeal Interlocutory Order *Filed April 23, 2014* | | 612 |
| Supplement to Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, To Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission To Appeal Interlocutory Order *Filed April 24, 2014* | | 675 |
| Order *Filed April 29, 2014* | | 762 |
| Plaintiff's Third Amended Original Petition *Filed May 2, 2014* | | 765 |
| Motion for Exclusion of Evidence (For Plaintiff's Failure to Respond to Discovery Requests) *Filed May 7, 2014* | | 820 |

Defendants' Hearing Presentation in Support of Motion for Exclusion of Evidence    848
    *Filed May 20, 2014*

Defendants' Motion for Partial Summary Judgment (as to all claims for relief based    950
on: default" on loan)
    *Filed May 22, 2014*

Defendants' Motion for Partial Summary Judgment (as to All Tort Claims, based    963
on Economic Loss Rule)
    *Filed May 22, 2014*

Defendants' Response to Plaintiffs' Traditional and No-Evidence Motion for Summary    975
Judgment on their Claims for Breach of Fiduciary Duty and Conspiracy with Exhibits A-G
    *Filed June 5, 2014*

Amanda Wade's Response (in her capacity as Independent Executor) to Nancy Burns'    1063
No-Evidence Summary Judgment Motion on Affirmative Defenses
    *Filed June 5, 2014*

Volume 2

Response in Opposition to Plaintiff's No-Evidence Motion for Partial Summary    1122
Judgment and Nancy Burns' Joinder (as to Affirmative Defenses and Couterclaims)
with Exhibits 1-25
    *Filed June 5, 2014*

Sixth Amended Answer To Plaintiff James E. Wade's Third Amended Original Petition    1263
and Second Amended Counterclaim of Johnny and Amanda Wade
    *Filed July 15, 2014*

Sixth Amended Answer to Plaintiff James E. Wade's Third Amended original    1275
Petition and Third Amended Couterclaim of Johnny and Amanda Wade
    *Filed July 15, 2014*

Fifth Amended Answer to Plaintiff Nancy Burns' Amended Petition for Damages    1296
for Breach of Fiduciary Duty and Second Amended Counterclaim
    *Filed July 15, 2014*

Order    1314
    *Filed July 29, 2014*

Response to James Wade's Motion for Continuance, and Motion for Leave to    1315
Supplement Summary Judgment Proof
    *Filed July 24, 2014*

Verification Pages for Sixth Amended Answer and Third Amended Counterclaim    1420
    *Filed August 4, 2014*

Consolidated Response of Johnny and Amanda Wade to Plaintiff's Motion for    1422
Traditional Summary Judgment on Defendants' Counterclaims and Plaintiff's Motion
to Dismiss Under Rule 91a
    *Filed September 9, 2014*

Response of Johnny and Amanda Wade to Plaintiff's Motion for Show Cause Order     1534
for Contempt and to Levy Sanction Award
    *Filed September 26, 2014*

Charge Of The Court     1539
    *Filed October 6, 2014*

Verdict     1541
    *Filed October 6, 2014*

Plaintiff James E. Wade's Motion For Judgment Non Obstante Verdicto     1559
    *Filed October 15, 2014*

Request For Denial Of Plaintiff's Motion For Judgment Non Obstante Verdicto and     1589
Defendants' Motion For Entry Of Judgment
    *Filed October 22, 2014*

Final Judgment     1599
    *Filed November 17, 2014*

Order Denying Plaintiffs' Motion For Judgment Notwithstanding The Verdict     1602
    *Filed November 17, 2014*

Plaintiff's Motion For New Trial     1603
    *Filed December 12, 2014*

Order Denying Motion For New Trial     1633
    *Filed January 26, 2015*

James E. Wade's Notice Of Appeal     1634
    *Filed February 12, 2015*

Plaintiff's Letter To Vicki Kanewske Requesting The Reporter's Record     1637
    *Filed February 20, 2015*

Plaintiff's Request for Preparation of Clerk's Record     1640
    *Filed February 20, 2015*

Defendant's Request for Preparation of Clerk's Record     1644
    *Filed March 11, 2015*

Defendant's Letter to Vicki Kanewske Requesting Reporter's Record     1647
    *Filed April 3, 2015*

Bill of Cost     1649

Clerk's Certification that Appellate Record is True and Correct     1650

002424

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY OR YOUR DRIVER'S LICENSE NUMBER.**

## Deed of Trust

### Terms

Date:  February 6, 2004

Grantor:  JOHNNY WADE and AMANDA WADE, husband and wife.

Grantor's Mailing Address:

JOHNNY WADE and AMANDA WADE

REDACTED

Trustee:  Pat E. Cavness

Trustee's Mailing Address:

P.O. Box 409
Lampasas, TX  76550
Lampasas County

Lender:  EDELL WADE

Lender's Mailing Address:

REDACTED
REDACTED
Burnet County

Obligation:

Note

Date:  February 6, 2004

Original principal amount:  $500,000.00

Borrower:  JOHNNY WADE and AMANDA WADE

Lender:  EDELL WADE

181369-2 02/04/2004

OFFICIAL PUBLIC RECORD
BURNET COUNTY, TEXAS
1223  0503

Jew000177

REDACTED  86

Maturity date: February 1, 2036

Terms of Payment: As provided in the note

Other Debt: None

**Property (including any improvements):**

That certain real property more particularly described in the attached Exhibit "A".

**Prior Lien:** None

**Other Exceptions to Conveyance and Warranty:** Validly existing easements, rights-of-way, and prescriptive rights, whether of record; all presently recorded and validly existing instruments, other than conveyances of the surface fee estate, that affect the Property; and taxes for 2004, and subsequent assessments for that and prior years due to change in land usage, ownership, or both

For value received and to secure payment of the Obligation, Grantors convey the Property to Trustee in trust Grantors warrant and agree to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantors' expense.

**Clauses and Covenants**

**A. Grantors' Obligations**

Grantors agree to-

1. keep the Property in good repair and condition;

2. pay all taxes and assessments on the Property before delinquency;

3. preserve the lien's priority as it is established in this deed of trust;

4. maintain, in a form acceptable to Lender, an insurance policy that-

   a. covers all improvements for their full insurable value as determined when the policy is issued and renewed, unless Lender approves a smaller amount in writing;

   b. contains an 80 percent coinsurance clause;

   c. provides fire and extended coverage;

   d. protects Lender with a standard mortgage clause;

   e. provides flood insurance at any time the Property is in a flood hazard area; and

   f. contains such other coverage as Lender may reasonably require;

OFFICIAL PUBLIC RECORD
EMMET COUNTY, TEXAS
1223 0504

TB1309-2 02/04/2004                                                                 2

Jew000178

5.  comply at all times with the requirements of the 80 percent coinsurance clause;

6   deliver the insurance policy to Lender within ten days of the date of this deed of trust and deliver renewals to Lender at least ten days before expiration;

7   to the best of their knowledge, obey all laws, ordinances, and restrictive covenants applicable to the Property; and

8.  keep any buildings occupied as required by the insurance policy.

**B.   Lender's Rights**

1.  Lender may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2   If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3.  Lender may apply any proceeds received under the insurance policy either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy.  If the Property is Grantors' primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the insurance proceeds available to Grantors for repairs.

4.  Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantors with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines

5.  If Grantors fail to perform any of Grantors' obligations, Lender may perform those obligations and be reimbursed by Grantors on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts.  The amount to be reimbursed will be secured by this deed of trust.

6   If there is a default on the Obligation or if Grantors fail to perform any of Grantors' obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may-

a.  declare the unpaid principal balance and earned interest on the Obligation immediately due;

b   direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

c.  purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation

181369-2 02/04/2004                                                                    3

Jew000179

7.      Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default

8.      Notwithstanding anything to the contrary contained herein or in the Note, prior to exercising any rights or remedies hereunder or under the Note (including acceleration of the Note) Lender will give Grantor ten days prior written notice and opportunity to cure any default in making a payment under the Note, and thirty days prior written notice and opportunity to cure any other default hereunder or under the Note. However, with regard to any default other than a failure to make a payment under the Note, such thirty day time period will be extended so long as Grantor commenced to cure such default during the initial thirty day period and thereafter diligently prosecutes such cure to completion.

C.     Trustee's Rights and Duties

If directed by Lender to foreclose this lien, Trustee will —

1.      either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.      sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantors, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3      from the proceeds of the sale, pay, in this order —

a.      expenses of foreclosure, including a reasonable commission to Trustee;

b.      to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c      any amounts required by law to be paid before payment to Grantors; and

d.      to Grantors, any balance; and

4      be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

D.     General Provisions

1      If any of the Property is sold under this deed of trust, Grantors must immediately surrender possession to the purchaser. If Grantors fail to do so, Grantors will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.      Recitals in any trustee's deed conveying the Property will be presumed to be true

181369-2 02/04/2004                            4

OFFICIAL PUBLIC RECORD
BEXAR COUNTY TEXAS

Jew000180

3. Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released

5. If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion

6. Grantors assign to Lender all amounts payable to or received by Grantors from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantors or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts.

7. Grantors assign to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantors warrant the validity and enforceability of the assignment. Grantors may as Lender's licensee collect rent and other income and receipts as long as Grantors are not in default with respect to the Obligation or this deed of trust. Grantors will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and deed of trust, Grantors may retain the excess. If Grantors default in payment of the Obligation or performance of this deed of trust, Lender may terminate Grantors' license to collect rent and other income and then as Grantors' agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantors' obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantors become a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8 Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9 In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10 When the context requires, singular nouns and pronouns include the plural

Jew000181

11.  The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust

12.  Grantors agree to furnish on Lender's request evidence satisfactory to Lender that all taxes and assessments on the Property have been paid when due

13.  If Grantors transfer any part of the Property without Lender's prior written consent, Lender may declare the debt secured by this deed of trust immediately payable and invoke any remedies provided in this deed of trust for default.   If the Property is residential real property containing fewer than five dwelling units or a residential manufactured home occupied by Grantors, exceptions to this provision are limited to (a) a subordinate lien or encumbrance that does not transfer rights of occupancy of the Property; (b) creation of a purchase-money security interest for household appliances; (c) transfer by devise, descent, or operation of law on the death of a co-Grantor; (d) grant of a leasehold interest of three years or less without an option to purchase; (e) transfer to a spouse or children of Grantors or between co-Grantors; (f) transfer to a relative of Grantors on Grantors' death; and (g) transfer to an inter vivos trust in which Grantors are and remain beneficiaries and occupants of the Property

14.  This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

15.  If Grantors and Borrowers are not the same person, the term Grantors includes Borrowers.

16.  Subject to any right to cure, Grantors and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

17.  Grantors agree to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement

18.  If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

19.  Grantors represent that this deed of trust and the Note are given for the following purposes:

The debt evidenced by the Note is in payment of the purchase price of the Property; the debt is secured both by this deed of trust and by a vendor's lien on the Property, which is expressly retained in a deed to Grantors of even date.  This deed of trust does not waive the vendor's lien, and the two liens and the rights created by this deed of trust are cumulative.  Lender may elect to foreclose under either of the liens without waiving the other or may foreclose under both

Jew000182

EXECUTED this 6 day of February, 2004.

_____
JOHNNY WADE

_____
AMANDA WADE

STATE OF California §

COUNTY OF RIVERSIDE §

This instrument was acknowledged before me on FEBRUARY 06 , 2004, by
JOHNNY WADE.

OFFICIAL SEAL
CHRISTINE D. WIXON
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1354921
RIVERSIDE COUNTY
MY COMM. EXP. APRIL 30, 2006

_____
Notary Public, State of CALIFORNIA

[Seal]

STATE OF CALIFORNIA §

COUNTY OF RIVERSIDE §

This instrument was acknowledged before me on FEBRUARY 06 , 2004, by
AMANDA WADE.

OFFICIAL SEAL
CHRISTINE D. WIXON
NOTARY PUBLIC-CALIFORNIA
COMM. NO. 1354921
RIVERSIDE COUNTY
MY COMM. EXP. APRIL 30, 2006

_____
Notary Public, State of CALIFORNIA

[Seal]

OFFICIAL PUBLIC RECORD
BURNET COUNTY, TEXAS
1203 0509

181369-2 02/04/2004

7

Jew000183

92



EXHIBIT A

THE STATE OF TEXAS }
COUNTY OF LAMPASAS }    KNOW ALL MEN BY THESE PRESENTS:

That we, Manuel Delbert Sylvester and Chester Horace Sylvester individually and as independent executors of the wills and estates of A. H. Sylvester and wife Emma Sylvester, both deceased, Hillis Sylvester wife of Manuel Delbert Sylvester, Melba Sylvester, wife of Chester Horace Sylvester, Lenora Sylvester Butler, and husband Austin H. Butler, Corvin Sylvester Stewart and husband Ivan H. Stewart, O. Zell Sylvester ................ in Travis County, Texas, except Chester Horace Sylvester and wife Melba Sylvester who reside in Hamilton County, for and in consideration of the sum of Twenty Thousand ($20,000.00) Dollars to us in hand paid and secured to be paid by Charles Otto Wade and wife Edell Sylvester Wade as follows:

Twelve Thousand ($12,000.00) Dollars cash in hand paid, the receipt of which is hereby acknowledged and for which no lien expressed or implied is retained or shall exist and one promissory Vendor's Lien note, of even date herewith given by the said Charles Otto Wade and wife Edell Sylvester Wade, payable at the express request and direction of all the parties hereto to Manuel Delbert Sylvester or order, due on or before February 1, 1952, with interest thereon from maturity until paid at the rate of six (6%) per cent per annum, said note being payable at Lampasas, Texas, and providing for the usual Vendor's Lien and ten per cent attorney's fee clauses, and the Vendor's Lien and superior title retained in this deed to secure the payment of said note are hereby transferred and signed to the said Manuel Delbert Sylvester, his heirs and assigns, and the undersigned grantors hereby acknowledge that the full and entire consideration for this conveyance has been paid to them and that they do not have, hold or claim any lien on the land and premises conveyed hereby except such Vendor's Lien and superior title in favor of said Manuel Delbert Sylvester, his heirs and assigns as aforesaid; have Granted, Sold and Conveyed, and by these presents do Grant, Sell and Convey unto the said Charles Otto Wade and wife Edell Sylvester Wade of Burnet County, Texas, all that certain real estate situated in Burnet County, Texas, and described as follows:

First Tract:  West One Quarter of Sec. 60, being one hundred sixty five and 20/100 acres in Burnet County, Texas, out of the Texas Central Railroad Company Survey, beginning at the N. W. cor. of the A. M. Derry Survey, a set stone from which a L O bra N 9½ E 216½ vrs. a do N 8-3/4 E 219½ vrs.  Thence with the N line of the said A. M. Derry Sur. N 71 E 945 vrs at md on the said N line from which the N E cor of the said A. M. Derry Sur. brs N 71 E 5 vrs.  The N. E. cor of the said Derry sur. is marked by a st md from which a Large L. O. marked X brs N 42 W 250 vrs.  Thence N. 19 W. with the W line of the E 3/4 of Sec. No. 60, at 410 vrs. the top of Bluff at 460 vrs. cor. on the West Edge of Branch at N W cor. of the said E 3/4 of Sec. No 60 on the S line of the Thos. Blair Sur.  Thence with the s line of the said Blair Sur. S 71 W 1390 vrs the NE cor. of the M. F. Kiesler Sur., St. Md. N S 19 E 951 vrs ........ forked Elm the SE cor. of the said Kiesler Sur., at 1120 an inner cor. of the T. C. R. R. Co. No. 59, for the S. W cor of this Sur.  Thence N 71 E 445 vrs. u st md the Southernmost SE cor. of this Survey on the W line of the said Derry Sur Th. N 19 W 660 vrs. to the place of beginning, as Surveyed by Dan W. Tayler, Jr.
Second Tract:  160 acres of the A. M. Derry Survey, Burnet County, Texas, as taken from the Patent which is recorded in Vol. A, page 259, Patent Records of Burnet County, Texas This patent is No. 591, Vol. 29, 160 acres, being Survey No. 599, on the waters of Mesquite Cr at tributary of the Lampasas River, about 15½ miles N 16 E from Burnet by virtue of an affidavit made before the Clerk of the County Court of Burnet County, December 29th, 1897, under an Act for the benefit of Actual

Jew000184

93

Occupants of Public lands, approved May 26th, 1873. Beginning at st md 562 vrs. N 19 W from a point 360 vrs N 71 E from the N W cor. of the Hugh McCoy sur; Th.N 19 W 950 vrs a st md whence a L O brs N 42½ W 250 vrs a Mesquite brs S½ E 162 vrs. Thence S 71 W 200 vrs a branch 950 vrs a st md whence a L. O. brs N 9½ E, 216½ vrs do brs N 8-3/4 E 219½ vrs. Th S 19 E 815 vrs a branch 950 vrs a st md. Th N 71 E 475 vrs a branch 950 vrs to the place of beginning, bearings marked B.

Third Tract: Out of the Thos. W. Blair Survey, described as ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ County, Texas, Vol. 40, pages 146-148. All that certain tract or parcel of land lying on Mesquite Creek in Burnet County, and being a part of an original survey in the name of Thomas Blair. Beginning at a stone md., it being one of the original corners of said original survey from which a Live Oak brs N 50 W 75 vrs. Thence S 71 W 1900 vrs to a stone pile from which a Live Oak brs N 50 W 75 vrs. Thence N 19 W with George Bertler's line 600 vrs to a rock md on T. W. Hart's South line from which an Elm brs S 7 W 51 vrs. Th N 71 E at 100 vrs the Creek, and at 1600 vrs. T. W. Hart's S. E. Cor., from which a Mesquite brs N 35 W 20 vrs. and Elm brs N 74 E 50 vrs. Th S 19 E to Mesquite Cr and with the meanders of the Creek down to where the Charles Wilson South line crosses the creek and thence South 19 E with said Wilson line 400 vrs. to the cor of the same. Th S 19 W with the original line 400 vrs to the beginning cor., containing two hundred acres, more or less. SAVE AND EXCEPT 40 acres, more or less, out of this Survey, the said 40 acres being as follows: Beg at the N W cor. of this Sur. Th about 100 yards to and across Mesquite Cr. Th along the N line of Mesquite Cr. to a Walnut tree about 40 feet below a rock fall in said Mesquite Cr. Thence across Mesquite Cr and S 19 E about 100 vrs to the original S boundary line of this survey, which last named 40 acres mor or less is hereby reserved from the provisions of this deed.

ALSO, SAVE AND EXCEPT, 10 acres, more or less, out of the above named Thos. Blair Sur as conveyed by Alice M. Berry and G. L. Graves and wife, M. H. Graves to H. D. F. Berry by deed dated Spt. 14, 1909, recorded in Vol. 48, pg. 95, Deed Records Burnet County, Texas, described as follows: All that certain piece, parcel or tract of land out of the Thomas Blair Sur on Mesquite Cr in Burnet County, Texas, described as follows: a part of the 160 acres, of the said Thomas Blair Sur conveyed to Alice M. Berry by J. M. Blair and wife by their deed dated May 29th, 1903, recorded in Vol. 40, pp pages 146-8, of the Deed Records of Burnet County, Texas, to which reference is here made and the said part herein conveyed is all of the same which lies on the East side of the Lampasas and Austin road, with Mesquite Cr as the N boundary line, the Chas Wilson Now owned by Jos Alexander as the East boundary and the R. B. ████████ Berry land on the South, said Lampasas and Austin road the West boundary, containing 10 acres, more or less.

being the identical land conveyed by William Ellis Berry et al to A. H. Sylvester by deed dated November 8, 1938 Recorded In Vol 87 pages 376-81 of the Deed Records of Burnet County, Texas to which instruments and the record thereof reference is here made for all purposes.

The grantors Manuel Delbert Sylvester, Lenora Sylvester Barker, Corsin Sylvester Stewart, Chester Horace Sylvester, and C. █████ Sylvester Phillips and the grantee Edell Sylvester Wade are respectively, all of the children of A. H. Sylvester and wife Emma Sylvester, both deceased, and all are the devisees and legatees in the respective wills of A. H. Sylvester and Emma Sylvester, both deceased, and this conveyance is made for the purpose of effectuating a partition and division of the estates of the said A. H. Sylvester

Jew000185

94

and Emma Sylvester, deceased, the undersigned grantors hereby conveying unto the grantees herein and undivided five-sixths (5/6) interest in the above described land, the grantee Edell Sylvester Wade owning the other undivided one-sixth (1/6) interest therein as one of the devisees of the A. H. and Emma Sylvester, deceased.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns forever, and we do hereby bind ourselves, our heirs, executors and administrators, to Warrant and Forever Defend all and singular the said premises unto the said Charles Otto Wade and wife Edell Sylvester Wade, their heirs and assigns against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

But it is expressly agreed and stipulated that the Vendor's Lien and superior title are retained against the above described property premises and improvements, in favor of Manuel Delbert Sylvester until the above described note and all interest thereon are fully paid according to its face and tenor, effect and reading, when this deed shall become absolute.

Witness our hands at Lampasas, Texas, this 1st day of January, A. D. 1952.

_Lenora Sylvester Butler_    _Manuel Delbert Sylvester_
Individually and as independent executor of will of A. H. & Emma Sylvester, both deceased

_Ina M. Stewart_    _Chester Harvey Sylvester_
Individually and as independent executor of will of A. H. & Emma Sylvester, both deceased

_Corrie Sylvester Stewart_    _Millie Sylvester_

_O. Zell Sylvester Phillips_    _Melba Sylvester_

_Gilbert Phillips_    _Austin M. Butler_

OFFICIAL PUBLIC WORKING COUNTY... 123

THE STATE OF TEXAS {
COUNTY OF Lampasas {

Before me, the undersigned authority, a Notary Public in and for Bovia County, Texas, on this day personally appeared Manuel Delbert Sylvester, and Millie Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purpose and consideration therein expressed, and the said Millie Sylvester, wife of the said Manuel Delbert Sylvester having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Millie Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

J. V. Barnett

_J. V. Barnett_
Notary Public, Bovia County, Texas

Jew000186

OFFICIAL PUBLIC
BURNET COUNTY
1223

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public in and for _____ County, Texas, on this day personally appeared Chester Horace Sylvester, and Melba Sylvester, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Melba Sylvester, wife of the said Chester Horace Sylvester, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Melba Sylvester acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

A V HAMMETT

Notary Public, Hamilton County, Texas

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public in and for _____ County, Texas, on this day personally appeared Austin M. Butler and Lenora Sylvester Butler, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Lenora Sylvester Butler, wife of the said Austin M. Butler, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Lenora Sylvester Butler acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

A V HAMMETT

Notary Public, _____ County, Texas

THE STATE OF TEXAS |

COUNTY OF _____ |

Before me, the undersigned authority, a Notary Public in and for _____ County, Texas, on this day personally appeared Ivan M. Stewart, and Corein Sylvester Stewart, his wife both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said Corein Sylvester Stewart, wife of the said Ivan M. Stewart, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said Corein Sylvester Stewart declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

A V HAMMETT

Jew000187

OFFICIAL PUBLIC RECORD
BURNET COUNTY

THE STATE OF TEXAS |

COUNTY OF ~~Hamilton~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Hamilton~~ County, Texas, on this day personally appeared Gilbert Phillips, and O. Zell Sylvester Phillips, his wife, both known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that they each executed the same for the purposes and consideration therein expressed, and the said O. Zell Sylvester Phillips, wife of the said Gilbert Phillips, having been examined by me privily and apart from her husband, and having the same fully explained to her, she, the said O. Zell Sylvester Phillips acknowledged such instrument to be her act and deed, and she declared that she had willingly signed the same for the purposes and consideration therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A. D. 1952.

A. V. HAMMETT

Notary Public, ~~Hamilton~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Hamilton~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Hamilton~~ County, Texas, on this day personally appeared Manuel Delbert Sylvester, Independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

A. V. HAMMETT

Notary Public, ~~Hamilton~~ County, Texas

THE STATE OF TEXAS |

COUNTY OF ~~Hamilton~~ |

Before me, the undersigned authority, a Notary Public, in and for ~~Hamilton~~ County, Texas, on this day personally appeared Chester ~~Johnson~~ Sylvester, individually and as independent executor of the wills and estates of A. H. Sylvester and wife Emma Sylvester, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration expressed therein, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, This 26th day of January, A.D. 1952.

A. V. HAMMETT

Notary Public, ~~Hamilton~~ County, Texas

Jew000188



OFFICIAL PUBLIC RECORD
BURNET COUNTY, TEXAS

1223 0515

Jew000189

AFTER RECORDING RETURN TO:

Armbrust & Brown, L. L. P.
Attn: Kristofer Kasper
100 Congress Ave, Suite 1300
Austin, Texas 78701
Tel: (512) 435-2325
Fax: (512) 435-2360

1223 0516

OFFICIAL PUBLIC RECORD
BURNET COUNTY, TEXAS

181369-2 02/04/2004

Jew000190

STATE OF TEXAS
COUNTY OF BURNET
I hereby certify that this instrument was FILED on this date
and at the time stamped hereon by me and was duly
RECORDED in the OFFICIAL PUBLIC RECORDS
OF BURNET COUNTY, TEXAS in the volume
and Page as shown

Janet Parker
County Clerk
Burnet County, Texas
By
DEPUTY

Any provision herein which restricts the sale, rental or use
of the described real property because of color or race is
invalid and unenforceable under federal law.

00232424

FILED

2004 MAR -3 AM 10:47

COUNTY CLERK
BURNET COUNTY, TEXAS

**SCANNED**

OFFICIAL PUBLIC RECORD
BURNET COUNTY, TEXAS
1223 0517

Jew000191

## CLERK'S CERTIFICATE THAT APPELLATE RECORD
## IS TRUE AND CORRECT

THE STATE OF TEXAS      §

§

COUNTY OF BURNET      §

I, Janet Parker, Clerk of the County Court of Burnet County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rules of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rules of Appellate Procedure 34.5(b).

GIVEN UNDER MY HAND AND SEAL at my office in Burnet County, Texas on this the 16th day of April, 2015.

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

By: _____
Jayme Ingram

1650

REPORTER'S RECORD

VOLUME 2 OF 4 VOLUMES

CAUSE NO: P9127/COURT OF APPEALS NO: 03-15-00100-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 10:35:27 AM
JEFFREY D. KYLE
Clerk

IN THE MATTER OF            )       IN THE COUNTY COURT

THE ESTATE OF              )       AT LAW

EDELL WADE                 )       BURNET COUNTY, TEXAS

MOTION HEARING

On the 11th day of April, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the HONORABLE RANDY SAVAGE, Judge presiding, held in Burnet, Burnet County, Texas.

Proceedings reported by computerized stenotype machine.

1

                    A P P E A R A N C E S

RICHIE & GUERINGER, P.C.

100 Congress Avenue, Suite 1750

Austin, Texas  78701

512-236-9220

     BY:  MR. SHELDON "DON" RICHIE

          MS. SHELLY D. MASTERS

          MS. EMILY SEIKEL

              APPEARING ON BEHALF OF JAMES (BUD) WADE


LAW OFFICE OF DON E. WALDEN

7200 North Mopac, Suite 300

Austin, Texas  78731

     BY:  MR. DON E. WALDEN

          APPEARING ON BEHALF OF NANCY BURNS


GRAVES DOUGHERTY HEARON & MOODY

401 Congress Avenue, Suite 2200

Austin, Texas  78701

512-480-5600

     BY:  MS. KATHRYN ALLEN

AND

STUBBS LAW OFFICE, PLLC

202 N. Porter Street

Lampasas, Texas   76550

512-556-8970

     BY: MR. EVAN STUBBS

               APPEARING ON BEHALF OF JOHNNY WADE

               AND APPEARING ON BEHALF OF AMANDA WADE,

               INDIVIDUALLY


HILL, DUCLOUX, CARNES & DE LA GARZA

400 West 15th Street

Suite 808

Austin, Texas   78701

512-474-7054

     BY:  MR. CLAUDE DUCLOUX

               APPEARING ON BEHALF OF AMANDA WADE,

               EXECUTOR

```
                    CHRONOLOGICAL INDEX

                  VOLUME 2 OF 3 VOLUMES

                     MOTION HEARING

April 11, 2014

                                PAGE        VOL.

PRESENTATION:

     BY: MS. ALLEN              8            2

         MR. RICHIE           41            2

         MS. ALLEN            73            2


COURT'S RULING                 75            2

REPORTER'S CERTIFICATE         82            2
```

P R O C E E D I N G S

THE COURT: Okay, after a brief recess I'm recalling cause number P9127, in the matter of the estate of Edell Wade. And based upon an earlier announcement I'm going to go ahead and begin hearing arguments. I understand that we're estimating three and a half hours today for the hearing. Does that still sound reasonable and appropriate?

MR. RICHIE: Yes, Your Honor.

MS. ALLEN : It does, Your Honor.

THE COURT: All right. Let the record reflect that counsel has agreed that that sounds about right. That would put us at -- I assume we will probably be taking a lunch break, but we should be able to finish up then early this afternoon.

The first motion I would like to hear is the partial summary judgment on James Wade's action to set aside the sale of the ranch. Who's going to be speaking on that?

MS. ALLEN: Your Honor, my name's Kappy Allen. I'm from Austin. I represent Johnny Wade and Amanda Wade, individually, not in her executor capacity. Evan Stubbs is co-counsel. He was not truant, he simply over-committed this morning. But he has joined us. And I will be presenting the motion as well.

THE COURT: Okay.

MR. RICHIE: And for the respondent on that motion, Your Honor, for Bud Wade, I'm Don Richie along with Shelly Masters and Emily Seikel, counsel from our office. Before we proceed I would like to remind the Court that we have objections to some of the summary judgment evidence that we would like to call to the Court's attention.

THE COURT: All right. Would you like to go ahead and voice your objection as she is --

I assume you have things that you're going to offer?

MS. ALLEN: Your Honor, it's not so much offer, although they are certainly part of the summary judgment record and we do have a kind of truncated presentation of part of the summary judgment proof that we'll be displaying. I am happy to proceed any way the Court likes with regard to objections. That is if I go forward and something is displayed, if there is an objection to it and the Court would like to take it up right then, I'm happy to do that. I'm happy to make my presentation, agree that by doing that Mr. Richie waives nothing and that he presents his objections when his presentation begins, but any way the Court wants to handle that is perfectly fine with me.

THE COURT: I think what we'll do is I'll go ahead and let you have your presentation uninterrupted, and then I'm going to go ahead and let you voice your objections to the various exhibits or to the various items that are contained in the motion for summary judgment, with the understanding and stipulation and agreement that you're not waiving anything by allowing her to present her case without interruption.

MR. RICHIE: Thank you, Your Honor.

THE COURT: All right.

You may proceed.

MR. DECLOUX: Your Honor, may it please the Court, just so the court reporter gets my name. I'm Claude Decloux and I entered an appearance a month ago on behalf of Amanda Wade in her capacity as independent executor.

THE COURT: Okay. Thank you.

MR. WALDEN: And my appearance, Your Honor, for the court reporter is Don Walden on behalf of Nancy Burns.

THE COURT: Thank you.

Everybody now that's going to be speaking has announced, right?

MS. ALLEN: Your Honor, before I begin, if I may, I have a copy of the Power Point presentation

that we are about to display for all counsel and the Court. I also have just a little demonstrative chart that helps me to be sure I understand who all the people are and some cases that we have selected from the prior materials in a very small notebook that I would like to distribute. Is this a good time for that?

THE COURT: Sure. Give it to them.

MS. ALLEN: Is the Court ready for me to proceed?

THE COURT: Yes, you may proceed.

MS. ALLEN: Your Honor, in light of the Court's earlier comments I'll start a little bit differently than I had planned. We hired on in this case in March, about March 10 of 2014 after Mr. Bujnoch's very unfortunate demise. When we did that, we committed that we would make every effort to adhere to the scheduling order that had been entered by this Court in January 2014 and to do everything we could to make sure that as efficiently as possible this case was resolved, either by settlement, or, if needed, by trial on June 9th, as the Court had set aside. We continue that commitment.

To that end, and I did not know Mr. Bujnoch, however by reputation he is all that the Court recalls. I don't mean otherwise when I say that it is apparent

8

that towards the end of his life he was not quite as organized perhaps as he might have been. So there were some gaps in things that needed to be filled in, some discovery matters that needed to be tended to. And so I had a phone call the day after we were hired with Mr. Richie to make clear that I did not intend to delay, that I intended to move forward and that any discovery matters that needed attention we intended to give those attention promptly and immediately.

At that time I was told that although Johnny and Amanda had been deposed and that Mr. Richie was not there, he didn't really think he needed to depose them. I told him then that it was his decision but he just needed to let me know. I have not had a request from him to depose them since that time. But if he wants it, it will happen. And it will happen on whatever schedule it needs to happen in order for this Court's scheduling order to be observed.

We learned on, I think it was early April, we learned that Mr. Bujnoch had made a response to a request for admission that we thought needed to be updated. We didn't know about it. It wasn't in the file. When we learned about it we updated it within 24 hours, and we gave it. So there is an amended response that was done 24 hours after we learned it was needed.

We also found out that Mr. Bujnoch's response to request for disclosure can't be located. Even Mr. Richie's office can't locate it, because he offered to furnish us a copy. When we learned that that could not be located, within 48 hours he had a response, full response, to request for disclosure. It's since been updated, and yesterday was updated in accordance with the scheduling order to designate experts. So I want to be as clear as I can be that if there are things that need to happen to keep this case on track so that it can conclude, we will make every effort to insure that that gets done and believe that we have done so to date. These two summary judgments that we have before the Court today are part of that effort.

When I spoke to Mr. Richie by phone he told me that the last settlement effort that they had had, which is the last one that there's been, was unsuccessful. And I asked has anything changed that might make it more likely that the case can settle? And he said it has not. To that end what we've tried to do are find areas where we believe the law says that there are claims that have been asserted but aren't viable so that we can obtain guidance from the Court as to what it is we need to have discovery about, what it is we need to focus on for settlement purposes and what it is we might need to

try in June. That's the purpose. I say that because I recall the first time I ever presented a motion for partial summary judgment. It was to Judge Dietz in Travis County, and Judge Dietz essentially said, Why are you wasting my time with a partial summary judgment when you're still going to have to try to the case?

Here there are very important reasons why partial summary judgment on the two very focused issues that were raised not only promote judicial economy in terms of discovery issues and in terms of trial preparation, but also may well facilitate this case getting manageable enough to get our arms around it. And that is the reason, the primary reason why we have made that approach rather than another approach.

At the end of my presentation -- I would turn now to law in fats, because I know that's what the Court is primarily interested in. But at the conclusion of my presentation I want to also demonstrate to the Court from a practical standpoint what the upshot will be from the granting or denial of the summary judgment on this particular claim, because this is an unusual case in that there are many ramifications that involve many other people and perhaps the Court's time as well. And I want to be sure that I have explained that so that it makes sense why I'm taking your time with something that

I know won't dispose of the whole case. There's a good reason and we appreciate the opportunity to apprise the Court of that.

Your Honor, what I have presented to the Court is just a chart. I do this for my benefit because I'm new to the case. I know the Court is not new to the case, but just to show who the parties are who are involved. The coloring, the significance of the coloring -- and it's just demonstrative -- but the significance on coloring of the chart is this. Over to the far left in blue there are three Wade siblings. Those three Wade siblings have announced publicly and in writing that they respect the decisions that their mom made during her lifetime and they do not challenge them and won't.

MR. RICHIE: Your Honor, I rise simply to let you know I'm going to talk. I have to object to her arguing outside the summary judgment record. There are no affidavits from Emma or from Charlie. There is no summary judgment. This is true hearsay.

THE COURT: Well, only in the fact that they have not joined in the lawsuit, so I'll overrule your objection because of that.

MS. ALLEN: And, Your Honor, I'm now giving background. I don't mean to say there is summary judgment evidence. We know that Johnny Wade respects

his mom's decisions. Emma Carter wrote this Court a letter some time ago in which she made it clear that she respected her mother's decisions and that she did not wish this dispute to continue. And Charlene is of the same mind. The two in gray I don't know about. I just don't know. Weldon Wade is apparently in Oklahoma. He's not a party. To my knowledge he's not hired any lawyers. His estate interest is in trust pursuant to Mrs. Wade's will. Why that's important is this. If and before there can be any setting aside of any 2004 transaction there has to be full restoration. A conservative calculation of that is more than 100,000 per beneficiary when you consider the principal paid, the taxes paid, the repair and maintenance paid, the new improvements that all these siblings watched Johnny and Amanda build in 2006; when you add all those benefits that will accrue to whoever ends up with the property, that's part of the restoration and it's going to have to be taken into account if this claim is pursued. Well, Weldon, his entire inheritance is in trust and even the plaintiff's summary judgment evidence shows that Weldon Wade can't pay his own living expenses. It will require more than Weldon Wade has in trust to set aside this transaction. And nobody has heard from him that he wants that. And so the same with Sue, the sister,

nobody has heard from her that she wants that. Nancy has sued but not for that. Nancy's cause of action is completely different. She might have sued to set aside the 2004 transaction, but she didn't. She ratified the 2004 because she sued on the note. So we know Nancy doesn't want to pay restitution and restoration and have the sale set aside. There's only one that has asserted that claim, only one. And I'm used to calling him James. I'll try to call him Bud. I apologize for that confusion. But he is the only one. And he comes before the Court with two varieties of claims in that regard. Here is one: I'm in the shoes of my mom, Edell, because that's what the law requires if you're going to assert undue influence and things like that. Then standing in the shoes of the grantor, and quote unquote, for her benefit. And so he is asserting for Edell Wade's benefit that she was taken advantage of. That's one variety of claim he makes. And here are his complaints. He says, first, I don't think mother wanted to sell the property at all. Second, I think that the price she charged was not enough. Third, I don't think that she should have made a loan to my brother to buy the property, And, fourth, the terms on which she made that loan I don't agree with. That's what he says. They are too low. They are not what a bank would have done.

Those are his complaints.

Now, if you could show the first -- in a nutshell, Your Honor, and there is, if it's helpful, there is a copy of that in the notebook. It's why I furnished it. I never know how visible these will be, but in a nutshell, and Your Honor has it exactly right, in 2003 in the presence of other family members -- and it's undisputed -- Mrs. Wade had a conversation in which she said to Johnny, I will sell you the ranch if you meet my price which is $500,000.

MR. RICHIE: Your Honor, I apologize, Ms. Allen. This is going to be an hour and a half presentation and am I supposed to be asserting my objections as we go? I'm trying to remember whether they're at the end or -- but we've already asserted in our response objections including the rule against the dead man statute, as it's commonly referred to. It's the hearsay rule basically under the rules of evidence. But we reassert that with respect to anything that --

THE COURT: All right. Unless you have independent corroboration I will have to sustain his objection as far as the conversation that took place between Johnny, Amanda and Mrs. Wade where the discussion was, You meet my price.

MS. ALLEN: Your Honor -- I'm sorry. Did

I interrupt the Court? I apologize.

THE COURT: No. I'm -- he has objected under the quote unquote dead man statute to your statements to the Court as far as what was said between the decedent and her son during the supposed negotiation for the sale of the ranch. So what I'm saying is I'm going to have to sustain his objection unless you have independent corroboration in order to get around the dead man statute.

MS. ALLEN: Your Honor --

MR. RICHIE: It's independent corroboration by a disinterested party.

THE COURT: That's basically true, yes.

MS. ALLEN: Your Honor, you will see that there is independent corroboration from Pat Cavness as we walk through the summary judgment evidence. I really understood that was one reason why Mr. Richie would make whatever objections -- and by the way, I think that if he wants to make them he better have filed them.

THE COURT: Excuse me just a second. I don't recall seeing Mr. Cavness's deposition in the file. I do recall later other attorneys involved in the case, but in fract there was something said I believe by Mr. Cavness that he had received a call from Mr. Bujnoch and that he was asserting attorney/client privilege in

16

behalf of his client, and therefore don't answer their questions.

MS. ALLEN: Your Honor, let me explain what's in the record, and although I can't respond to what went on in the past -- what's in the record is the affidavit of Nancy Burns. She went to Mr. Cavness's office and got a copy of all of his files and attached them to her affidavit saying, This is a copy of the file that I got from the lawyer Mr. Cavness. And that's what we rely on is her affidavit and her materials that she said she obtained from him. That's what we're using. And if we could just skip for a moment -- one more. Right there. This is what's attached. If I may, Your Honor, because it's so -- there's also a copy in the Court's notebook, but if I may, these are the notes of Mr. Cavness according to Ms. Burns. January 6th, 2004, everybody takes the position that Mr. Cavness was Mrs. Edell Wade's lawyer. And, Your Honor, when I say "Mrs. Wade" I mean Mrs. Edell Wade. Everybody takes the position, and I think rightly so, that Mr. Cavness was her lawyer. And at a meeting that Ms. Burns attended here was the discussion. There was going to be a sale, that it was going to be to Johnny and Amanda, that it was going to be this property, 475 acre ranch. Here's the part that's hard to read. Oh, and to respond, Your

Honor, to a question you raised earlier, I didn't see about the cattle. Here it is. Bill of sale on cattle, equipment, tractor, post hole digger, chisel, hay cubes, et cetera. It's right there. And we'll see it later in the closing document. But we see it first from Mr. Cavness. He says the price one-fifty plus three-fifty, which they're internally allocating for capital gains reasons, he says that there's going to be a loan, that it's going to be 2 percent -- it's hard to read, I know. It's going to be 2 percent interest payable monthly on the first day of the month for two years. Thereafter it's going to be principal and interest, 2 percent, 30 years, over 30 years, full right to prepay. Those were the deal points as he understood them and he recorded them. That the buyer would pay taxes, of course, and seller is basically to get the life estate, the right to stay there the rest of her life, as long as she wants. And that was part of the deal. And so these are Mr. Cavness's notes of what his client and her attorney-in-fact, Mrs. Burns, explained were the deal points of the transaction.

Now, what happened to that? On January 16, 2004, Mr. Cavness prepared documents that he sends out not for review, but signature. He says, You sign these things that I just did. I'll have my client sign them and I'll

record them.  Okay.  You know -- we know he would not have done that had he not been persuaded that his client wanted this deal.  He would not have done it.  And this document looked exactly like his notes said they were supposed to.  There was a deed from Mrs. Wade to Johnny and Amanda that talked about a note.  It talked about a note of $500,000, just the right amount  It was going to be secured by a lien, a vendor's lien and a deed of trust lien.  There was a promissory note.  The lender, no secret, was Mrs. Wade.  It was 500,000.  It was 2 percent.  It matured 30 years after the two years so 236.  It had the same terms as in his notes, accrued interest payable for two years on the first day of the month and prinicpal and interest thereafter, and it had the right to prepay and it had security in the form of a vendor's lien ande a deed of trust to Pat Cavness, trustee.  That's what he was ready for Mrs. Wade to sign.

May we see the deed of trust.

He did a deed of trust.  The trustee, Pat Cavness. Lender, Edell Wade.  No secret that it's a loan.  No secret that it's 500,000.  No secret who the borrowers are.  No secret what the maturity date is.  All of these things are consistent in eery respect with the recitation that Mrs. Wade said, This nisd my price.  And

if you believe Mrs. Burns when she says when we were there Pat Cavness said, Now, you know this might not be full market value. It was after that that Mr. Cavness went right ahead, surely at his client's instruction, and prepared documents for her to sign that he thought reflected the deal that she intended to make.

THE COURT: Did she subsequently, according to your position, strike the requirement of the life estate? Because I noticed in some other closing documents that were drafted where Amanda Wade made notation, No life estate.

MS. ALLEN: She did not. And there is one. I'll skip to -- right here. Here's Cavness's closing agreement and it has the part about seller remaining in possession as long as she wishes. That was the deal. And I call it a life estate because everyone intended and expected she would live there for the balance of her life, and she did. There was a need to have another law firm actually complete the scrivenering, the Armbrust & Brown firm. I have and am fully prepared to show the Court if needed not what I think about it, but the testimony in the record about why that happened. The why it happened is that Mr. Cavness made an ugly remark that Mrs. Edell Wade didn't appreciate.

THE COURT: I thought it was his wife made the statement.

MS. ALLEN: The testimony in the record which is what I'm going to try to stick rigidly if I can, the testimony in the record is that Nancy reported to her mother that Mr. Cavness had made an ugly comment and that Mrs. Edell Wade did not appreciate the ugly comment and did not wish to complete the deal with Mr. Cavness. That testimony is cued up and the documents that go with it are cued up. I don't belabor that now because it's beside the point, but if you hear in a minute the suggestion that Amanda Wade fired Mr. Cavness because he would not make changes to the documents, that is a fabrication. You will see no testimony to that effect. And I will, when I -- if I am permitted a chance to come back I will show the testimony itself and the documents that go with it. And we know that that's true, that is that it was a scrivener effort by the Armbrust firm to finish out the documents. We know that simply by comparing them.

May we back up to the first comparison where we can look at the warranty deed of Mr. Cavness's. The warranty deed as it were scrivenered by the Armbrust firm. And it's the same. In the respects that Mr. Bud Wade wants to complain about price, loan, that she sold

it at all, that it was 2 percent; all these things are the same in all respects. They just had someone else finishing up the paper work and those documents were signed and recorded. There's the stamp. You'll see they're recorded March 3, 2004.

May we skip to the next -- well, in fact, here's the signature page on the deed and here's what you see. First, Mrs. Wade signs in Lampasas of course. And her longtime, trusted CPA, Lorilee Graham, takes her acknowledgement. And of course, that means something. I acknowledge I executed this for the purposes and considerations herein expressed. It's meaningful. Mrs. Wade's CPA is with her. They sign it, execute it, acknowledge it. Johnny and Amanda aren't there, haven't been there. They're in California. They're moving from California, but they're not there. This is all done by mail. Someone else -- I think I know who -- took Mrs. Wade to her CPA's office to finish this up.

Here is what shows us March 3rd, 2004, recording in the Burnet -- I'm sorry, in the official public records of Burnet County, Texas.

May we look at the next -- promissory note. Cavness promissory note. Armbrust. They're the same. The lender, the borrower, the amount, 2 percent, 2 percent  They change here because it had been a month.

It wasn't January 1, 2036. It was February 1, 2036. They delayed a month that they did not think they would. So there is a little bit of change in payment schedule. But the terms are the same. Principal -- I mean interest payable for two years. Principal and interest thereafter. It's 2 percent. It's secured. And look here, Armbrust, did they make themselves the trustee? No, they did not. Pat Cavness, trustee. They carry forward all of his deal points.

Let me see the deed of trust. No, the --

The promissory note and the deed of trust, grantor, the same. The trustee, still Pat Cavness. They make themselves trustee. And it's still Pat Cavness, by the way. The lender, Edell Wade. Edell Wade. Here's the note. Here's the amount. Everything that is being -- and recorded March 3rd, 2004. So complained about mama didn't want to sell it. That can't be a surprise. Mama shouldn't have made the loan. That's not a surprise. Mama shouldn't have made it on the terms that she did. Her lawyer documented those terms. Her accountant notarized her signature. All of the things that are complained about were either actually known or irrebuttably constructively known on March 3rd, 2004.

The Court asked a moment ago this question, and I might not get it exactly right. But the question is, is

23

it a question of fact that you didn't investigate -- I'm not sure I've got the Court's question just quite right, but that was the topic. The answer is in this cass, No. Here's why. First of all, the difficulty here is I'm having to pretend that Mrs. Wade didn't know what she was doing because everything tells us that Mrs. Wade knew exactly what she was doing. Her lawyer and her accountant wouldn't have done what they did if they had thought otherwise. So we pretend that Mrs. Wade didn't know what she was doing. She had the advisors there who did and her attorney-in-fact who did. And was told to the effect of you ought to maybe check out this price because it might be below market value by her lawyer. And her decision was, This is what I want to do. There is nothing inconsistent with that at all. So I'm having to pretend that Mrs. Wade ought to have discovered the terms of a transaction that she, by all accounts, intended to do and signed off on just shortly after February 6th, 2007.

In Texas the law is that for a grantor the cause of action to set aside a deed that a grantor signs, you're presumed to know what you signed and it accrues the day you sign it. So it accrued shortly after February 2004. Even if we indulge the fiction, and it is a fiction, that whose knowledge matters; is it Bud Wade's

24

knowledge? That is not whose knowledge matters, by the way. He is standing in the shoes of his mom for this purpose. But let's pretend for a moment that that's what's important. First, is this something that is inherently undiscoverable? Because that's the only way you ever get to the discovery rule to start with. The discovery rule only applies to something inherently undiscoverable, and that is a question of law.

Here, in the cases that we furnished to the Court -- in particular those cases at the last three tabs of the notebook, tell us that when something is of public record, and it has all the information you're complaining about in it, it is not inherently undiscoverable as a matter of law. No discovery rule. So that doctrine does not apply at all. But even if it did, in Texas when it's recorded you have irrebuttable constructive notice. And that is the same as actual knowledge of what's in it.

Now, if it didn't address the complaints that he was making it would be a different story. But it addresses all of the complaints that he is making. Yes, she sold the property even though he said she didn't want to. Yes, she made a loan. Yes, she sold it for $500,000. Yes, it was at 2 percent. All of those things are available. He says in his discovery

responses that in March, 2004, that -- and I think the way he says it is that he attempted to investigate the sale through his sister, Nancy.

THE COURT: Through who?

MS. ALLEN: His sister, Nancy.

THE COURT: Nancy. Yes.

MS. ALLEN: Yes. That's his interrogatory answer. So we know he's at least curious, and obviously it was of concern to him what the price was because he's complaining about it now. He says, I tried to investigate it starting in March of 2004 with Nancy. He also says later, still in 2004, his mom, Mrs. Wade, called up Bud's wife, Gwen, on the phone and told her, I sold the ranch to Johnny. He says his mom didn't volunteer details. Didn't say whether or not they asked. Didn't volunteer details. But no secret. And again this is evidence of somebody who knew what they were doing and intended to do it. Even later in 2004 calling Gwen.

Now, all of this time, starting from the time these documents get signed, Johnny and Amanda Wade are making payments. Those payments are going into Mrs. Wade's account and Mrs. Wade is using them to buy CDs that later get distributed to these folks when she passes away. Well, why is she doing that? It makes perfect

sense to me. One, she's worried about Weldon. She sets his up to be in a trust because he can't pay his living expenses. Weldon has no need for one-seventh interest in her Lampasas ranch. He needs cash flow. And frankly so does she because here, as in Travis County, cattle operation net revenues have negative in front of them. So she's able to turn that ranch into a steady, solid, dependable cash flow, and --

THE COURT: Let me stop you right there. If Johnny bought the cattle, why was she paying for the feed?

MS. ALLEN: She was not.

THE COURT: I thought you just said that she paid -- that's what the money was being used for, the monthly payments were being used to buy cattle feed.

MS. ALLEN: I am not speaking up, and I apologize, Your Honor. The monthly payments were used to buy certificates of deposit.

THE COURT: Okay.

MS. ALLEN: That then were distributed after her passing --

THE COURT: Yes.

MS. ALLEN: -- to all of the siblings. So what wasn't generating any income for her, that ranch, and it was just generating expense, she turned

into an income stream that she then used to buy certificates of deposit and to make sure Weldon had enough money to take care of himself. And those ultimately got distributed. But the point, only point I'm trying to make here is that Mrs. Wade, from the time that the note got signed, Johnny and Amanda made the payments exactly as they were supposed to under the note. And in fact later in 2004 they sold their property in California and made a $150,000 prepayment to Mrs. Wade which she turned into a certificate of deposit. That's in the summary judgment record. That got distributed to the beneficiaries after her death.

And so all of this time Johnny and Amanda are making the payments and Mrs. Wade is accepting the payments, and it makes perfect sense why. So that is all happening in 2004. Now, in -- and I'm sorry. I'm going to get back on the microphone. I may be losing my voice a little bit. So all of that is known during the 2004 timeframe. All the records are public. There is a phone call about the sale to Gwen. Mr. Bud Wade says he's trying to investigate. But you know what he doesn't do, not in 2004, not in 2005, not in 2006, not in 2007, not in 2008, not in 2009, not in 2010, he doesn't ever talk about it or try to talk about it with his mom. He doesn't ever try to talk about it with

Johnny or with Amanda. He doesn't ever try to talk about it with Pat Cavness. He doesn't ever try to look in the public records, which we know he knows how to do, because he did later. That's how he found the documents that upset him. So we know he knows how to do that. In none of those years did he do any of those things. No time when it might have made a difference to his mom if there were really something bad going on did he do anything.

His mom passed away August 14, 2010. He still didn't do anything. During 2010 to 2011 he received more than $84,000 in distributions from these certificates of deposit that had been funded in this way. He knew where they came from because he got the accounting and the inventory that said so. And he accepted them. He still has them. And he hasn't even offered to return it. He accepted the benefits of the ranch sale, and it was only when the last distribution was done that he decided that he would file suit. And he decided to file suit for the benefit of Edell Wade. Not during her lifetime when it might have mattered, but only after she had passed away and he wouldn't incur her wrath, only after he had gotten all the distributions from all of the note payments. It was not until then that he says that he wants to sue his brother Johnny for

the benefit of his mother. He also says he wants to sue for his own benefit, which is the case under a claim of tortious interference of inheritance. What that means is that he is saying, Back when mom sold the ranch she really didn't have the right to do that because I was expecting to get it. I was expecting to inherit it. And Johnny stepped in the middle of all of that and bought the ranch and I didn't get it. And that's tortious interference. That's what this is about. That's his claim. He knew that his mother sold the ranch in March of 2004, and I'm betting he knew it earlier, but it is undisputed that he knew it in March of 2004. He did nothing.

The Veltmann case that is the last case in the notebook I've provided to the Court has a very helpful explanation in it of why the statute of limitations in a case like this is especially important and why even though it might feel like justice isn't being done, it is. The reason is because our law does not allow people who know that they have a complaint and who know how to find out whether they really do, whether there is really something wrong, we don't let those people wait until the witnesses have passed away, the evidence is lost and people can't defend themselves. That's not justice. That is why we have the statute of limitations. There's

not a fact issue here as to whether or not Mr. Bud Wade ought to have investigated or is charged with having investigated.  Even if it were his claim, two questions that have to be decided are questions of law.

Now, I digress just for a moment to address something else that the Court raised a little bit earlier, and that is that it's accurate that back in August of 2011 Nancy burns, in her lawsuit on the note, she is suing on the note, she's ratified the deal.  In her lawsuit on the note she raised the question about was it all paid in 2011.  What the summary judgment evidence shows us is that in September 2012, September 27, 2012, the estate's independent accountants rendered their report to the Court.  And at that time they confirmed exactly what the note balance was, just what we thought it was, as of the date of death.  It confirmed that.  And they confirmed in Schedule 8, that during the time of administration all of the payments have been made and so the note was current through September 10, 2012, for sure, according to these accountants.

THE COURT:  What about the 81,000?

MS. ALLEN:  They had accounted for it and I will -- what happened, Your Honor, is that in a deposition in 2011, there were requests made for

particular checks, it happened it wasn't all the checks that accounted for the payments, it so happened. Nobody realized that, and so at the deposition the parties weren't able to reconcile it in 2011.

MR. WALDEN: Your Honor, I need to interject on behalf of my client. That's not accurate. I was the one taking the deposition. I'm Don Walden on behalf of Nancy Burns. And the deposition transcript is here. It was pointed out to Amanda Wade that there was an $80,000 discrepancy and she said she had documentation for all of the payments. And I asked if she and her attorney, Mr. Stubbs, who is here today, could provide those documentation to me. It has been two years and eight months and I have gotten zero. Nothing. There was no reconciliation of anything during the deposition, and the transcript is part of the record.

MS. ALLEN: May I proceed, Your Honor.

THE COURT: Your response? Does this accounting provide that?

MS. ALLEN: This is the estate's accounting that was provided to everybody, and so I guess the short answer to the question is have I seen the backup documentation? Yes. Is it in Mr. Bujnoch's documents produced? Yes, sir, it is. Have I personally

updated the production since that time to account for all of the payments since the date of the accounting? I absolutely have. And I've got it with me. But they do too.

MR. WALDEN: I have never been -- it was August 4th, 2011. It has never been provided to me, at least in any format that indicates that this is what this is. If it's something that's been buried in a larger document production, I would like for them to point it out to me. I have been waiting for it since --

THE COURT: Go ahead and turn it over to him now so that he can have a chance to look at it before he gets up to argue.

MR. RICHIE: I believe the accountant started with the balance at the date of death, in other words, the modification that already was missing, the 80,000, they have not explained or produced anything to explain or to prove that there was a debt forgiveness of 30 or what happened to the other 49,000-some odd.

THE COURT: Well, I recall in reviewing the deposition that there was the issue at that point as far as whether or not there was an explanation of a $30,000 gift or discussion regarding a $30,000 gift, but that didn't cover the entire $81,000.

MR. RICHIE: There wasn't any proof of

the $30,000 gift.

THE COURT: I understand that.

MR. RICHIE: The accountants started with the modified amount, which is already $80,000 down.

MR. STUBBS: Evan Stubbs for the record. At the deposition with Mr. Walden I was present. Just so it's not misled to the Court, relatively soon thereafter we went to a mediation. We thought that the case was settled. I don't know what happened after that point but to represent that this was requested and then was never provided is a little bit inaccurate from the standpoint of -- not that it was not requested, and as to whether or not it was provided, I don't know. Ms. Allen would have to be able to show that. But we did think the case was settled, therefore the need --

THE COURT: According to Ms. Allen, you've got the records. I'm just saying go ahead and turn it over to them.

MR. WALDEN: Your Honor --

MS. ALLEN: If I may, it will be in two pieces. One, we did not bring along July 17 of 2013 -- and I believe at the Court's request Mr. Bujnoch made a report to the Court that identified every single thing he produced and these checks up to that point are here. They're on his list and they were produced. I am just

about to find for Mr. Walden the email by which I sent he and Mr. Richie the other checks. So I'll be happy to find that. But the long and short of it is I'll have to tell you, Your Honor, after three years of litigation, three years of litigation, and according to Mr. Richie, to my astonishment, on his part only, $280,000 of attorney's fees, if there was something wrong with the accounting on this note --

THE COURT: Excuse me. What?

MS. ALLEN: Mr. Richie says he has $280,000 in attorney's fees in this file.

THE COURT: In this case?

MS. ALLEN: Yes, sir. And if I had done that I would know for sure where all those checks were.

MR. RICHIE: And I do know. Hopefully have been provided. Does not account for the $80,000 that is in discrepancy between the note balance on the date of the modification and the amount of the original amount minus the payments that were made.

MS. ALLEN: Your Honor, I'm happy to try -- I invite them to try here on June 9 the questions about the note modification. That is fine. I'm happy for them to do that. We will then try his foreclosure claim that he has just raised, that's fine. But as to this 2004 ranch sale, there is no reason why this

plaintiff could not have raised his complaints. He hired Mr. Richie at one point. He could have hired Mr. Richie much earlier when it might have mattered to his mom. He didn't do it. And that is why the law says he doesn't get to complain now.

I endeavor to show the Court, because I believe it, that I'm not asking the Court to rule on a technical defense so that I can hide behind it for something that was done that was wrong. We'll try that note modification June 9, and I'll be happy to. But that 2004 land sale needs to be put to rest.

THE COURT: I understand the difference between the two issues. But you're saying that that document you have in your hands right there explains the $81,000 discrepancy?

MS. ALLEN: Your Honor, what I'm saying is this document identifies Mr. Bujnoch's production very specifically so we have, up to a point, very specific identification if there is a discovery question. They ought to know. They ought to have an accountant who can say I have gone through all of this and here's what missing. I would if I had spent $300,000 in this case.

MR. WALDEN: Well, Your Honor, I've done that. That is why I pointed out the discrepancy. It's

the fiduciary's burden to document every expense. If it's part of Mr. Bujnoch's big long index, I would think the way to do it if they actually found the checks they have not provided in discovery which led me to conclude there is a discrepancy, the way to do it would be, Here Mr. Walden. Here are the checks that account for this other $80,000 or this other 50. We know there is nothing to document. They allege a gift of 30 that Amanda Wade testified to, but Johnny Wade testified he didn't know about. But if there was -- if they were going to come up with $50,000, the way to do it would have been, Don, here it is. Here's the other $50,000. If it's buried somewhere in some other discovery I hope they'll point it out to me like a fiduciary would.

THE COURT: Well, let's move on with your argument. We'll come back. I assume that one of the issues still left on the table is the discrepancy in the note and whether or not the note -- let's assume if for instance I rule in your favor on the limitations issue on the sale of the ranch, you still have a lot of discrepancy between the parties as far as the note, the second note, the one that reduced it to zero percent, and the principal balance. These are all things that I don't know know whether or not there has been adequate discovery but I'm going to make sure that there will be

37

as far as making sure that your position is known to them. And if you've got the checks, then produce them. If you don't have them available, then explain why you don't.

MS. ALLEN: Your Honor, they will have the checks before they leave this courthouse today.

THE COURT: Okay. Good.

MS. ALLEN: And I will be happy to -- in fact, that is one of the reasons that I have not sought summary judgment as to the modification. That's one of the reasons that issue has been left to set aside. I chose the issues that the law was clear on and the facts were clear on. And there are two of them.

In this 2004 land sale here's why. Here's why it's important. You've seen the parties, how many of them there are. We know they don't agree. We know they don't. These two over here don't agree. One of them has ratified the transaction. One of them wants to set it aside. Well, if we go forward on a claim to set aside this transaction there is no way it can go without Mr. Bud Wade joining everybody else. They have to be here because they're going to have liability for restoration in the unlikely event it got set aside. And I just did, while I was sitting here, I mean, a napkin calculation. Just looking at principal and ad valorem

taxes and repair expenses, that sort of thing, it's more than $115,000 each of benefit that has been paid over -- it's been a long time that it's been paid, that people have sat by and watched them do. That all has to come back, it all has to come back from all of them. So they're all going to have to become parties. And a lot of them don't want to. They don't challenge the sale.

With regard to Weldon Wade, it almost is frankly a violation of the in --- I never say it right, in terrorem clause. Because it was Mrs. Wade's intent that Weldon have income, and we're about to now undo that. So that may well be a violation of that, that Weldon's representative needs to tend to. Well, guess what? The trustee is Amanda Wade, and we know she can't do anything without somebody complaining about it. So we're going to have to have an ad litem for Weldon for all of those claims that Weldon might have so they can get tended to. We're going to have an issue about responsible third parties if Nancy, having the power of attorney, was with Mrs. Wade when she did this deal and it's now shown that it shouldn't have been done, that it was undue influence, that it was fraud, that it was something, she's got responsibility. If Mr. Bud Wade was involved in it, he's got responsibility. And so for all these beneficiaries' sake they would have to be

named and tried as responsible third parties. Those are issues that we have if we don't get the claim disposed of.

And finally -- and it is what I do for a living, but I'm very mindful that this is not a case that involves Texaco and Exxon. It's a family. And they don't have unlimited resources and they don't need to be spending them like this. And if we can try only those issues that we really legitimately need to, we don't need a bunch of appraisers and we don't need a bunch of accountants -- we need some accountants, but we don't need a bunch of appraisers. We don't need other people to testify about value and use of property. We don't need experts on repair maintenance expenses. We don't need to tally up restoration and have experts about that and discovery. So we don't need all those things. Your Honor, if the Court is persuaded that we do, then I respect that and I will be ready and I will do whatever is required to maintain the schedule that the Court needs to keep.

But in this instance both facts and the law mandate that this claim to cancel transaction after eight years of being quiet on purpose and knowing and taking the money, that can't be sustained. So we, if we can conclude that we don't need to try it and we don't need

to have discovery about it, then we can focus on what we really do need to try, have discovery about it if there are things, and that's all that this motion is about.

So with that, I think I'll conclude. And if the Court would allow it, might I have a brief response after the presentations.

THE COURT: Well, what we'll do is it's about ten minutes till 12. I don't know if you all would like to work on into -- in other words I'm more than happy to sit here and hear the rebuttal, or if you would like we can go to lunch and then come back and start again. I mean, just whatever you want to do.

MR. RICHIE: I would like to do rebuttal while the argument is fresh on my mind.

THE COURT: That would be fine. Then you may proceed.

MR. RICHIE: I'm only sitting down because you asked me to.

THE COURT: Yeah. And pull that mic up a little closer. I'm still having trouble hearing you. Just move some stuff out of the way.

MR. RICHIE: Can you hear me now, judge?

THE COURT: Yeah.

MR. RICHIE: All right. Thank you. May it please the Court. Don Richie on behalf of Bud Wade.

Ms. Allen seems to argue mostly that because the case has so many facts that will have to be determined at trial that it would be costly to proceed and that the cost of bringing an expert, which we designated, Mr. Bolton, to talk about the value of the property on the date of the sale being at least two times, probably more like three times what was paid for the property, is going to be complicated, it's going to take jury time, court time, is not a basis for summary judgment. It is not now and it never will be.

So what we really are here about today on summary judgment is whether or not there are fact questions. And to start with I went through their summary judgment, not our response, their summary judgment motion and just in the recital of the background there were over 30 fact questions raised by Ms. Allen, recognized by Ms. Allen. This case, Ms. Allen says, we have to go back and look at what was Mrs. Wade's state of mind at the time. I agree. And one thing about state of mind is not just whether or not you were unduly influenced but whether or not you were misled.

Here we have a sale by an 87 year old woman, maybe 89, of the primary asset that she owned to one of her seven children after she had clearly indicated in the prior will an intent to leave her estate to all seven

children equally. Then when she redid her will she reasserted that same desire in the will that has been probated in this Court. So let me start by saying there is no will contest here. That is not what this is about. My client does not seek to set aside the will, has never sought to set aside the will and believes that the will properly and appropriately reflects his mom's wishes at the time of her death, which is that her seven children would be taken care of. In fact, she had actually indicated an interest that Weldon, who is less capable than the rest, would get more and his interest would be held in a trust so that he couldn't waste it and there would be something there for the rest of his life.

Mr. Bud Wade has brought this case not to enrich himself. It's to bring assets back into the estate. And so the comment about needing other parties here, this case is over two or three years old. The Court has a scheduling order that is still in existence. The need, the right to bring in third parties existed until February of this year. Not only did Johnny Wade not bring in any third parties, but in their recent supplemental production, responses to requests for disclosure, Ms. Allen said she didn't intend to bring in any other third parties, none are necessary. So it's

not like we've done something to preclude those that need to be here from being here, and the Court may remember that at the Court's insistence all of the heirs had to come to this courthouse to meet with you, Judge, and to talk about the expense of this case and the complication of this case and why it would be better to heal this family and save the money of the fight. And everyone but Emma was here. Emma did not come to that meeting. But Weldon was here, Charlene was here, Sue was here and all of these people that they claim have an interest and should want to be here, they were here. And they know about the case. They could have easily hired a lawyer and made an appearance and been here, and they chose not to.

But what's important is that Bud Wade is bringing this claim on behalf of the estate, to bring property back into the estate, not put it in his pocket. So the idea that these individuals are going to owe restoration, somehow are going to give back what they've already gotten can't even be determined until the estate is resolved and concluded and determined whether or not once the property comes back in and is sold, is there enough money to repay Johnny and Amanda for the funds through contribution tracing that they paid for this property and believed that they owned it from 2004 till

the date of the trial. Is there enough to repay them and still have more to distribute than what's already been distributed. Or is there not. So this idea of restoration is one of the facts that's going to happen at trial. And one of the things that will be proved is they didn't pay rent while they lived on the property from 2004. Are the payments that were made by Johnny and Amanda Wade greater than, equal to or less than the fair lease value of that property that they made their homestead for now over 10 years. So that's a fact question at trial. I think it's a red herring. It's a ruse.

Then we get back to the question of, well, what did Bud Wade determine? What did he find? When did he find it? What could his 89 year old mother have found when she is living with Johnny and Amanda? Her lawyers have been wrested from her. Pat Cavness, Amanda Wade has testified, in the summary judgment evidence, that Pat Cavness -- they did go to him and he talked to them about the sale, and he had some complaints and objections. That's a fact question. What did Nancy Burns understand those objections to be. We know what Mrs. Allen would like you to believe. That is certainly one recitation. Mrs. Burns, in her affidavit for summary judgment evidence says all they talked about was

the sale. They didn't talk about the terms while she was there. She heard about a sale, but no terms. A sale at 12 or $1,300 an acre may not have been objectionable. One at less than $500,000 is objectionable.

What did Ms. Wade belive when she signed the papers and what had she been told by Johnny and Amanda after her lawyer was terminated and a new lawyer in Austin, Texas was retained. The testimony in both Johnny and Amanda's deposition, Johnny didn't even meet with the Armbrust lawyers. Amanda did. Amanda who now wants to buy this property from her mother in law who has recited in her deposition that she would have never moved to Texas to care for her mother in law. And Johnny has testified he would have never moved here, but for the sale of the ranch. It was a condition. And they were only going to move here to care for the mother who needed so much care that she sold them the ranch. And then they go on to testify that she didn't really need the care. When they went on vacation they didn't tell their other children -- their brothers and sisters, because mom could take care of herself. She didn't need any help. Well, that's a fact question. Did she need help or didn't she need help. Is that the reason mom sold the ranch? Or representations were made and what

did she rely on when she sold that ranch and what did she believe would be the consideration for it. Another fact question.

So if you looked at -- if you look at the deed, Ms. Allen wants you to believe that everybody could understand and everybody could know what the terms of this deal were by looking at the instruments that were filed of record. If I may, I want to show you the deed. We're just not as fancy as the Graves Dougherty firm. We didn't bring our audio/visual person with us, but we do have the deed here. The warranty deed with vendor's lien. This is the one that got filed. May I approach the bench, Your Honor?

THE COURT: Yes, you may.

MR. RICHIE: Ms. Allen, I don't have a copy for you, but it's Exhibit I to our response. It is the warranty deed with vendor's lien.

MS. ALLEN: I have everything that you are furnishing to the Court. It's accurate.

MR. RICHIE: Thank you.

What's interesting about the deed, Judge, the deed that Mrs. Wade signed, look at the consideration. It says, Cash. Cash on a promissory note. Well, how much cash? What did she believe she was being paid for this property? You can't look at that and determine the

47

purchase price. It is not possible and wasn't possible for Mrs. Wade. It certainly raises a fact question for a jury as to what she believed she was selling the property for and on what terms she was selling it.

If you look at the deed of trust, another public record --

THE COURT: I'm familiar with the deed of trust.

MR. RICHIE: Thank you, Judge. You won't find anything on the deed of trust and you never would. As the Court stated on the record that you have been involved in real estate transactions before, a deed of trust states what the debt is that is being secured by the deed of trust, not what the purchase price is of the property pledged, and you will not --

THE COURT: Well, it says vendor's lien.

MR. RICHIE: I'm sorry, Your Honor?

THE COURT: Vendor's lien was secured by the deed of trust, so, yes, we knew it was part of the purchase price that was being secured by the deed of trust.

MR. RICHIE: Part of the purchase price, but you can't tell what the purchase price is. The vendor's lien is retained in the deed and the deed of trust is a pledge of property -- the vendor's lien is a

48

pledge of property. The deed of trust is an additional contractual pledge of the property.

May I approach with this deed of trust?

THE COURT: You may. Let me make this comment though. These are the sort of questions that the decedent should have asked her attorney, Mr. Cavness. Again, because of my knowledge of real estate I know that every deed that has ever been prepared recites $10 and other good and valuable consideration. Or if you have a real estate lien note, the note -- what I'm trying to say is that it's traditional language in a warranty deed to recite consideration of $10, and in this case, the execution of a promissory note in the amount of $500,000. What I'm trying to say to you counsel is I'm not really finding that a persuasive argument. I think there are some really good points you have ahead of you, but that's not one of them.

MR. RICHIE: Thank you, Your Honor. I'm not suggesting that there is anything unusual about the deed. What I'm suggesting is you can't tell from it what the purchase price is because deeds rarely recite the purchase price, because people don't want to put a record on what the purchase price is for the real property.

THE COURT: Creates a real problem with

the tax people.

MR. RICHIE: That is one of them. So I want to call the Court's attention to the case of Matejek, in the matter of the estate of Edward John Matejek. It's a Corpus Christi case from 1996. And I apologize again to Ms. Allen, I don't have a copy of it. I do for the Court.

THE COURT: I've already read that case.

MR. RICHIE: It's cited in our brief. May I approach?

THE COURT: Yes.

MS. ALLEN: Mr. Richie, if you give a case to the Court I trust that you give a case to the Court. I'm not going to have a problem with it.

MR. RICHIE: It wasn't a matter of trust. I want you to have a copy of it.

MS. ALLEN: You don't have one for me, so that's okay too.

MR. RICHIE: Thank you, Judge.

Matejek is a case that is dealing with deed records and talks about what you can -- what someone who is looking at a public record, what knowledge they're charged with from looking at public records. And what the Court held, Judge, was that -- this is on page 7.4, this is the back of the document I handed you -- is that

50

one is charged with constructive notice of the actual knowledge that one could gain by examination of the public records. Constructive notice is limited to the facts reflected on the face of the records. The only thing filed here were the deed and the deed of trust. You cannot find the amortization. You can't find the term of the note from looking at either of those documents. And Mrs. Wade, Edell, first of all was 89 years old. Secondly, you can't see that from looking at those documents to see what the terms were. That's a public record. She didn't go to the lawyer who drafted those. She didn't meet with the lawyer who drafted those. Amanda has testified in the deposition testimony that is included in the record that she did not meet -- Mrs. Wade, Edell Wade, was not taken to Austin to meet with the lawyers and did not meet the lawyers and that the lawyers who drafted these instruments were in fact hired by Amanda, represented Amanda and were paid for by Amanda and Johnny from her checking account. So Mrs. Wade didn't have a lawyer to talk to as Mr. Cavness had been terminated. She didn't have a lawyer to talk to at the time she was executing these documents, and there is no evidence and there will be none that she met with the lawyers that drafted the documents and talked to them about the terms. So that raises a fact question as to

what she knew, when she knew it, what she believed. Then you get back to the Texas law on different types of fiduciary relationships that exist. Amanda was working on these documents with the lawyers in Austin. And she was talking to her mother in law about those documents and her mother in law was unrepresented. There is not even a contest that she was represented in the execution of these documents.

Under Texas law, and we cited this in our response, there are two types of fiduciary duties that can occur. There are those that are expressed and then there are those that happen because of the circumstances. We believe it will be determined here that Amanda Wade was a person that Edell Wade trusted and placed confidence in to document a deal and to treat Mrs. Edell Wade's interest fairly and that a fiduciary duty of her. What happened before the sale of the property once Pat Cavness was terminated and Amanda goes and finds an attorney to draft these documents and she is the only one, Amanda is talking to Edell Wade about the terms of the deal documents, what they documents do and what the documents don't do. We believe that that's the point where Amanda became a fiduciary to Edell and that she owed to Edell full disclosure, she owed her loyalty, she owed her a duty of no conflicts of interest.

If we roll forward in time from that, so number one, we have shown that there is some fact question about what Edell knew and who should have told her and who has the duty to prove that Edell understood what she was doing and that she wasn't being unduly influenced by Johnny and Amanda, the purchaser of the property with respect to their purpose in coming to town and whether or not there was a fair purchase price being paid and whether it was being paid for.

The Court asked the question a while ago about whether or not her life estate had been eliminated, had ever been modified. You won't find life estate in that deed. You won't find life estate in that deed of trust. A life estate reservation would be in the deed. It's not there in the original deed. So not only was it not ever modified, it never existed. If she believed she had a life estate, if that's one thing she was told, why don't the documents reflect it. Was that a misrepresentation? She was told she was going to be paid 2 percent. She didn't get paid 2 percent. You roll along in time, and not only was she not paid 2 percent after modification, by the time you do an $81,000 credit against the original principal there was no 2 percent. Because of all of the give-back that occurs with that 81,000 -- what Mr. Walden was trying to

53

say a moment ago is that the fiduciary has the duty to establish -- first of all, the debtor under the note has the duty to establish that they have paid the note or that it's forgiven somehow. They can't produce one piece of paper, not a gift letter, not a gift deed, not a gift tax return where Edell Wade says, I want to forgive $30,000. And then Amanda Wade testifies in her deposition not as it was reported by Mr. Stubbs, but what she says is, Gosh I don't -- this is on page 69 of her deposition. She says, I can't explain the $49,000 discrepancy. I don't have any proof of the 30,000 other than that's what she wanted to do.

Then Mr. Walden asked her -- I was not there -- Mr. Walden asked her, he says on page --- starting on 69 to 70:

Well, $49,000, wouldn't you remember tht if you had paid another $49,000. That's on page 70, line 7. Line 5 is where the question starts.

And she answered: Well, if I have paid it I obviously didn't remember.

He says: Right. Then he goes on: Now you provided your -- your responses you made in discovery, indicated that you've furnished me records of all of the payments you've made; correct?

Answer: Yes, I believe my responses said that.

54

Okay. I'm showing you what I'm going to have the reporter mark as Exhibit 8. Do you recognize that?

I think I've seen this.

Those are the responses to requests for production of documents that we made in this cause; correct?

Yes.

And I'm looking down at Request No. 2 in the response, and the question says, We asked for documentation requesting every payment you've made.

Her response: Well, it says in my possession.

Question: Right. And I'm going to direct you to the sentence beginning about half way down the response beginning with "as". I'm going to read it.

As for additional documents please see the attached note that additional documentation has presumably been in the control, custody or control of respondent, which is you, but is now missing, lost or has been destroyed.

That's Amanda's response to where are the additional documents: They're missing, lost or destroyed.

Mr. Walden says: Do you stand by that statement today?

She responds: That documentation may be missing, lot or destroyed?

He says: Yes.

She says:  I suppose so.

Mr. Walden:  Okay.  Do you think documentation of payment of an additional $49,000 approximately is missing, lot or destroyed?

Answer:  I don't know that I'm going to -- I won't say it's missing, lost or destroyed.  What I'll say is if there is a discrepancy in the note I'll look into it further.

So clearly he had asked her to produce this.

She goes on to say:  I'll try to find whatever else I've paid but I have not really been able to lay my hands on it before.

And he says:  Okay.  Thank you.

We have not seen proof, not just testimony but proof of payment, checks, canceled check for $49,000 or the 30, so there is about an 80,000 or $81,000 discrepancy here plus interest.  In a $500,000 note that's material that is unexplained by the maker of the note who has an obligation to prove payment.

And then as the executor, because we've pled for a breach of fiduciary duty as part of our plea, as an executor she had a duty to foreclose on the note at least in August of 2011 when it was established that there was $80,000 of unpaid principal and interest.  To this date that foreclosure has not occurred.

56

So there are fact questions about what's the amount of the note. There are fact questions about what is the amount of interest. There are fact questions about breach of fiduciary duty when a modification is done in 2010. There are fact questions about what does Edell Wade know, when did she know it and who should have told her. And what is the effect of Amanda Wade terminating Pat Cavness and hiring another lawyer, not for her mother in law, but for Johnny and Amanda to document the sale of the most significant asset this lady owned and the most significant asset of this estate. Those are fact questions that defeat summary judgment.

We made a chart, Your Honor, this is just going through their motion for summary judgment. May I approach?

THE COURT: Yes.

MR. RICHIE: This is just demonstrative. This is a fact question. It's not every one of them, it's just a lot. And on the left it says matter of dispute, in the middle what did the defendant say in their motion for summary judgment and what do we say in our response and where do we find it and is it a disputed fact or not. And as you can see there was an agreement that she had seven children and she lived on a 475 acre ranch and she lived there with her husband,

Otto, until he passed away in 1996. From that point on there's almost no agreement of the facts until you get over to did Edell pass away in August 2010. That's undisputed. This is some of the 30-something issues of disputed facts in this case. It is not disputed that Bud Wade knew there was a sale in 2004 and it is not disputed that Nancy Burns knew there was a sale. We do object to any suggestion that what Nancy Burns knew is somehow imputed to her brother James. There is no -- there has been no showing of anything other than they both knew there was a sale. Neither of them has testified, neither of them will testify that they knew this was a 32 year note signed by an 89 year old -- accepted by an 89 year old woman who would have been 121 when she got paid. Neither of them will testify that they knew it was at 2 percent and neither of them will testify that they knew the total purchase price of what was being purchased. In fact, there is a closing statement that calls into question what was being purchased. It's one of the summary judgment exhibits called "closing agreement".

May I approach, Your Honor, with that?

THE COURT: You may.

MR. RICHIE: It's Exhibit Q.

It raises the question about what was being offered

for $500,000. What's important about that is, is when we're putting on evidence of the difference between the fair market value of this land and what was paid for it, we believe there is an argument that only $350,000 was paid for 474 acres, not $500,000 for 475, which creates a greater discrepancy in the difference between the value of the date of the sale and the value paid. Another fact question. What did Mr. Wade know at the time she signed that appears that she didn't believe she was getting $500,000 for the real estate, for the ranch, because that says, that closing agreement says she was getting $150,000 for the house and acre and only $350,000 for the real -- for the rest of the ranch.

Again, Your Honor, summary judgment is to determine whether or not there is an issue and whether or not there is a legal basis for a claim. Bud Wade is an heir. He has a right under the Probate Code to assert claims on behalf of the estate. He's asserting them on behalf of the estate. Bud Wade also, with respect to the declaratory judgment action seeks this Court to impose a constructive trust. A jury can't declare a constructive trust.

We also are asking this Court to -- that's probably for a later argument actually on attorneys' fees. I apologize for going into that now.

59

There is case law in Texas that says that Bud did not have the duty to exercise diligence once he knew there was a sale, and perhaps you can find that case. It's in our brief and I do want to talk about that. What was his duty? He's the son. He's not claiming that his mother was mentally impaired in 2004. He did not seek a guardianship. Simply knowing that there is a sale doesn't put one on notice of a fraud, doesn't put one on notice of fraud in the sale of a real estate transaction, doesn't put one on notice of negligent misrepresentations or intentional misrepresentations. And as I've shown the Court through the deed and the deed of trust, nobody contends the promissory note was published. It wasn't filed of record. He had no way to know what the terms of the sale were, what representations were made to mom. What he has said in his affidavit, summary judgment affidavit is that his mom was happy. Nancy also said mom was happy. She was independent. Johnny and Amanda moved here, they locked the gates. The family is kind of secluded. They stopped taking her to church, she stopped taking care of herself. When Nancy went over to find out -- Nancy had found out that the power of attorney that Nancy had enjoyed for years for both her mother and father, the way she found out that had been changed is she went to

the bank to work on some renewals of some CDs and was told, You can't. You're no longer her power of attorney. She went straight to her mother's house, was meeting with her mother and Amanda comes in and Johnny comes racing up on his ATV, jumps off, comes in red faced, scolding his mother. And Nancy has testified and will at trial that mom looked worried, scared and that her demeanor seemed to change after Amanda and Johnny came in. Those are facts that a jury can look at to conclude that there was undue influence being exercised over mom and that that undue influence led to things like the note modification, led to things like the original sale itself. And when Amanda gets rid of a lawyer we don't know what she said to mom or what she repeated that Pat Cavness may have said or how it came about that they got a lawyer in Austin, Texas, 170 miles, 60 miles -- felt like 150 this morning coming up here -- or whatever it is. They don't take mom. They don't get the lawyers to come over here. Nobody is representing mom except Amanda.

THE COURT: What about the terms of the note, the deed, the deed of trust being the same regardless of which attorney drafted it?

MR. RICHIE: We don't even know that Pat Cavness discussed that with Edell. We see his notes

that he understood those were the terms. We don't know if he discussed them with Edell and to what extent. We know those cases that say -- legal malpractice cases -- a lawyer has a duty to attempt to understand that the client understands the information they're given, the advice they're given and --

THE COURT: I thought through discovery we had a copy of the documents that Mr. Cavness prepared. We also had a set of documents that the second attorney prepared and they were, for all practical purposes, essentially the same.

MR. RICHIE: If you look at Exhibit 4 to our motion, when you look at the Pat Cavness document -- and I don't have a fancy -- can I bring it up and show it to you?

THE COURT: Sure.

MR. RICHIE: This is what was put up on the board. What's interesting about this is you have Pat Cavness's file and you will see that he doesn't say what he discussed with Mrs. Wade after the time he prepared the documents. Look at the letter transmitting the documents. Look who they're addressed to. They're not even addressed to Mrs. Wade. They're addressed to Johnny Wade and Amanda Wade. So there is nothing in that file to indicate that he had discussed any of that

62

with Mrs. Wade to assure she understood it.

And half-way or three-quarters of the way down is an asterisk, looks like there is a 2 next to it. Says: Amanda will call with rate and monthly payment. Even this does not say that Mrs. Wade understood or was even told what the rate and monthly payment would be. So you've got Amanda and Johnny dictating this transaction.

And then further on in there, there's another note, kind of looks like this, and Pat Cavness makes a note to Amanda: I fully understand the changes of substance in the documents but I am at a loss to understand the changes of form. Perhaps you can fill me in on that. Pat.

So he's not -- there is nothing in here to show that he is communicating with his client and there is also -- this -- they have a date of January 6th on here. The documents that got signed and filed are in March, I think. You've got my copy, Judge. I think that deed was in March. There is a three month gap -- no, I'm sorry.

No, I meant the deed itself. It's up there? I'll find it. What's the date of the deed? Oh, here it is. March, I think. Right.

Mrs. Wade signs it. It's notarized on February 12th, Judge. Pat Cavness was terminated. We don't know

what if any discussions he had with her. There is nothing in the file that says he had any between January and February 12th when they were signed. They were in California. She was in Lampasas. And I just think that raises a fact question about what she knew, when she knew it, what was on her mind and whether or not there was undue influence that led to the sale of the ranch at that price on a 32 year note with 2 percent. Those are fairly extraordinary terms, I think for any real estate transaction, let alone one of an 89 year old woman. So we believe that raises a fact question. Whether or not a jury accepts our version of the truth or not is not dispositive of a summary judgment motion.

In the Kansas Reassurance Company Limited versus Congressional Mortgage Corporation, 20 F.3d 1360 Fifth Circuit case, it' a Texas case, there's a comment on constructive notice on page 1370: It is settled by numerous decisions of our courts that a duly recorded instrument carries notice of its contents only to those that are bound to search for them.

So, you know, what can be seen is a question about the fiction of what Bud Wade should have known. He wasn't a party to those instruments. He's certainly not bound to go search for them by any law that Ms. Allen cited. And had he searched for it he wouldn't have seen

the purchase price.  He wouldn't have been able to see the terms of the note.  He wouldn't have been able to see the interest rate.  It wouldn't have put him on notice of those things that he needed to be on notice of to bring this claim.

There is a case called Rentfro that Ms. Allen cites in her materials and so do we.  In the Rentfro case the difference was there as the Court says -- and it's Rentfro, R-e-n-t-f-r-o, out of San Antonio.  But what the Court said, and it's interesting, is that in that case -- and this is hard to read some of the page numbers, but I think it's on page 9, it says:  Rentfro seems to acknowledge -- so Rentfro would be in the shoes of Bud Wade -- Rentfro seems to acknowledge that deeds were executed and recorded shortly after the events occurred.  Rentfro's affidavit also seems to suggest that before or soon after the deeds were signed she was aware of all of the alleged facts by which she later based her 2003 intervention.

Bud Wade has told this Court in numerous ways and so has Nancy Wade that they did not know the terms of the note, didn't know the rate of the note, they didn't know the purchase price of the property, and you couldn't see that from the instruments.  So the Rentfro case may hold for the proposition that you're bound by

what the public documents show but only to the extent that it shows the things that you complain of. And these documents do now show those things.

THE COURT: What about the argument she made that we have an eight year period there while mom was alive. Why didn't the son call mom and say, Mom, what's going on? Or why didn't he call Nancy? I think he did say that he talked to Nancy. He also talked to his wife. He was aware of the fact that there was a sale, but he didn't inquire of his mother or anyone else what the terms of the sale were. If he was so concerned about all of this, why didn't he inquire using the -- I'm not talking about going down and digging through public records. I'm talking about picking up the phone or dropping by and saying, What's going on?

MR. RICHIE: And I think that's a fact question and it's an equitable question. I don't think it's a legal question. He had no duty to ask. He's a son. He's not complaining that mom had -- that she was mentally incompetent. He has no legal duty to do that. So I think there's a fair question why he did not ask, but I don't think it's dispositive of summary judgment because he had no duty to ask. What he will tell you is that he didn't want to interfere. It's his mother's life. His mother's world. He didn't want to make her

unhappy. She was old. He has already told you in his affidavit and in Ms. Burns' affidavit mom was beginning to get agitated, seemed agitated. So he didn't want to further stir the pot. And he didn't know the things that put him on notice to ask those kinds of questions.

Again, a sale at $1,200 an acre, we wouldn't be here unless the note was for zero interest and 40 years, then we would still be here. But a normal note, 15 year note, 20 year note, 4 or 5 percent interest rate, $1,200 an acre, that's not the issue. It's not the fact of the sale. You're not trying to get this property to make it a monument to the family to go to every year for the rest of their lives. They are trying to bring an asset to the estate so that the value of that asset can be properly shared among all seven children like Mrs. Wade wanted it to be done. There is no duty for them to have made an inquiry as to the terms of the sale or her motive in the sale of the property until they found out there was a problem, until they found out there was something extraordinary. Pat Cavness is fired, lawyers in Austin are hired, the note gets modified. All of these facts stacked up that they learned after her death.

THE COURT: I understood that the business about Mr. Cavness being fired was something

that -- was it Nancy that was aware of?

MR. RICHIE: I don't believe so.

MS. ALLEN: That is in the summary judgment brief, Your Honor.

THE COURT: Well, I'll let you all hash that out in a little bit, but --

MR. RICHIE: Nancy said, when she got the file in 2010, she knew after the death that she knew that Mr. Cavness had been terminated. Now, what Ms. Allen is going to tell you is you can see from the deed, Return to Armbrust & Brown when it's recorded, that there is another lawyer involved. But that didn't mean that that lawyer was representing mom. In fact, they weren't. So you still wouldn't know from looking at the deed, the return-to deed, whether or not that is Johnny's lawyer, which it was, or whether or not that was mom's lawyer, whether or not Pat Cavness was still in the picture or not.

So, yes, she learned eventually but not until mom's death, and that's what she says in her affidavit. She knew that Pat Cavness had made a comment. That comment being: Do you like -- to Edell -- Do you like Amanda? And I think the suggestion is that it was made not more like, Do you like her. But, Do you like Amanda? It wasn't necessarily a positive comment. And I think you

will hear that. It doesn't mean she knew Pat Cavness had been terminated and I think she will tell you under oath that she did not know that.

Amanda's testimony in her deposition on page 31: That's what Pat said to Nancy and Nancy related to me. And she said: Well, yes, we love her.

This is Amanda testifying about what Nancy told her Pat had said.

Well, yes, we love her.

And then based on that: Do you want to continue using him? We didn't want to continue using him. I'm sorry. And then based on that: I didn't want to continue using him.

This is Amanda saying she didn't want to use him. Not Edell Wade didn't want to use him. And so we just had the documents redone by a different attorney in Austin.

And then he goes on to say: Well, whose attorney was it?

And she says: Well, it's mine and Johnny's. And we paid the bill.

There is another case, the Estate of Walter Fawcett, 55 SW.2d 214 Eastland.

THE COURT: You said SW.2d?

MR. RICHIE: I may have. 55 SW.3d, 214.

69

I'm sorry.

THE COURT: There you go. All right.

MR. RICHIE: This case calls for the fact that reasonable due diligence is a question of fact for a jury.

THE COURT: Yes, I'm familiar with that case.

MR. RICHIE: So it's a fact question. The question is a good question. I certainly asked it myself when I first met Bud and Nancy. And there is no duty to make inquiry. Whether they prove to a jury that there is some basis for estoppel, we don't have one today. And I would like to conclude by saying this idea that they're estopped because they received the benefits of the payments, there isn't any evidence, because it's not so -- that when those payments were made and those payments were paid to bank accounts of Mrs. Wade, that any of her other children got any of that money. So the benefits of the note payments is a facade or at least a fact question. Money is fungible. We don't know what money got distributed to Bud Wade. We don't know what money got distributed to Nancy Burns. We know money got distributed. We don't know if it's the money from the payment of the rent. It's money on the estate account. She had other money. She had Social Security. She had

interest on her CDs, et cetera. So to say that they are estopped because they accepted the benefits of the transaction, they didn't receive any benefits of the transaction and received none of those payments during that time they were being made. So that is not accurate, but if Ms. Allen believes she can convince a jury that they have somehow received those benefits and that therefore knew about it and benefited from it and knew at the time they were receiving them, that mom was being paid and was going to build an inheritance for the future or something like that, perhaps she can prove an estoppel. Not for summary judgment.

May I have just a moment, please.

In conclusion, Your Honor, it' just there are so many facts in this case. There are so many issues that took place over so many years. It is an extraordinary case. We have a lawyer, a California lawyer, a mother in law, buying property one-half to one-third of its value, 32 year note. First there's low interest, then there's no interest. No proof of -- none at all that mom intended that reduction of $81,000. In fact, Amanda and Johnny were both shocked that there was a discrepancy between the original note payments and the amount of the modification. Couldn't explain where the modification came from.

So we believe this case is right for trial. There are a lot of fact questions with respect to the issue of the sale of the land in 2004, the question about why it wasn't foreclosed once their payments weren't made, why Pat Cavness wasn't replaced with a new trustee at the time Amanda is walking around with a power of attorney and had the power to use that to happen on behalf of Mrs. Wade. Didn't do that. So we believe we have a breach of fiduciary duty to bring the propepty back in in 2009 and 10 when that modification got there. In '11 when Don Walden proved up that the note hadn't been -- that the balance that was claimed by the maker of the note was less than the true balance that was in default, still no foreclosure. No foreclosure to this date.

So we believe there are a lot of fact questions, multiple theories that would allow this property to be brought back into this estate, either through a recision or a foreclosure. And that being said, this case needs to go to trial so all of the facts can come out. Summary judgments are limited to the summary judgment facts. It's different than a jury trial, and our client, Mr. Wade, Bud Wade, deserves his day in Court to put forth this matter and try to recover for the estate the primary asset that his mom and dad worked so hard to accumulate during their lifetime and that was intended

to be there for the benefit of all seven children.

Thank you, Your Honor.

THE COURT: Thank you.

Do counsel for the other parties wish to address the Court on this issue?

MR. DUCLOUX: I'll limit myself to 60 seconds, but I will be happy to go after.

THE COURT: Well, the issue of regarding the executor and what she did, when she did it are issues that I think are tied in with the, more with the issue of whether or not she should be removed, not necessarily the initial sale of the property.

Counsel, I know that you're representing Nancy, but at the same time I just didn't know if you wanted to address any issues at this point?

MR. WALDEN: I'll wait. I don't have anything to add that you haven't already heard.

THE COURT: Do you want a brief rebuttal?

MS. ALLEN: Your Honor, I need 60 seconds.

You've just heard an admission that Mrs. Wade had full capacity. There is not a lack of capacity issue. You have just heard an admission that the plaintiff who claims he wants to set the sale aside knew about it and he knew about it as early as March, 2004. That is the

end of that. Mrs. Wade is allowed, she is a grown up person with capacity, and she gets to dispose of her property as she sees fit, and that is exactly what the summary judgment evidence shows she said she was going to do. So that's the end of that.

The problem as subscribed to you by Mr. Ritchie is that after she died they didn't get as much as they were expecting. That is not a cause of action. If there is money owed to the estate under the loan documents that has not been paid and they can show that, it should be tried. That would be justice. But this sale by a woman who they admit had capacity and admit that they knew about, in 2004, they don't get to wait eight-plus years. The law does not allow that. She gets to dispose of her property as she sees fit, and she did that.

And, Your Honor -- five more seconds -- for the record Mr. Bujnoch's report to the Court reflects that he has produced all of the banking records beginning 2004 forward through 2012, the date of the audit. I produced before and have just recently from my computer to Mr Richie and to Mr. Walden the balance of the banking record for the time period that this does not cover. If they have a legitimate complaint that I have not complied with a discovery obligation, I will present myself to this Court any time that the Court desires to

respond to that.

THE COURT: Well, that's one of the other items we will be hearing today.

All right. After hearing the evidence -- and let me just say this. I know that families, kids and families, may take advantage of a parent to the detriment of the other kids. I also know that sons don't want to rock the boat if mama is happy and bring her into the picture of a possible conflict between the kids. They want their mom to have a happy home, happy life. And I don't think that possibly mom got the best deal, but at the same time mom got other benefits as a result of this deal. And that is to have someone at the ranch caring for her. I can understand why he insisted upon buying the ranch if he was going to live there and take care of mom. Then that would be in effect, in my mind, a part of the consideration of the sale of the ranch, was that promise from her son.

Accordingly, the Court is going to grant the partial summary judgment which bars Bud from seeking a recision of the sale. Now, that's not to say that we don't have fact issues regarding the second note. I believe we do. I believe there are issues there that will need to be resolved by a jury.

After lunch we'll go ahead and address the other

motions that are before the Court. We will be in recess say, for -- how long do you all think you need to be gone to eat? Let's be back by 1:30.

(Lunch break ensued.)

MS. ALLEN: Your Honor, if I may as a housekeeping matter. I neglected to provide the Court with an order earlier. I've shared one with opposing counsel and would like to share it with the Court, if it's convenient.

THE COURT: All right. Let me just ask -- this is again cause number P9127, Estate of Edell Wade, deceased. And we just finished the hearing on one of the pretrial motions and I granted it. And there has now been handed to me an order granting defendant's Amended Motion for Partial Summary Judgment concerning the 2004 sale pertaining to all claims, and the question at this point is has counsel approved it?

Has this order been passed around to opposing counsel?

MS. ALLEN: I have shared it with opposing counsel, Your Honor.

THE COURT: Does anyone object to the form of this motion -- this order?

MR. RICHIE: I do, Your Honor. Don Richie on behalf of Bud Wade. I have a proposed

addition.

THE COURT: And have you shared that with counsel?

MR. RICHIE: I have now, Your Honor.

MS. ALLEN: I'm ready to respond at the Court's pleasure.

MR. RICHIE: May I show the Court?

THE COURT: Yes.

MR. RICHIE: I apologize for my handwriting, Judge.

THE COURT: Okay. Does the defense attorney have any objections to the revisions to the proposed order?

MS. ALLEN: We do, Your Honor.

THE COURT: All right.

MS. ALLEN: Yes, Your Honor. We do.

THE COURT: Okay. Well, let's let counsel have a seat and then I'll hear your objections.

Let me first of all say this. You gave the first one. Let him tell me why I should make the changes and then you can rebut.

All right. Go ahead, counsel.

MR. RICHIE: Your Honor, the way I understand the Court's ruling is that the question about whether or not the sale could be rescinded after 2004

after waiting till 2012 to bring the claim, the Court's ruling that the sale could not be rescinded, I did not understand the Court to rule that the question was the amount at which it was sold or the terms upon which it was sold or whether or not Mrs. Wade for example had been unduly influenced, did not understand this to be foreclosed.  Also the matter of the note modification is --

THE COURT:  Let me just say this.  My intention was to foreclose everything but the issues regarding the second note.

MS. ALLEN:  Understood, Your Honor.  And I believe that my order does that.  It certainly is the intent.

MR. RICHIE:  Of course we don't think it does that because it says all claims.  The claim on the note is part of --

THE COURT:  Well, I will be glad to clarify my order by going ahead and saying pertaining to all claims except the zero interest note.

MR. RICHIE:  We've pled breach of fiduciary duty and --

THE COURT:  Well, you'll have issues of fiduciary relationship that are anew in this second note, primarily because of the power of attorney.

Secondly, at that particular point it seems like the facts show that there is more isolation than when they first moved in. These are some things that I think will probably be germane to the issues that you've challenged the second note on. But as far as being able to set aside the sale of the ranch to the defendant, I intended to close the door on that issue today so that you all would have a better understanding of where you go in potential settlement negotiations and other matters.

As far as being able to maintain that there was undue influence exerted, that she was susceptible to undue influence because of diminished mental capacity, these are all things that are left to be litigated. I don't believe they are left to be litigated as far as the actual sale of the ranch, only those issues as they relate to the second note that was drafted at this point is of concern to the Court.

MS. ALLEN: If the Court wishes to make that clarification, we have no objection.

THE COURT: All right. I'm going to grant some of the relief that you're requesting by going ahead and finding that pertaining to all claims -- I'm going to go ahead and insert "except the zero percent interest note".

MR. RICHIE: If I might ask, Your Honor,

could you say "including all claims relating to the zero interest note"?

THE COURT: Pertaining to all claims other than the zero percent interest note.

MR. RICHIE: My concern was Mr. Stubbs said it's his understanding -- this is my understanding of what I heard him say, that he thinks only the amount of the note is --

THE COURT: No, that's not true. The other issues that I see regarding the note -- that's not really on the agenda today. But if it helps you all as far as clarifying the Court's position on that matter, it does appear to me that we have a fact question of whether or not the decedent voluntarily entered into a note modification agreement knowing the actual principal balance left owing on the note, because there's apparently now -- you may have cleared this up with giving them copies of the canceled checks, but through earlier pleadings it appeared that there was a constant $81,000 discrepancy in the amount of the note. That's an issue. Also an issue on whether or not what motivated mom to make a zero percent interest note. Was it because she didn't like the IRS as alleged in the pleadings or is it because she was in some way misled. I don't know. But those I believe are fact issues that

are in dispute and would have to be resolved by answers to special issues at a jury trial.

Now, I want you all to be able to litigate those issues. So I will go ahead and clarify my ruling to go ahead and say pertaining to all claims except regarding the zero percent note.

MR. RICHIE: Thank you.

(End of proceedings.)

C E R T I F I C A T E

STATE OF TEXAS        )

COUNTY OF BURNET      )

I, VICKI K. KANEWSKE, Official Court Reporter in and for the County Court at Law of Burnet, Burnet County, State of Texas, do hereby certify the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $834 and has been paid for by Mr. Don Richie, Attorney at Law.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 3rd day of March, 2015.

/s/ Vicki K. Kanewske

VICKI K. KANEWSKE, TEXAS CSR NO: 2159; EXPIRES: 12-31-16

Official Court Reporter, Burnet County Court at Law

220 S. Pierce, Burnet, Texas  78611

512-715-5244; Fax: 512-715-5226; Email: Vkaykan@live.com

# Clerk's Record

## VOLUME 1 OF 2

Trial Court Cause Number P9127
In the County Court
Of Burnet County, Texas
W. R. SAVAGE, Judge Presiding

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

IN THE MATTER OF THE ESTATE OF
EDELL WADE

Appealed to the
Court of Appeals for the Third District of Texas,
at Austin, Texas

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Attorney for Appellant: SHELDON E. RICHIE
Address: 100 CONGRESS AVE, SUITE 1750 – AUSTIN, TEXAS 78701
Telephone No.: 512-236-9220
Fax No.: 512-236-9230
E-mail address: srichie@rg-austin.com
State Bar No.: 16877000
Attorney for: JAMES E. WADE, Appellant(s)

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

CAUSE NO. P9127

ESTATE OF EDELL WADE, DECEASED    §        IN THE COUNTY COURT AT LAW

§        OF

§        BURNET COUNTY, TEXAS


**INDEX**

| Name | Volume 1 | Page |
|---|---|---|
| Defendants' Johnny and Amanda Wade's Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>*Filed March 20, 2014* | | 5 |
| Defendants Johnny Wade's and Amanda Wade's Traditional and No Evidence Motion for Partial Summary Judgment on Plaintiff James Wade's Claims for Attorney's Fees Against Defendants in their Individual Capacities<br>*Filed March 20, 2014* | | 166 |
| Plaintiff's Motion For Continuance And, In The Alternative, Response To Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale<br>*Filed April 7, 2014* | | 279 |
| Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning The 2004 Sale (Pertaining to All Claims)<br>*Filed April 14, 2014* | | 611 |
| Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion for Partial Summary Judgment Concerning The 2004 Sale or Alternatively, To Sever Plaintiff's Claims Concerning The 2004 Sale Or For Permission To Appeal Interlocutory Order<br>*Filed April 23, 2014* | | 612 |
| Supplement to Plaintiff's Emergency Motion To Reconsider Order Granting Defendants' Amended Motion For Partial Summary Judgment Concerning the 2004 Sale or, Alternatively, To Sever Plaintiff's Claims Concerning the 2004 Sale or For Permission To Appeal Interlocutory Order<br>*Filed April 24, 2014* | | 675 |
| Order<br>*Filed April 29, 2014* | | 762 |
| Plaintiff's Third Amended Original Petition<br>*Filed May 2, 2014* | | 765 |
| Motion for Exclusion of Evidence (For Plaintiff's Failure to Respond to Discovery Requests)<br>*Filed May 7, 2014* | | 820 |

Defendants' Hearing Presentation in Support of Motion for Exclusion of Evidence     848
     *Filed May 20, 2014*

Defendants' Motion for Partial Summary Judgment (as to all claims for relief based on: default" on loan)     950
     *Filed May 22, 2014*

Defendants' Motion for Partial Summary Judgment (as to All Tort Claims, based on Economic Loss Rule)     963
     *Filed May 22, 2014*

Defendants' Response to Plaintiffs' Traditional and No-Evidence Motion for Summary Judgment on their Claims for Breach of Fiduciary Duty and Conspiracy with Exhibits A-G     975
     *Filed June 5, 2014*

Amanda Wade's Response (in her capacity as Independent Executor) to Nancy Burns' No-Evidence Summary Judgment Motion on Affirmative Defenses     1063
     *Filed June 5, 2014*

                                                     Volume 2

Response in Opposition to Plaintiff's No-Evidence Motion for Partial Summary Judgment and Nancy Burns' Joinder (as to Affirmative Defenses and Couterclaims) with Exhibits 1-25     1122
     *Filed June 5, 2014*

Sixth Amended Answer To Plaintiff James E. Wade's Third Amended Original Petition and Second Amended Counterclaim of Johnny and Amanda Wade     1263
     *Filed July 15, 2014*

Sixth Amended Answer to Plaintiff James E. Wade's Third Amended original Petition and Third Amended Couterclaim of Johnny and Amanda Wade     1275
     *Filed July 15, 2014*

Fifth Amended Answer to Plaintiff Nancy Burns' Amended Petition for Damages for Breach of Fiduciary Duty and Second Amended Counterclaim     1296
     *Filed July 15, 2014*

Order     1314
     *Filed July 29, 2014*

Response to James Wade's Motion for Continuance, and Motion for Leave to Supplement Summary Judgment Proof     1315
     *Filed July 24, 2014*

Verification Pages for Sixth Amended Answer and Third Amended Counterclaim     1420
     *Filed August 4, 2014*

Consolidated Response of Johnny and Amanda Wade to Plaintiff's Motion for Traditional Summary Judgment on Defendants' Counterclaims and Plaintiff's Motion to Dismiss Under Rule 91a     1422
     *Filed September 9, 2014*

Response of Johnny and Amanda Wade to Plaintiff's Motion for Show Cause Order for Contempt and to Levy Sanction Award                                    1534
        *Filed September 26, 2014*

Charge Of The Court                                                          1539
        *Filed October 6, 2014*

Verdict                                                                      1541
        *Filed October 6, 2014*

Plaintiff James E. Wade's Motion For Judgment Non Obstante Verdicto          1559
        *Filed October 15, 2014*

Request For Denial Of Plaintiff's Motion For Judgment Non Obstante Verdicto and Defendants' Motion For Entry Of Judgment                                  1589
        *Filed October 22, 2014*

Final Judgment                                                              1599
        *Filed November 17, 2014*

Order Denying Plaintiffs' Motion For Judgment Notwithstanding The Verdict    1602
        *Filed November 17, 2014*

Plaintiff's Motion For New Trial                                            1603
        *Filed December 12, 2014*

Order Denying Motion For New Trial                                          1633
        *Filed January 26, 2015*

James E. Wade's Notice Of Appeal                                            1634
        *Filed February 12, 2015*

Plaintiff's Letter To Vicki Kanewske Requesting The Reporter's Record        1637
        *Filed February 20, 2015*

Plaintiff's Request for Preparation of Clerk's Record                       1640
        *Filed February 20, 2015*

Defendant's Request for Preparation of Clerk's Record                       1644
        *Filed March 11, 2015*

Defendant's Letter to Vicki Kanewske Requesting Reporter's Record           1647
        *Filed April 3, 2015*

Bill of Cost                                                                1649

Clerk's Certification that Appellate Record is True and Correct             1650

CAUSE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

This case is submitted to you by asking questions about the facts, which you must decide from the evidence you have heard in this trial.

You are the sole judges of the credibility of the witnesses and the weight to be given their testimony, but in matters of law, you must be governed by the instructions in this charge.

In discharging your responsibility on this jury, you will observe all the instructions which have previously been given you. I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

1. Do not let bias, prejudice, or sympathy play any part in your deliberations.

2. In arriving at your answers, consider only the evidence introduced here under oath and such exhibits, if any, as have been introduced for your consideration under the rulings of the Court – that is, what you have seen and heard in this courtroom together with the law as given you by the Court. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3. Since every answer that is required by the charge is important, no juror should state or consider that any required answer is not important.

4. You must not decide who you think should win, and then try to answer the questions accordingly. Simply answer the questions, and do not discuss nor concern yourselves with the effect of your answers.

5. You will not decide the answer to a question by lot or by drawing straws, or by any other method of chance. Do not return a quotient verdict. A quotient verdict means that the jurors agree to abide by the result to be reached by adding together each juror's figures and dividing by the number of jurors to get an average. Do not do any trading on your answers; that is, one juror should not agree to answer a certain question one way if others will agree to answer another question another way.

1539

6.      Unless otherwise instructed, you may answer a question upon the vote of ~~ten~~ 5 or more jurors. If you answer more than one question upon the vote of ~~ten~~ 5 or more jurors, the same group of at least ~~ten~~ 5 of you must agree upon the answers to each of those questions.

These instructions are given you because your conduct is subject to review the same as that of the witnesses, parties, attorneys and the judge. If it should be found that you have disregarded any of these instructions, it will be jury misconduct and it may require another trial by another jury; then all of our time will have been wasted.

The presiding juror or any other who observes a violation of the Court's instructions shall immediately warn the one who is violating the same and caution the juror not to do so again.

When words are used in this charge in a sense that varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless you are otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No."

The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are otherwise instructed.[1]

SIGNED October 6, 2014.

_____
PRESIDING JUDGE

FILED THIS 6th DAY OF Oct A.D. 20 14

_____
COUNTY CLERK, BURNET COUNTY, TEXAS
BY_____ DEPUTY

---

[1] *See* Texas Pattern Jury Charge (Business, Consumer, Insurance, Employment) (2012) ("PJC") 100.3.

2

1540

| ESTATE OF | § | COUNTY COURT AT LAW |
|---|---|---|
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 1

A relationship of trust and confidence existed because Edell Wade justifiably placed trust and confidence in Johnny Wade.

Did Johnny Wade's acceptance of the Modification Agreement comply with his fiduciary duty to Edell Wade?

Because a relationship of trust and confidence existed between them, Johnny Wade owed Edell Wade a fiduciary duty. To prove he complied with his duty, Johnny Wade must show---

a.      the transaction in question was fair and equitable to Edell Wade; and

b.      Johnny Wade made reasonable use of the confidence that Edell Wade placed in him; and

c.      Johnny Wade acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; and

d.      Johnny Wade placed the interests of Edell Wade before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Edell Wade, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary.

You are further instructed that a fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties.

Answer "Yes" or "No".

Answer: _Yes_

FILED THIS 10th DAY OF Oct A.D. 2014

_Janet Parker_
COUNTY CLERK, BURNET COUNTY, TEXAS
BY_____ DEPUTY

1541

## CERTIFICATE AS TO JURY QUESTION NO. 1

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_Barbara Churchwell_                _Laura Joerner_

_Jimmie Sue McKellar_               _Karen Eata_

1542

# CAUSE NO. P9127

| ESTATE OF | § | COUNTY COURT AT LAW |
|---|---|---|
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 2

A relationship of trust and confidence existed because Edell Wade justifiably placed trust and confidence in Amanda Wade.

Did Amanda Wade's acceptance of the Modification Agreement comply with her fiduciary duty to Edell Wade?

Because a relationship of trust and confidence existed between them, Amanda Wade owed Edell Wade a fiduciary duty. To prove she complied with her duty, Amanda Wade must show---

a.    the transaction in question was fair and equitable to Edell Wade; and

b.    Amanda Wade made reasonable use of the confidence that Edell Wade placed in her; and

c.    Amanda Wade acted in the utmost good faith and exercised the most scrupulous honesty toward Edell Wade; and

d.    Amanda Wade placed the interests of Edell Wade before her own, did not use the advantage of her position to gain any benefit for herself at the expense of Edell Wade, and did not place herself in any position where her self-interest might conflict with her obligations as a fiduciary.

You are further instructed that a fiduciary duty owed by one person to another extends only to dealings within the scope of the fiduciary relationship between the parties.

Answer "Yes" or "No".

Answer: _Yes_

## CERTIFICATE AS TO JURY QUESTION NO. 2

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____          _____

_____          _____

_____

1544

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| --- | --- | --- |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

If you have answered "no" to Question No. 1 or Question No. 2, then answer the following Question. Otherwise, do not answer the following Question.

## QUESTION NO. 3

What sum of money, if paid now in cash, would fairly and reasonably compensate the Estate of Edell Wade for its damages, if any, resulting from either Johnny Wade or Amanda Wade's failure to comply with his/her fiduciary duty to Edell Wade?

The loan modification resulted in a difference, calculated as:

    a.     the total amount Johnny and Amanda would have paid Mrs. Wade or her estate under the terms of the February 6, 2004 Promissory Note, had it not been modified, from May 1, 2009 through today; and

    b.     the total amount Johnny and Amanda actually paid from ~~May 1, 2009~~ ~~February 6, 2004~~ May 1, 2009 through today.

Answer in dollars and cents, if any.

Answer:     $_____

1545

## CERTIFICATE AS TO JURY QUESTION NO. 3

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____     _____

_____     _____

_____

1546

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

Answer the following question only if you answered "No" to Question No. 1 or Question No. 2. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. Otherwise, you must not answer that part of the following question.

<u>QUESTION NO. 4</u>

Do you find by clear and convincing evidence that the harm to Edell Wade resulted from intentional breach of fiduciary duty or self-dealing ?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No".

Answer: _____-

1547

## CERTIFICATE AS TO JURY QUESTION NO. 4

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____          _____

_____          _____

_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

Answer the following question only if you unanimously answered "Yes" to Question No. 4. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION NO. 5

What sum of money, if any, if paid now in cash, should be assessed against Johnny Wade and Amanda Wade and awarded to the Estate of Edell Wade as exemplary damages, if any, for the conduct found in response to Question 4?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1.      The nature of the wrong.
2.      The character of the conduct involved.
3.      The degree of culpability of Johnny Wade and Amanda Wade.
4.      The situation and sensibilities of the parties concerned.
5.      The extent to which such conduct offends a public sense of justice and propriety.
6.      The net worth of Johnny Wade and Amanda Wade.

Answer in dollars and cents, if any.


Answer: _____

1549

## CERTIFICATE AS TO JURY QUESTION NO. 5

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

| ESTATE OF | § | COUNTY COURT AT LAW |
| | § | |
| EDELL WADE, | § | OF |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## JURY QUESTION NO. 6

The Court instructs that, if you found that the Modification Agreement was wrongfully procured in breach of fiduciary duty or otherwise, then, for purposes of determination of attorneys' fees, if any, the 2004 Promissory Note is in default and the Plaintiff shall be awarded attorneys' fees. If you found that the Modification Agreement was wrongfully procured, then answer the following question. Otherwise, do not answer the following question.

1.      What is a reasonable fee for the necessary services of James "Bud" Wade and Nancy Wade Burns' attorneys, stated in dollars and cents?

Answer with an amount for each of the following:

(1)      For representation in the trial court.

Answer: _____

(2)      For representation through appeal to the court of appeals.

Answer: _____

(3)      For representation at the petition for review stage in the Supreme Court of Texas.

Answer: _____

(4)      If accepted, for representation at the merits briefing stage and through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: _____

## CERTIFICATE AS TO JURY QUESTION NO. 6

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____          _____

_____          _____

_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |
| | § | |

## QUESTION NO 7

Did AMANDA WADE comply with her fiduciary duty in connection with her administration of the Estate of Edell Wade?

In administering the estate, AMANDA WADE owed the beneficiaries of the estate a fiduciary duty. To prove she complied with this duty in connection with Modification Agreement, AMANDA WADE must show that, during her administration of the estate of Edell Wade in question

1. the administration of the estate was fair and equitable to the beneficiaries, considering AMANDA WADE's obligations in administering the estate; and

2. AMANDA WADE made reasonable use of the confidence placed in her as the result of her appointment; and

3. AMANDA WADE acted in the utmost good faith and exercised the most scrupulous honesty toward the beneficiaries in connection with the estate administration in question; and

4. AMANDA WADE placed the interests of the beneficiaries before her own and did not use the advantage of her position to gain any benefit for herself at the expense of the beneficiaries; and

5. AMANDA WADE fully and fairly disclosed to the beneficiaries all material facts known to AMANDA WADE concerning the estate in question that might affect the rights of the beneficiaries.

Answer "Yes" or "No."

Answer: ___Yes___

## CERTIFICATE AS TO JURY QUESTION NO. 7

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____          _____

_____          _____

_____

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

## QUESTION NO. 8

Did Amanda Wade act in good faith, whether successful or not, in defending the action for her removal?

"Good Faith" means an action that is prompted by honesty of intention and a reasonable belief that the action was probably correct?

Answer "Yes" or "No."

ANSWER: _Yes_

## CERTIFICATE AS TO JURY QUESTION NO. 8

We, the jury, have answered the above and foregoing question as herein indicated, and herewith return same into Court as our verdict.

(To be signed by the presiding juror if unanimous.)

_____
Presiding Juror

(To be signed by those rendering if not unanimous.)

_____          _____

_____          _____

_____

1556

CASE NO. P9127

| IN THE ESTATE OF | § | IN THE COUNTY COURT |
| --- | --- | --- |
| | § | |
| EDELL WADE, | § | AT LAW |
| | § | |
| DECEASED | § | BURNET COUNTY, TEXAS |

If you answered "yes" to Question 8, then answer Question 9. Otherwise, do not answer Question 9.

## QUESTION NO. 9

What sum of money do you find to be the necessary expenses and disbursements, including reasonable attorney's fees, for defending this action for removal?

Answer in dollars and cents for each of the following:

1. For representation in the trial court.

Answer: $333,000 00

2. For representation through appeal to the court of appeals.

Answer: $20,000 00

3. For representation at the petition for review stage in the Supreme Court of Texas.

Answer: $7500 00

4. For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: $10,000 00

## CLERK'S CERTIFICATE THAT APPELLATE RECORD
## IS TRUE AND CORRECT

THE STATE OF TEXAS              §
                                §
COUNTY OF BURNET                §

I, Janet Parker, Clerk of the County Court of Burnet County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all of the documents specified by Texas Rules of Appellate Procedure 34.5(a) and all other documents timely requested by a party to this proceeding under Texas Rules of Appellate Procedure 34.5(b).

GIVEN UNDER MY HAND AND SEAL at my office in Burnet County, Texas on this the 16th day of April, 2015.

JANET PARKER,
Burnet County Clerk
220 South Pierce Street
Burnet, Texas 78611

By: _____
Jayme Ingram

1650